BUCHALTER NEMER
A Professional Corporation
BARBARA E. LICHMAN, PH.D. (SBN 138469)
blichman@buchalter.com
PAUL J. FRAIDENBURGH (SBN 280354)
pfraidenburgh@buchalter.com
18400 Von Karman Avenue, Suite 800
Irvine, CA  92612
Telephone: (949) 760-1121; Facsimile: (949) 720-0182

Attorneys for Plaintiffs
COMAV, LLC and
COMAV TECHNICAL SERVICES, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| COMAV, LLC, a California limited liability company; COMAV TECHNICAL SERVICES, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>SOUTHERN CALIFORNIA LOGISTICS AIRPORT AUTHORITY, a joint powers authority; CITY OF VICTORVILLE, CALIFORNIA, a municipal corporation; PRATT & WHITNEY LINE MAINTENANCE SERVICES, INC., a division of United Technologies Corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. 5:16-cv-1267<br><br>**VERIFIED COMPLAINT FOR: (1) VIOLATION OF 42 U.S.C. § 1983; (2) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (4) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; (5) DECLARATORY RELIEF; AND (6) INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs ComAv, LLC ("ComAv") and affiliate ComAv Technical Services, LLC ("CTS") (collectively "Plaintiffs") allege as follows:

## NATURE OF THE CASE

1.      This case arises out of an airport hangar sublease to CTS' predecessor, Southern California Aviation ("SCA"), now assigned to CTS ("CTS Sublease") that Defendants Southern California Logistics Airport Authority ("Airport Authority"),

City of Victorville, California ("City"), and Pratt & Whitney Line Maintenance Services, Inc. ("Pratt") (collectively "Defendants") have attempted in bad faith to terminate, without, among other things, fulfilling their legal obligation to enter into negotiations for renewal of CTS' Sublease on any terms, let alone the "reasonable" and "equitable" terms that Defendants are obligated to observe where aeronautical services providers such as CTS are involved.  In doing so, Defendants ignore Plaintiffs' 18 year incumbency on the Southern California Logistics Airport ("Airport") in various facilities, and their faithful performance of obligations and compliance with the terms and conditions of the leases or subleases for each.

2.      Neither this case nor Defendants' actions are predicated on a challenge to Plaintiffs' compliance with lease terms.  Instead, it arises out of  Defendants' City and Airport Authority's desperation to obtain a lease rate that will help them circumvent pending claims of securities fraud brought by the Securities and Exchange Commission ("SEC"), *Securities and Exchange Commission v. City of Victorville, et al.*, U.S.D.C. Case No. EDCV13-0776 JAK (DTBx).  A true and correct copy of the SEC Complaint is attached hereto and incorporated herein by reference as Exhibit A.  As a result of the SEC's filing of its federal claims pertaining to Defendants' fraudulent manipulation of the value of four hangars on the Airport, including the hangar at issue here, Hangar 681, Defendants have failed and refused to enter into negotiations with Plaintiffs toward the extension of the CTS Sublease from Pratt (a true and correct copy of the CTS Sublease is attached hereto and incorporated herein by reference as Exhibit B), or a new sublease directly with Defendant Airport Authority, and have ignored Plaintiffs' year-long effort to begin negotiations for a new sublease, based on the "reasonable" and "equitable" lease rate required by federal law and regulation for aeronautical service providers.  Instead, Defendants City and Airport Authority have been negotiating freely with both aeronautical and non-aeronautical users, on and off the Airport, during the same period, from whom they can demand, and are hoping to

obtain, a vastly higher lease rate, to artificially increase the valuation of Hangar 681 and thereby moot SEC's charges against them.

3.      Plaintiffs have now received a 30-Day notice to vacate Hangar 681, from Pratt (a true and correct copy of the 30-Day notice to vacate is attached hereto and incorporated herein by reference as Exhibit C), without any consideration by Pratt of the detriment to current and future business relationships implicated in such a notice, or consideration of the opportunity for mitigation of such impacts through the invocation of the holdover provisions included in Pratt's direct sublease from Defendant Airport Authority ("Pratt Sublease"), which would allow Plaintiffs to remain on a month to month basis until the issues alleged here are resolved.  A true and correct copy of the Pratt Sublease from Defendant Airport Authority is attached hereto and incorporated herein by reference as Exhibit D.  These actions were taken by Defendants despite Plaintiffs' 18 year incumbency on the Airport; their scrupulous compliance with the terms of their various leases and subleases during that time; and their manifest contributions to the Airport and to the regional economy.

4.      As a result of their actions and/or inactions, Defendants City and Airport Authority have violated not only: (1) contractual obligations to the Federal Aviation Administration, enacted for the purpose of protecting aeronautical users of an airport, under, among others, 47 U.S.C. § 47107(a)(1)-(5), implemented by Grant Assurance 22, Economic Nondiscrimination; 49 U.S.C. § 40103(e), implemented by Grant Assurance 23, prohibiting the grant to any aeronautical service provider of an "exclusive right" to do business on the airport; and 49 U.S.C. §§ 47107(b), 47133(a), and 47107(2)(a), implemented by Grant Assurance 25, the rules governing the use of "airport revenues;" but also (2) Plaintiffs' procedural and substantive due process rights pursuant to the 5th and 14th Amendments to the United States Constitution and Article 1, Section 7 of the California Constitution, as applied through 42 U.S.C. § 1983; and along with Defendant Pratt, (3) state law

prohibitions on breach of the covenant of good faith and fair dealing inherent in Plaintiffs' sublease, and intentional and negligent interference with Plaintiffs' prospective economic advantage in the continuity of Plaintiffs' leasehold and relationship with its existing and future clients.

5.     Defendants' refusal to even discuss with Plaintiffs an extension of the current CTS Sublease and/or entry into a new sublease directly with Defendant Airport Authority has serious, damaging consequences to Plaintiffs.  Without a sublease for Hangar 681, Plaintiffs will not be able to serve either narrow or wide-body aircraft, their "bread and butter," and among the largest aircraft in the world fleet.  Moreover, because the maintenance of Plaintiffs' license as a certificated repair station is partially dependent on Plaintiffs ability to provide a maintenance hangar large enough to accommodate the largest aircraft permitted on its license, and because it cannot do so without Hangar 681, Plaintiffs' license will be severely jeopardized.  The damages suffered by Plaintiffs will be multiple, *i.e.*, loss of immediate, valuable business opportunities; loss of the ability to do business on the Airport into the indefinite future; and the jeopardy to its license enabling it to do business at all.

6.     For all the above reasons, Plaintiffs ask this Court to grant them declaratory relief confirming their claims, and injunctive relief, halting Plaintiffs imminent eviction from Hangar 681 currently scheduled for June 30, 2016, and from leasing that hangar to another party, pending the outcome of Plaintiffs' administrative action brought pursuant to 14 C.F.R. Part 16 and/or good faith negotiations with Plaintiffs towards a reasonable and equitable lease rate, consistent with those of other similarly situated aeronautical users on the Airport, to which Plaintiffs are entitled by law and equity.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), 2201-2202 (declaratory judgment), and 42 U.S.C. § 1983.

8.      This Court further has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the City and Airport Authority are located within this district, and a substantial part of the events and/or omissions giving rise to ComAv's claims occurred in this district.

**PARTIES**

10.      Plaintiff ComAv is an affiliate of Plaintiff CTS, and, along with its other affiliates, an 18 year hangar tenant, aircraft maintenance service provider on narrow and wide-body aircraft, and an aeronautical user of the Airport.

11.      Plaintiff CTS is an affiliate of ComAv, an aircraft maintenance service provider, and sublessee from Pratt of Hangar 681.

12.      Defendant Airport Authority is a California joint powers authority, and sponsor and operator of the Airport.  The Airport Authority was formed to assume control of the former George Air Force Base from the initial delegee, the Victor Valley Economic Development Corporation to which a portion of the former George Air Force Base was leased by the Air Force after George Air Force Base closed in 1993, pursuant to the Base Reuse and Realignment Act of 1993.   The Airport Authority is also the issuer of the relevant bonds in the SEC's Complaint for securities fraud, and is considered a component unit of the City for accounting purposes.

13.      Defendant City is located in southwestern San Bernardino County, approximately 90 miles northeast of Los Angeles, California. The City is governed by a five-member City Council, the members of which also comprise the governing board of the Airport Authority.  City staff including the Assistant City Manager, Keith Metzler, constitute the staff of the Airport Authority.

14.     Defendant Pratt, a division of United Technologies Corporation, is direct sublessee of Hangar 681 from Defendant Airport Authority, pursuant to the Pratt Sublease.

15.     Plaintiffs are currently unaware of the true names and capacities of Defendants DOES 1 through 100, inclusive, as the information concerning their identities is within the sole and exclusive control of Defendants.  Therefore, Plaintiffs sue those parties by such fictitious names.  Plaintiffs are informed and believe, and on that basis allege, that DOES 1 through 100, inclusive, are agents of Defendants, and each of them is responsible in some manner for the conduct alleged in this Complaint.  Plaintiffs will seek leave to amend this Complaint to state the true names and capacities of the fictitiously named parties when the same have been ascertained.

16.     Defendants identified in paragraphs 12, 13, 14 and 15, inclusive, are sometimes referred to collectively herein as "Defendants."

## GENERAL ALLEGATIONS

**A.     ComAv and CTS Enter Into a Sublease Agreement for Hangar 681.**

17.     ComAv, through its affiliate CTS, is the longest term aeronautical service provider on the Airport, and one of its largest employers.  ComAv's incumbency at the Airport began in 1998, shortly after the closure of George Air Force Base in the 1993 Base Reuse and Realignment process, and the original lease of some portions of the former base to the Victor Valley Economic Development Authority, at which time George Air Force Base became the Southern California Logistics Airport.  Subsequently, the Victor Valley Economic Development Authority delegated its decisionmaking power over the Base property to Defendant Airport Authority.  In or about 2001, ComAv entered into a partnership with Pratt .  Pratt subleased Hangar 681 directly from Defendant Airport Authority, which is the primary lessee from the Air Force, and subsequently further subleased Hangar 681 to CTS' predecessor SCA in July, 2011.  The CTS Sublease was subsequently

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
BN 20840005v3

VERIFIED COMPLAINT

amended and restated May 1, 2013 (*see* Exhibit B).  Even through ComAv purchased Pratt's interest in 2013, the Pratt and CTS Subleases are still in force and effect.

18.    The Pratt Sublease with Defendant Airport Authority obligates Pratt to "comply with all applicable Federal, State and local laws, regulations and standards that are or may become applicable to Sublessee's activities on the Subleased Premises," Pratt Sublease, ¶ 31, including the provision which states "it is understood that nothing herein contained shall be construed to grant or authorize the granting of an exclusive right. . ."  Pratt Sublease, Exh. C.

19.    All of the terms, provisions, covenants and conditions in the Pratt Sublease are made applicable to the CTS Sublease pursuant to CTS Sublease, paragraph 2.

**B.    Defendants City and Airport Authority are Trying to Cover Their Tracks for Having Raised Funds for Airport Development Using Tax Increment Bonds Based on Fraudulently Inflated Property Values of the Hangars at the Airport.**

20.    Municipalities often raise funds through "general obligation bonds," which, in general, are secured and their debt service paid by a municipality's ability to raise revenue through the imposition of taxes.

21.    However, Defendant Airport Authority does not have the power to levy property taxes.  Therefore, instead of general obligation bonds, it relied on "tax allocation" bonds, also known as "tax increment" bonds, to finance the capital projects for the redevelopment of the Airport area.

22.    Although formerly fairly common in California until the demise of redevelopment agencies on February 1, 2012, tax increment bonds were structured very differently than the more familiar general obligation bonds.  Unlike general obligation bonds, tax increment bonds could not rely on a municipality's general taxing authority to secure and pay the obligation of the bonds.  Instead, tax

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**VERIFIED COMPLAINT**
BN 20840005v3

increment bonds were only secured, and their obligations could only be paid, by the "incremental" increase in property tax revenues resulting from an increase in the aggregate assessed value of the property within the relevant redevelopment area. The increased assessed value resulted from appreciation in existing properties or new construction.  Consequently, the amount of tax increment bonds that a redevelopment agency like Defendant Airport Authority could issue was limited to the increase in the aggregate assessed value of the property in the redevelopment area.

23.     To calculate the amount of the property tax increment available to secure and pay the debt service of tax increment bonds, the assessed value of property in a redevelopment area was first determined for a particular "base" year, typically the year immediately before the redevelopment plan was adopted. The annual tax revenue collected from the property in the area was then divided among the local taxing agencies within the redevelopment project area and the redevelopment agency. Generally, the tax agencies received the taxes that were generated from the base year valuation of that property, while, subject to various exceptions and carve-outs, the redevelopment agency received the remainder—that is, the "tax increment"—which was the tax revenue collected on any increase in the assessed value of the project area over the base year valuation of that property. The redevelopment agency could then pledge this tax increment revenue to repay tax increment bonds used to finance or refinance redevelopment projects.

24.     In the mid-2000s, Defendant Airport Authority used tax increment bond offerings to finance a number of redevelopment projects, including the construction of a power plant and four new airplane hangars ("Hangars") on the former Air Force base.   By late 2007, it needed $50 million to pay a deposit on a turbine for the power plant, and planned to finance that payment with a new $68 million tax increment bond offering.  However, given the tightening credit market and the subordinate nature of the bonds, prospective bond purchasers demanded

1    that the debt service ratio for this offering be increased to 1.25 (from the 1.10 ratio

2    governing prior bond offerings).  As a result, Defendant Airport Authority was

3    forced to downsize its December 2007 bond offering from $68 million to $42

4    million.  This left Defendant Airport Authority with few resources to continue its

5    redevelopment activities.  Indeed, by that time, nearly all of the tax increment

6    available to Defendant Airport Authority had been used to secure its prior bond

7    issuances.

8         25.    In February 2008, in an effort to escape from this financial constraint,

9    Defendant Airport Authority borrowed $35 million in short-term financing.  It then

10   publicly offered $13.3 million of subordinate tax increment bonds in April 2008 to

11   repay part of that short-term debt.  This April 2008 financing was premised, in part,

12   on an assessed value of $65 million for the four Hangars including Hangar 681.

13   This $65 million valuation was used to determine the all-important tax increment

14   for the April 2008 bond offering, and allowed Defendant Airport Authority to

15   satisfy the minimum 1.25 annual debt service ratio for the offering.  However, the

16   Hangars' $65 million assessed value was vastly inflated, resulting in the disclosure

17   of false tax increment and debt service ratios in the Official Statement provided to

18   investors in the April 2008 bond offering.

19   **C.    The SEC Sues Defendants City and Airport Authority for Securities**

20   **Fraud Arising from the Artificially Inflated Hangar Prices.**

21        26.    On April 29, 2013, the SEC filed a federal complaint (attached hereto

22   as Exhibit A) based, *inter alia*, on the allegations stated in Paragraphs 11-17, *supra*.

23   The SEC's lawsuit targeted the City, and Airport Authority, the Airport Authority's

24   Bond Underwriter and Construction Manager, Kinsell Newcomb and DeDios, and

25   its principal, Jeffrey Kinsell, and the City's then-Director of Economic

26   Development, now Assistant Airport Manager, Keith Metzler, for, among other

27   things, fraud in connection with the sale of securities under various sections of the

28   Securities Exchange Act of 1934, and Securities Act of 1933.  The charges arose

out of Defendants City and Airport Authority's allegedly fraudulent inflation and misrepresentation of the value of four hangars on the Airport, including Hangar 681, in order to support the sale of tax increment bonds to the public in amounts not justified by the value of the underlying assets.

27.     The SEC's complaint specifically charged: "By engaging in this conduct, the Authority, KND, Affiliates and Kinsell violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act of 1933 (the "Securities Act"), and the City, Metzler, KND, Kinsell and Williams aided and abetted violations of these antifraud provisions of the federal securities laws… Therefore, with this action, the SEC seeks permanent injunctions, disgorgement with prejudgment interest and civil penalties against Defendants."  Exhibit A, ¶ 8.

28.     SEC further alleges the improper diversion of revenue by entities including KND, and Jeffrey Kinsell, charged with the management of construction of the hangar project

29.     The SEC's action against Defendants City and Airport Authority is currently pending in this judicial district.

**D.     Defendants City and Airport Authority Impede Lease Renewal Negotiations with ComAv and Inflate the Price per Square Foot of ComAv's Hangar.**

30.     In 2011, Pratt renewed its sublease for Hangar 681 which it had originally subleased from Defendant Airport Authority, and which it subsequently further subleased to CTS.

31.     Despite ComAv's successful service to the Airport and the community, Defendants have, without explanation, refused to initiate negotiations with ComAv for a "reasonable" (FAA Order 5190.6B, § 14.3), and "equitable" (FAA Order 5190.6B, § 9.5.d.), lease rate for an extension of the existing sublease or a new sublease for Hangar 681 as required by federal law and regulations,

instead making multiple different excuses for delay, including most recently the requirement of audited financial reports as a precondition to negotiation, rather than its previous procedure, over the course of ComAv's 18 year incumbency in various facilities, of reaching an agreement on lease rates contingent upon proof of financial viability.

32.     Beginning its attempt to informally resolve its lease issue with the Defendants City and Airport Authority almost a year ago, on June 10, 2015, Plaintiffs submitted a written request to Defendants to begin negotiations for a new sublease without delay.  After response from Defendant Airport Authority indicating they would be marketing the hangar publicly, on June 24, 2015, Plaintiffs made an offer for a sublease renewal at "fair market rent" with the same to be determined by independent appraisers.  On or about February 9, 2016, after a number of phone calls and letters none of which resulted in a single counteroffer from Defendants City or Airport Authority, Plaintiffs revised their offer upward to include: (a) a new sublease; (b) with a term of five years, with ComAv given two option periods of five years each to extend the term; and (c) an initial lease rate of $.70 per square foot on a triple net basis with escalation clauses allowing increases of 1% per year during the option periods.

33.     On February 16, 2016, Defendants City and Airport Authority responded through Keith Metzler, a named defendant in the SEC's action, notifying Plaintiffs that their previous offer of $.70 per square foot was far below Defendant Airport Authority's general asking price of $1.25 per square foot; that Defendant Airport Authority would require verification of creditworthiness before it would enter into negotiations, was marketing the property to an array of outside interests, and would negotiate through its real estate broker Kent Hinds at Cushman and Wakefield.

34.     On March 9, 2016, Plaintiffs responded to Metzler's February 16th letter, complaining that, despite several offers by Plaintiffs, dating back eight

months (at that time), there had been no progress in negotiating, much less consummating, the lease for Hangar 681, although other hangar lease negotiations were ongoing by Defendant Airport Authority and third parties.  Plaintiffs' letter further requested a formal response or counteroffer for Hangar 681.  Finally, Plaintiffs' letter informed Defendant Airport Authority that Plaintiffs intended to put the new sublease in the name of CTS to which SCA had assigned its interests.

35.     Also on March 9, 2016, in response to the above letter from Plaintiffs, Sophie Smith, the City's Economic Development Director for Defendant City, referred to the February 16 letter from Keith Metzler, as rejecting the $.70 per square foot offer made by Plaintiffs; referred to the previously mentioned $1.25 per square foot asking price from Defendant Airport Authority; but refused to make a formal counteroffer, including conditions and contingencies, and instead referred Plaintiffs to further conversations with realtor Kent Hinds.

36.     On March 17, 2016, Plaintiff ComAv's Executive Vice President William Morris received another e-mail from realtor Kent Hinds, again refusing to make a counterproposal and instead imposing the condition that "before we can proceed with a counterproposal, we will need to review your current financial conditions," and requesting the last three years of "audited" financial reports, as well as a current balance sheet and income statement.  Hinds further stated that "once we review these we will craft the appropriate response."

37.     On March 21, 2016, Plaintiffs responded to the March 17 e-mail from Kent Hinds, acknowledging not only the necessity "for the Airport to receive reasonable and adequate financial assurances," but once again reiterating its request that Defendant Airport Authority "proceed with the counteroffer without delay."

38.     In another letter of March 23, 2016, Plaintiffs further responded in detail to Defendant Airport Authority's previous e-mail, expressing not only Plaintiffs' "general concerns" about "the difficulty we are having in obtaining real, substantive progress in lease negotiations," but also about the parties for which

Plaintiffs were being asked to provide access to the Hangar, and the possibility that it was to support the defense of the "SEC lawsuit."  Specifically, Plaintiffs pointed to an inspection that had been scheduled for the purported purpose of supporting the Airport's and City's defense to the SEC Lawsuit.  It was only later that Plaintiffs learned that the inspection was a showing of the property to Raytheon Company for the purpose of leasing to Raytheon Company at the expiration of the CTS Sublease.

39.     On March 29, 2016, despite Defendant Airport Authority and City's refusal to cooperate, Plaintiffs once again went one step further and produced the supplemental financial information Defendant Airport Authority had requested in its March 17, 2016 letter, with the exception of the audited financial reports, which were not immediately available, because Plaintiffs' lenders and investors do not require them.

40.     On April 15, 2016, Plaintiffs' outside counsel, Barbara Lichman, sent a letter to Eric Ray, Airport Manager, expressing ComAv's further concerns about the potentially discriminatory implications of Defendant Airport Authority's disparate treatment of existing leaseholders and lease renewals for substantially similar facilities.

41.     On April 26, 2016, Plaintiffs' outside counsel received a letter from Defendant Airport Authority's outside counsel, Andre de Bortnowsky, who used Plaintiffs' April 15, 2016 letter as an excuse to further delay making a counteroffer by seeking direction on settlement terms from Defendant Airport Authority's Board, and refusing to either meet or submit a counteroffer until after that next (unspecified date) Board meeting.  In addition, on May 5, 2016, Plaintiffs' counsel received yet another letter from Defendant Airport Authority's counsel, requesting even more financial data on the ground that the data previously received did not constitute "financial statements received and prepared by a CPA, akin to an audit," and on that basis further delaying submission of a counteroffer.

VERIFIED COMPLAINT

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 20840005v3

42.     On May 24, 2016, Defendant Airport Authority, through Keith Metzler, set up yet another roadblock to negotiation of a lease renewal, by making a "critical precursor to productive negotiation" the agreement not to bring a legal challenge to vindicate Plaintiffs' rights under the Grant Assurances and acknowledging that the Airport is "entertaining other proposals," while at the same time refusing to entertain the proposals already made by Plaintiffs.

43.     Finally, on June 1, 2016, Plaintiffs received from Pratt a notice to vacate Hangar 681 no later than June 30, 2016, pursuant to the CTS Sublease.

44.     In summary, Defendants City and Airport Authority's refusal to negotiate a new lease for the past 12 months, coupled with the notice to vacate on June 30, 2016, has caused manifest prejudice to Plaintiffs' ability to do business on the Airport, including, but not limited to, interference with Plaintiffs' commitments to its customers to provide maintenance on narrow and wide-body aircraft which requires a hangar the size of Hangar 681.  More specifically, under 14 C.F.R. § 145.103, Plaintiff CTS' repair station license requiring a maintenance hangar large enough to accommodate the largest aircraft permitted under its license, 14 C.F.R. § 145.103(b), will be placed in serious jeopardy.  Consequently, Defendants City and Airport Authority's refusal to negotiate may not merely raise the level of operational uncertainty, but put Plaintiffs, long-term, positively contributing, aeronautical users at the Airport since its inception, out of business entirely.

**E.     Defendants' Obligation to Enter Into Lease Negotiations with Plaintiffs Arises Out of Federal Statutes and Regulations, and Their Application in the Pratt Sublease.**

45.     "Part 16 of the FAA's regulations permits a 'person directly and substantially affected by any alleged noncompliance [to] file a complaint with the Administrator,'" *Boca Airport, Inc. v. FAA*, 389 F.3d 185, 186 (D.C. Cir. 2004), quoting 14 C.F.R. § 16.23.  The regulations define noncompliance as "'anything done or omitted to be done by any person in contravention of any provision of any

Act . . . as to matters within the jurisdiction of the Administrator.'"  14 C.F.R. § 16.3.

46.     The Airport and Airway Improvement Act of 1982, as amended, and codified at 49 U.S.C. §§ 40101, *et seq.*, and 47101, *et seq.* ("AAIA") makes a condition of receiving federal funds for airport improvements that airport sponsors such as Defendant Airport Authority make written assurances that the sponsor will make the airport available for public use without unjust discrimination and will subject [Fixed-Based Operators or FBOs] who use the airport in a similar manner to the same charges.  *See Gary Jet Center, Inc. v. Gary/Chicago International Airport Authority*, 2014 U.S. Dist. LEXIS 45201.  "A fixed-base operator (FBO) is a commercial entity providing aeronautical services such as fueling, maintenance, storage . . . to the public.  FAA Order 5190.6B, Chapter 8, Exclusive Rights, p. 8-11, fn. 25.

47.     Grant Assurance 22 implements the provisions of 49 U.S.C. § 47107(a)(1)-(6), and requires, in pertinent part, that the operator of a federally obligated airport, among other requirements, "make [its] airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport."  Grant Assurance 22(a).  "The term 'unjust discrimination' is not statutorily defined, but the agency has interpreted it to require a showing that a party similarly situated to the complainant was treated preferentially."  *R/T 182, LLC v. Federal Aviation Administration*, 519 F.3d 307, 309 (6th Cir. 2008).

48.     With respect to FBOs like Plaintiffs, Grant Assurance 22 further ensures that "each fixed-based operator at any airport owned by the sponsor shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed-base operators making the same or similar uses of such airport and utilizing the same or similar facilities.  [Assurance 22(c)]"  *See*

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

VERIFIED COMPLAINT

*Skydance Helicopters, Inc. d/b/a Skydance Operations, Inc. v. Sedona Oak-Creek Airport Authority, et al.*, Director's Determination, Docket No. 16-02-02.

49.     FAA Order 5190.6B further expands upon the statutory definitions, where it requires an airport proprietor "to negotiate in good faith for the lease of premises available to conduct aeronautical activities," FAA Order 5190.6B, § 9.7, and requires that an FBO be subjected to "substantially comparable rates, fees, rentals, and charges . . . [if it] assume[s] similar obligations, use[s] similar facilities, and make[s] similar use of the airport."  FAA Order 5190.6B, § 9.2.a.  In short, the treatment of "aeronautical users" such as FBOs must be "reasonable," FAA Order 5190.6B, § 14.3, as well as "equitable," FAA Order 5190.6B, § 9.5.d.

50.     While the FAA acknowledges the potential for differences in lease rates based on differences in the nature or use of the facilities of the airport, those different lease rates must be justified by the attributes of the facilities themselves (such as location), or the structure of ownership (*e.g.,* a lease for improved real property versus a ground lease with the tenant having constructed and financed the improvements), FAA Order 5190.6B, § 9.2.d.

51.     In this case, when Defendants City and Airport Authority's initially demanded lease rate of $1.25 per square foot is compared to the lease rates of other FBOs on the Airport performing aircraft maintenance services; in facilities that are virtually identical in attribute; with options to renew their leases not available to Plaintiffs; and in generally similar financial arrangements when adjusted for differences in the structures of the lease, Defendants' violation of Grant Assurance 22(c) comes clearly into focus.

52.     Specifically, there are currently three comparable hangar tenants (and three affected hangars) on the Airport – Boeing (Hangar 678); Pacific Aerospace and Technology ("PART") (previously occupying Hangar 678 with office space); Leading Edge (Hangers 746 and 747) to CTS (Hangar 681).  All perform similar aircraft maintenance services in hangars that range between 117,323 square feet

(including office space) and 67,500 square feet in size although PART's lease for its 117,323 square foot hangar was mutually terminated due to performance issues. All paid or are currently paying between $.53 per square foot (Boeing) and $.69 (Leading Edge).  Leading Edge made tenant improvements to both of the hangars it occupies in the amount of $550,000, and in return received reduced rent.  Notably, the other tenants have the further benefit of options to remain after their initial lease terms expire, carrying Hangar 678 to the year 2025; Hangar 746 to the year 2036, and Hangar 747 to the year 2028.  Clearly, therefore, because Plaintiff CTS currently uses similar facilities(hangar in excess of 60,000 square feet), makes similar use of the Airport (aircraft maintenance), and assumes similar obligations (its similar lease rate per square foot for the similar facility), it fits directly within the scope of the term "similarly situated," and Defendants are obligated "to negotiate in good faith" for a new sublease with Plaintiffs under rates, fees and rental charges that are "substantially comparable" to those of Boeing and Leading Edge, FBOs that use similar facilities in size and make similar use of the Airport for aircraft maintenance purposes.

53.     Nevertheless, Defendants City and Airport Authority have proceeded thus far by simply alluding to a proposed general lease rate of $1.25 per square foot, without any specific reference to the specific attributes of Hangar 681, and without having performed an appraisal, and, thus, without any substantiation for the price demanded.  The rationale for the Defendants City and Airport Authority's refusal to perform an appraisal can clearly be discerned.  Any disclosure of the true, lower, lease value of Hangar 681 would essentially eviscerate Defendants City and Airport Authority's defense to the SEC Lawsuit because it would demonstrate conclusively that the hangar had been overvalued in the bond offering, as the County's tax assessor had already determined.

54.     Moreover, Defendants City and Airport Authority have persistently refused to make counteroffers since June, 2015, thus forcing Plaintiffs to negotiate against themselves on such pretexts as:

a.     the requirement for ever expanding assurances of financial viability, despite Plaintiff ComAv's 18 year tenure on the Airport, characterized by its faithful performance of its obligations under the various subleases, including the current sublease for Hangar 681; Defendant Airport Authority's 18 year history of negotiating leases with Plaintiff ComAv and its affiliates, based on the satisfaction of contingencies, including the subsequent requirement of proof of financial viability; and Plaintiffs' submission of financial information on March 29, 2016; and

b.     Plaintiffs' use of outside legal counsel in lease negotiations, which Defendant Airport Authority's outside counsel, in his April 26, 2016 letter, chose to regard as "raising the stakes" on the negotiations; causing a delay in negotiations while Defendant Airport Authority investigates the issues raised in Plaintiffs' April 15, 2016 letter (concerning grant assurance obligations about which Defendant Airport Authority should already have been well aware); and soliciting the direction of the Board of Defendant Airport Authority in lease negotiations (which should long since have been ascertained).

55.     In its later communication of May 24, 2016, Defendants City and Airport Authority insisted on, as a "critical precursor" to "negotiation" by Defendant City and Airport Authority, some kind of telephonic conversation between its outside counsel and Plaintiffs' to "resolve concerns" raised by Plaintiffs about potential violations of grant assurances.  Defendant City and Airport Authority's "condition" appears to be nothing more than a veiled threat to stop dealing with Plaintiffs, absent Plaintiffs' agreement to relinquish its legal right to object to Defendant City and Airport Authority's delaying tactics, failure to fully engage in negotiation, and consequent violation of its grant assurances.

56.    Moreover, and in addition to the failure to negotiate with Plaintiffs, Defendants City and Airport Authority failed to justify their almost 100% increase in the current lease rates by any independent change in the attributes of the facilities occupied by Plaintiffs, or by comparison between Hangar 681 and the other comparable hangars on the Airport occupied by other FBOs, as required by FAA Order 5190.6B, § 9.2d.

57.    Finally, and in direct violation of paragraph 31 of the Pratt Sublease and paragraph 2 of the CTS Sublease, among other sections, Pratt has sent a 30-day notice to vacate, predicated upon Defendant City and Airport Authority's acts in violation of the Grant Assurances, contractual commitments with which by the terms of the Pratt Sublease, Pratt is also obligated to comply.

58.    In short, Defendants are seeking to increase the lease rate paid by Plaintiffs for Hangar 681 by fiat, making that rate almost double that paid by Plaintiffs' peers on the Airport, without a shred of statutory or regulatory support or financial justification.  Therefore, based on Defendants' violation of  49 U.S.C. §§ 47101(1)-(6), and Grant Assurance 22, alone, Defendants should be compelled to act in accordance with the law and regulation and negotiate with Plaintiffs for a new lease, or lose the benefit of FAA funding that has been so instrumental in the Airport's development.

59.    Defendants' conduct has also violated 49 U.S.C. § 47107(a)(4) and 40103(c).  The Congress of the United States has spoken unequivocally at least twice on the issue of "exclusive rights" ["A person does not have an exclusive right to use an air navigation facility on which Government money has been expended," 49 U.S.C. § 40103(e); "a person providing, or intending to provide, aeronautical services to the public will not be given an exclusive right to use the airport," 49 U.S.C. § 47107(a)(4)].

60.    Federal regulation implements that position, where it states, in pertinent part, that "the sponsor of a federally obligated airport '… will permit no

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

VERIFIED COMPLAINT
BN 20840005v3

exclusive right for the use of the airport by any persons providing, or intending to provide, aeronautical services to the public …'"" *Skydance Helicopters, supra*, p. 19, citing Grant Assurance 23.  An "exclusive right" has been judicially defined as a "power, privilege, or other right excluding or debarring another or others from enjoying or exercising a like power, privilege or right." *See, e.g.*, *41 North 73 West, LLC, supra,* 408 Fed.Appx. at 400, citing *Pompano Beach, supra*, 774 F.2d at 1541.

61.     Moreover, such an exclusive right need not be expressly conferred. Rather, "[s]uch a right is constructively granted when 'the imposition of unreasonable standards or requirements' has the practical effect of imposing a significant burden on an entity's ability to engage in a particular aeronautical activity . . ." *Id.*  In *Pompano,* an applicant for a lease at the Pompano Beach airport was offered a lease containing restrictive provisions [*e.g.*, requirement for minimum investment in property of $500,000; a $5,000 deposit at the beginning of the lease term; and the same lease rate for unimproved land as already required for improved land, *Id.* at 1543, fn. 14] not present in other leases on the airport.  The court found that: (1) the required provisions were facially disadvantageous to the applicant; (2) the applicant's testimony at hearing established that they were prejudicial to his ability to do business; and (3) the City's delays in negotiating with the applicant benefited the incumbent lessees.  On those bases, the court found not only that the differential requirements amounted to unjust discrimination, but also that "the City's conduct had the effect of granting the Beckers [the incumbent leaseholders] an exclusive right at its Air Park." *Id.* at 1544.  Thus, the Appellate Court affirmed the FAA's order requiring the City to offer the applicant a lease with "terms, conditions, and requirements substantially identical" to those applicable to other leaseholders. *Id*. at 1545.

62.     Virtually the same circumstances exist here, with the notable exception of the fact that, unlike the applicant in *Pompano*, who was applying for initial

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**VERIFIED COMPLAINT**
BN 20840005v3

access to the airport, Plaintiffs have proven themselves reliable, contributing members of the Airport and Victorville communities for 18 years.   Here, as in *Pompano*, Defendant Airport Authority seeks to impose requirements on Plaintiffs in terms of a lease rate double that which is applicable to other similarly situated FBOs and hangar occupants.  Moreover, and although, in *Pompano*, the court found prejudicial mere "delay" in the negotiation of a lease, Defendant Airport Authority's actions in this case are far more prejudicial where it has entirely refused to negotiate the lease extension with Plaintiffs.  It is, therefore, impossible to determine with any specificity what further conditions Defendants City and Airport Authority may attempt to impose on Plaintiffs, except to say that even the doubling of the current lease rate will, in and of itself, have, like the conditions imposed on the applicant in *Pompano*, substantial prejudicial effect on Plaintiffs' ability to do business at the Airport.  *Id*. at 1543.

63.     Moreover, Defendant Pratt has benefitted by Defendants City and Airport Authority's unjustified demand, in direct contravention of the terms of its own sublease, which prohibit the actual or effective grant of an exclusive right.

64.     In summary, Defendants' unreasonable demand of twice the lease rate of other similarly situated hangar occupants, and its refusal to negotiate further with Plaintiffs, without any justification, constitutes the quintessential imposition of an unreasonable standard, with the practical effect of placing an unreasonable burden on Plaintiffs' ability to sustain their business at the Airport, and, thus, the constructive grant of an exclusive right in contravention of federal law and policy.

65.     Finally, Defendants City and Airport Authority have also violated 49 U.S.C. §§ 47107(b)(1) and (2)(A) prohibiting revenue diversion.  The Congress has taken an especially intransigent position in its prohibition of revenue diversion.  That is, "the Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that . . . the revenues

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

VERIFIED COMPLAINT

BN 20840005v3

generated by a public airport will be expended for the capital or operating costs of –
(A) the airport; (B) the local airport system; or (C) other local facilities owned or
operated by the airport owner or operator and directly and substantially related to
the air transportation of passengers or property." 49 U.S.C. § 47107(b)(1).  Airport
revenues are defined broadly to include, among other things, "direct payments or
indirect payments, other than payments reflecting the value of services and facilities
provided to the airport." 49 U.S.C. § 47107(2)(A).

66.     Despite this unequivocal prohibition, diversion of revenue is exactly
what Defendants City and Airport Authority have allowed, and for which they are
attempting to compensate with the unjustly discriminatory increase in Plaintiffs'
rental rates.  Specifically, and as set forth in more detail in the SEC Complaint,
KND was the sole underwriter of a $13.3 million bond offering by Defendant
Airport Authority of subordinate tax increment bonds, in April, 2008, premised at
least partially on an assessed valuation of $65 million for four new hangars.  This
assessed value of $65 million forms the basis of a cause of action in the SEC
Complaint against Defendants Airport Authority and City for falsely inflating the
assessed valuation of the hangars to $65 million, thus falsifying the tax increment
and debt service ratios to the public.  Specifically, it is alleged by the SEC that
KND Affiliates, LLC, a firm also partially owned by Jeffrey Kinsell, one of the
underwriters, was retained to manage the construction of the four hangars, even
though he had no experience in construction management, and that KND and its
part owner Kinsell "engaged in an additional fraudulent scheme to take undisclosed
construction and management fees collected on the airport hangar project."  It is
further specifically alleged by the SEC that the KND affiliates did misappropriate
$2.3 million of bond proceeds through a fictitious 15% per month "property
management fee" and used them for purposes wholly unrelated to the Airport.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**VERIFIED COMPLAINT**

BN 20840005v3

**F.    Plaintiffs Exhausted Their Administrative Remedies.**

67.    On June 7, 2016, Plaintiffs filed a Complaint and Request for Investigation Pursuant to 14 C.F.R. Part 16 with the Federal Aviation Administration ("FAA").  A true and correct copy of the Part 16 Complaint is attached hereto and incorporated herein by reference as Exhibit E.

68.    Plaintiffs' Part 16 Complaint states the following in its request for relief from the FAA: "The Airport Authority's refusal to initiate lease negotiations with ComAv/CTS under lease terms comparable to those applicable to other, similarly situated, aeronautical users on the Airport, has not merely violated the Airport Authority's contractual obligations under Grant Assurances 22, 23 and 25, but has also serious, damaging consequences for ComAv and its affiliates.  Without Hangar 681, CTS will not be able to serve its narrow and wide-body customers who operate among the largest aircraft in the world fleet, and, its license as a certificated repair station, which requires that CTS provide a maintenance hangar large enough to accommodate the largest aircraft permitted under its license, will be severely jeopardized.  14 C.F.R. § 145.103(b).  Therefore, the damages suffered by ComAv and CTS will be multiple – the loss of both a valuable current business opportunity, and the potential for loss of the opportunity to do business on the Airport into the indefinite future.  All ComAv has asked of the Airport Authority is the opportunity for fair and open lease negotiations consistent with the Airport Authority's past history with ComAv, and its obligations under its Grant Assurances.  In the absence of the Airport Authority's compliance, ComAv asks FAA to find the Airport Authority in violation of Grant Assurances 22, 23 and 25, and require that it immediately comply with its statutory, regulatory and contractual responsibilities, or lose the funding upon which it so heavily relies."  *See* Exhibit E, ¶ 49.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

VERIFIED COMPLAINT

BN 20840005v3

## FIRST CAUSE OF ACTION

### Violation of 42 U.S.C. § 1983

### (Against Defendants City and Airport Authority

### and DOES 1 through 100, inclusive)

69.     Plaintiffs repeat and reallege each and every paragraph contained in this Complaint and incorporate all other allegations of the Complaint herein by reference.

70.     A plaintiff asserting a violation under 42 U.S.C. § 1983 must establish the following four factors:  (1) the plaintiff was deprived of a constitutional right; (2) the local authority or municipality has a policy or custom; (3) the local policy or custom amounted to deliberate indifference to plaintiff's constitutional rights; and (4) the policy was the moving force behind the constitutional violation.  *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691-94 (1978).  *See also, Mabe v. San Bernardino County Department of Public Social Services*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

71.     Official municipal policy includes the decisions of governmental lawmakers, the acts of policymaking officials, and practices so persistent and widespread as to practically have the force of law.  *See Connick v. Thompson*, 563 U.S. 51, 60 (2011).  The act of an airport authority board in rejecting a lease proposal has been found "an action taken under color of state law that represents the policy of Defendant Airport Authority."  *Kriss v. Fayette County,* 827 F.Supp.2d 477, 489-490 (2011).

72.     Defendants City and Airport Authority's local policy has violated Plaintiffs' procedural and substantive due process rights under the United States and California Constitutions.  To prevail on a substantive due process claim, a plaintiff must prove the particular interest at issue was protected by the substantive due process clause, and the government's deprivation of that protected interest shocks the conscious.  *Id*. at 492.  "Because ownership of real property is protected

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**VERIFIED COMPLAINT**

BN 20840005v3

by substantive due process, a plaintiff alleges a property interest worthy of substantive due process protection 'in situations where the governmental decision in question impinges upon a landowner's use and enjoyment of property.'" *Id.* citing *DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell*, 53 F.3d 592, 600-01 (3d Cir. 1995).

73.     To prevail on a procedural due process claim, a plaintiff must demonstrate a protected interest or property interest; a deprivation of that interest by the government; and a lack of process.  *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).

74.     Plaintiffs have established sufficient facts to support both claims here. Plaintiffs have established that: (1) Plaintiffs have an indisputable property interest in their occupancy of Hangar 681, and current sublease; and (2) Defendants City and Airport Authority have failed and refused to negotiate with Plaintiffs for a new sublease, thereby seeking to deprive Plaintiffs of that property interest without so much as a personal interchange to discuss its deprivation, any bases in violation of any term in the existing sublease, and without regard to Plaintiffs' rights under any federal law or regulation.

75.     Defendants City and Airport Authority's action, or inaction, moreover, shocks the conscious, and involves the most egregious official conduct, where it is taken to artificially enhance the lease value of Hangar 681 in order to mask Defendants City and Airport Authority's violation of federal law, and avoid the sanction of federal law for Defendants City and Airport Authority's fraudulent conduct in creating a false value for the hangar and thereby wrongfully gaining financial advantage, in defiance of federal law, as charged by the SEC in its Complaint.

76.     Therefore, Defendants City and Airport Authority have violated Plaintiffs' rights under 42 U.S.C. § 1983 where Plaintiffs were deprived of their constitutional rights to substantive and procedural due process by the local policy

articulated, and carried out by policymaking officers, who ignored, over the period of a year, Plaintiffs' repeated pleas for negotiation toward a reasonable and equitable sublease agreement, as required by federal law and regulation. Defendants City and Airport Authority's actions and/or failure to act were carried out for reasons that are, in and of themselves, in violation of federal law and regulation, and those actions and/or failures to act have resulted in extreme jeopardy to Plaintiffs' property interests.

## SECOND CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

### (Against All Defendants and DOES 1 through 100, inclusive)

77.    Plaintiffs repeat and reallege each and every paragraph contained in this Complaint and incorporate all other allegations of the Complaint herein by reference.

78.    Plaintiffs have an existing and valid sublease from Pratt, entered into originally in 2011, which both parties knew would give rise to, and would in the future continue to result in, substantial economic benefit to Plaintiffs.

79.    Defendants City and Airport Authority have had, and continue to have, knowledge of, and have given approval to, Plaintiffs' sublease with Pratt. Nevertheless, Defendants, and each of them, have intentionally interfered with the relationship between Plaintiffs and their customers by terminating the existing sublease; failing and refusing to negotiate with Plaintiffs for a continuation of the sublease with Pratt, or to negotiate a  new sublease for Hangar 681 directly with the Airport Authority; and forcing Plaintiffs to immediately vacate Hangar 681, without consideration of the actual loss of Plaintiffs' current business, and loss of any opportunity for the development of future business.

80.    As a result, Plaintiffs will suffer severe economic injury by virtue of, among other things: (1) the absence of a venue within which to provide services to potential clients; and (2) the potential impairment of their license to provide

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

VERIFIED COMPLAINT

BN 20840005v3

aeronautical services, and will continue to suffer such economic harm into the indefinite future, if Defendants are permitted to carry out their illegal plans.

## THIRD CAUSE OF ACTION

### Negligent Interference with Prospective Economic Advantage

### (Against all Defendants and DOES 1 through 100, inclusive)

81.     Plaintiffs repeat and reallege each and every paragraph contained in this Complaint and incorporate all other allegations of the Complaint herein by reference.

82.     Defendant Pratt knew or should have known when it entered the CTS Sublease that Plaintiffs would be dependent upon Hangar 681 to conduct its business and serve current and future clients.

83.     Defendants City and Airport Authority, and each of them, have known of the CTS Sublease and approved it in 2011, and have further known since at or before that time that Plaintiffs require the use of Hangar 681 to continue to conduct their existing business; obtain future business; and maintain their license to provide aircraft service.

84.     Despite that knowledge, Defendants have repeatedly failed and refused, and continue to fail and refuse, to initiate or participate in lease negotiations with Plaintiffs toward a new lease for Hangar 681, or an extension of the current CTS Sublease.

85.     It was reasonably foreseeable by Defendants that Defendants' conduct in failing and refusing to negotiate for a sublease extension or a new sublease would interfere with, impair, and even terminate, Plaintiffs' business relationships on the Airport, although Defendants to this date, have taken no steps to exercise due care in attempting to mitigate the damage to Plaintiffs' business relationships they have already caused, or will inevitably cause in the future.

86.     Defendants' conduct has, in fact, resulted in such damage to Plaintiffs' business relationships by, among other things: (1) negligently interfering with

Plaintiffs' ability to consummate existing contracts; (2) negligently interfering with Plaintiffs' ability to consummate future maintenance contracts with various aircraft manufacturers; and (3) negligently placing in jeopardy Plaintiffs' license to perform such maintenance services at all, by depriving Plaintiffs of a facility large enough to accommodate the largest aircraft allowed by its certificate, as required by FAA regulation 14 C.F.R. § 145.103(b).

87.   Defendants have, therefore, negligently interfered with Plaintiffs' current and prospective economic advantage resulting in serious economic damage and detriment to Plaintiffs.

## FOURTH CAUSE OF ACTION

### Breach of the Covenant of Good Faith and Fair Dealing

### (Against Defendant Pratt and DOES 1 through 100, inclusive)

88.   Plaintiffs repeat and reallege each and every paragraph contained in this Complaint and incorporate all other allegations of the Complaint herein by reference.

89.   Implied in the CTS and Pratt Subleases is a duty of good faith and fair dealing upon the parties in their performance.

90.   It is undisputed that Plaintiffs have fulfilled each and every one of their duties and obligations under the CTS Sublease for Hangar 681.

91.   Defendant Pratt has acted in bad faith by intentionally and negligently causing damage to Plaintiffs' current and future business relationships through, among other things, Defendant Pratt's notice to vacate Hangar 681, even though Defendant Pratt had the option of allowing Plaintiffs to "hold over" on a month to month basis at 150% of the current lease rate until the issues raised by Defendants are resolved, pursuant to the CTS and Pratt Subleases.

92.   In adopting this course of action, Defendant Pratt has wrongfully and intentionally breached the duty of good faith and fair dealing implied in the CTS

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

VERIFIED COMPLAINT

BN 20840005v3

Sublease for Hangar 681, and has thereby proximately and directly caused Plaintiffs' damages.

## FIFTH CAUSE OF ACTION

### Declaratory Relief

### (Against All Defendants and DOES 1 through 100, inclusive)

93.     Plaintiffs repeat and reallege each and every paragraph contained in this Complaint and incorporate all other allegations of the Complaint herein by reference.

94.     An actual controversy has arisen and now exists between Plaintiffs and Defendants as to their respective rights and duties.  Plaintiffs contend, and the FAA and United States courts have agreed, that the federal Grant Assurances compel Defendants to act in good faith to negotiate and offer leases of a reasonable term, and to do so without discrimination or unreasonable delay or the imposition of unreasonable barriers or restrictions.  Defendants dispute Plaintiffs' contentions, and maintain that their federal obligations do not compel Defendants to enter into negotiations for a new lease term with Plaintiffs or to request reasonable and equitable lease terms consistent with those applied to other, similarly situated, aeronautical users.

95.     Plaintiffs further contend that Defendant Pratt has a contractual duty of good faith to consider the impacts of its notice to vacate, and to use all possible means within the scope of the underlying sublease between Defendants Pratt and Airport Authority, including the holdover provision, to mitigate Plaintiffs' damages until such time as the issues raised by Defendants can be resolved.

96.     Plaintiffs desire a judicial determination of their rights and a declaration as to the reasonableness of Defendants' conduct, including Defendants' refusal to negotiate toward a new or extended sublease with Plaintiffs; or to extend the CTS Sublease on a monthly basis as allowed by the existing CTS and Pratt Subleases.  A judicial declaration is necessary and appropriate at this time and

under the circumstances so that Plaintiffs may ascertain their rights.  Defendants'
refusal to meet their obligations is causing a burden on Plaintiffs because the
uncertainty regarding Plaintiffs' future at the Airport is disrupting Plaintiffs' ability
to operate Plaintiffs' business and disrupting Plaintiffs' current and future
relationships with clients, vendors, and others with whom Plaintiffs enjoy or would
otherwise enjoy beneficial relationships.

## SIXTH CAUSE OF ACTION

### Injunctive Relief

### (Against all Defendants and DOES1 through 100, inclusive)

97.     Plaintiffs repeat and reallege each and every paragraph contained in
this Complaint and incorporate all other allegations of the Complaint herein by
reference.

98.     Beginning in or about June 10, 2015, and continuing to the present
time, Defendants, and each of them, has wrongfully refused to negotiate in good
faith toward a new sublease for Hangar 681, and have instead ordered Plaintiffs to
vacate Hangar 681 in patent violation of Defendants' federal obligations and
without any attempt to mitigate the severe economic repercussions of their actions,
in patent violation of their duty of good faith under the existing Pratt and CTS
Subleases.

99.     Due to the impending termination of the CTS Sublease, this Complaint
seeks immediate judicial intervention to suspend termination of the CTS Sublease
and Plaintiffs' vacation of Hangar 681 on June 30, 2016, pending resolution of the
claims stated herein.

100.   In addition, Defendants, and each of them, has acted in direct disregard
of their federal obligations as they relate to Defendants' efforts to terminate
Plaintiffs' leasehold interests without cause, to unreasonably and unlawfully
interfere with Plaintiffs' business, and to offer Plaintiffs' leased hangar for non-
aviation purposes at unreasonably inflated prices.  Although Plaintiffs continue to

**VERIFIED COMPLAINT**

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 20840005v3

pursue administrative remedies through Federally-Assisted Airport Enforcement Proceedings under 14 C.F.R. Part 16, an immediate preliminary injunction is necessary to prevent Defendants City and Airport Authority from taking any action to lease Hangar 681 to a party other than Plaintiffs, until the FAA's adjudication under 14 C.F.R. Part 16 has been concluded and an administrative determination reached, and/or negotiations concluded toward reasonable and equitable lease rates for Hangar 681, as determined by this Court.

101.   Injunctive relief is also necessary to preserve the jurisdiction of the FAA over the pending Part 16 enforcement proceedings (and ultimately that of the United States Court of Appeals for the Ninth Circuit or the District of Columbia Circuit), pursuant to 9 U.S.C. §§ 47151(b) and 47122.

102.   Injunctive relief is further necessary to protect Plaintiffs from these unconstitutional actions brought under color of law, and as such is authorized pursuant to 42 U.S.C. § 1983.

103.   Defendants' wrongful conduct, unless and until enjoined and restrained by order of this Court, will cause and is causing great and irreparable injury to Plaintiffs as Plaintiffs will suffer immediate cessation of a vital part of their business at the Airport; severe jeopardy to Plaintiffs' license as aeronautical service providers; and serious negative impact on the Airport, and the Victor Valley where Plaintiffs employ almost 200 persons.

104.   Plaintiffs have no plain, speedy, and adequate remedy in the ordinary course of law for the injuries currently being suffered and imminent should the 30-Day notice to vacate continue to eviction, as it will be impossible for Plaintiffs to determine the precise amount of damage that Plaintiffs will suffer if this aspect of their business is no longer viable.

/ / /

/ / /

/ / /

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them, as follows:

1.     For a declaratory judgment providing that Plaintiffs have a right to lease facilities at the Airport, for aviation use, on reasonable terms and without unjust discrimination, under both federal and state law as set forth herein including, but not limited to, 42 U.S.C. § 1983;

2.     For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining defendants, and each of them, and their agents, servants, employees, and successors in office, and all persons acting under, in concert with, or for them, from taking any action that unreasonably affects Plaintiffs' right, title, or interest in Hangar 681 until the resolution of Plaintiffs administrative complaint pursuant to 14 C.F.R. Part 16, and/or the conclusion of negotiations toward the imposition of reasonable and equitable lease rates for Hangar 681, as determined by this Court.

3.     For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendants, and each of them, and their agents, servants, employees, and successors in office, and all persons acting under, in concert with, or for them, from continuing to pursue the termination of Plaintiffs' lease under the 30-Day notice to vacate Defendants served on Plaintiffs pending the outcome of this action;

4.     For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendants, and each of them, and their agents, servants, employees, and successors in office, and all persons acting under, in concert with, or for them, from bringing any future unlawful detainer action or other action against Plaintiffs in retaliation for Plaintiffs' exercise of their rights under the First and Fourteenth Amendments to the United States Constitution and

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**VERIFIED COMPLAINT**

BN 20840005v3

under the Federal Grant Assurances enforced by the Federal Aviation Administration;

5.      For an order requiring Defendants to show cause why they should not be enjoined as set forth in this Complaint during the pendency of this action and during the pendency of the parallel Part 16 proceedings initiated by Plaintiffs on June 7, 2016;

6.      For damages in the sum of no less than $225,000, plus damages in such further sums as may be sustained and as are ascertained before final judgment in this action;

7.      For punitive or exemplary damages;

8.      For costs of suit incurred in this action;

9.      For an award of attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

10.     For such other and further relief as the Court deems proper.

Dated:  June 14, 2016                         BUCHALTER NEMER

                                              */s/ Barbara E. Lichman*
                                              Barbara E. Lichman, Ph.D.
                                              Paul J. Fraidenburgh
                                              BUCHALTER NEMER
                                              18400 Von Karman Avenue
                                              Suite 800
                                              Irvine, CA  92612
                                              (949)760-1121
                                              (949)720-0182 Fax
                                              blichman@buchalter.com
                                              pfraidenburgh@buchalter.com

                                              *Counsel for Complainants*
                                              *COMAV, LLC and COMAV TECHNICAL*
                                              *SERVICES, LLC*

VERIFIED COMPLAINT

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 20840005v3

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury in this action.

Dated:  June 14, 2016                    BUCHALTER NEMER

*/s/ Barbara E. Lichman*
Barbara E. Lichman, Ph.D.
Paul J. Fraidenburgh
BUCHALTER NEMER
18400 Von Karman Avenue
Suite 800
Irvine, CA  92612
(949)760-1121
(949)720-0182 Fax
blichman@buchalter.com
pfraidenburgh@buchalter.com

*Counsel for Complainants*
*COMAV, LLC and COMAV TECHNICAL*
*SERVICES, LLC*

VERIFIED COMPLAINT

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 20840005v3

## VERIFICATION

I am President and CEO of Plaintiff ComAv, LLC, of which Plaintiff ComAv Technical Services, LLC ("CTS") is an affiliate, and am authorized to execute this Verification on behalf of Plaintiffs.  I have read the foregoing **VERIFIED COMPLAINT FOR: (1) VIOLATION OF 42 U.S.C. § 1983; (2) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (4) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; (5) DECLARATORY RELIEF; AND (6) INJUNCTIVE RELIEF**  and am familiar with its contents.  The facts stated in the foregoing document are true of my own personal knowledge, except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is due and correct, and that this Verification is executed on June 14, 2016 at Victorville, California.

_____
Craig Garrick

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

VERIFIED COMPLAINT