# EXHIBIT E

# EXHIBIT E

## BEFORE THE U.S. DEPARTMENT OF TRANSPORTATION
## FEDERAL AVIATION ADMINISTRATION
## WASHINGTON, D.C.

COMAV, LLC, a California limited liability
company; COMAV TECHNICAL SERVICES,
LLC, a Delaware limited liability company,

      Complainants,

    vs.

SOUTHERN CALIFORNIA LOGISTICS
AIRPORT AUTHORITY, a joint powers
authority; CITY OF VICTORVILLE, a
municipal corporation.

      Respondents.

Case No.: FAA Docket No.: _____

 

## COMPLAINT AND REQUEST FOR INVESTIGATION
## PURSUANT TO 14 C.F.R. PART 16

Communications with respect to this document should be sent to Complainants' representative:

Barbara E. Lichman, Ph.D.
Paul J. Fraidenburgh
BUCHALTER NEMER
18400 Von Karman Avenue
Suite 800
Irvine, CA  92612
(949)760-1121
(949)720-0182 Fax
blichman@buchalter.com
pfraidenburgh@buchalter.com

*Counsel for Complainants*
*COMAV, LLC and COMAV TECHNICAL SERVICES, LLC*

June 7, 2016

## BEFORE THE U.S. DEPARTMENT OF TRANSPORTATION
## FEDERAL AVIATION ADMINISTRATION
## WASHINGTON, D.C.

| | | |
|---|---|---|
| COMAV, LLC, a California limited liability company; COMAV TECHNICAL SERVICES, LLC, a Delaware limited liability company, | ) ) ) ) | Case No.: FAA Docket No.: _____ |
| Complainants, | ) ) | |
| vs. | ) ) | |
| SOUTHERN CALIFORNIA LOGISTICS AIRPORT AUTHORITY, a joint powers authority; CITY OF VICTORVILLE, a municipal corporation. | ) ) ) ) ) | |
| Respondents. | ) ) | |

## COMPLAINT AND REQUEST FOR INVESTIGATION
## PURSUANT TO 14 C.F.R. PART 16

### I.   SUBJECT OF COMPLAINT

1.      ComAv, LLC ("ComAv"), and its affiliate ComAv Technical Services, LLC

("CTS"), fixed-based operator ("FBO"), providing maintenance services for large commercial

aircraft, and hangar tenant at Southern California Logistics Airport ("Airport"), operated by the

Southern California Logistics Airport Authority ("Airport Authority"), hereby file, pursuant to

14 C.F.R. Part 16, this formal complaint and request for investigation against Respondents

Airport Authority and City of Victorville ("City"), the City Council of which constitutes the

Board of the Airport Authority.  The complaint challenges, among other things, the Airport

Authority's consistent refusal to negotiate toward an extension of CTS' current five year

sublease for Hangar 681 at the Airport, while throwing up unprecedented barriers to negotiation

with ComAv, and freely negotiating with other parties both aeronautical and nonaeronautical,

resulting in violation of the Airport's contractual conditions to funding from the federal

government ("Grant Assurances"), including Grant Assurance 22, Economic Nondiscrimination; 23, Exclusive Rights; and 25, Airport Revenues, pursuant to the Airport and Airway Improvement Act of 1982, as amended, and codified at 49 U.S.C. §§ 40101, *et seq.*, and 47101, *et seq.* ("AAIA").

## II.     JURISDICTION

2.      Jurisdiction over this Complaint is conferred on the Administrator of the Federal Aviation Administration ("FAA") by 49 U.S.C. § 47107, *et seq.*, and 14 C.F.R. § 16.1.

3.      The names and addresses of the responsible persons at the Airport Authority and City of Victorville are:

> Eric C. Ray, Airport Manager
> Keith Metzler, Assistant Airport Manager
> Southern California Logistics Airport Authority
> 18374 Phantom Street
> Victorville, CA  92394
>
> Douglas B. Robertson, City Manager
> Gloria Garcia, Mayor
> Sophie L. Smith, Director of Economic Development
> City of Victorville
> City Hall
> 14343 Civic Drive
> P.O. Box 5001
> Victorville, CA  92393-5001

## III.     PARTIES

4.      The Airport Authority is a California joint powers authority, and sponsor and operator of the Airport.  The Airport Authority was formed to assume control of the former George Air Force Base from the initial delegee, the Victor Valley Economic Development Corporation after George Air Force Base closed in 1993, pursuant to the Base Reuse and Realignment Act of 1993.

EXHIBIT E

5.        The City is the public entity that operates the Airport Authority.  Executive and management positions at the Airport Authority are filled by members of the City Council, and City administrative staff.

6. .      Complainant ComAv is an affiliate of CTS, and, along with its other affiliates, an 18 year hangar tenant, aircraft maintenance service provider on narrow and wide-body aircraft, and aeronautical user of the Airport.

7.        Complainant CTS is an affiliate of ComAv, an aircraft maintenance service provider, and sublessee from Pratt & Whitney of Hangar 681.

## IV.      SUMMARY OF ARGUMENT

8.        This Complaint arises out of the Airport Authority's yearlong refusal to enter into negotiations toward an extension of CTS' five year sublease for Hangar 681, instead throwing up financial and other barriers to even the initiation of negotiations, despite the fact that the Airport Authority has been negotiating freely with both aeronautical and nonaeronautical users, on and off the airport, during the same period.  The Airport Authority has, thus, violated its obligations to CTS and ComAv under, among others, Grant Assurance 22, Economic Nondiscrimination, implementing 49 U.S.C. § 47107(a)(1)-(5), where the Airport Authority has consistently refused to negotiate in good faith for reasonable and equitable terms for the renewal of CTS' lease for Hangar 681, as it is required to do with any "similarly situated" aeronautical user at the Airport [Declaration of Craig Garrick ("Garrick Decl."), ¶¶ 9, 10, 15, 16, 17, Exhibits F, G, K, L, M].

9.        This failure to negotiate is in spite of the fact that: during their 18 year presence on the Airport as lessee of various hangars and other facilities, CTS and its affiliate ComAv have faithfully performed all of the terms of their lease and other commitments to the Airport [Garrick Decl., ¶ 4]; the Airport Authority has a long history of negotiating lease terms with ComAv which have unanimously depended upon later confirmation of contingencies for financial

3

viability; ComAv's has repeatedly requested to negotiate, and made multiple offers for renewal of the lease term. [Garrick Decl., ¶ 5, Exhibit C; ¶¶ 6, 12]. To add injury to insult, the Airport Authority is admittedly negotiating with other parties, both on and off the Airport, aeronautical and nonaeronautical, to obtain a lease rate of $1.25 per square foot, almost double that which is currently being paid by CTS, or any other current incumbent aeronautical lessee on the Airport. [*See, e.g.*, Garrick Decl., ¶ 6, Exhibit D; Morris Decl., ¶ 4]

10.     The motivation behind the Airport Authority's refusal to negotiate is clear. It is to delay the resolution of the lease dispute with CTS until after the existing lease expires, thus leaving CTS with no options, and the Airport Authority free to raise the hangar's lease rate at will to any party, aeronautical or non-aeronautical, on or off the Airport. This would not only allow the Airport Authority to realize more income from the property, but also to avoid the potential sanctions arising out of a lawsuit brought by the Securities and Exchange Commission ("SEC") [Declaration of Susan Barrett ("Barrett Decl."), ¶¶ 2, 3, Exhibit A] in 2013 ("SEC Lawsuit"), challenging the actions of the Airport Authority, its Assistant Director, Keith Metzler, and the City, in improperly inflating, and subsequently fraudulently misrepresenting to the public, the assessed valuation of four hangars, for the purpose of enhancing the amount of tax increment financing available to the Airport Authority. Because lease rate is a factor in assessed valuation, the Airport Authority now seeks to raise Hangar 681's lease rate, and, thus, its assessed valuation, to moot the SEC's claim of prior falsification of disclosures of asset value.

11.     Attempting to escape one set of onerous legal sanctions, however, the Airport Authority finds itself in the midst of others arising out of:

a.     Violation of 49 U.S.C. §§ 40103(e), 47107(a)(4), and Grant Assurance 23, Exclusive Rights, where a significant economic burden has been placed on CTS from the Airport

Authority's demand for a lease rate vastly in excess of that applicable to the other airport incumbents using similar facilities for a similar purpose, and its refusal to negotiate terms for a renewal of ComAv's lease, thus causing prejudice to, and even foreclosing, ComAv's ability to do business on the Airport [Garrick Decl., ¶ 18], *see, e.g., City of Pompano Beach v. Federal Aviation Administration*, 774 F.2d 1529, 1544 (11th Cir. 1985);

        b.     49 U.S.C. §§ 47107(b), 47133(a), 47107(l)(2)(a), and Grant Assurance 25, Airport Revenues, which require the sponsor of a federally obligated airport to expend all revenues generated by the airport and local taxes on aviation fuel for airport purposes. In this case, the Airport Authority is impermissibly attempting to escalate rental rates, and, thus, property values for Hangar 681 for the sole purpose of compensating for the improper diversion of Airport revenues to outside management companies who are using those fees for purposes unrelated to management or improvement of the Airport, as set forth in SEC Complaint. [Barrett Decl., Exhibit A, ¶¶ 6, 7].

        12.     The results of these actions, or inactions, on the part of the Airport Authority has been to create an unjustly discriminatory atmosphere that undermines the value, and interferes with the ongoing operation, of CTS' facility, and its affiliate, ComAv, while falsely inflating the value of the Airport Authority's property interest by, among other things, artificially increasing lease rates for the sole purpose of allowing the Airport Authority to borrow more capital not justified by the current value of the property. This sleight of hand amounts to a gross violation of its commitments not only to the public generally as charged by the SEC, but also to the FAA and ComAv specifically, and justifies an order requiring the Airport Authority to offer ComAv/CTS a lease with "'terms, conditions, and requirements substantially identical'" to those

applicable to the other "similarly situated" lessees on the Airport. *City of Pompano Beach, supra,* 774 F.2d at 1545.

## V. CTS HAS SOUGHT INFORMAL RESOLUTION OF ITS COMPLAINT

13.     Pursuant to 14 C.F.R. § 16.21(b), CTS confirms that substantial and reasonable good faith efforts to resolve this dispute informally prior to the filing of this Complaint have been made, and that no reasonable prospect for timely resolution of the dispute exists. Complainant's efforts to achieve informal resolution include multiple correspondence, telephone conversations and meetings between ComAv and representatives of the Airport Authority beginning on June 10, 2015 and continuing through May 24, 2016 as set forth below. [*See* Garrick Decl., ¶¶ 5-17, and Exhibits A-M].

## VI. FACTUAL BACKGROUND

14.     ComAv, through its affiliate CTS, is one of the longest term aeronautical service providers on the Airport, and one of its largest employers. [Garrick Decl., ¶ 2]. Its incumbency at the Airport began in 1998, shortly after the closure of George Air Force Base in the 1993 Base Reuse and Realignment process, and the original lease of some portions of the former base to the Victor Valley Economic Development Authority, at which time George Air Force Base became the Southern California Logistics Airport. [Garrick Decl., ¶ 2]. Subsequently, the Victor Valley Economic Development Authority delegated its decisionmaking power over the Base property to the Southern California Logistics Airport Authority, a California Joint Powers Authority. [Garrick Decl., ¶ 3, Exhibit A, ¶ A, Recitals].

15.     In or about 2001, ComAv entered into a partnership with Pratt & Whitney [Garrick Decl., ¶ 3]. In 2011, Pratt & Whitney renewed its sublease for Hangar 681 which it had originally subleased from the Airport Authority [Garrick Decl., ¶ 3, Exhibit A], and which it subsequently further subleased to CTS [Garrick Decl., ¶ 4, Exhibit B]. Even though ComAv

6

EXHIBIT E
241

purchased Pratt & Whitney's interests in 2013, the subleases between the Airport and Pratt & Whitney, and Pratt & Whitney and CTS remain in full force and effect. [Garrick Decl., ¶ 4]. Also in 2013, the SEC brought its lawsuit against the City, the Airport Authority, the Airport Authority's Bond Underwriter and Construction Manager, Kinsell Newcomb and DeDios, and its principal, Jeffrey Kinsell, and the City's then-Director of Economic Development, now Assistant Airport Manager, Keith Metzler, for, among other things, fraud in connection with the sale of securities under various sections of the Securities Exchange Act of 1934, and Securities Act of 1933. The charges arose out of the defendants' allegedly fraudulent inflation and misrepresentation of the value of four hangars on the Airport, including Hangar 681, in order to support the sale of tax increment bonds to the public in amounts not justified by the value of the underlying assets. [Barrett Decl., Exhibit A].

16.     Despite ComAv's successful service to the Airport and the community, the Airport Authority has, without explanation, refused to initiate negotiations with ComAv for a "reasonable," FAA Order 5190.6B, § 14.3, and "equitable," FAA Order 5190.6B, § 9.5.d., lease rate for Hangar 681, instead making multiple different excuses for delay, including more recently the requirement of audited financial reports a precondition to negotiation, rather than its previous procedure, over the course of ComAv's 18 year incumbency in various facilities, of reaching an agreement on lease rates contingent upon proof of financial viability.

17.     Beginning its attempt to informally resolve its lease issue with the Airport almost a year ago, on June 10, 2015, ComAv submitted a written request to the Airport Authority to begin lease negotiations without delay. [Garrick Decl., ¶ 5]. After response from the Airport Authority indicating they would be marketing the hangar publicly, on June 24, 2015, ComAv made an offer for a sublease renewal at "fair market rent" with the same to be determined by

independent appraisers. [Garrick Decl., ¶ 5]. On or about February 9, 2016, after a number of phone calls and letters none of which resulted in a single counteroffer from the Airport Authority, ComAv revised its offer upward to include: (a) a new lease; (b) with a term of five years, with ComAv given two option periods of five years each to extend the term; and (c) an initial lease rate of $.70 per square foot on a triple net basis with escalation clauses allowing increases of 1% per year during the option periods. [Garrick Decl., ¶ 6, Exhibit C].

18.    On February 16, 2016, the Airport Authority responded through Keith Metzler, the Assistant Airport Manager, and Victorville's Assistant City Manager, notifying ComAv that its previous offer of $.70 per square foot was far below the Airport Authority's general asking price of $1.25 per square foot; the Airport Authority would require verification of creditworthiness before it would enter into negotiations; the Airport Authority was marketing the property to an array of outside interests; and the Airport Authority would negotiate through its real estate broker Kent Hinds at Cushman and Wakefield. [Garrick Decl., ¶ 7, Exhibit D].

19.    On March 9, 2016, ComAv responded to Metzler's February 16th letter, complaining that, despite several offers by ComAv, dating back eight months (at that time), there had been no progress in negotiating, much less consummating, the lease for Hangar 681, although other hangar lease negotiations were ongoing by the Airport Authority and third parties. ComAv's letter further requested a formal response or counteroffer for Hangar 681. Finally, ComAv's letter informed the Airport Authority that ComAv intended to put the new sublease in the name of CTS, as was the original sublease. [Garrick Decl., ¶ 8, Exhibit E].

20.    Also on March 9, 2016, in response to the above letter from ComAv, Sophie Smith, the City's Economic Development Director, referred to the February 16 letter from Keith Metzler, as rejecting the $.70 per square foot offer made by ComAv; referred to the previously

mentioned $1.25 per square foot asking price from the Airport Authority; but refused to make a formal counteroffer, including conditions and contingencies, and instead referred ComAv to further conversations with realtor Kent Hinds. [Garrick Decl., ¶ 9, Exhibit F].

21.     On March 17, 2016, ComAv's Executive Vice President William Morris received another e-mail from realtor Kent Hinds, again refusing to make a counterproposal and instead imposing the condition that "before we can proceed with a counterproposal, we will need to review your current financial conditions," and requesting the last three years of "audited" financial reports, as well as a current balance sheet and income statement. Hinds further stated that "once we review these we will craft the appropriate response." [Garrick Decl., ¶ 10, Exhibit G].

22.     On March 21, 2016, ComAv responded to the March 17 e-mail from Kent Hinds, acknowledging not only the necessity "for the Airport to receive reasonable and adequate financial assurances," but once again reiterating its request that the Airport Authority "proceed with the counteroffer without delay." [Garrick Decl., ¶ 11, Exhibit H].

23.     In another letter of March 23, 2016, ComAv responded in detail to the Airport Authority's previous e-mail, expressing not only ComAv's "general concerns" about "the difficulty we are having in obtaining real, substantive progress in lease negotiations," but also about the parties for which ComAv was being asked to provide access to the Hangar, and the possibility that it was to support the defense of the "SEC [Securities and Exchange Commission] lawsuit." [Garrick Decl., ¶ 12, Exhibit I]. Specifically, ComAv pointed to an inspection that had been scheduled for the purported purpose of supporting the Airport's and City's defense to the SEC Lawsuit. It was only later than ComAv learned that the inspection was a showing of the

property to Raytheon Company for the purpose of leasing to Raytheon Company at the expiration of CTS' lease.

24.     On March 29, 2016, despite the Airport Authority's refusal to cooperate, ComAv once again went one step further and produced the supplemental financial information the Airport Authority had requested in its March 17, 2016 letter, with the exception of the audited financial reports, which were not immediately available, because ComAv's lenders and investors do not require them. [Garrick Decl., ¶ 13].

25.     On April 15, 2016, ComAv's outside counsel, Barbara Lichman, sent a letter to Eric Ray, Airport Manager, expressing ComAv's further concerns about the potentially discriminatory implications of the Airport Authority's disparate treatment of existing leaseholders and lease renewals for substantially similar facilities. [Garrick Decl., ¶ 14, Exhibit J; Morris Decl., ¶ 4].

26.     On April 26, 2016, ComAv's outside counsel received a letter from the Airport Authority's outside counsel, Andre de Bortnowsky, who used ComAv's April 15, 2016 letter as an excuse to further delay making a counteroffer by seeking direction on settlement terms from the Airport Authority's Board, and refusing to either meet or submit a counteroffer until after that next (unspecified date) Board meeting. [Garrick Decl., ¶ 15, Exhibit K]. In addition, on May 5, 2016, ComAv's counsel received yet another letter from the Airport Authority's counsel, requesting even more financial data on the ground that the data previously received did not constitute "financial statements received and prepared by a CPA, akin to an audit," and on that basis further delaying submission of a counteroffer. [Garrick Decl., ¶ 16, Exhibit L].

27.     Finally, on May 24, 2016, the Airport Authority, through Keith Metzler set up yet another roadblock to negotiation of a lease renewal, by making a "critical precursor to productive

negotiation" the agreement not to bring a legal challenge to vindicate ComAv's rights under the

Grant Assurances and acknowledging that the Airport is "entertaining other proposals," while at

the same time refusing to entertain the proposals already made by ComAv. [Garrick Decl., ¶ 17,

Exhibit M].

28.     In summary, the Airport Authority's refusal to negotiate a renewal of the lease for

the past 12 months, coupled with the proximity of the lease's expiration on June 30, 2016, has

caused manifest prejudice to CTS' (and ComAv's) ability to do business on the Airport,

including, but not limited to, interference with ComAv's commitments to its customers to

provide maintenance on narrow and wide-body aircraft which requires a hangar the size of

Hangar 681. [Garrick Decl., ¶ 18]. More specifically, under 14 C.F.R. § 145.103, CTS' repair

station license requiring a maintenance hangar large enough to accommodate the largest aircraft

permitted under its license, 14 C.F.R. § 145.103(b), will be placed in serious jeopardy.

Consequently, the Airport Authority's refusal to negotiate may not merely raise the level of

operational uncertainty, but put CTS and ComAv, long-term, positively contributing,

aeronautical users at the Airport since its inception, out of business entirely. [Garrick Decl., ¶

18].

## VII.   LEGAL FRAMEWORK

29.     "Part 16 of the FAA's regulations permits a 'person directly and substantially

affected by any alleged noncompliance [to] file a complaint with the Administrator,'" *Boca

Airport, Inc. v. FAA*, 389 F.3d 185, 186 (D.C. Cir. 2004), quoting 14 C.F.R. § 16.23. The

regulations define noncompliance as "'anything done or omitted to be done by any person in

contravention of any provision of any Act . . . as to matters within the jurisdiction of the

Administrator.'" 14 C.F.R. § 16.3.

30.     The AAIA makes a condition of receiving federal funds for airport improvements that airport sponsors such as the Airport Authority make written assurances that the sponsor will make the airport available for public use without unjust discrimination and will subject [Fixed-Based Operators or FBOs] who use the airport in a similar manner to the same charges.[1] *See Gary Jet Center, Inc. v. Gary/Chicago International Airport Authority*, 2014 U.S. Dist. LEXIS 45201. The FAA ultimately reviews the complaint for whether it is "supported by . . . reliable, probative, and substantial evidence contained in the record," 14 C.F.R. § 16.227, in accordance with "applicable law, precedent and public policy," *Id., see also 41 North 73 West, Inc. v. U.S. Department of Transportation*, 408 Fed.Appx. 393, 399 (2010). In this case, the "reliable, probative, and substantial evidence," *Id.*, overwhelmingly establishes noncompliance by the Airport Authority with the following of its contractual assurances:

## A.     FIRST CAUSE OF ACTION – VIOLATION OF GRANT ASSURANCE 22 – ECONOMIC NON-DISCRIMINATION

31.     Grant Assurance 22 implements the provisions of 49 U.S.C. § 47107(a)(1)-(6), and requires, in pertinent part, that the operator of a federally obligated airport, among other requirements, "make [its] airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport." Grant Assurance 22(a). "The term 'unjust discrimination' is not statutorily defined, but the agency has interpreted it to require a showing that a party similarly situated to the complainant was treated preferentially." *R/T 182, LLC v. Federal Aviation Administration*, 519 F.3d 307, 309 (6th Cir. 2008).

---

[1] "A fixed-base operator (FBO) is a commercial entity providing aeronautical services such as fueling, maintenance, storage . . . to the public. FAA Order 5190.6B, Chapter 8, Exclusive Rights, p. 8-11, fn. 25.

EXHIBIT E

32.     With respect to FBOs like CTS, Grant Assurance 22 further ensures that "each fixed-based operator at any airport owned by the sponsor shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed-base operators making the same or similar uses of such airport and utilizing the same or similar facilities. [Assurance 22(c)]" *See Skydance Helicopters, Inc. d/b/a Skydance Operations, Inc. v. Sedona Oak-Creek Airport Authority, et al.,* Director's Determination, Docket No. 16-02-02.

33.     FAA Order 5190.6B further expands upon the statutory definitions, where it requires an airport proprietor "to negotiate in good faith for the lease of premises available to conduct aeronautical activities," FAA Order 5190.6B, § 9.7, and requires that an FBO be subjected to "substantially comparable rates, fees, rentals, and charges . . . [if it] assume[s] similar obligations, use[s] similar facilities, and make[s] similar use of the airport." FAA Order 5190.6B, § 9.2.a.  In short, the treatment of "aeronautical users" such as FBOs must be "reasonable," FAA Order 5190.6B, § 14.3, as well as "equitable," FAA Order 5190.6B, § 9.5.d.

34.     While the FAA acknowledges the potential for differences in lease rates based on differences in the nature or use of the facilities of the airport, those different lease rates must be justified by the attributes of the facilities themselves (such as location), or the structure of ownership (*e.g.,* a lease for improved real property versus a ground lease with the tenant having constructed and financed the improvements), FAA Order 5190.6B, § 9.2.d.

35.     In this case, when the Airport Authority's initially demanded lease rate of $1.25 per square foot is compared to the lease rates of other FBOs on the Airport performing aircraft maintenance services; in facilities that are virtually identical in attribute; with options to renew their leases not available to CTS; and in generally similar financial arrangements when adjusted

13

for differences in the structures of the lease, the Airport Authority's violation of Grant Assurance 22(c) comes clearly into focus.  [*See* Morris Decl., ¶ 4].

36.    Specifically, there are currently three comparable hangar tenants (and three affected hangars) on the Airport – Boeing (Hangar 678); Pacific Aerospace and Technology ("PART") (previously occupying Hangar 678 with office space); Leading Edge (Hangers 746 and 747) to CTS (Hangar 681).  All perform similar aircraft maintenance services in hangars that range between 117,323 square feet (including office space) and 67,500 square feet in size,[2] and all paid or are currently paying between $.53 per square foot (Boeing) and $.69 (Leading Edge).[3] Notably, the other tenants have the further benefit of options to remain after their initial lease terms expire, carrying Hangar 678 to the year 2025; Hangar 746 to the year 2036, and Hangar 747 to the year 2028.  Clearly, therefore, because CTS currently uses similar facilities(hangar in excess of 60,000 square feet), makes similar use of the Airport (aircraft maintenance), and assumes similar obligations (its similar lease rate per square foot for the similar facility), it fits directly within the scope of the term "similarly situated," and the Airport Authority is obligated "to negotiate in good faith" for the renewal of CTS' lease under rates, fees and rental charges that are "substantially comparable" to those of Boeing and Leading Edge, FBOs that use similar facilities in size and make similar use of the Airport for aircraft maintenance purposes.  [Morris Decl., ¶ 4].

37.    Nevertheless, the Airport Authority has proceeded thus far by simply alluding to a proposed general lease rate of $1.25 per square foot, without any specific reference to the attributes of CTS' hangar, and without having performed an appraisal [Morris Decl., ¶ 6], and,

---

[2] PART's lease for its 117,323 square foot hangar was mutually terminated due to performance issues.
[3] Leading Edge made tenant improvements to both of the hangars it occupies in the amount of $550,000, and in return received reduced rent.

14

thus, without any substantiation for the price demanded.  The rationale for the Airport Authority's refusal to perform an appraisal can clearly be discerned.  Any disclosure of the true, lower, value of the hangar would essentially eviscerate the Airport Authority's defense to the SEC Lawsuit because it would demonstrate conclusively that the hangar had been overvalued in the bond offering, as the County's tax assessor had already determined.

38.  Despite these manifest issues, arising from, among other things, the Airport Authority's failure and refusal to negotiate a lease extension, the Airport Authority has thus far proceeded by simply mentioning a generally applicable lease rate of $1.25 per square foot without any methodological substantiation; and persistently refusing to make counteroffers even for that amount since June, 2015, [Garrick Decl., ¶¶ 5, 6, 8, Exhibit C], and forcing CTS to negotiate against itself on such pretexts as:

a.  the requirement for ever expanding assurances of financial viability, despite ComAv's 18 year tenure on the Airport characterized by its faithful performance of its obligations under the various subleases, including CTS' current sublease for Hangar 681; the Airport Authority's 18 year history of negotiating leases with ComAv and its affiliates, based on the satisfaction of contingencies, including the requirement of proof of financial viability; and ComAv's submission of financial information on March 29, 2016 (Garrick Decl., ¶¶ 4, 12, 13); and

b.  ComAv's use of outside legal counsel in lease negotiations, which the Airport Authority's outside counsel, in his April 26, 2016 letter (Garrick Decl., ¶ 15, Exhibit K), chose to regard as "raising the stakes" on the negotiations; causing a delay in negotiations while the Airport investigates the issues raised in ComAv's April 15, 2016 letter (concerning grant assurance obligations about which the Airport Authority should already have been well aware);

EXHIBIT E

and soliciting the direction of the Board of the Airport Authority in lease negotiations (which should long since have been ascertained).  In its later communication of May 24, 2016 (Garrick Decl., ¶ 17, Exhibit M), the Airport Authority insisted on, as a "critical precursor" to "negotiation" by the Airport Authority, some kind of telephonic conversation between its outside counsel and ComAv's to "resolve concerns" raised by ComAv about potential violations of grant assurances.  The Airport Authority's "condition" appears to be nothing more than a veiled threat to stop dealing with ComAv, absent ComAv's agreement to relinquish its legal right to object to the Airport Authority's delaying tactics, failure to fully engage in negotiation, and consequent violation of its grant assurances.

39.     Moreover, and in addition to the failure to negotiate with ComAv, the Airport Authority failed to justify its almost 100% increase in the current lease rates by any independent change in the attributes of the facilities occupied by ComAv, or by comparison between Hangar 681 and the other comparable hangars on the Airport occupied by other FBOs, as required by FAA Order 5190.6B, § 9.2d.

40.     In short, the Airport Authority is seeking to increase the lease rate paid by ComAv for Hangar 681 by fiat, making that rate almost double that paid by ComAv's peers on the Airport, without a shred of statutory or regulatory support or financial justification.  Therefore, based on the Airport Authority's violation of Grant Assurance 22 alone, the Airport Authority should be compelled to act in accordance with the law and regulation or lose the benefit of FAA funding that has been so instrumental in the Airport's development.

B.     **SECOND CAUSE OF ACTION – VIOLATION OF GRANT ASSURANCE 23 – EXCLUSIVE RIGHTS**

41.     The Congress of the United States has spoken unequivocally at least twice on the issue of "exclusive rights" ["A person does not have an exclusive right to use an air navigation

facility on which Government money has been expended," 49 U.S.C. § 40103(e); "a person

providing, or intending to provide, aeronautical services to the public will not be given an

exclusive right to use the airport," 49 U.S.C. § 47107(a)(4)].

      42.     Federal regulation implements that position, where it states, in pertinent part, that

"the sponsor of a federally obligated airport '… will permit no exclusive right for the use of the

airport by any persons providing, or intending to provide, aeronautical services to the public

…'''" *Skydance Helicopters, supra*, p. 19, citing Grant Assurance 23. An "exclusive right" has

been judicially defined as a "power, privilege, or other right excluding or debarring another or

others from enjoying or exercising a like power, privilege or right." *See, e.g., 41 North 73 West,

LLC, supra,* 408 Fed.Appx. at 400, citing *Pompano Beach, supra,* 774 F.2d at 1541.

      43.     Moreover, such an exclusive right need not be expressly conferred. Rather,

"[s]uch a right is constructively granted when 'the imposition of unreasonable standards or

requirements' has the practical effect of imposing a significant burden on an entity's ability to

engage in a particular aeronautical activity . . ." *Id.* The factual situation in *Pompano* is

instructive here. In that case, an applicant for a lease at the Pompano Beach airport was offered a

lease containing restrictive provisions [*e.g.*, requirement for minimum investment in property of

$500,000; a $5,000 deposit at the beginning of the lease term; and the same lease rate for

unimproved land as already required for improved land, *Id.* at 1543, fn. 14] not present in other

leases on the airport. The court found that: (1) the required provisions were facially

disadvantageous to the applicant; (2) the applicant's testimony at hearing established that they

were prejudicial to his ability to do business; and (3) the City's delays in negotiating with the

applicant benefited the incumbent lessees. On those bases, the court found not only that the

differential requirements amounted to unjust discrimination, but also that "the City's conduct had

the effect of granting the Beckers [the incumbent leaseholders] an exclusive right at its Air Park." *Id.* at 1544. Thus, the Appellate Court affirmed the FAA's order requiring the City to offer the applicant a lease with "terms, conditions, and requirements substantially identical" to those applicable to other leaseholders. *Id.* at 1545.

44. Virtually the same circumstances exist here, with the notable exception of the fact that, unlike the applicant in *Pompano*, who was applying for initial access to the airport, ComAv has proven itself a reliable, contributing member of the Airport and Victorville communities for 18 years. Here, as in *Pompano*, the Airport Authority seeks to impose requirements on ComAv in terms of a lease rate double that which is applicable to other similarly situated FBOs and hangar occupants. Moreover, and although, in *Pompano*, the court found prejudicial mere "delay" in the negotiation of a lease, the Airport Authority's actions in this case are far more prejudicial where it has entirely refused to negotiate the lease extension with ComAv. It is, therefore, impossible to determine with any specificity what further conditions the Airport Authority may attempt to impose on ComAv, except to say that even the doubling of its current lease rate will, in and of itself, have, like the conditions imposed on the applicant in *Pompano*, substantial prejudicial effect on ComAv's ability to do business at the Airport. *Id.* at 1543. [Garrick Decl., ¶ 18].

45. In summary, the Airport Authority's unreasonable demand of twice the lease rate of other similarly situated hangar occupants, and its refusal to negotiate further with ComAv, without any justification, constitutes the quintessential imposition of an unreasonable standard, with the practical effect of placing an unreasonable burden on ComAv's ability to sustain its business at the Airport [Garrick Decl., ¶ 18], and, thus, the constructive grant of an exclusive right in contravention of federal law and policy.

## C.   THIRD CAUSE OF ACTION – VIOLATION OF GRANT ASSURANCE 25 – AIRPORT REVENUES

46.     The Congress has taken an especially intransigent position in its prohibition of revenue diversion.  That is, "the Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that . . . the revenues generated by a public airport will be expended for the capital or operating costs of – (A) the airport; (B) the local airport system; or (C) other local facilities owned or operated by the airport owner or operator and directly and substantially related to the air transportation of passengers or property." 49 U.S.C. § 47107(b)(1).  Airport revenues are defined broadly to include, among other things, "direct payments or indirect payments, other than payments reflecting the value of services and facilities provided to the airport."  49 U.S.C. § 47107(l)(2)(A).

47.     Despite this unequivocal prohibition, diversion of revenue is exactly what the Airport Authority has allowed, and for which it is attempting to compensate with the unjustly discriminatory increase in ComAv's rental rates.  Specifically, and as set forth in more detail in the SEC Complaint, Kinsell, Newcomb and DeDios, Inc. ("KND") was the sole underwriter of a $13.3 million bond offering by the Airport Authority of subordinate tax increment bonds, in April, 2008, premised at least partially on an assessed valuation of $65 million for four new hangars.  [Barrett Decl., Exhibit A, ¶ 4].[4]  It is alleged by the SEC that KND Affiliates, LLC, a firm also partially owned by Jeffrey Kinsell, one of the underwriters, was retained to manage the construction of the four hangars, even though he had no experience in construction management [Barrett Decl., Exhibit A, ¶ 6], and that KND and its part owner Kinsell "engaged in an

---

[4] This assessed value of $65 million forms the basis of a cause of action in the SEC Complaint against the Airport Authority and City for falsely inflating the assessed valuation of the hangars to $65 million, thus falsifying the tax increment and debt service ratios to the public.  [*See, e.g.*, Barrett Decl., Exhibit A, ¶ 5].

additional fraudulent scheme to take undisclosed construction and management fees collected on the airport hangar project." [Barrett Decl., Exhibit A, ¶ 6].  It is further specifically alleged by the SEC that the KND affiliates did misappropriate $2.3 million of bond proceeds through a fictitious 15% per month "property management fee" [Barrett Decl., Exhibit A, ¶ 7], and used them for purposes wholly unrelated to the Airport.

48.     The long and the short of the situation is that another federal agency, the SEC, to which the FAA in its adjudicatory capacity owes deference under the law, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), has made a plausible case that money that was collected for use on the Airport, in the construction of hangars, was in fact diverted to private use as an "indirect payment" that did not "reflect the value of services and facilities provided to the airport," and, thus, constituted per se Revenue Diversion, categorically prohibited by both statutes and this agency's policies implementing those statutes.

## VIII.  REQUESTED RELIEF

49.     The Airport Authority's refusal to initiate lease negotiations with ComAv/CTS under lease terms comparable to those applicable to other, similarly situated, aeronautical users on the Airport, has not merely violated the Airport Authority's contractual obligations under Grant Assurances 22, 23 and 25, but has also serious, damaging consequences for ComAv and its affiliates.  Without Hangar 681, CTS will not be able to serve its narrow and wide-body customers who operate among the largest aircraft in the world fleet, and, its license as a certificated repair station, which requires that CTS provide a maintenance hangar large enough to accommodate the largest aircraft permitted under its license, will be severely jeopardized.  14 C.F.R. § 145.103(b).  Therefore, the damages suffered by ComAv and CTS will be multiple – the loss of both a valuable current business opportunity, and the potential for loss of the opportunity to do business on the Airport into the indefinite future.  All ComAv has asked of the Airport

Authority is the opportunity for fair and open lease negotiations consistent with the Airport

Authority's past history with ComAv, and its obligations under its Grant Assurances.  In the

absence of the Airport Authority's compliance, ComAv asks FAA to find the Airport Authority

in violation of Grant Assurances 22, 23 and 25, and require that it immediately comply with its

statutory, regulatory and contractual responsibilities, or lose the funding upon which it so heavily

relies.

Dated:  June 7, 2016                              BUCHALTER NEMER


                                                 *Barbara E. Lichman*
                                                 Barbara E. Lichman, Ph.D.
                                                 Paul J. Fraidenburgh
                                                 BUCHALTER NEMER
                                                 18400 Von Karman Avenue
                                                 Suite 800
                                                 Irvine, CA  92612
                                                 (949)760-1121
                                                 (949)720-0182 Fax
                                                 blichman@buchalter.com
                                                 pfraidenburgh@buchalter.com

                                                 *Counsel for Complainants*
                                                 *COMAV, LLC and COMAV TECHNICAL*
                                                 *SERVICES, LLC*

EXHIBIT E

# GARRICK DECLARATION

## DECLARATION OF CRAIG GARRICK

I, Craig Garrick, declare as follows:

1.     I am President and CEO of ComAv, LLC, of which ComAv Technical Services, LLC ("CTS"), sublessee of Hangar 681 from Pratt & Whitney, Inc. at Southern California Logistics Airport ("Airport") is an affiliate. I have first-hand personal knowledge all matters set forth herein and could and would competently testify to them if called upon to do so at trial.

2.     ComAv, through its affiliate CTS, is the longest term aeronautical service provider on the Airport, and one of its largest employers. The Airport is operated by the Southern California Logistics Airport Authority ("Airport Authority") which is itself fully controlled by the City Council and staff of the City of Victorville, California ("City").

3.     ComAv and its affiliates, including CTS, were the first operating aeronautical businesses on the Airport, commencing in 1998. In or about 2001, ComAv entered into a partnership with Pratt & Whitney. From the time Hangar 681 was built in 2006, CTS has been the sublessee (under its prior name of "Southern California Aviation," or "SCA"). In 2011, Pratt & Whitney renewed its sublease for Hangar 681 with the Airport Authority. Pratt & Whitney's sublease reveals that, in 1993, the Base Reuse and Realignment Act of 1993 closed then-George Air Force Base, and the Air Force leased portions of the property directly to the Victor Valley Economic Development Authority. The Victor Valley Economic Development Authority subsequently delegated its decisionmaking authority with respect to the Airport to the Airport Authority which now has the power to enter into transactions on behalf of the Victor Valley Economic Development Authority. See Southern California Logistics Airport, Standard Sublease Agreement (#681) attached to this Declaration as Exhibit A, Recitals A-E.

4.     For the past five years, since 2011, Hangar 681 has been occupied exclusively by CTS (which was previously jointly owned by Pratt & Whitney and ComAv), under a subsequent sublease from Pratt & Whitney. See Letter Agreement of July 22, 2011, from Stephen Forino, President, United Technologies Realty to Southern California Aviation, LLC, attached to this Declaration as Exhibit B. Even though ComAv purchased Pratt & Whitney's interests in 2013, the subleases between the Airport and Pratt & Whitney, and Pratt & Whitney and CTS, remain in full force. During its 18 year incumbency on the Airport, ComAv, and its affiliate CTS, have faithfully performed all terms of their subleases and other commitments.

5.     ComAv's initial attempt to informally resolve its lease issues with the Airport began almost a year ago, on June 10, 2015, when ComAv submitted a written request to the Airport Authority to begin lease negotiations without delay. After a response from the Airport Authority, indicating they would be marketing the hangar publicly, on June 24, 2015, ComAv submitted a lease renewal offer on behalf of CTS to the Airport Authority, specifying "fair market rent" with the same to be determined by independent appraisers. This initiative was the beginning of numerous attempts to obtain the Airport Authority's cooperation in negotiating a lease extension, without success.

6.     On or about February 9, 2016, after a number of telephone calls and correspondence, which did not result in a counteroffer from the Airport Authority, ComAv revised its offer upward to include: (a) a new lease; (b) with a term of five years, with ComAv given two option periods of five years each to extend the term; and (c) an initial lease rate of $.70 per square foot on a triple net basis, with escalation clauses allowing increases of 1% per year during the option periods. See February 9, 2016 letter from ComAv, attached to this Declaration as Exhibit C.

7.    On February 16, 2016, the Airport Authority responded through Keith Metzler, the Assistant Airport Manager and Victorville's Assistant City Manager, notifying ComAv that its previous offer of $.70 per square foot was far below the Airport Authority's general asking price of $1.25 per square foot; the Airport Authority would require verification of creditworthiness; the Airport Authority was marketing the property to an array of outside interests; and the Airport Authority would negotiate through its real estate broker Kent Hinds at Cushman and Wakefield.  See February 16, 2016 letter from Keith Metzler attached to this Declaration as Exhibit D.

8.    On March 9, 2016, ComAv responded to Metzler's February 16th letter, complaining that, despite several offers by ComAv, dating back eight months (at that time), there had been no progress in negotiating, much less consummating, the lease for Hangar 681, although other hangar lease negotiations were ongoing between the Airport Authority and third parties.  ComAv's letter further requested a formal response or counteroffer for Hangar 681.  See March 9, 2016 letter from ComAv attached to this Declaration as Exhibit E.

9.    Also on March 9, 2016, in an e-mail response to the above letter from ComAv, Sophie Smith, the City's Economic Development Director, referred to the February 16 letter from Keith Metzler (Exhibit B above) as rejecting the $.70 per square foot offer by ComAv; referred to the previously mentioned $1.25 per square foot asking price from the Airport Authority; but refused to make a formal counteroffer, including conditions and contingencies, and instead referred ComAv to further conversations with realtor Kent Hinds.  See March 9, 2016 e-mail from Sophie Smith attached to this Declaration as Exhibit F.

10.    On March 17, 2016, ComAv's Executive Vice President William Morris received an e-mail from realtor Kent Hinds, informing ComAv that "before we can proceed with a

counterproposal, we will need to review your current financial conditions," and requesting the last three years of "audited" financial reports, as well as a current balance sheet and income statement. Hinds further committed that "once we review these we will craft the appropriate response." See March 17, 2016 e-mail from Kent Hinds attached to this Declaration as Exhibit G.

11.     On March 21, 2016, ComAv responded to the March 17 e-mail from Kent Hinds, acknowledging not only the necessity "for the Airport to receive reasonable and adequate financial assurances," but also requesting that it "proceed with the counteroffer without delay," and agreeing that such a counteroffer could reasonably be based on the fulfillment of specified financial contingencies. See March 21, 2016 e-mail from William Morris attached to this Declaration as Exhibit H.

12.     On March 23, 2016, ComAv further responded stating not only ComAv's "general concerns" about "the difficulty we are having in obtaining real, substantive progress in lease negotiations," but also about "the purpose or parties for whom we have been providing access to the hangar," and the possibility that it was to support the defense of the SEC [Securities and Exchange Commission] lawsuit. Specifically, ComAv pointed to an inspection of the hangar that had been requested by the Airport Authority for the alleged purpose of supporting the Airport's and City's defense to the SEC lawsuit. It was only later that ComAv learned that the inspection was a showing of the property to Raytheon Company for the purpose of leasing the hangar to it at the expiration of CTS' lease. See March 23, 2016 e-mail from ComAv attached to this Declaration as Exhibit I.

13.     On or about March 29, 2016, despite the Airport Authority's refusal to cooperate, ComAv went a step further and produced financial information requested by the Airport

Authority in its March 17 letter, with the exception of the audited reports which were not immediately available, as ComAv's lenders and investors do not require such information.

14.     On April 15, 2016, ComAv's outside counsel, Barbara Lichman, sent a letter to Eric Ray, Airport Manager, further expressing ComAv's concern about the potentially discriminatory implications of the Airport Authority's disparate treatment of existing leaseholders and lease renewals for substantially similar facilities.  See April 15, 2016 ComAv letter attached to this Declaration as Exhibit J; Morris Decl., ¶ 4.

15.     On April 26, 2016, ComAv's outside counsel received a letter from the Airport Authority's outside counsel who used ComAv's April 15, 2016 letter as an excuse to further delay making a counteroffer by seeking direction on settlement terms from the Airport Authority Board, and refusing to either meet or submit a counteroffer until after the next (unspecified date) Board meeting.  See April 26, 2016 letter from Andre de Bortnowsky attached to this Declaration as Exhibit K.

16.     On May 5, 2016, ComAv's counsel received yet another letter from the Airport Authority's counsel, requesting even more financial data, on the ground that the data previously received did not constitute "financial statements received and prepared by a CPA, akin to an audit," and on that basis further delaying submission of a counteroffer.  See May 5, 2016 letter from Airport Authority counsel attached to this Declaration as Exhibit L.  These demands for financial data as a precondition to negotiation are all the more suspicious in that, during its 18 year presence on the Airport, ComAv has negotiated a number of leases.  In every instance, the negotiations took place subject to contingencies, including proof of financial viability.  Never before in its history on the Airport has ComAv been asked to provide proof, let alone audited proof, before initiation of negotiations.

17.     Finally, on May 24, 2016, the Airport Authority, through Keith Metzler set up yet another roadblock to negotiation of a lease renewal by making a "critical precursor to productive negotiation" the assurance that ComAv would not take advantage of its legal rights under the grant assurances, and acknowledging that the Airport is "entertaining other proposals," while at the same time refusing to entertain the proposals already made by ComAv. See May 24, 2016 e-mail from Keith Metzler attached to this Declaration as Exhibit M.

18.     The Airport Authority's refusal to negotiate a renewal of the lease over the last 12 months, coupled with the imminence of the sublease's expiration, has caused manifest prejudice to CTS' (and ComAv's) ability to do business on the Airport, including, but not limited to, interference with CTS' contractual commitment to its customers to provide maintenance on their narrow and wide-body aircraft which requires a hangar the size of Hangar 681. More specifically, as a certificated aircraft repair station under 14 C.F.R. § 145.103, CTS' repair station license will be placed in jeopardy if it is unable to provide a maintenance hangar large enough to accommodate the largest aircraft permitted under its license. 14 C.F.R. § 145.103(b). Consequently, the Airport Authority's refusal to negotiate may not merely raise the level of operational uncertainty, but put CTS, and ComAv, long-term, positively contributing, aeronautical users at the Airport since its inception, out of business on the Airport entirely.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 6th day of June, 2016 at Victorville, California.

Craig Garrick

# EXHIBIT A

# SOUTHERN CALIFORNIA LOGISTICS AIRPORT AUTHORITY

## STANDARD SUBLEASE AGREEMENT
### (# 681)

This Sublease Agreement (the "Sublease") is made this *as of the* 1st day of July, 2011, by and between SOUTHERN CALIFORNIA LOGISTICS AIRPORT AUTHORITY (SCLAA), a California joint powers authority, (hereinafter referred to as "Sublessor") and PRATT & WHITNEY LINE MAINTENANCE SERVICES, INC., a Delaware Corporation, (hereinafter referred to as "Sublessee").

## RECITALS

These Recitals are included to assist in interpreting this Sublease and to understand the basis upon which certain terms and conditions have been included. It is not intended, nor should it be construed, to supersede or amend the specific terms and conditions of this Sublease.

A.     The United States Air Force ("Air Force") and the Victor Valley Economic Development Authority ("the Authority") have previously entered into certain Department of the Air Force Leases pertaining to portions of former George Air Force Base, which is now known as Southern California Logistics Airport ("SCLA") (hereinafter referred to as the "Air Force Leases").

B.     The Authority has delegated its decision-making authority with respect to SCLA to the Sublessor, which now has the authority to enter into transactions on behalf of the Authority.

C.     Sublessee's predecessor in interest, Pratt & Whitney Specialty Materials and Services, Inc., had previously entered into a Sublease Agreement (herein after referred to as the "Original Sublease") on September 22, 2005 where the Southern California Logistics Airport became the successor entity to the Sublessor.

D.     Sublessor and Sublessee agree that this Sublease Agreement shall replace the Original Sublease and any extensions relating to the Original Sublease as may have been approved by the Authority in writing.

E.     Sublessee seeks to continue sublease from the Sublessor a portion of the property subject to the Air Force Leases, (hereinafter defined as the "Leased Premises").

## TERMS AND CONDITIONS

1.     <u>Subleased Premises</u>.   Subject to the terms and conditions herein contained, Sublessor hereby subleases to Sublessee, and Sublessee hereby subleases

from Sublessor certain property which is part of SCLA, described as follows (the "Subleased Premises"):

        a.    A portion of that certain real property designated as Building 681, comprising approximately of 67,500 square feet of hangar space and 5,272 square feet of office space, together with the improvements thereon, located at SCLA at 18260 Phantom St., Victorville, California, including related tarmac, as depicted on Exhibit A, attached hereto and incorporated herein by this reference;

        b.    Together with all appurtenances, rights, privileges and easements in any way applicable thereto.

        c.    In addition to the foregoing Subleased Premises, Sublessee will have a "right of use" for the areas of the tarmac outlined on the map attached hereto and incorporated by reference herein as Exhibit D for use of ingress and egress to the Subleased Premises. Sublessee agrees and understands this tarmac area will be shared and used as common ingress and egress with other hangars at SCLA. Sublessee shall not cause this tarmac area to become blocked or limit use of this area by other aircraft needing to enter adjacent hangars. This right of use will allow Sublessee to use an area of the tarmac which is 270' wide by 250' deep located directly outside and in front of the Subleased Premises as indicated on Exhibit D. This area will be available for Sublessee to use for staging of aircraft that are incidental to a scheduled maintenance operation prior to entering the Subleased Premises and also may be used as an extension of the hangar for servicing aircraft as long as this use does not impede the ingress, egress or business operations of adjacent hangars and does not result in undue wear and tear or damage to the tarmac area.

    2.    **Term.**  The Term of this Sublease shall commence on July 1, 2011 (the "Sublease Commencement Date") and shall expire on May 31, 2016 (the "Termination Date") unless sooner terminated as herein provided. To the extent any of the leases or subleases referenced in Recital A hereof are terminated (other than the Original Sublease which this Sublease replaces), and such lease or sublease governs this Sublease, then this Sublease shall also terminate, as of the date of termination of the applicable governing lease or sublease.

    3.    **Termination.**  Intentionally Omitted.

    4.    **Right to Terminate for Development.**  With respect to any building which Sublessee occupies pursuant to this Sublease, after Sublessee's execution of this Sublease, Sublessor shall have the right, upon giving Sublessee three hundred sixty-five (365) days prior notice in writing (the "Development Termination Notice"), to terminate this Sublease. Such right shall only be exercised in good faith to the extent Sublessor requires the current space for the development of SCLA. In the event Sublessor exercises its termination option contained in this Section 4, Sublessor shall use its best efforts to relocate Sublessee to suitable space on SCLA upon the written

EXHIBIT E
266

request of Sublessee received within thirty (30) days after Sublessee receives the Development Termination Notice.

5.    Rental.  During the Term, Sublessee shall pay monthly base rent for the Subleased Premises equal to $47,880 (based on $40,500 for hangar and $7,380 for offices) per month (the "Monthly Base Rent"), with an anniversary annual increase (the "Annual Anniversary Increase") of one (1%) percent thereafter commencing on Date.

     a.    Payment.  Monthly Base Rent shall be payable in advance prior to the first (1st) day of each calendar month and without demand to:

          Southern California Logistics Airport Authority
          Attention: Executive Director
          18374 Phantom Street
          Victorville, California 92392

Or at such other place as Sublessor may designate in writing from time to time.

6.    Security Deposit.  Sublessee shall deposit with the Sublessor upon execution hereof $47,880 as security for Sublessee's faithful performance of Sublessee's obligations hereunder.  If Sublessee fails to pay rent or other charges due hereunder, fails to pay any utility or service provider, or otherwise defaults with respect to any provision of this Sublease, the Sublessor may use, apply or retain all or any portion of said deposit for payment of any rent or other charges in default or for the payment of any other sum to which the Sublessor may become obligated by reason of Sublessee's default, or to compensate the Sublessor for any loss or damage which the Sublessor may suffer thereby.

7.    Late Charge.  Sublessee hereby acknowledges that late payment by Sublessee to Sublessor of any installment of rent, or any other sums due hereunder will cause Sublessor to incur costs not contemplated by the Sublease, the exact amount of which will be extremely difficult to ascertain.  Accordingly, if any installment of rent, or any other sum due from Sublessee is not received by the Sublessor within ten (10) days after such amount is due, whether or not any notice of default or other notice has been given, Sublessee shall pay to the Sublessor a one-time late fee of six percent (6%), in addition to the delinquent payment.  The parties hereby agree that such interest charges represent a fair and reasonable estimate of the costs the Sublessor will incur by reason of late payment by Sublessee.  Notwithstanding the foregoing, in the event the Sublessee elects to make annual payments in advance, then no late fee shall apply.

8.    Limited Right to Possession of the Subleased Premises.  Sublessee agrees that the terms of its possession shall be subject to any outstanding easements and rights-of-way not within the control of the Sublessor and further to the right of entry by the United States Air Force as provided under the Air Force Leases. The Sublessor shall use best efforts to ensure the quiet use and enjoyment of the Subleased Premises by Sublessee. However, unreasonable interference by Sublessor or the Air Force in the

quiet enjoyment of the Subleased Premises by Sublessee such that it results in material financial detriment to Sublessee and Sublessee being unable to continue its business functions in a commercially reasonable manner, shall be grounds for termination of the Sublease by Sublessee.

9.     <u>Holding Over</u>.   In the event Sublessee, with or without the Sublessor's prior written consent, holds over and continues in possession of the Subleased Premises after the Termination Date of this Sublease, Sublessee's occupancy of the Subleased Premises shall be considered a month-to-month tenancy subject to all the terms and conditions of this Sublease in effect on the day immediately preceding the Termination Date, except that the Monthly Base Rent for any such holdover period shall be increased to one hundred fifty percent (150%) of the Monthly Base Rent.

10.     INTENTIONALLY OMITTED

11.     <u>Maintenance</u>.   Except for (i) repair and maintenance necessitated by Sublessor's activities; and (ii) any capital repairs or replacements, including, but not limited to, repairs and replacement of the exterior, roof, common areas and structural elements of the Subleased Premises and repair and replacement of all systems including HVAC, electrical and plumbing, Sublessee shall at all times during the Term hereof and until surrender and termination, keep and maintain the Subleased Premises in good and substantial order and repair, and shall undertake all necessary repair and maintenance of Subleased Premises.

12.     <u>Use and Condition of Subleased Premises</u>.   The Subleased Premises are to be used by Sublessee for aviation-related hangar, testing, storage, maintenance, refurbishment and office purposes and for no other purpose unless expressly agreed to by the Sublessor in writing. Sublessee agrees to use the Subleased Premises in such a manner as to not interfere with the Sublessor's rights in the Subleased Premises or the surrounding areas, to comply with all airport rules and regulations, all applicable governmental laws, ordinances, and regulations in connection with its use of the Subleased Premises, to keep the Subleased Premises in a clean and sanitary condition, and to use all reasonable precaution to prevent damage, or injury to the Subleased Premises.

a.     <u>No Warranties</u>.   Except as provided herein, Sublessee agrees that no promises, covenants, representations, statements or warranties have been made on behalf of the Sublessor to Sublessee respecting the condition of the Subleased Premises, or the manner of operating the Subleased Premises or the maintaining of any repairs to the Subleased Premises.

b.     <u>Acceptance of Subleased Premises</u>.   Sublessee acknowledges that it has satisfied itself by its own independent investigation that the Subleased Premises are suitable for their intended use, and that neither the Sublessor nor the Sublessor's agent or agents have made any representation or warranty as to the present or future suitability of the Subleased Premises for the conduct of Sublessee's business.

Sublessee's taking possession or use of the Subleased Premises for any purpose shall constitute Sublessee's acceptance of the Subleased Premises "as-is" in its existing condition.

   c.  <u>Notice of Presence of Asbestos and Lead Based Paint</u>. Sublessee, its successors and assigns are warned that the Subleased Premises may contain asbestos materials and lead based paint materials. No warranties, either expressed or implied, are given with regard to the quantity, location or condition of the asbestos containing materials or the lead based paint materials. Sublessee, its successors and assigns, shall be deemed to have relied solely on their own judgment in assessing the overall condition of all or any portion of the Subleased Premises, including any asbestos hazards or lead based paint hazards or concerns. Sublessee acknowledges that Sublessee was given every opportunity to inspect the Subleased Premises to assess the risk, if any, from asbestos containing material or lead based paint materials.

   The Sublessor assumes no liability for damages for personal injury, illness, disability or death to Sublessee or to Sublessee's successors, assigns, employees, invitees, or any other persons subject to Sublessee's control or direction, or to any person, including members of the general public arising from or incident to the purchase, transportation, removal, handling, use, disposition or any activity causing or leading to contact of any kind whatsoever with asbestos or lead based paint on the Subleased Premises which is the subject of this Sublease, whether Sublessee, its successors or assigns has or have properly warned or failed to properly warn the individuals injured. Sublessee, its successors and assigns, further agree, that in its use and occupancy of the Subleased Premises, it will comply with all federal, state and local laws relating to asbestos and lead based paint.

   d.  <u>Personal Property</u>. Sublessee shall, at the termination of this Sublease, by lapse of time or otherwise, remove all of Sublessee's personal property, repair any damage to the Subleased Premises resulting therefrom, and surrender the Subleased Premises to the Sublessor in as good a condition as when Sublessee took possession, normal wear and tear excepted.

   13.  <u>Waste or Nuisance</u>. Sublessee shall not commit or permit the commission by others of any waste on the Subleased Premises. Sublessee shall not maintain, commit, or permit the maintenance or commission of any nuisance on the Subleased Premises nor shall Sublessee use or permit the use of the Subleased Premises for any unlawful purpose.

   14.  <u>Taxes</u>. Sublessee shall pay when due and prior to delinquency all taxes, assessments, and other charges including possessory interest taxes levied or imposed by any governmental entity on the possessory interest of Sublessee in the Subleased Premises and the personal property, trade fixtures, appliances, and leased equipment placed by Sublessee in, on, or about the Subleased Premises during the Term of this Sublease. Sublessee recognizes that the interests of Sublessee in this Sublease shall be subject to the imposition of a possessory interest tax by the San Bernardino County

Assessor, and Sublessee agrees to pay such tax amount as may be so levied with respect to the possessory interest of Sublessee in the Subleased Premises under this Sublease.   Sublessee further acknowledges that pursuant to California Health and Safety Code Section 33673, the property shall be assessed in the same manner as privately owned property and Sublessee shall pay taxes upon the assessed value of the entire property and not merely the assessed value of its leasehold interest.

15.   Compliance With Air Force Lease Covenants, Conditions and Restrictions And Related Agreements.

a.      Sublessee acknowledges a copy of the applicable Air Force Lease is available and on file in the SCLA office.

b.      Sublessee expressly acknowledges that the Sublessor has assumed certain duties and obligations to the Air Force under the Air Force Lease affecting the use and occupancy of the Subleased Premises.  Sublessee further agrees that as of the commencement date of this Sublease (the "Commencement Date"), it shall not cause a breach of the duties and obligations set forth under the Air Force Leases as those duties and obligations relate to the Subleased Premises.  These duties and obligations include, but are not limited to, the following which are presented below for purposes of reference and convenience:

I.      Air Force Lease Condition 10 (Environmental Protection);

II.     Air Force Lease Condition 17 (Development and Alterations); and

III.    Air Force Lease Condition 26 (Restrictions on Use of Leased Premises).

c.      Any use, occupancy or activity of Sublessee on the Subleased Premises which may result in either the receipt by the Sublessor of a notice of default from the Air Force under the Air Force Lease or a notice of default from either the Air Force or the Federal Aviation Administration under any Airport deed, shall be deemed to be a default of Sublessee under this Sublease. The response of the Sublessor following receipt of any such notice of default or breach from either the Air Force under the Air Force Lease or from the Air Force and/or the Federal Aviation Administration under the Airport deed, shall not waive, stay or otherwise mitigate or remedy the default of Sublessee to the Sublessor under this Sublease. Sublessee shall have no right under this Sublease to participate in any proceeding between the Air Force, the Federal Aviation Administration and the Sublessor for the resolution of an alleged default, breach or other dispute of the parties arising under the Air Force Lease and/or the Airport deed except to the extent the Sublessee is alleged to have directly caused such breach or default.

EXHIBIT E
270

d.     Sublessee acknowledges that the Subleased Premises are, or will be, subject to certain Declaration of Covenants, Conditions and Restrictions to be recorded in the official records of San Bernardino County, California, as amended (the "CC&Rs"). There shall also be included in any assessments the amount of assessments levied pursuant to the CC&Rs and applicable to the Subleased Premises, determined by the ratio that the rentable area of building on the Subleased Premises bears to the total net rentable area of building or buildings which include the Subleased Premises and for which a separate assessment is made pursuant to the CC&Rs.

16.     Insurance.

a.     Comprehensive Commercial General Liability Insurance. Sublessee shall procure and maintain at its own expense, during the term of this Sublease, comprehensive commercial general liability insurance with a company or companies acceptable to Sublessor, of not less than Five Million Dollars ($5,000,000.00) per occurrence, Ten Million Dollars ($10,000,000) in the aggregate, for bodily injury, personal injury, death, loss, or damage to property resulting from the activities conducted by the Sublessee or its officers, employees, servants, volunteers, and agents and independent contractors on the Subleased Premises. Such policies shall provide coverage for bodily injury, personal injury and property damage to the Subleased Premises based upon, involving or arising out of the use, occupancy or maintenance of the Subleased Premises and all areas appurtenant thereto.

b.     Property Casualty Insurance. Sublessee shall keep in full force and effect a policy of insurance against fire, vandalism, malicious mischief, and all other perils as are from time to time included in an "all risk" coverage endorsement insuring Sublessee's improvements constructed on the Subleased Premises, if any, in an amount which is at least one hundred percent (100%) of the full replacement cost.

c.     Workers' Compensation Insurance. Sublessee shall procure and maintain at its' own expense, during the Term of this Sublease, workers' compensation insurance, providing coverage as required by the California State Workers' Compensation Law. If any class of employees employed by Sublessee is not protected by the California State Workers' Compensation Law, Sublessee shall provide adequate insurance for the protection of such employees to the satisfaction of the City.

d.     Self-insured. If Sublessee is self-insured, it shall provide certificates or evidence to Sublessor indicating that its insurance meets the levels and requirements as set forth herein above.

e.     Additional Named Insureds. Notwithstanding any inconsistent statement in any required insurance policies or any subsequent endorsements attached thereto, the protection offered by all policies shall bear an endorsement whereby it is provided that, Sublessor, the Authority, the City of Victorville, the City Attorney, and their officers, employees, servants, volunteers, agents and independent contractors are named as Additional Insureds.

EXHIBIT E
271

17.     **Proof of Insurance Coverage.**

a.     Sublessee shall secure from a good and responsible company or companies authorized to do insurance business in the State of California the policies of insurance required by this Sublease and furnish to Sublessor certificates of said insurance on or before the Sublease Commencement Date.

b.     The certificates of insurance shall bear an endorsement whereby it is provided that, in the event of cancellation or amendment of any required insurance policy for any reason whatsoever, Sublessor shall be notified by mail, postage prepaid, not less than thirty (30) days before the cancellation or amendment is effective.  In the case of non-payment, ten (10) days' advance written notice shall be given.

c.     The certificates of insurance shall bear an endorsement whereby it is provided that the respective insurance policy shall not be terminated or expire without first providing thirty (30) days written notice to Sublessor of such termination or expiration.

d.     All required insurance coverage shall be maintained by Sublessee throughout the term of this Sublease.

18.     **Personal Property at Risk of Sublessee.**  All personal property which Sublessee maintains at the Subleased Premises shall be at the risk of Sublessee only. Except for the grossly negligent, reckless, or unlawful intentional acts of the Sublessor, its agents, employees, guests or invitees, the Sublessor shall not be liable for any damage to any property of Sublessee or for any damage to Sublessee's property in moving the same to or from the Subleased Premises.

19.     **Utilities and Other Services.**  Sublessee shall contract with and pay the applicable provider, whether the provider is the Sublessor or other party, all charges for water, gas, electricity, lights, heat, sewer or other utilities used or supplied upon or in connection with its use of the Subleased Premises and shall indemnify, defend and hold harmless the Sublessor against any liability arising out of Sublessee's responsibilities under this Section 19.

20.     **Alterations, Improvements and Additions.**  Sublessee shall not make any alterations, improvements or additions to the Subleased Premises without the prior written consent of the Sublessor. Any machinery, equipment or apparatus, which belongs to Sublessee may be removed by Sublessee at any time prior to the expiration of the term of this Sublease, or extension thereof. Any improvements made to the Subleased Premises shall remain on the Subleased Premises. In the case of removal of equipment or fixtures, Sublessee shall restore the area to its original condition.

21.   Airport Development.   The Sublessor, at its sole discretion, shall determine and may from time to time change the routes of surface ingress and egress to and from the Subleased Premises, but agrees to locate such routes as conveniently as may be done for Sublessee, having in mind the reasonable requirements of the Sublessor with respect to the operation of the SCLA.  Notwithstanding the above, if the rerouting of such ingress and egress routes significantly disrupts the normal operations of Sublessee such that it results in material financial detriment to Sublessee, then Sublessee shall have the right to terminate this Sublease.

22.   Signs.   Sublessee shall not post, install, erect or operate any sign, placard, poster or other device on any part of the Subleased Premises without the prior written permission of the Sublessor, which permission shall not be unreasonably withheld.   Sublessor hereby acknowledges that Sublessee's existing signage has received Sublessor's permission. Such signs as may from time to time be permitted by the Sublessor shall be made, posted, maintained and removed, and repair any damage caused by removal, at Sublessee's own cost and expense. Sublessor shall have the right to remove unauthorized signs at Sublessee's expense.   Sublessee shall be responsible for all costs associated with the purchase and installation of the required Building Standard Suite Signage in accordance with local codes.

23.   Liens.   Sublessee shall not suffer or permit any liens to stand against the Subleased Premises, or any part thereof, by reason of any work, labor, services or materials done for, or supplied to Sublessee or anyone holding the Subleased Premises or any part thereof through or under Sublessee. If any such lien shall at any time be filed against the Subleased Premises, Sublessee shall cause such lien to either be discharged of record sixty (60) days after the date that Sublessee receives notice of the filing. Notwithstanding the above, in any bona fide dispute between Sublessee and any third party concerning work done by the third party on or for the Subleased Premises, and as a result of the dispute the third party files a lien against the Subleased Premises, then, in lieu of obtaining the discharge of the lien within the sixty day period, Sublessee, at its option, may either file suit against the third party, a part of the suit being to judicially negate or remove the lien or Sublessee may file an appropriate bond or other device allowed by law to remove the lien.

24.   Inspection by the Sublessor.   Sublessee shall permit the Sublessor, or its agents, representatives, or employees to enter the Subleased Premises at mutually agreeable, reasonable times for the purpose of inspecting the Subleased Premises to determine whether Sublessee is complying with the terms of this Sublease, for the purpose of doing other lawful acts that may be necessary to protect the Sublessor's interest in the Subleased Premises, or for the purpose of performing the Sublessor's duties under this Sublease. Except in the event of an emergency, the Sublessor shall contact Sublessee, no less than 24 hours prior to the time that Sublessor desires to enter the Subleased Premises to arrange a mutually agreeable time for the inspection.

25.   Damage or Destruction of Subleased Premises. Unless occasioned by the negligence or intentionally unlawful act of Sublessee, if, during the term of this

Sublease, any portion of the Subleased Premises shall be damaged by fire or other catastrophic cause, so as to render such portion of the Subleased Premises untenable, the obligations under this Sublease shall be immediately suspended while such portion of the Subleased Premises remains untenable. In the event of such damage, the Sublessee shall give Sublessor notice of such untenable conditions and the Sublessor shall elect in its sole discretion, whether to repair the Subleased Premises or to cancel this Sublease with respect thereto. It shall notify Sublessee in writing of its election within thirty (30) days after such damage. In the event the Sublessor elects to repair the Subleased Premises, the work or repair shall begin promptly and shall be carried on without unnecessary delay. In the event the Sublessor elects not to repair the Subleased Premises or portion thereof, the Sublease shall be deemed canceled as of the date of damage with respect to the applicable portion. Such damage shall not extend the sublease term. In the event that insurance proceeds are received by Sublessee under the property casualty policy required to be carried by Sublessee, and the Sublease is terminated under this Section, the Sublessor shall be entitled to the portion of such proceeds attributable to the fixtures, improvements, and other property which would remain with the Subleased Premises, and Sublessee shall be entitled to the portion of such proceeds attributed to the fixtures and property on the Subleased Premises which would be removed by Sublessee. Notwithstanding anything in this paragraph to the contrary, if the Subleased Premises are rendered inadequate for Sublessee to conduct its normal operations in or upon the Subleased Premises (or such portion of the Subleased Premises which is still tenable), and it is reasonably anticipated that the damages shall not be repaired or otherwise resolved, within sixty (60) days of the date of the accident, then Sublessee, at its sole and exclusive option, may immediately terminate this Sublease. Additionally, irrespective of whether Sublessee remains in possession and occupancy of the Subleased Premises or elects to terminate this Sublease, rent payable under this Sublease shall abate during the period that the Subleased Premises are not totally useable by Sublessee. The abatement shall be pro rata in proportion to the ratio that the amount of space which Sublessee is actually able to occupy and from which it is able to conduct operations bears to the total Subleased Premises. Sublessee shall continue to make all other payments during this period, including taxes.

26. **Assignment and Subletting.** Sublessee shall not cause, or permit, by operation of law or otherwise, any assignment, encumbrance or transfer of this Sublease or any estate or interest therein without the prior written consent of the Sublessor, which consent shall not be unreasonably withheld. Sublessee shall not sublet the Subleased Premises or any part thereof without the prior written consent of the Sublessor. Sublessor hereby acknowledges and consents to the Sublease by Sublessee to The Boeing Company dated as of March 15, 2011, as the same may hereafter be extended. An assignment or subletting shall not relieve Sublessee of any of its obligations or liabilities for the term of this Sublease, both Sublessee and any subsequent assignees and Sublessee will be deemed to be bound hereunder. The Sublessor's consent to any such assignment, transfer or subletting shall not constitute consent to any further assignment, transfer or subletting. This provision is not intended, nor should it be construed, to prevent Sublessee from allowing such independent

contractors onto the Subleased Premises who are involved in Sublessee's normal operations on the Subleased Premises (such as repair and maintenance personnel, janitorial personnel and similar). Additionally, this provision should not be construed to prevent subcontractors of Sublessee from conducting their work on the Subleased Premises in conjunction with the normal operations conducted by Sublessee. To the extent that Sublessor must grant its consent for Sublessee's subcontractors to enter onto the Subleased Premises for the above-described purposes, consent is hereby deemed to be granted.

27.    Indemnification.

a.    To the fullest extent permitted by law, Sublessee hereby agrees to defend, indemnify and hold Sublessor, the City of Victorville, the Victor Valley Economic Development Authority and all or any of its employees, directors, agents, and assigns, the City of Victorville and all or any of its employees, directors, agents ("Indemnified Parties"), and assigns harmless against and from any and all claims, actions, suits, proceedings, demands, losses, judgments and costs and expenses, including attorneys' fees, arising from any legal action or proceeding initiated by any individual or entity arising out of, or resulting from the performance of this Sublease, except for any such claim arising out of the negligence or willful misconduct of the Indemnified Parties.

b.    Sublessor shall defend, indemnify and hold harmless Sublessee, its officers, officials, agents, employees and volunteers against and from any and all claims, actions, suits, proceedings, demands, losses, judgments and costs and expenses, including attorneys' fees, arising from any legal action or proceeding initiated by any individual or entity arising out of, or resulting from the performance of this Sublease, except for any such claim arising out of the negligence or willful misconduct of Sublessee and its officers, agents, employees or volunteers.

28.    The Sublessor's Environmental Representations.

a.    Except as otherwise provided in Section 12 hereof, Sublessee shall not be held responsible or deemed liable by the Sublessor for any hazardous environmental condition on the Subleased Premises, which existed prior to Sublessee's occupancy of the Subleased Premises.

b.    Except as provided in Section 12 hereof, the Sublessor represents that to the best of its actual knowledge, the Subleased Premises are free from any violations of law or regulations pertaining to occupational hazards and environmental conditions or Hazardous Materials as defined in Section 29 of this Sublease. In the event that any hazardous environmental conditions exist on the Subleased Premises as of the Sublease Commencement Date which result in a loss to Sublessee and which were caused by Sublessor, the United States Air Force or parties or entities within the control of, or under contract with Sublessor, then the Sublessor shall indemnify, defend and hold Sublessee harmless from any costs, expenses, attorney fees or liabilities relating to any claims of such violations or conditions existing prior to Sublessee's

occupancy of the Subleased Premises. Sublessor shall indemnify Sublessee from hazardous environmental conditions or violations caused directly by the Sublessor, its employees, agents or licensees during or subsequent to the term of this Sublease.

      c.    Sublessee shall be solely responsible for obtaining at its cost and expense; any environmental permits required for its operation under this Sublease independent of any existing permits.

    29.   <u>Compliance With Environmental Laws.</u>

      a.    The words and phrases set forth below shall have the following definitions:

      I.    "Hazardous Material" means and includes any material that because of its quality, concentration or physical or chemical characteristics, poses a significant present or potential hazard to human health and safety or to the environment if released into the workplace or the environment. Hazardous Materials include hazardous wastes, toxic substances, petroleum products and motor fuels and similar substances and materials, including all substances and materials defined as hazardous or toxic substances or materials under California Health and Safety Code Section 25501(l) and (m) or other similarly applicable state, federal or local law.

      II.    "Environmental laws" means and includes the various health and safety laws and regulations of state, federal and local agencies pertaining to the manufacture, use, storage, disposal, release, and reporting relating to hazardous materials

      b.    As of the Sublease Commencement Date, Sublessee shall not cause or permit any Hazardous Materials to be used, generated, manufactured, produced, stored, brought upon, or  released, on, under or about the Subleased Premises, or transported to and from the Subleased Premises, by Sublessee, its agents, employees, contractors, or invitees in violation of any Environmental Law. Sublessee shall indemnify, defend and hold harmless the Sublessor from any damage, cost, expense, liability, fine, or penalty resulting from any unauthorized discharge, emission, spill, storage, release, disposal or use of any hazardous materials by Sublessee, its officers, agents, employees, contractors or invitees or any of them. This obligation of Sublessee shall survive the Termination Date or earlier termination of this Sublease, and shall apply whenever the Sublessor incurs cost or liability arising from any use or activity of Sublessee relating to Hazardous Materials during the Term hereof.

    Sublessor shall indemnify, defend and hold harmless the Subless from any damage, cost, expense, liability, fine, or penalty resulting from any unauthorized discharge, emission, spill, storage, release, disposal or use of any hazardous materials by Sublessor, its officers, agency, employees, contractors or invitees or any of them.

This obligation of Sublessor shall survive the Termination Date or earlier termination of this Sublease.

    c.  Without limiting the foregoing, if the presence of any hazardous material on, under or about the Subleased Premises caused by Sublessee, its agents, employees, contractors, or invitees results in an unpermitted, unscheduled or unauthorized release or contamination of the Subleased Premises by such Hazardous Material at any time during the Term of this Sublease, then Sublessee shall at its sole cost and expense promptly take all actions necessary to return the Subleased Premises to the condition existing prior to the unpermitted, unscheduled or unauthorized release of any such Hazardous Material to the Subleased Premises.

    d.  Sublessee shall immediately notify the Sublessor of the occurrence of any of the following events: (i) receipt by Sublessee of any correspondence or communication from any governmental entity regarding the application of environmental laws to the Subleased Premises or the investigation or enforcement by such governmental entity of any such environmental laws in connection with Sublessee's occupancy or use of the Subleased Premises, and (ii) unpermitted, unscheduled or unauthorized release of any Hazardous Material on the Subleased Premises which may occur at any time during the Term of the Sublease.

    e.  To the extent Sublessee may conduct any use or activity on the Subleased Premises which includes the use, handling, transport, or disposal of any Hazardous Material in quantities which exceed the threshold amounts authorized under California Health and Safety Code Section 25503.5, Sublessee shall, at its sole cost and expense, prepare and submit to the City of Victorville for approval, renewal or amendment, as applicable, a Business Plan for the Subleased Premises, as the term "Business Plan" is described under California Health and Safety Code Section 25504.

    f.  Notwithstanding any of the foregoing, in the event Sublessee, its agents, employees, contractors, or invitees, fails to use and maintain the Leased Premises in accordance with the provisions of this Section 29, Sublessor and/or the City of Victorville (the "City") shall have the right, but not the obligation, to enter the Subleased Premises and undertake remedial action as necessary in order to ensure that the Subleased Premises are in compliance with all environmental laws. In such event, Sublessee shall reimburse Sublessor and/or the City for all reasonable sums incurred by it for such remediation activities. In such event Sublessor may, in its sole discretion, and not limiting its ability to recover through any other means provided in law or equity, determine to deduct all or a part of such sums due under this section from the Security Deposit.

  30.  <u>Surrender of Subleased Premises</u>. On the Termination Date of this Sublease, Sublessee shall surrender and deliver the Subleased Premises to the Sublessor clean and free of debris in as good condition as it is on the Sublease Commencement Date of this Sublease, excluding reasonable wear and tear.

31.   Compliance with Laws. Sublessee shall comply with all applicable Federal, State and local laws, regulations and standards that are or may become applicable to Sublessee's activities on the Subleased Premises. Sublessee agrees to abide by and conform to the SCLA Rules and Regulations, attached hereto as Exhibit B, and incorporated herein by this reference as may be amended from time to time, and to cause its employees, suppliers, shippers, customers, and invitees to so abide and conform. The Sublessor shall have the right, from time to time, to modify, amend and enforce said rules and regulations. In addition, Sublessee agrees to abide by the FAA Rules and Regulations attached hereto as Exhibit C and incorporated herein by this reference as may be amended from time to time, and to cause its employees, suppliers, shippers, customers, and invitees to so abide and conform. The Sublessor shall not be responsible to Sublessee for the noncompliance of said rules by other tenants, their agents, employees and invitees. The judgment of any court of competent jurisdiction, or the admission of Sublessee in a proceeding brought against Sublessee by any government entity, that Sublessee has violated any such statute, ordinance, regulation, or requirement (except where such admission may be the basis for settlement) shall be conclusive as between the Sublessor and Sublessee and shall constitute grounds for declaration of default, breach, forfeiture, and termination of this Sublease by the Sublessor.

32.   Defaults. In the event Sublessee should default in the performance of any covenant or condition of this Sublease (excluding the payment of monthly rent or other amounts due hereunder) and such default is not cured or removed within thirty (30) days after service of written notice upon Sublessee of such default in the performance of any covenants and conditions; then in such event, the Sublessor shall have the right and option to terminate this Sublease, to re-enter the Subleased Premises, to evict Sublessee and to remove Sublessee's possessions, all without being deemed guilty of any trespass, and without prejudice to any claim for arrears of rent or breach of covenant. Notwithstanding the foregoing, if Sublessee, prior to the expiration of such thirty (30) day period for default diligently commences to cure such default but is unable to do so within the thirty (30) day period, then such period shall be extended for an additional thirty (30) days provided Sublessee continues to make a diligent effort to cure the default. Any statutory notice required as part of any eviction action or similar type of proceeding may be included with any notice of default given pursuant to this Section and the Sublessor need not declare a default and have such default remain uncured prior to delivery of such statutory notice. Failure to pay Monthly Base Rent or any other amounts when due shall be deemed a default under this provision. Sublessee shall cure such default within ten (10) days after service of written notice.

33.   Remedies of the Sublessor. In the event of any breach of the Sublease by Sublessee and the cure periods described in Section 32 hereof have expired, the Sublessor may at any time thereafter, with or without notice or demand and without limiting the Sublessor in the exercise of any other right or remedy, which the Sublessor may have by reason of such breach:

EXHIBIT E
278

       a.     terminate Sublessee's right to possession of the Subleased Premises by any lawful means, in which case this Sublease shall terminate and Sublessee shall immediately surrender possession of the Subleased Premises to the Sublessor. In such event, the Sublessor shall be entitled to recover from Sublessee all damages incurred by the Sublessor by reason of Sublessee's default, including, but not limited to the cost of repairing or restoring damages to the Subleased Premises caused by Sublessee, the cost or removal of Sublessee's improvements, fixtures and other contents of the Subleased Premises, costs associated with past or future brokerage commissions and marketing expenses and the other costs payable by the Sublessor in connection with the recovery of possession of the Subleased Premises, including reasonable attorneys' fees as well as (a) the worth at the time of award by the court having jurisdiction thereof of the unpaid rent which had been earned at the time of termination, and (b) the worth at the time of award by the court having jurisdiction thereof of the amount by which the unpaid rent for the balance of the Term after the time of such award may exceed the amount of such rental loss for the same period that Sublessee proves could be reasonably avoided; or

       b.     pursue any other remedy now or hereafter available to the Sublessor under the laws or judicial decisions of the State of California.

    34.   **Default by the Sublessor.** In the event Sublessor should default in the performance of any covenant or condition of this Sublease and such default is not cured or removed within thirty (30) days after service of written notice of default upon Sublessor, then in any such event, Sublessee shall have the right and option to terminate this Sublease and shall have the right and option to pursue any remedy available to Sublessee under the laws of the State of California. If Sublessor, prior to the expiration of such thirty (30) day period for a default, diligently commences to cure such default, but is unable to do so within the thirty (30) day period, then such period shall be extended for an additional thirty (30) days provided Sublessor continues to make a diligent effort to cure the default. In event of uncured default Sublessee shall have all remedies available at law or in equity for any default or breach of this Sublease by the Sublessor.

    35.   **Force Majeure-Unavoidable Delays.** If the performance of any act required by this Sublease to be performed by either the Sublessor or Sublessee is prevented or delayed by reason of an act of God, strike, lockout, labor troubles, inability to secure materials, unreasonably restrictive governmental laws or regulations, or any other cause except financial inability that is not the fault of the party required to perform the act, the time for performance of the act will be extended for a period equivalent to the period of delay, and performance of the act during the period of delay will be excused. However, nothing contained in this Section shall excuse the prompt payment of rent by Sublessee as required by this Sublease or the performance of any act rendered difficult solely because of the financial condition of the party required to perform the act.

36.   Notices.  Any and all notices or demands required or permitted to be given hereunder must be personally delivered (including by nationally recognized overnight courier) or be mailed by registered or certified mail, return receipt requested, addressed as follows:

To the Sublessor:   Southern California Logistics Airport Authority
18374 Phantom
Victorville, CA 92392
Attn: Executive Director

With copies to:   Green, de Bortnowsky & Quintanilla, LLP
23801 Calabasas Road, Suite 1015
Calabasas, CA 91302
Attn: Andre de Bortnowsky

To Sublessee:   Pratt & Whitney Line Maintenance Services, Inc. ~~SF~~
~~13010 Aerospace Drive~~ *18438 Readings Street*
Victorville, CA 92394
Attn:  General Manager

with a copy to:   United Technologies Realty, Inc.
Four Farm Springs Road
Farmington, CT 06032
Attn:  Manager, Aerospace Real Estate

or at such other address or addresses that either party may hereafter designate in writing to the other. Any notice or demand which is mailed by registered or certified mail or sent by overnight courier as provided above shall be deemed to be effective and given for all purposes three (3) business days following the time of deposit thereof in the United States mail.

37.   Miscellaneous.

a.   One or more waivers of any provision of this Sublease by the Sublessor shall not be construed as a waiver of a subsequent breach of the same provision and the Sublessor's consent or approval shall not be deemed to waive or render unnecessary the Sublessor's consent or approval to or of any subsequent or similar act by Sublessee.

b.   If either party to this Sublease shall bring any action for any relief against the other, declaratory or otherwise, to enforce the terms hereof or to declare rights here under (collectively, an Action), the losing party shall pay to the prevailing party attorneys' fees and costs incurred in bringing and prosecuting such Action and/or enforcing any judgment, order, ruling, or award (collectively, a Decision) granted therein, all of which shall be deemed to have accrued on the commencement of such Action and shall be paid whether such Action is prosecuted to a Decision.  Any Decision entered in

such Action shall contain a specific provision providing for the recovery of attorneys' fees and costs incurred in enforcing such Decision. The court may fix the amount of reasonable attorneys' fees and costs on the request of either party. For the purposes of this paragraph, attorneys' fees shall include, without limitation, fees incurred in the following: (1) post-judgment motions and collection actions; (2) contempt proceedings; (3) garnishment, levy, and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation. "Prevailing party" within the meaning of this paragraph includes, without limitation, a party who agrees to dismiss an Action on the other party's payment of the sums allegedly due or performance of the covenants allegedly breach, or who obtains substantially the relief sought by it. Nothing contained in the Section shall be interpreted to mean that Sublessor has agreed to arbitrate any dispute which may arise hereunder.

c.   This Sublease can be modified, supplemented, amended or rescinded only by a writing expressly referring to this Sublease and signed by Sublessor and Sublessee.

d.   If any term of this Sublease or any application thereof shall be invalid or unenforceable, the remainder of this Sublease and any other application of such term shall not be affected thereby. Unless otherwise expressly provided herein, any approval or consent of Sublessor required hereunder shall not be unreasonably withheld or delayed. This Sublease shall be binding upon and inure to the benefit of and be enforceable by the respective successors of the parties hereto. The heading in the table of contents of this Sublease are for purposes of reference only and shall not limit or define the meaning hereof.

e.   This Sublease contains the entire understanding and agreement of the parties, supersedes all prior understandings and agreements, and cannot be changed orally. This Sublease shall be construed in accordance with the laws of the State of California. Time is of the essence.

f.   Any conflict between the printed provisions, exhibits, or addenda of this Sublease and the typewritten or handwritten provisions, if any, shall be controlled by the typewritten or handwritten provisions provided such typewritten or handwritten provisions are initialized by both parties.

g.   This Sublease shall be of no force and effect unless executed by both parties.

h.   This Sublease may be executed by the parties in counterparts, and when executed by each of the parties, each counterpart shall be deemed to be a part of the same instrument.

**[END OF THIS PAGE]**

IN WITNESS WHEREOF, the parties have executed this Sublease Agreement as of the day and year first written above.

SOUTHERN CALIFORNIA LOGISTICS AIRPORT AUTHORITY

Signature: _____
                                                         Date
Name and Title: _____

ATTEST:

Signature: _____
                                                         Date

PRATT & WHITNEY LINE MAINTENANCE SERVICES, INC.

Signature: _____
                                                         Date
Name and Title: _____
                        Stephen Forino, President
                        United Technologies Realty, Inc.
                        Authorized agent

APPROVED AS TO STANDARD FORM:

Signature: _____
Authority Legal Counsel                      Date

RISK MANAGER
CHUCK BUQUET

Signature: _____
                                                         Date

\SCAA\0004A\DOC\116-4 082111.docx

# EXHIBIT A

## DESCRIPTION OF SUBLEASED PREMISES



EXHIBIT E
284

## EXHIBIT B

## SCLAA RULES AND REGULATIONS

# SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

RULES AND REGULATIONS FOR THE USERS OF SOUTHERN CALIFORNIA LOGISTICS AIRPORT; ESTABLISHING FEES FOR THE VARIOUS USES; DEFINING TERMS; PROHIBITING OR LIMITING CERTAIN ACTIVITIES; FIXING PENALTIES FOR VIOLATIONS; AND PROVIDING FOR AMENDMENTS TO THESE RULES AND REGULATIONS AS MAY BE NEEDED FROM TIME TO TIME

## SECTION 1. SHORT TITLE:

1.1　These Rules and Regulations shall be referred to as the Southern California Logistics Airport (SCLA) Rules and Regulations. It may be amended by a majority vote by the Board of the Southern California Logistics Airport Authority (SCLAA).

## SECTION 2. APPLICABILITY:

2.1　These Rules and Regulations apply equally to every Airport User. The Airport Operating Manual or Specifications, as applicable, adopted in accordance with FAR Part 139, and the Airport Policies and Procedures Manual are hereby made by reference a part of these Rules and Regulations.

## SECTION 3. RESPONSIBILITIES:

3.1　Management: It shall be the responsibility of the Airport Director to fairly and impartially administer these Rules and Regulations.

3.2　Users: It shall be the responsibility of every Airport User, pilot or other, to become familiar with the SCLA Rules and Regulations and to obey those Rules and Regulations. Current copies of these Rules and Regulations will be maintained reflecting any amendments and will be posted at the SCLA Administrative Office and at Million Air. Additional copies will be provided by the SCLA Airport Director through the SCLA Administrative Office to any Airport User who requests such copy.

## SECTION 4. DEFINITIONS:

For the purposes of these Rules and Regulations, the following definitions and meanings shall apply unless otherwise specified:

4.1　"Air Operations Area" or "AOA" means the area upon which aircraft are able to operate and includes the runways, taxiways, taxi lanes, apron area, and the vehicle and personnel gates that lead to these areas.

4.2　"Air Carrier" means any person who undertakes directly, by lease, or other arrangement, to engage in air transportation of persons or things. An "Air Carrier" operates in various categories, under authority or certification by the FAA and holds a current FAA certificate to transport air passengers or property for hire.

Pg.1 of 38

SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

4.3 "Aircraft" means a device that is used, or is intended to be used, for flight in the air. "Aircraft" includes airplanes, helicopters and gliders, and lighter than air devices such as blimps or balloons, but does not include hang gliders.

4.4 "Aircraft Owner" shall mean a Person who holds title to an Aircraft.

4.5 "Aircraft Operator" shall mean the Person who is operating or controlling an Aircraft while said Aircraft is on Airport property.

4.6 "Aircraft Storage" shall have the same meaning as "Stored Aircraft".

4.7 "Airport" means the SCLA, its buildings and facilities, all lands owned and or controlled by the SCLAA contiguous to the airport, including airspace above such land and the designated approaches thereto.

4.8 "Airport Director" means that person so appointed by the SCLAA or his designated representative.

4.9 "Airport Master Security Program" or "Airport Security Program" means the Security Program, which is the responsibility of an Airport Operator pursuant to TSA 1542.

4.10 "Airport Operations and Security Department" or means the Airport Operations and Security Department of the Southern California Logistics Airport.

4.11 "Airport Security Areas" or "Secure Areas" means Air Operations Areas, roadways, and common Air Carrier areas within terminal facilities (i.e. baggage makeup areas), excluding exclusive leasehold structural areas, to which public access is limited or denied under Airport Master Security Program.

4.12 "Airport Security Coordinator" or "ASC" means an individual appointed by the Airport Director, charged with the responsibility to implement and enforce the Airport Master Security Program, employed by the City of Victorville and under the direction of the Airport Director, or the Airport Security Coordinator's designated representative.

4.13 "Airport Tenant" means an individual, partnership, corporation or other business entity, and its agents, employees, representatives, and subtenants which occupies or controls all or part of Airport areas, buildings or other facilities which they lease from the Southern California Logistics Airport Authority.

EXHIBIT E
287

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

4.14 "Airport Tenant Security Program" shall have the same meaning as set forth in TSA1542.113, entitled "Airport Tenant Security Programs."

4.15 "Airport User" means any Person who uses the Southern California Logistics Airport, including but not limited to, Airport Tenants and subtenants, Fixed Base Operators, Air Carriers, Aircraft Owners, Aircraft Operators, Commercial Operators, passengers, and their employees, agents, representatives, agents, successors and assigns.

4.16 "Authorized Person" means an individual authorized with a Personnel Identification Badge issued by the Airport Security Coordinator, or his designated representative, to have unescorted access authority to Airport Security Areas.

4.17 "Air Traffic" means Aircraft operating in the air or on an Airport surface, exclusive of loading ramps or parking areas.

4.18 "Air Traffic Clearance" means an authorization issued by Air Traffic Control personnel for an Aircraft to proceed under specified traffic conditions within controlled airspace.

4.19 "Air Traffic Control" or "ATC" shall mean the Air Traffic Control of the Southern California Logistics Airport.

4.20 "Airworthy Condition" means a condition wherein an Aircraft can take flight under its own power. See definition of "Non-Airworthy Aircraft" below.

4.21 "Autorotation" means a rotorcraft flights condition in which the lifting rotor is driven entirely by action of the air when the rotorcraft (helicopter) is in motion.

4.22 "Balloon" means a lighter-than air aircraft, which is not engine-driven.

4.23 "Based Aircraft," means Aircraft that are parked on the Airport for thirty (30) days or longer and are not part of an aircraft storage program.

4.24 "Ceiling" means the height above the earth's surface of the lowest layer of clouds or obscuring phenomena, that is reported as "broken," "overcast," or "obscuration," and is not classified "thin" or "partial".

4.25 "City" means the City of Victorville.

4.26 "Commercial Operator" means any Person who, for compensation or hire, engages in the carriage of persons, property, or mail in air commerce, or engages in other aerial activity such as flight instruction, aerial photography, fire fighting, agricultural aviation activities, or traffic surveillance.

EXHIBIT E

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

4.27   "Criminal History Records Check (CHRC)" means a fingerprint-based criminal history records check as described in 49 CFR § 1542.

4.28   "Commercial Use" means use of SCLA for revenue-producing commercial activities.

4.29   "Dismantled Aircraft" means an Aircraft which has been disassembled to a point where it is not reasonable to assume that said Aircraft can be reassembled and placed in an Airworthy Condition.

4.30   "Driving Permit" means a permit issued by the Airport Director or his designee in order for an Individual to operate a Vehicle on the Airport.

4.31   "Escort" means an Authorized Person or Authorized Persons accompanying, monitoring, directing and controlling the actions of an Individual or Individuals who are not displaying Personnel Identification Badges, and/or who are not otherwise Authorized Persons, within Airport Security Areas. The Authorized Person(s) performing an Escort must be displaying valid Personnel Identification Badges, must be accompanying the Individual or Individuals for performance of direct job duties and must ensure that those Individuals who are being escorted remain within sight and sound at all times.

4.32   "Executive Director" means the Executive Director of the Southern California Logistics Airport Authority.

4.33   "FAA" means the Federal Aviation Administration of the United States Government or any federal agencies succeeding to its jurisdiction.

4.34   "Fixed Base Operator" means any Person who rents, leases, or owns facilities located on SCLA, who by virtue of his specific type of aviation or aviation related activity, requires the occupancy of a site with contiguous aircraft apron and direct access to the Aircraft Operation Area, and who engages in a business activity providing aviation sales or service, including but not limited to any of the following:

      1. Selling and/or servicing new and used Aircraft and component parts;

      2. Aircraft maintenance and repairs;

      3. Sales and/or repair of avionics;

      4. Aviation training (including ground or flight instruction);

      5. Aerial photography;

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

6. Air ambulance service;

7. Aircraft agricultural operations (crop dusting, spraying, or the application of seed, fertilizers, pesticides, defoliants, etc);

8. Aircraft rental, charter, leasing;

9. Aircraft Storage;

10. Fuel and oil sales and servicing; and

11. Aircraft servicing or ground handling including cargo handling, baggage handling, lavatory service, water service, air starts, ground power, or other elements related to aircraft handling.

4.35　"Flight Visibility" means the average forward horizontal distance from the cockpit of an Aircraft in flight, at which prominent unlighted objects may be seen and identified by day, and prominent lighted objects may be seen and identified by night.

4.36　"Ground Visibility" means prevailing horizontal visibility near the earth's surface.

4.37　"Helicopter" means a rotor driven aircraft (rotorcraft) that, for its horizontal motion, depends primarily on its engine-driven rotors.

4.38　"IFR" means Instrument Flight Rules covering meteorological conditions below the minimums for flight under visual (VFR) conditions.

4.39　"Individual" means a natural person.

4.40　"Maintenance" means inspection, overhaul, repair, preservation, and the replacement of parts, including preventive maintenance.

4.41　"Movement Area" means the runways, taxiways, and other areas of the Airport, which are utilized for taxiing, takeoff, and landing of Aircraft. The Movement Area does not include parking and loading ramps. Entry into the Movement Area requires ATC approval.

4.42　"Night" means the time between the end of evening civil twilight and the beginning of morning civil twilight as published in the American Air Almanac, converted to local time.

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

4.43   "Non-Airworthy Condition" means when an Aircraft cannot take flight under its own power as a result of being in disrepair or in the process of being disassembled.

4.44   "Notice of Violation" means a written notification of non-compliance with these Rules and Regulations, issued by the Airport Director or his designated representative.

4.45   "Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity, and includes a trustee, receiver, assignee, or similar representative of any of them.

4.46   "Personnel Identification Badge" means a Personnel Identification Badge issued to an Individual by the Southern California Logistics Airport for purposes of granting that Individual unescorted access authority to the Restricted Area.

4.47   "Ramp" means an improved surfaced area reserved exclusively for the parking and taxiing of Aircraft.

4.48   "Restricted Area" means all areas or facilities accessible only by Authorized Persons or Persons under Escort, and including all Ramp areas and the Aircraft Operations Area (AOA).

4.49   "Roadway" means that portion of an area improved or designed or ordinarily used for vehicular travel. A roadway on the Airport Operations Area is called a vehicle service road ("VSR").

4.50   "Runway" means an improved surfaced area reserved exclusively for the landing and taking off of Aircraft.

4.51   "Scheduled Air Carrier" means any Person providing scheduled passenger or cargo service from the Airport in accordance with a published schedule and having at least one scheduled departure per day, or no less than five scheduled departures per week, and operating under authority of the Federal Aviation Administration and the Airport.

4.52   "Security Perimeter" means the portion of the Airport that is enclosed by fencing, walls or other barriers, and to which access is controlled through designated entry points.

4.53   "SCLA" means Southern California Logistics Airport.

4.54   "SCLAA" means Southern California Logistics Airport Authority.

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

4.55   "Security Devices" means equipment installed or placed by or under the direction of the Southern California Logistics Airport Authority, or designated representative, to monitor or control entrances to and exits from Airport Security Areas. "Security Devices" include, but are not limited to, bells, sirens, communication equipment, locks and corresponding keys, emergency exits, electronic access control and other security equipment.

4.56   "Security Identification Display Area" or "SIDA" shall have the same meaning as set forth in TSA1542.205. Before being granted unescorted access to the SIDA, individuals must undergo a Criminal History Record Check and employment history verification.

4.57   "Security Screening Area" means an access point, including entrances and exits, to the Airport Security Areas, Secure Areas and the Sterile Areas, where Vehicles, equipment, individuals, and belongings are inspected prior to entrance.

4.58   "Sterile Area" means an area to which access is controlled by the inspection of individuals and property in accordance with FAA and TSA requirements.

4.59   "Stirling Airport International" or "SAI" means SCLA's development partner.

4.60   "Stored Aircraft" means aircraft that are parked at/on airport property and are part of an aircraft storage program.

4.61   "Taxiway" means an improved surfaced area reserved exclusively for use by aircraft to proceed to and from ramp and runway areas.

4.62   "Traffic Pattern" means the traffic flow that is prescribed for aircraft landing at or taking off from SCLA.

4.63   "Unnecessary Noise" means any engine noise that is greater than the level produced when the engines are at idle except when required for taxiing of the aircraft, takeoff or landings.

4.64   "Vehicle" means every device in, upon or which any individual or property is or may be transported or drawn upon a roadway, excepting devices moved by human power or used exclusively upon stationary rails or tracks. A bicycle shall be considered a vehicle under all portions of these Rules and Regulations, which govern right-of-way.

4.65   "Vehicle Owner" means a person who holds the legal title of a vehicle.

4.66   "Vehicle Service Road" or "VSR". (See Roadway.)

4.67   "VVEDA" means the Victor Valley Economic Development Authority.

EXHIBIT E
292

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS**

4.68    "VFR" means Visual Flight Rules covering meteorological conditions, above those requiring flight under IFR conditions.

4.69    "Word Construction": The following construction applies throughout these Rules and Regulations:

       1.    Words importing the singular include the plural,

       2.    Words importing the plural include the singular; and,

       3.    Words importing the masculine gender include the feminine and the neutral gender.

**SECTION 5.   NECESSITY:**

5.1    These Rules & Regulations are enacted to protect the health, safety and peace, and to promote the welfare and convenience of the general public using SCLA, or affected by activities related to the Airport by providing for the orderly conduct of activities on, or related to, the Airport. The use of the Airport or any of its facilities in any manner shall create an obligation on the part of the Airport User to obey all of the rules and regulations herein provided.

**SECTION 6.   BASED AIRCRAFT:**

6.1    Any Person desiring to base an Aircraft at SCLA shall register such Aircraft at the Airport Operations and Security Department as soon as possible but not later than 24 hours after the arrival of the Aircraft. If a change in ownership occurs while the Aircraft is based at the Airport, the new Aircraft Owner shall re-register the Aircraft with the Airport Operations and Security Department, again, no later than 24 hours after the change in ownership occurred.

6.2    Except as specifically set forth in an Airport land or facility sublease, Aircraft in a Non-Airworthy Condition shall not be permitted to remain on the Airport in excess of five (5) days without the express prior written permission of the Airport Director. Such Aircraft shall be removed from the Airport or stored at the Aircraft Owner's expense.

**SECTION 7.   AIRCRAFT STORAGE AND PARKING:**

7.1    Aircraft shall only be stored or parked at places as set forth in such Person's sublease or as may be authorized by the Airport Director, and such storage or parking shall be at the sole risk of the Aircraft Owner and/or Aircraft Operator, and without any responsibility to SCLAA, VVEDA or Stirling Airport International, or any of their officers, employees, agents or representatives, for any loss of, or damage to the Aircraft while so stored or parked. The Aircraft Owner and/or the Aircraft Operator shall be responsible for the tying-down and/or securing of his Aircraft. The Aircraft Owner and/or Aircraft Operator shall likewise be responsible for any liability arising from or caused by his

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS**

Aircraft or his activities.  All Airport Tenants desiring to store Aircraft at SCLA must notify the Airport Director in writing prior to the Aircraft arriving at SCLA.

**SECTION 8.  COMMERCIAL ACTIVITY:**
8.1   No Person shall utilize SCLA for any revenue-producing commercial activities without the express written permission of SCLAA or its designated representative, and obtaining a City of Victorville Business License for such activities, and paying the fees and charges established for such use or license.

**SECTION 9.  AIRPORT FEES:**
9.1   Funding for Airport operations and capital improvements is derived through various types or classes of Airport User Fees.  Airport User fees are specifically established to compensate the Airport for the use, maintenance and repair of Airport facilities, as well as to minimize the need for on-going general taxpayer support.

9.2   A schedule of rates and charges for the use of the Airport and its facilities may be found as Attachment A to these Rules and Regulations.

9.3   Any Aircraft Owner or Aircraft Operator who fails to pay any fee duly charged for Aircraft owned or controlled by him shall have such Aircraft subject to impounding until the fees are paid, along with any impound fees, or until the Aircraft is sold for charges.

**SECTION 10.  HOURS OF OPERATION:**
10.1   SCLA shall be open for public use at all hours of the day and night, subject to any restrictions imposed by the Airport Director due to inclement weather, condition of the landing area, presentation of special events, construction or repair activities, or similar causes.  The control tower is open 24 hours a day, 7 days a week.  The Airport is attended from 6:00 A.M. to 10:00 P.M. daily by Million Air.  Services may be obtained from Million Air during said hours at telephone number (760) 246-7794 or UNICOM (122.85 MHz).

**SECTION 11.  UNATTENDED AIRCRAFT:**
11.1   No Aircraft shall be left unattended on the Airport unless properly secured or within a hangar.  Aircraft Owners and/or Aircraft Operators of Aircraft left so unattended shall be liable for damage to other Aircraft or property resulting from the failure to adequately secure or tie down the Aircraft.

**SECTION 12.  MAINTENANCE:**
12.1   Unless otherwise authorized by the Airport Director, or specified as a permitted use in an Airport facility or land sublease, no Aircraft or Vehicle maintenance, other than that which is required to remove damaged Aircraft from the Runway or Taxiway(s), or that which is necessary to replace a flat tire, shall be

Pg.9 of 38

# SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

performed at SCLA except in areas specifically designated by the Airport Director for that purpose.

## SECTION 13.  EQUIPMENT REQUIREMENTS:

13.1    Every Aircraft using SCLA shall be equipped with a fully functional, two-way radio, except when operating into or from the Airport under an FAA waiver for radio maintenance.    The ATC frequency is 118.35 MHz and the ground control frequency is 124.45 MHz.    Weather and traffic advisories are broadcast on 109.40 MHz.  No fixed-wing Aircraft equipped with a tailskid shall operate on any paved surface of SCLA.

## SECTION 14.  ACCIDENTS:

14.1    Every Person involved in, or witnessing an Aircraft operating accident on the Airport shall report promptly the details of such accident to the Airport Director, ATC, or FAA.

14.2    In addition, the Aircraft Owner and/or the Aircraft Operator, including pilot, shall report fully to the California Division of Aeronautics the details on any accident in which there is death or injury, or in which damage to the property of others exceeds $400.00.

14.3    The Aircraft Owner and/or the Aircraft Operator of an Aircraft which is damaged or wrecked in an accident shall be responsible for the prompt removal of the Aircraft as directed by the Airport Director.

14.4    Where the Aircraft Owner and/or Aircraft Operator of an Aircraft which is damaged or wrecked in an accident is unable to arrange for removal of such disabled or wrecked Aircraft, the Airport Director shall have the authority to move, or arrange the removal of, the Aircraft when released (if applicable) by the FAA or the National Transportation Safety Board (NTSB).

14.5    No liability shall be incurred by the SCLAA, SAI, VVEDA, the Airport Director or any of their officers, employees, agents, successors and assigns, for damage aggravated by, or resulting from, removal of an Aircraft pursuant to Section 14.4 of these Rules and Regulations.

## SECTION 15.  NOISE:

15.1    No Person shall operate any Aircraft in flight or on the ground in such a manner as to cause Unnecessary Noise as determined by applicable Federal or State or local laws and regulations.

## SECTION 16.  RESTRICTED AREAS:

16.1    Restricted Areas include those areas leased to the Army National Training Center, Advanced Unmanned Systems-Concept Exploration, Southern California Aviation, Victorville Aerospace LLC, Army Reserve, or other area that has direct access to the AOA.  No Person shall enter any Restricted Area

EXHIBIT E
295

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS**

except (a) employees or invitees of the leaseholder, (b) Persons duly authorized by the Airport Director, including, but not limited to, Authorized Persons who have received Personnel Identification Badges, or (c) security or fire-fighting personnel.

16.2   Every Person who has access to a restricted area shall close and lock the door, gate or other device immediately after it has been used unless it is under surveillance of a Person who is responsible for controlling entry at that access point.

16.3   Every Airport Tenant whose premises have total or limited access to any Restricted Areas shall prevent access to the Restricted Areas by Persons who are not authorized to have such access.

16.4   The Airport Director's staff is authorized to close and lock any door, gate or other device permitting access to a Restricted Area that is found open or unlocked and unattended.

16.5   Every Person to whom a key, code or access device has been issued by the Airport Security Director, or his designated staff, shall use the key, code or access device to enter a Restricted Area only in accordance with any conditions of issuance and only at Restricted Area access points.

16.6   Except where authorized by the Airport Director and subject to any conditions of issuance, no Person shall:

   1.   Loan or give to another Person a key, code or access device issued to him; or

   2.   Have possession of, or use for any purpose, a key, code or access device that was issued to him by a Person not having authority to do so.

**SECTION 17. ANIMALS:**

17.1   No Person shall willfully and knowingly allow or permit any animal owned, possessed, or harbored by him to enter the Airport unless the animal is leashed or restricted in such manner as to be under control, or is in a shipping container, or is otherwise under physical restraint, nor shall any Person allow or permit such animal except "special assistance animals" (i.e. guide dog) to enter any Airport building without the approval of the Airport Director.

**SECTION 18. ACCESS TO RUNWAYS AND TAXIWAYS:**

18.1   No Person shall enter upon any Runway or Taxiway, or the movement area as defined by FAA, without the express consent of the Air Traffic Control Tower representative.

EXHIBIT E
296

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS**

**SECTION 19. <u>STARTING ENGINES:</u>**
19.1    No Person shall start any Aircraft engine at SCLA:

    1.  Unless a competent operator is at the controls;

    2.  Unless the Aircraft is equipped with adequate brakes fully applied or the wheels are securely blocked with blocks or chocks that can be removed safely (Skid equipped helicopters do not have brakes or chocks);

    3.  When the Aircraft is in such a position that the propeller slipstream or jet blast can cause damage to, or interfere with the operation of, other Aircraft, Vehicles, mobile equipment, hangers, shops, other buildings, or can cause injury to passengers, spectators, or other personnel; and

    4.  When the Aircraft is within 50 feet of any building without prior written consent.

**SECTION 20.  <u>ENGINE RUN-UPS:</u>**
20.1    No Person shall conduct an aircraft engine run-up beyond idle anywhere on the Airport other than in areas designated by the Airport Director (with the exception of helicopters, which routinely operate with engines beyond idle as part of normal operations).

20.2    Persons who want to conduct an engine run-up beyond idle shall first call ATC on the ground control frequency, 124.45 MHz, and request clearance to one of the two engine run-up areas.  ATC will advise the Airport User, given the current wind direction, to proceed to one of two designated engine run-up areas.

20.3    ATC will make the final determination of which engine run-up area should be used.

20.4    The Person requesting the engine run-up beyond idle will conduct the engine run-up in the area designated by ATC and he shall exercise the necessary caution to ensure no damage is created by the engine run-up.

**SECTION 21.  <u>TAXIING:</u>**
21.1    Only those personnel that have training and are qualified to taxi a particular type of Aircraft are permitted to taxi Aircraft at SCLA.

21.2    No Person shall taxi any Aircraft into, out of, or within any hangar or other building on or adjacent to the Airport.

21.3    No Person shall taxi any Aircraft across the double yellow lines on the edge of Taxiways and the apron.

Pg.12 of 38

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

21.4  Nor shall any Person move any Aircraft under its own power on the Airport unless that Person is in full control of such aircraft, and has assured himself that there is no danger of collision with other Aircraft, Vehicles, equipment, buildings, or other obstacles.  Aircraft shall be taxied at a safe speed.

## SECTION 22.  DUMPING REFUSE:
22.1  No Person shall place, deposit, or dump any garbage, cans, bottles, papers, ashes, sewage, carcass of any dead animal, offal, trash rubbish, debris or any other refuse in any location on the Airport except in containers designed for such purposes.

## SECTION 23.  FIREARMS:
23.1  No Person shall shoot any projectile from a firearm or other device, into, on, or across any portion of the Airport, nor have in his possession, or under his control, any firearm which is not unloaded and securely wrapped and boxed for shipment, or explosive or explosive device; provided,

23.2  However, that this Section does not apply to peace officers, military personnel, or Airport security guards who are acting in the performance of their duties as such.  Firearms on Airport property are pre-coordinated with ASCs when possible.

## SECTION 24.  TRAFFIC PATTERN:
24.1  Every Aircraft before landing and after takeoff shall be flown as directed by ATC.

## SECTION 25.  TAKE-OFFS AND LANDINGS:
25.1  No aeronautical activity shall be conducted at SCLA except in conformance with current Federal Aviation Regulations, State of California law and regulations, and these Rules and Regulations.

25.2  All initial takeoffs shall commence at the end of the Runway unless cleared by the ATC Tower.

25.3  Due to the complex mix of Aircraft that utilize SCLA, there is need to limit those type of aircraft and aerial activities that represent a potential hazard to normal flight operations.  The following aircraft and aerial activities are restricted from operating at SCLA except in emergency situations or with prior approval of the Airport Director:

    1.  Hot Air Balloons;

    2.  Hang Gliders;

    3.  Parachutists;

EXHIBIT E
298

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

    4.  Radio Controlled Aircraft;

    5.  Ultra Light Aircraft;

    6.  Gliders; and

    7.  Motorized Lighter than Air Aircraft.

**SECTION 26.   AIRCRAFT FUELING AND DEFUELING:**

26.1   In accordance with the regulations from the National Fire Protection Association (NFPA), Uniform Fire Code (UFC), and the Department of Transportation (DOT) the following rules and regulations must be observed while fueling aircraft:

26.2   All fuel servicing must be done outside of any building or hangar. (NFPA 407 3-10).

26.3   Aircraft shall be located a minimum of fifty (50) feet away from any building openings, doors, windows, etc.

26.4   During fuel handling, no passenger shall be permitted in or on the Aircraft unless a cabin attendant is stationed at or near the cabin door.

26.5   Fueling shall not be done while an on-board engine is operating ("hot fueling") without the permission of the Airport Director and then, it shall only be permitted when representatives of the Fire Department are standing by. Exception is allowed for A.P.U. operation on large aircraft. (NFPA 407 3-5.1)

26.6   Equipment other than Aircraft service equipment shall not be permitted within fifty (50) feet of an Aircraft during fueling or defueling. (NFPA 407 3-5.1)

26.7   No open flames, smoking, battery chargers, or any material or device which is likely to cause a spark shall be in use within fifty (50) feet of an Aircraft or fueling truck during fueling or defueling operation. (NFPA 407 3-7, 3-8). Exception is allowed for Ground Power Units.

26.8   All hoses, funnels and appurtenances used in fueling or defueling activities shall be equipped properly with grounding and bonding devices to prevent possible static ignition of volatile liquids or vapors. Such grounding and bonding devices shall be used during all fueling and defueling activities.

26.9   Refueling vehicles, fuel hoses and defueling equipment shall be maintained in a safe, sound, operational and non-leaking condition.

EXHIBIT E
299

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS**

26.10  Gravity (hand) fueling may not be accomplished with any container having a capacity greater than five (5) US gallons.  (NFPA 407 3-2.3)

26.11  All portable fuel containers must be approved and marked so as to identify the product contained therein. (UFC)

26.12  Any fuel transported by privately owned vehicles, not specifically designed for the transport of flammable liquids and appropriately placarded, are limited to a maximum of 20 U.S. gallons in an approved and marked container.  (DOT and UFC)

26.13  Portable fuel containers shall be kept in approved locations, at least fifty (50) feet from any building, and secured in a cabinet or locker marked "Flammable." (UFC)

26.14  Every Person engaged in aircraft fuel handling shall exercise due care to prevent the overflow of tanks and spilling of fuel.  Fuel spills are a fuel operator's responsibility.

26.15  Where there has been a fuel spill or leak, no Person shall start the engine of any Aircraft in close proximity until the spill or leak has been cleaned up.  In event such spills or leaks are over 10 ft. in any direction, or over 50 sq. ft. in area, or continues to flow, or are otherwise a hazard to persons or properties, the SCLA Fire Department & Haz-Mat shall be notified.

26.16  In addition, all fuel storage on the Airport shall be regulated by NFPA 407, the UFC, and be approved by the City of Victorville Fire Chief or his designee.

**SECTION 27.  VEHICLE OPERATIONS:**

27.1  No Person shall travel on any portion of the Airport except upon the roads, walks, or places provided for the particular class of traffic, nor occupy the roads or walks in such manner as to hinder or obstruct their proper use.

27.2  Unless escorted by an Authorized Person who is authorized to drive on the AOA, no Person shall operate a Vehicle on the Airport without successfully passing the SCLA driving test, being issued a Personnel Identification Badge, and possessing a valid state driver's license, with the exception of the Airport ARFF, or Law Enforcement.

27.3  No Person shall operate a powered industrial vehicle without a Driving Permit on the Ramps, Taxiways, Runways or designated Roadways.  An exception will be made for employees working within the exclusive leaseholders premises as authorized by the Airport Director.

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

27.4   Persons who employ individuals at the Airport shall be responsible to provide training for powered industrial vehicles and equipment, and for maintaining all training materials and records relating to the employee's duties.

27.5   SCLA requires that employers "certify" that training and evaluations have been completed and maintained in the employee's files up to 180 days upon separation of employment, and are available for inspection by the FAA, TSA and the Airport Operations and Security Department upon request.

27.6   Motor-vehicle traffic shall yield the right-of-way to Aircraft.

27.7   Every vehicle, excluding ARFF and construction vehicles operating within the Movement Area, shall have a flashing yellow beacon and carry a 2-way radio or be escorted by a vehicle so equipped.   Construction vehicles must be identified with an orange and white flag and a 2-way radio or be escorted by an authorized vehicle so equipped.

27.8   Any accident, involving a motor vehicle, which results in a fatality or injury, or in property damage, shall be reported by the driver, or his representative, to the Airport Director.

27.9   No Person shall operate any motor vehicle on the airport in excess of 25 miles per hour except emergency vehicles responding to an emergency situation, or emergency vehicles involved in training or drills with prior ATC coordination.   On passenger loading ramps, around parked Aircraft, and in areas immediately adjacent to hangars, speed shall not exceed ten (10) miles per hour.

27.10 Vehicles shall not be parked on the Airport other than in the manner and locations indicated by posted traffic signs and markings.

27.11 Unattended Vehicles may be parked only in designated Airport vehicle parking lots.

27.12 Vehicles parked other than specified in "27.10" and  "27.11" above, may be moved by Airport personnel, and in such event a towing charge will be levied prior to releasing the Vehicle from impound.  Neither SCLAA, VVEDA, the City, nor any of their respective officers, employees, agents, or designated representatives shall be liable for damages sustained by such Vehicles during said movement.

27.13 Motor vehicles shall not be driven on or across Runways or other portions of the Movement Area without permission from ATC Tower to do so.  Two-way radio communications with Ground Control (on frequency 124.45) shall be required between the ATC Tower and such vehicles.  Exceptions may be granted   during   maintenance   activities   as   long   as   two-way   radio

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

communications control is maintained with at least one vehicle controlling the activity.  ARFF vehicles may contact the ATC tower on the fire net per operational agreement.

27.14 Motor vehicles shall not be driven or parked upon, or within fifty (50) feet of Aircraft parking areas, ramp areas, or aprons without express approval of the Airport Director.   Exceptions:   aircraft support, airport maintenance, emergency vehicles, or fuel or service vehicles.

27.15 No Person may operate a motor vehicle or Aircraft in or on any portion of the Airport while under the influence of alcohol or drugs.

27.16 No Vehicle shall be operated on the Airport unless the Vehicle has been registered to drive on the Airport with Airport Operations.  To register a Vehicle to drive on the Airport requires:  a) proof of ownership, b) proof of vehicle registration with the Department of Motor Vehicles for State of California, or the Department of Motor Vehicles for another State; and c) proof of insurance as set forth in Section 37 of these Rules and Regulations.

27.17 Vehicles passing through electronic access perimeter security gates are required to stop just past the gate and wait for the gate to fully close before continuing.  Vehicle operators should ensure no unauthorized persons enter the AOA while the gate is closing.  Vehicle entry procedure is one vehicle per gate activation unless the vehicles following are under Escort.

## SECTION 28.  FIRE HAZARDS:

28.1   No Person shall light or smoke any cigarette, cigar, pipe, or similar object in the following Airport areas:

    i.   Within any hangar, or fuel handling or fuel storage areas;

    ii.   Inside any Aircraft (whether or not such Aircraft are parked or stored) or within fifty (50) feet thereof;

    iii.   Within fifty (50) feet of any "No Smoking" sign posted;

    iv.   Within any Vehicle operating on the AOA;

    v.   Within any building on the Airport.

28.2   No Person may use flammable liquids, solvents, or substances to clean any Aircraft, engine, part, or accessory thereof, within any hangar or building except a building specially designed for that purpose and approved in writing by the Airport Director.  Such approval shall only be granted when the Airport Director approves the ventilation provisions, fireproofing, and fire-extinguishing equipment.

EXHIBIT E
302

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

28.3  No Person shall light or use any open flame for any purpose in any hangar or other building on the airport without the prior written consent of the Airport Director and Fire Chief.

28.4  No Person shall operate any welding or cutting equipment (electric or gas) anywhere on the Airport without prior written approval of the Airport Director and the SCLA Fire Department. A welding permit is required and may be obtained at the fire station.

28.5  No Person shall clean or degrease any Aircraft or part thereof except at or in a maintenance station properly equipped for such purposes, or in a space designated or authorized by the Airport Director.

28.6  No Person shall store or stock any material or substance, or lease or permit such activities in or on the Airport in such a manner, or of such nature, as to constitute a fire hazard. No Person shall keep, store or discard any flammable liquid, gas, signal flare, or other flammable material in any hangar, shop, building, room, enclosure, or other place on the Airport except in areas specially designated by the SCLA Fire Department for such purpose.

28.7  Lessees of hangars, shops, or other Airport areas shall provide suitable metal receptacles with hinged lids for the storage of oily waste, rags, and other similar rubbish. The lessee shall remove all such materials at frequent intervals.

28.8  Every lessee shall maintain his leased area clean and reasonably free of oil, grease, waste, other flammable materials and weeds.

28.9  Lessees shall provide, and maintain in proper working order, adequate and readily accessible fire extinguishers. Each such extinguisher shall bear a suitable tag, which indicates the most recent date of inspection or servicing. SCLA Fire Department shall approve all extinguishers, their type, and location.

28.10 No Person shall move, relocate, or otherwise disturb any wheeled fire extinguisher on the Airport without the permission of the SCLA Fire Department unless specifically for emergency use.

28.11 All fires on the Airport, regardless of size, even if extinguished, shall be immediately reported to the SCLA Fire Department without delay.

SECTION 29. FUEL SALES:
29.1  No Person shall deliver aviation fuels or lubricants to, or dispense such fuel from, at, or upon the Airport without a lease or permit from the Airport Director.

EXHIBIT E
303

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS**

29.2 For the right, privilege and concession of making deliveries of all types of aviation fuels and lubricants, and other fuels, to any Person or location at or upon the Airport, other than to a central fuel person or location at or upon the Airport, other than to a central fuel service stand provided by the Airport, there is levied against such lease or permit holder, a flowage fee of ten cents (.10) for each gallon of fuel so delivered.

29.3 No fuel shall be stored anywhere on the Airport except approved by the Airport Director and the SCLA Fire Department.

**SECTION 30.   SECURITY:**

30.1 Though not required, SCLA operates under the guidelines established by FAR Part 139 "CERTIFICATION AND OPERATIONS SERVING CERTAIN AIRCRAFT OPERATORS."   To this end, SCLA has prepared and implemented a security program that parallels the requirements contained in TSA 1542.   This program includes the following elements: Personnel Identification Badging, controlled access to the Air Operations Area (AOA), driver licensing for personnel operating on the AOA, Vehicle registration, and perimeter security.   All personnel operating at SCLA are required to abide by the SCLA Airport Master Security Program.

30.2 Personnel Identification Badges.   Only those individuals that have a need to be on the AOA will be issued a Personnel Identification Badge and granted unescorted access to the AOA and Restricted Areas.   Individuals that require access must apply for a Personnel Identification Badge at the Airport Operations and Security Department.   Lost or stolen Personnel Identification Badges must be reported to the Airport Operations and Security Department immediately.   The application process includes:

    1. A ten-year employment/education or unemployment history verification check, with five years verified by the individual's former employer(s), and

    2. A CHRC, which is information gathered from the Federal Bureau of Investigation, provided to SCLAA after submitting a Live Scan Fingerprint to the Transportation Clearing House.

30.3 Fingerprints are collected by the Airport Security Coordinator, or his designated representative, at the expense of the individual's employer.

30.4 A Fingerprint-based Criminal History Records Check as described in TSA 1542.209 is required before authorized unescorted access to the Airport is granted. The results of the CHRC will be among the determining factors as to whether the issuance of a Personnel Identification Badge is granted.

EXHIBIT E
304

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

30.5   Identification for Authorized Persons contains the individual's photograph, name, company name, expiration date, identification number and color blocks that indicate authorized access areas granted to the badge holder.

30.6   Individuals who have a need to be within the Airport Operations Area (AOA) are required to attend an Airport Familiarization and Security Identification Display Area (SIDA) class and will be required to display a Personnel Identification Badge while operating in such areas.

30.7   The Airport Badging Office issues Non-Driving Identification Badge and Identification Badges with Driving Permit, upon completion of a SIDA Class and AOA Drivers Training and satisfactory score upon completion of a written test.  Driving permits will be determined and issued in accordance with the applicant's job related duties on the airport.

30.8   The Airport Security Coordinator will confirm or deny an applicant's request for a badge based on verification of the CHRC and the employment/education or unemployment history verification check, with five years verified by the employer, and the need of the applicant to access the AOA.  If a Personnel Identification Badge is warranted, the Airport Security Coordinator, or his designated representative, will issue the Badge.

30.9   All Personnel Identification Badges issued by the Airport Operations and Security Department are the property of Southern California Logistics Airport Authority and MUST be returned upon expiration, separation of employment (for any reason), when the job function no longer requires Personnel Identification Badge, and upon demand of staff from the Southern California Logistics Airport. Any misuse or willful failure to return a Personnel Identification Badge is punishable by fine as dictated in the Airport Rules and Regulations. Personnel Identification Badges are non-transferable and must be used only by the individual to whom they are issued.

30.10  No individual shall enter the AOA of the Airport without a Personnel Identification Badge unless the individual is accompanied by an Authorized Person with a Personnel Identification Badge who shall be fully responsible for the unbadged person being escorted.  Fire department personnel responding to an emergency wearing uniforms or other identifying clothing, shall not be required to wear an identification badge.

30.11  No Authorized Person shall Escort any individual who is not in the performance of job-related duties and who requests access to the Airport as a visitor without the consent and approval of the Airport Director.  Person(s) denied access to the Airport by Airport security officers, must abide by the decision of the security officers under the direction of this rule.  Visitor Escort must be conducted during normal business hours of the Airport

SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

Operations and Security Department, unless prior approval of the Airport Director has been established

30.12 Authorized Persons shall always prominently display their Personnel Identification Badge while on the AOA. Failure to prominently display an issued Personnel Identification Badge while on the AOA shall constitute a violation for which a fine shall be assessed as set forth in Section 43, PENALTIES AND APPEALS.

30.13 Individuals who do not display a Personnel Identification Badge, and who are not under Escort by an Authorized Person displaying a Personnel Identification Badge, shall immediately be reported to the Airport Director and shall be escorted off the AOA by the Airport Director or his staff.

30.14 Authorized Persons who have been issued a Personnel Identification Badge and are involved in an accident while operating on the AOA will be asked to submit to a drug-screening test. Authorized Persons who refuse to submit to the drug-screening test will be considered as having failed the test and the Authorized Person will be considered to be under the influence of drugs or alcohol.

30.15 Controlled Access to the AOA. Any Airport Tenant that has direct access to the AOA, should, because of their immediacy of access, be considered part of the AOA. These Airport Tenants shall therefore take measures to protect access to the AOA. As required by TSA 1542.113 Airport Tenant Security Programs, the Airport Tenant must assume responsibility for specified security measures of the Secure Area, AOA, or SIDA. Airport Tenants are encouraged to develop individual security programs designed to meet the needs of their particular businesses. In all cases such security programs must be approved in writing by the Airport Director.

30.16 While on the AOA, customers and clients of the Airport or Airport Tenants must be under Escort at all times. Failure to provide an Escort may constitute the issuance of a Notice of Violation that could result in sanctions. See Section 43, PENALTIES AND VIOLATIONS for a discussion on the scope of fines/penalties associated with violations of the Airport Security Program.

30.17 The Airport Operations and Security Department administers the licensing program for drivers on the AOA. This program involves a study element that describes the procedures for driving on the AOA at SCLA. A written test will be administered and all applicants must pass the test in order to receive a license to drive on the AOA.

30.18 Vehicle Registration for driving on the AOA. All Vehicles that operate on the AOA must be registered with the Airport Operations and Security

Pg.21 of 38

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS**

Department. All Vehicles that operate on the AOA will be issued a Radio Call Sign that must be utilized while on the AOA. Airport Standard Operating Procedure No. 200-01 describes the Radio Call Sign Procedure.

30.19 <u>Perimeter Security</u>. The Airport is surrounded by an eight-foot (8') high chain link fence. Barbed wire is placed atop this fence. There are numerous locked gates that access the Airport perimeter. Airport Tenants that are situated on the immediate perimeter of the AOA must employ secured personnel doors.

30.20 All Persons that operate on the Airport are charged with the responsibility of maintaining the security of the Airport. To this end, Persons who observe breaches in security are to call said incidents to the attention of the Airport Operations and Security Department.

30.21 A Person's responsibility under Section 30.20 includes breaches to the procedural elements of the Airport Security Program, as well as the physical elements of the Airport Security Program (perimeter fence, vehicle gates, etc.).

30.22 The issuance under this Section of either (i) a Personnel Identification Badge, or (ii) a Personnel Identification Badge with Driving Permit to drive on the AOA, shall be conditioned upon the express consent of the individual to whom the badge is issued, to a drug and alcohol screening in the event that such individual is involved in an accident while on Airport property.

30.23 In the event that an individual to whom a Personnel Identification Badge or Personnel Identification Badge with Driving Permit has been issued (a) tests positive for the use of a controlled substance not prescribed by a physician or has a blood alcohol content equal to or in excess of .08, or (b) refuses to consent to a drug and alcohol screening, then such individual's Personnel Identification Badge and/or Driving Permit shall be revoked by the Airport Director.

30.24 A Personnel Identification Badge and/or Driving Permit which has been revoked under Section 30.23 of these Rules and Regulations will remain revoked until the individual's employer petitions the Airport Director in writing, to have said individual's Personnel Identification Badge and/or Driving Permit reinstated.

30.25 Reinstatement of a Personnel Identification Badge and/or Driving Permit which has been revoked under Section 30.23 of these Rules and Regulations remains the prerogative of the Airport Director; however, reinstatement will not be unreasonably withheld.

EXHIBIT E
307

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS**

30.26  Reinstatement of a Personnel Identification Badge and/or Driving Permit which has been revoked under Section 30.23 of these Rules and Regulations will depend on, as a minimum, the employer's verification of a negative drug test as part of a return to duty test.  Any individual who has verified positive drug test results on two drug tests will not be permitted to thereafter work or drive on the AOA, regardless of whether such individual is accompanied by an individual properly in possession of a Personnel Identification Badge and/or Permit.

**SECTION 31.  AIRPORT SECURITY AREAS:**

31.1  Unauthorized Entry and Exit:  No Person shall seek entry to or exit from Airport Security Areas except through designated entrances and exits.  No individual shall seek entry to or exit from Airport Security Areas over, under or through fencing, walls, window, air or other vents.

31.2  Only Authorized Persons, or those individuals under Escort, shall have access by any means to Airport Security Areas.

31.3  A Person performing an Escort must, at all times, be in a position to actively monitor, direct and control the movements and actions of the accompanied individual(s).

31.4  No individual shall enter/exit or allow another individual to enter/exit into Airport Security Areas except by using his Personnel Identification Badge. No individual shall follow another individual into an Airport Security Area without first using his or her Personnel Identification Badge through any electronic access installed at the entry/exit point.  This provision does not apply to an individual under Escort.

31.5  No individual shall drive a Vehicle into Airport Security Areas unless the individual has used his or her Personnel Identification Badge to open any electronic access installed at the entry point.  No individual shall allow other Vehicles to follow or tailgate in Airport Security Areas.  This provision does not apply to Vehicles under Escort.

31.6  No Person shall tamper with or in any way hamper the effective operation of Security Devices.

31.7  Security of Access Points:  No Person shall leave open, propped or unsecured any door, gate or access point leading to or allowing access to Airport Security areas.  No Person shall hold, prop or cause a door, gate or access point to be open beyond the period of time allowed by a Security Device unless an Authorized Person attends the door. When an Authorized Person is attending a security door, he or she must be physically present at the door and must use his or her Personnel Identification Badge to activate additional time for the door to be open.

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS**

**SECTION 32.   RESPONSIBILITY OF AIRPORT TENANTS:**

32.1   <u>Adherence to the Security Rules and Regulations</u>:  Airport Tenants with access to Airport Security Areas on their leased area shall follow these Rules and Regulations by posting signs, approved by the SCLAA, which prohibit access into the Airport Security Areas.  Airport Tenants with access to Airport Security Areas shall at all times keep the access secured or staffed in a manner that prevents unauthorized individuals from accessing Airport Security Areas.  Airport Tenants shall retain keys or other means of access to Airport Security Areas under their control and issue such access only to Authorized Persons.

32.2   Airport Tenants with access to Airport Security Areas shall appoint at least one employee of the Airport Tenant as the security contact primarily responsible for the Airport Tenant's leased area which access Airport Security Areas.   Airport Tenants shall advise the Airport Security Coordinator in writing of the individual or individuals at all times having such responsibility.

32.3   Airport Tenants must provide a quarterly employee roster to the Airport Operations and Security Department in the months of January, April, July and October, and immediately notify the Airport Operations and Security Department of employee separation.

32.4   Airport Tenants must immediately confiscate Personnel Identification Badges, with or without access media, as well as any keys that would allow access to the Airport, from individuals upon separation of employment. Any misuse or willful failure to return a Personnel Identification Badge is punishable by fine as dictated in these Rules and Regulations.

**SECTION 33.   OTHER PROHIBITED ACTS:**

33.1   <u>Bypassing Security Screening Area</u>:  No individual shall enter a Sterile Area through a Security Screening Area unless first going through equipment that has been installed for inspection of individuals and their belongings.  Armed federal and local law enforcement officers on official duties at the Airport, airport operations and maintenance personnel, and others exempted by the FAA do not have to be inspected, provided they follow FAA and TSA regulations.

33.2   <u>Statements Against Aviation Safety or Security</u>:  No Person shall make a statement to another so as to indicate that the Person or another may have possession of a firearm, bomb or explosive device while at the Airport.

33.3   <u>Interference with Airport Personnel</u>:  No Person shall intimidate, threaten, hinder or obstruct Airport Personnel or Airport Security Officers in the performance of his or her official job duties or lessen the ability of such person to perform his or her duties.

Pg.24 of 38

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS**

33.4 <u>Interference with Flight Operations</u>: No Person shall intimidate, threaten, hinder or obstruct an aircraft crewmember in the performance of his or her official job duties or lessen the ability of such aircraft crewmember to perform his or her duties.

33.5 <u>Unattended Baggage</u>: No Person shall leave any bag, luggage, box or container unattended in the terminal areas of the Airport, which are accessible to the public.

33.6 <u>Presenting a Weapon at Security Screening Area</u>: No Person shall place firearm(s), explosive device(s), knife/knives or other FAA/TSA prohibited items that could be used as a weapon onto inspection equipment at a Security Screening Area without first declaring such item(s). Only Persons authorized by the TSA may test Security Screening Areas.

**SECTION 34. <u>ENFORCEMENT</u>:**

34.1 <u>Notices of Violation</u>: The Airport Operations and Security Department will conduct inspections and enforce violations of these Rules and Regulations, Minimum Standards, and any permits issued hereunder regarding activities at the Airport. All Personnel Identification Badge holders and persons with access cards will be subject to a Notice of Violation (NOV) when reasonable grounds exist to believe that Rules and Regulations, Minimum Standards or a permit have been violated, either by commission or omission.

34.2 NOV's will be monitored and issued by Airport Operations and Security Department personnel or by recommendation from an Authorized Person of Authority. A copy of the NOV will be given to the Personnel Identification Badge holder, or the Person(s) observed committing the violation(s).

34.3 The NOV may serve as a notice only or may include a penalty ranging from suspension to revocation. Any violation of a severe nature as determined by the Airport Director will warrant immediate suspension or revocation of the Personnel Identification Badge. Severe violations include, but are not limited to, any violation that may result in property damage, injury, runway incursions, or other safety hazards, or that threatens the environment or public welfare.

34.4 The receipt of three (3) NOVs, which have not been appealed or that have been upheld upon appeal, within a twenty-four (24) month period will be considered grounds for revocation of the Personnel Identification Badge.

34.5 When an NOV or sanction is issued, a letter indicating as such will be sent to the individual's employer, advising the employer of the violation.

34.6 Upon written request, the Airport Security Coordinator may review and recommend modification of the NOV.

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

**SECTION 35.    SUSPENSIONS:**

An Individual's authorization to use a Personnel Identification Badge may be suspended for any of the following reasons:

1. Violation of these Rule and Regulations.

2. Violation of any rule or regulation of SCLAA for which a criminal penalty may be imposed.

3. Violation while on Airport property of any law of the State of California or the United States for which a criminal penalty may be imposed.

4. Actions which interfere with or threaten the operation of the Airport, or the comfort, safety or convenience of passengers, Authorized Person's employed by the City of Victorville, or otherwise constitute just cause for suspension.

35.2   The Airport Director or an Airport Security Coordinator shall issue written notice of the Suspension, which shall state the nature and date of the violation, the length of Suspension, and the date the Suspension shall begin and the Individual's right to have a hearing pursuant to the provisions of Section 43 of these Rules and Regulations. The suspension may be for up to ninety (90) days as determined by the Airport Director or the Airport Security Coordinator.

**SECTION 36.    REVOCATION:**

36.1   An Individual's authorization to use a Personnel Identification Badge may be revoked for any of the following reasons:

1. Any act that seriously endangers property or Persons or indicates willful or reckless disregard for, and which has an immediate impact on the health, safety or welfare of the public or poses a serious threat to the security of the Airport.

2. A violation warranting Suspension where the Individual has had a previous suspension for the same or similar offense.

36.2   The Airport Director or Airport Security Coordinator shall issue a written notice of Revocation, which shall state the nature and date of violation, the date and Revocation shall begin, and the Individual's right to a hearing pursuant to the provisions of Section 43 of these Rules and Regulations.

**SECTION 37. LIABILITY INSURANCE:**

37.1   Every Airport User shall carry insurance as required by their lease, sublease or permit to operate on Southern California Logistics Airport and as required

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

by State and Federal regulations. Any person operating a vehicle within the fenced area of the Airport, who does not have a lease, sublease, or Operating Permit, is required to have comprehensive automobile insurance with combined single limits for bodily injury and property damage of not less than $1,000,000.

37.2 Airport Users shall provide Certificates of Insurance naming VVEDA, SCLA and Stirling Airports International as Additional Insured's with respect to their lease, sublease or permit. These Certificates of Insurance shall also provide for a 30-day Notice of Cancellation for those policies listed on the Certificate of Insurance.

37.3 The Airport User shall formally advise its insurers that all Vehicles in use with or without valid Airside Vehicle Permits are intended to be operated on that portion of the Southern California Logistics Airport premises known as Airside, and should those insurers exclude, limit, or otherwise restrict coverage while the Vehicle is on Airside, the Occupant shall obtain and keep in full force and effect at all times, a policy of Aviation Liability Insurance covering both license-plated and unlicensed plated Vehicles while on Airside

## SECTION 38. ILLEGAL ACTIVITIES: No Person shall:

38.1 Take or use any Aircraft, aircraft parts, instruments, or tools pertaining thereto, which are owned, controlled, or operated by any other Person, while such Aircraft, parts, instruments, or tools are stored or otherwise left on SCLA, or within its hangars, building, or facilities, without the written consent of the owner/operator thereof, except upon satisfactory evidence of the right to do so duly presented to the Airport Director, or authorized by him or so ordered by a court of competent jurisdiction.

38.2 Land, takeoff, taxi, or otherwise operate any Aircraft on, at, or from SCLA when he knows such Aircraft is not operating properly, or is equipped with any part or safety device which is defective or unsafe. Deviations from this restriction shall only be permitted by specific authorization from the Airport Director and/or FAA if required, or his designated representative.

38.3 Operate any Aircraft on or at the Airport, or on any Runway thereof, when the Airport or Runway has been closed to traffic by the Airport Director or other legal authority, or when such closure has been indicated by the placement of an "X" at each end of the closed Runway.

38.4 Operate any aircraft on, at, or in the vicinity of SCLA in willful or wanton disregard for the safety of persons or property, whether his own or that of others.

EXHIBIT E
312

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS**

38.5 Engage in the performance of any aerobatics, stunt, or maneuver not necessary to a normal takeoff, landing, normal turn or level flight of the Aircraft, over or within one mile of the exterior boundaries of the airport without the permission of the Airport Director or ATC.

38.6 Engage in the sale of any goods, wares, merchandize, or services at or upon the Airport without first having secured from the Airport Director a lease or permit therefore, and paying any required fees for such lease or permit.

38.7 Board an aircraft at the Airport without the prior approval of the Aircraft's owner or representative.

**SECTION 39.  AIRPORT CLOSURE:**
39.1 The Airport Director is hereby directed and authorized to close the Airport, or portions thereof, or suspend operations related to the landing, takeoff, or taxiing of Aircraft during any period in which he determines that such operations, or their continuance, would be hazardous.

39.2 Causes for such closure could include, but would not be limited to, adverse weather conditions, runway maintenance or repairs, runway obstacles, fire, Aircraft or other accident.

39.3 The Airport Director or his designee shall immediately notify the Riverside Flight Service Station and issue a NOTAM, advising of the closure.

**SECTION 40.  THRU-THE-FENCE ACTIVITIES:**
40.1 Thru-the-fence activities, defined as accessing the Airport from private land outside the airport perimeter for the purpose of utilizing or otherwise benefiting from the Airport, are strictly prohibited.

**SECTION 41.  SEVERABILITY:**
41.1 Should any article, section, sub-section, sentence, clause or phrase of these Rules and Regulations be held invalid or unconstitutional for any reason, such decision shall not affect the remaining portion of these Rules and Regulations.

41.2 The SCLA Authority hereby declares that it would have adopted these Rules and Regulations and each article, section, sub-section, sentence, clause or phrase, regardless of the fact that any one or more articles, sections, sub-sections, sentences, clauses, or phrases be declared invalid or unconstitutional.

**SECTION 42.  DISMANTLING AIRCRAFT:**
42.1 No Person shall dismantle an Aircraft of any type outside of a hangar unless they receive prior written approval from the Airport Director. Any Person permitted to dismantle an aircraft outside of a hangar must:

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

42.2   Submit a written request to the Airport Director describing the type of aircraft to be dismantled, the dismantling procedures to be employed, the procedures for disposing of all dismantled material, toxic material clean up and abatement procedures, and the schedule for dismantling an aircraft.

42.3   Conduct all aircraft dismantling within a fenced in area to prevent visual contact with the dismantling activity.

42.4   Return the area used for dismantling to its original condition as approved by the Airport Director in his/her sole discretion.

42.5   Procure a performance bond to ensure any contamination, remediation of contamination and the dismantling area is returned to its original state. The amount of the bond will depend upon the procedures set forth in the request and the potential exposure and land clean-up cost to the Airport.

42.6   Receive the prior approval of the SCLA Fire Department.

42.7   Adhere to all City of Victorville, State and Federal environmental regulations.

42.8   Upon receipt of the information set forth in 42.1 through 42.7 above, the availability of land to conduct dismantling and other airport operating requirements and/or constraints, the Airport Director will either approve the Aircraft dismantling request by issuing a written Letter of Permit with appropriate indemnities and airport protection provisions to the requesting person or business or deny the request by providing a Letter of Denial to the requestor.

## SECTION 43. PENALTIES AND APPEALS:

43.1   Fixing penalties for violations:  Any Airport User including, without limitation, sublessees, suppliers, contractors, guests, invitees, or others that do not adhere to or violates these Rules and Regulations shall be sanctioned.

43.2   Sanctions may include, but are not limited to, a fine paid to the Airport, denial of the use of the Airport for a specified period of time, and/or a referral to the Transportation Security Administration and/or Airport Authority Attorney with a recommendation for criminal prosecution.

43.3   In determining the sanctions to be imposed, the Airport Director may take into consideration any mitigating or aggravating factors that may exist including, without limitation, the number of previous violations and the cooperation of the person involved.

43.4   Fines shall be assessed from $100.00 to $10,000.00 per day per incident depending on the severity of the violation.

EXHIBIT E
314

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

43.5 Should an infraction occur, and should the infraction and situation surrounding the infraction warrant, fines will be assessed on a graduated/increasing basis.

43.6 All fines assessed to a sublessee, or to a sublessee's suppliers, contractors, guests, invitees, or others, will be added to a Sublessee's monthly rent and subjected to late fees and default provisions as set forth in a Sublessee's land or facility Sublease.

43.7 Fines assessed to Airport Users who do not have a land or facility Sublease at SCLA, shall be paid before the Airport User is permitted to use the Airport again.

43.8 Continuous violation of these Rules and Regulations shall result in denial to use the Airport. Attachment B provides an example of fines as may be applied.

43.9 Removal from Airport Premises: The Airport Director, or his designated representative, may order removal of anyone from the Airport who knowingly and willfully violates any provision of these Rules and Regulations.

43.10 Recourse under Tenant's Lease: SCLAA may take action against Airport Tenants under their lease agreements irrespective of any other penalties under these Rules and Regulations.

43.11 RIGHTS OF APPEAL: Fines and other sanctions may be appealed to the Executive Director. Requests for appeal must be made in writing to the Executive Director within ten (10) business days from the date the fine was presented to the Airport User.

43.12 The Executive Director (or his designated representative) will convene an administrative hearing and shall serve as the hearing officer (the "Hearing Officer"). Failure of any Airport User to properly file an appeal shall constitute a waiver of its right to an administrative hearing and adjudication of the fine or any portion of the total amount of the fine.

43.13 The Airport User or other Person in receipt of the fine or sanction shall be provided a written notice of the date, time, and location of the hearing. The notice will include the date, time and nature of the alleged violation.

43.14 The hearing shall be conducted in an informal manner and strict rules of evidentiary procedure will not apply. The Hearing Officer may consider any evidence that is reasonably probative and aids in the determination of the facts.

43.15 Parties are entitled to be represented by an attorney of their choice, to bring witnesses, and present documentary evidence. Parties have the right to have

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

all records or documents relevant to the proceedings provided to them at the cost of reproduction.

43.16 At the conclusion of the appeal hearing, and pursuant to the Hearing Officer's authority, the Airport Director's imposition of sanctions may be upheld, modified or reversed. Parties will be provided with the results of the hearing in writing, including any penalties imposed by the Hearing Officer. The decision of the Hearing Officer is final.

## SECTION 44. EFFECTIVE DATE

44.1 These changes contained in the Southern California Logistics Airport Rules and regulations shall be of full force and effective immediately upon filing of same with proof of publication with approval of the Southern California Logistics Airport Authority.

Peter R. Soderquist
Airport Director

EXHIBIT E
316

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS**

**Attachment A**

### SOUTHERN CALIFORNIA LOGISTICS AIRPORT
### Airport Rates and Charges

**Introduction / Guiding Principles:**

A.1   In establishing a Schedule of Airport Rates and Charges, the Southern California Logistics Airport Authority (the "Airport Authority") is required by federal regulations to ensure that charges are fair, reasonable and non-discriminatory.   Further, Airport Rates and Charges are to be reasonably consistent with the rates and charges being applied by other airports for similar types of activities, unless there is a special situation unique to the Southern California Logistics Airport.

A.2   The Airport Authority fully recognizes the FAA prohibition against the diversion of Airport revenues for non-airport purposes.   It is recognized that failure to collect fair and reasonable fees and market-based rents for the use of Airport property, facilities and equipment can be considered a form of Revenue Diversion.  The Authority also recognizes the FAA requirement to establish a Schedule of Rates and Charges that will permit the Airport to be as self-sustaining as possible.

**Airport User Fees Defined:**

A.3   Aircraft Landing Fees:  The Southern California Logistics Airport Authority (SCLA) has expended a significant amount of funds to provide aviation facilities for the benefit of aircraft owners and operators.  Landing fees are assessed to help offset the cost of operating and maintaining the Airport's runway, taxiway, and aircraft parking ramp areas.  Landing fees are based upon the Certified Maximum Gross Landing Weight (MGLW) of the aircraft multiplied by the Airport Authority's established landing fee rate per 1,000 pounds of Certified Maximum Gross Landing Weight.

A.4   Commercial Aircraft:  The Airport Authority assesses a landing fee on *each* aircraft landing conducted by an airline or other commercial Air Carrier, operating under FAR Part 121 (airline), Part 129 (international airline), Part 135 (air taxi), or other similar regulation, regardless of the purpose of the landing.

A.5   Signatory Landing Fees:  Signatory landing fees are assessed to an airline, or other large (over 75,000 lbs MGLW) commercial aircraft operator having a Signatory Operating Agreement with SCLA.  To be eligible for Signatory Operating Agreement status, the operator must have one or more of the following:

**Pg.32 of 38**

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

    i.    *A lease with the Airport Authority of a ground site having at least 10,000 square feet or more that is used to accommodate the organization's primary base of business on Airport property.*

    ii.    *A lease with the Airport Authority, or an approved sublease, of a building,* or part of a building totaling at least 4,000 square feet that is used as the organization's primary base of operations on the Airport.

    iii.    Commercial Airlines operating under the military Civilian Reserve Air Force (CRAF) program.

**A.6**    **Non-Signatory Landing Fees:** Non-signatory Landing Fees are assessed at a rate of 125% of the Signatory Landing Fee rate for large commercial operators (over 75,000 lbs MGLW) using the Airport who do not have Signatory Operating Agreement status with the Airport Authority, or have an agreement, but do not meet any of the Signatory eligibility criteria specified in paragraph 2 above. *The Non-Signatory Landing Fee is intended to compensate the Airport Authority for the operator's use of the Airport's runway and taxiway areas as well as compensation for the privilege of being able to access the airport to conduct business.*

**A.7**    **Private Aircraft:** The Airport Authority assesses a landing fee on each aircraft landing conducted by large private operators (over 75,000 lbs MGLW) operating under FAR Part 91, or other similar regulation, regardless of the purpose of the landing. Landing fees for private aircraft that are operated under FAR Part 91 and are based at the airport under conditions set forth in a long term agreement with the Authority will be charged landing fees as required by that agreement.

**Aircraft Parking Fees:**

**A8.**    **Signatory Aircraft Parking Fees:** Aircraft having Signatory status as defined in A.1 above, are not required to pay parking fees during the time an aircraft is in the loading/ unloading process (24 hour maximum). Signatory Aircraft are also exempt from aircraft parking fees on the weekend, and over national holidays, as long as the weekend/holiday parking occurs in the middle of the loading/unloading process. Signatory Aircraft that are not in the unloading/loading process, and/or use aircraft parking areas in excess of the 24-hour maximum, are required to pay established aircraft parking fees.

**A9.**    **Non-Signatory Aircraft:** Non-signatory aircraft are required to pay established aircraft parking fees.

EXHIBIT E
318