## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

A10.  Private Aircraft:  All private aircraft (both heavy and light) are required to pay aircraft parking fees.  Aircraft that are based at the airport under conditions set forth in a long term agreement with the Authority will be charged parking fees as required by that agreement.

A.11  Aircraft Storage Fees:  Aircraft storage fees are charged to aircraft that are stored on areas other than the main parking apron.  Fees are payable under one of three different categories: under 50,000 lbs MGTW, narrow body aircraft, and wide body aircraft.  Remote aircraft storage is occasioned by the many acres of closed runways and taxiways that make a suitable "hard stand" for aircraft parking.  The availability of these areas is directly related to the longevity of these surfaces.  As these surfaces fail to be usable for aircraft parking, they will be removed from the inventory of remote parking.  The Airport Authority makes no representation that it will maintain these surfaces and those businesses that store aircraft thereon do so at their own risk.

A.12  Fuel Flowage Fees:  A substantial percentage of the fuel dispensed at SCLA is "pre-purchased" by large aircraft operators that enjoy discounts based on the large volumes of fuel these carriers purchase nationally.  This pre-purchased fuel is stored in SCLA's fuel farm to which SCLA assesses a *storage fee*.  SCLA also assesses a *flowage fee* on each gallon of fuel delivered from the fuel farm to the aircraft.

A.13  Fuel flowage and fuel storage fees reflect the intent of the Airport Authority to generate reasonable revenues for the use of the airport's fuel storage facility, while at the same time, encouraging aircraft operators to use SCLA as a base of operations.

A.14  All fuel sold at SCLA is subject to the described fuel flowage fees with following exceptions:

1.  Non-Signatory Air Cargo Operators:  Commercial Air Cargo Operators that are considered Non-Signatory as defined in Section A.1 above and pre-purchase fuel that is stored in the Airport's fuel farm for use in their aircraft, shall pay *flowage fees* and *storage fees*.

2.  Signatory Cargo Operators:  Commercial Air Cargo Operators that meet the requirements of Signatory status as defined in Section A.1 above and pre-purchase fuel that is stored in the Airport's fuel farm for use in their aircraft shall pay the appropriate *storage fee*.

3.  Non-Commercial Signatory:  Based operators (signatory) that are non-commercial (Part 91) will pay the appropriate *storage fee* and a *modified flowage fee* as provided in the operators lease agreement.

# SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

### Southern California Logistics Airport
### Schedule of Rates and Charges

**Landing Fees:**

| | |
|---|---|
| Signatory airline (over 75,000 lbs MGLW) | $ .85 per 1,000 pounds MGLW |
| Non-signatory airline (over 75,000 lbs MGLW) | $1.06 per 1,000 pounds MGLW |
| Private aircraft (over 75,000 lbs MGLW) | $ .85 per 1,000 pounds MGLW |

**Fueling Fees:**
*(Flowage fee –$ .08 per gal; Storage fee –$ .02 per gallon)*

**Aircraft Parking Fees:** (commercial aircraft)

| | |
|---|---|
| Signatory airline | $200.00 per day |
| Non-signatory airline | $200.00 per day |

**Transient Aircraft Tie down Fees:** (general aviation aircraft; main ramp)

| | | |
|---|---|---|
| Single engine ................... | $ 5.00 per day | $ 80.00 per month |
| Multi engine .................... | $ 10.00 per day | $120.00 per month |
| Mid-weight aircraft (12.5K lbs to 25K lbs) | $ 20.00 per day | $200.00 per month |
| Large aircraft (25Klbs to 100K lbs) | $ 30.00 per day | $300.00 per month |
| Narrow body ..................... | $100.00 per day | $1,000.00 per month |
| Wide body ....................... | $200.00 per day | $2,000.00 per month |

**Wash Rack:**

| | | |
|---|---|---|
| Any aircraft...............................,....................$ 40.00 per hour | | $240.00 per day |

**Live Scan Fingerprint Transmission Fee Per Applicant for Criminal History Records Check:**

Call Airport Operations at (760) 243-1915 for Fingerprint transmission fees.

**Personnel Identification Badge**

| | |
|---|---|
| Personnel Identification Badge with or without access card...............$ 10.00 | |
| Lost Personnel Identification Badge ...........................................$ 100.00 | |

*(Fees are subject to change)*

EXHIBIT E
320

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

### Notes:
Parking charges for Signatory Airlines do not apply for the first 24 hours, weekends, or holidays. Transient aircraft tie down fees apply to aircraft remaining overnight.    Transient aircraft remaining parked longer than overnight Military aircraft are exempt from paying landing, parking and storage fees.

### Definitions:

### Signatory –
Having a lease or sublease of a ground site or building space on the Airport in accordance with the Airport Authority's Rates and Charges Policy; or, an airline having a contractual airline operating arrangement with an organization that has such a lease on airport property.

### Non-signatory –
Those operators who do not have an On-Airport Lease Agreement with the Airport Authority in accordance with the Rates & Charges Policy.

**MGLW** – Maximum (certificated) Gross Landing Weight

**MGTW** – Maximum (certificated) Gross Takeoff Weight

**Narrow body aircraft** – i.e. B-727; B-737; DC-9; MD-80

**Wide body aircraft** – i.e. B747; B-777; DC-10; MD-11

EXHIBIT E
321

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

**Attachment B**

### SCLA
### SCHEDULE OF FINES

**B.1**  In most situations, a sanction or fine will be levied upon the employer of the individual involved in the infraction.  All sanctions or fines assessed will be added to the employer's basic monthly rent and subjected to late fees and default provisions as set forth in an Airport Tenant's land or facility sublease. Fines assessed to Airport Users who do not have a land or facility Sublease at SCLA, shall be paid before the Airport User is permitted to use the Airport again.  Continuous violation of these Rules and Regulations shall result in denial to use the Airport.

**B.2**  The following schedule should be regarded as a suggested schedule of fines. The Airport Director has the sole discretion and authority to levy fines, their amount and final disposition.

**B.3**  For minor infractions related to vehicle operations on the AOA such as:

| | |
|---|---|
| Speeding on the AOA. | $100.00 |
| Operating a vehicle on the AOA without: | |
| Airport issued I'D Badge or drivers permit, appropriate markings or two-way radio communication with ATCT. | $100.00 |
| Runway incursion. | $500.00 |
| Taxiway incursion. | $300.00 |
| For negligence resulting in, and failure to correct, FOD | $100.00 |

**B.4**  For breaches in security such as:

| | |
|---|---|
| 1.  Leaving a perimeter gate unattended. | $100.00 |
| 2.  Failure to accompany non-badged person on the AOA. | $100.00 |
| 3.  Sharing a security code or vehicle gate card. | $300.00 |
| 4.  Bypassing Security. | $300.00 |
| 5.  Sharing a Personnel Identification Badge. | $300.00 |
| 6.  Losing a Personnel Identification Badge. | $100.00 |

**B.5**  For miscellaneous infractions of the Rules and Regulations such as:

| | |
|---|---|
| 1.  Smoking in a non-approved area. | $100.00 |
| 2.  Parking or storing aircraft in non-approved areas. | $100.00 |
| 3.  Performing aircraft maintenance in unauthorized areas. | $100.00 |
| 4.  Knowingly allow an unsafe condition to exist. | $300.00 |
| 5.  Bringing an unauthorized vehicle on the airport. | $100.00 |

**B.6**  A Federal Aviation Administration (FAA) or Transportation Security Administration (TSA) fine levied at the SCLA may be directly forwarded to a tenant if such tenant action is cause for the FAA/TSA penalty

## SOUTHERN CALIFORNIA LOGISTICS AIRPORT RULES AND REGULATIONS

A second violation of the above listed offenses will result in the doubling of the applicable fine.  A third offense will result in the tripling of the applicable fine and a suspension of privileges until corrective actions are taken and documented.

EXHIBIT E
323

# EXHIBIT C

# FAA RULES AND REGULATIONS

EXHIBIT E
324

## FAA RULES AND REGULATIONS

### LEASE PROVISIONS REQUIRED BY THE
### FEDERAL AVIATION ADMINISTRATION

The Tenant, for himself, his heirs, personal representatives, successors in interest, and assigns, as part of the consideration hereof, does hereby covenant and agree "as a covenant running with the land" that in the event facilities are constructed, maintained, or otherwise operated on the said property described in this lease, for, a purpose involving the provision of similar services or benefits, the Tenant shall maintain and operate such facilities and services in compliance with all other requirements imposed pursuant to Title 49, Code of Federal Regulations, DOT, Subtitle A, Office of the Secretary, Part 21, Nondiscrimination in Federally-Assisted Programs of the Department of Transportation Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations may be amended.

The Tenant, for himself, his heirs, personal representative, successors in interest, and assigns, as part of the consideration hereof, does hereby covenant and agree "as a covenant running with the land" that: (1) no person on the grounds of race, color or national origin shall be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land and the furnishing of services thereon, no person on the grounds of race, color, or national origin shall be excluded from participation in, denied the benefits of, or otherwise be subject to discrimination, (3) that the Tenant shall use the premises in compliance with all other requirements imposed by or pursuant to Title 49, Code of Federal Regulations, Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Nondiscrimination in Federally-Assisted Programs of the Department of Transportation-Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulation may be amended.

That in the event of breach of any of the above nondiscrimination covenants, Authority shall have the right to terminate the lease, and to reenter and repossess said land and the facilities thereon, and hold the same as if said lease had never been made or issued. This provision does not become effective until the procedures of 49 CFR Part 21 are allowed and completed including expiration of appeal rights.

Tenant shall furnish it's accommodations and/or services on a fair, equal and not unjustly discriminatory basis to all users thereof and it shall charge fair, reasonable and not unjustly discriminatory prices for each unit or service: PROVIDED THAT the Tenant may be allowed to make reasonable and nondiscriminatory discounts, rebates or other similar type of price reductions to volume purchasers.

Non-compliance with Provision 4 above shall constitute a material breach thereof and in the event of such non-compliance and Authority shall have the right to terminate the lease agreement, and the estate hereby created without liability therefore or at the election of the authority or the United Sates either or both said Governments shall have the right to judicially enforce provisions.

Tenant agrees that it shall insert the above five provisions in any lease agreement, by which said Tenant grants a right or privilege to any person, firm or corporation to render accommodations and/or services to the public on the premises herein leased.

The Tenant assures that it will undertake an affirmative action program as required by 14 CFR Part 152, Subpart E, to insure that no person shall on the grounds of race, creed, color, national origin, or sex be excluded from participating in any employment activities covered in 14 CFR, Part 152, Subpart E. The Tenant assures that no person shall be excluded on these grounds from participating in or receiving the services or benefits of any program or activity covered by this subpart. The Tenant assures that it will require that it's covered sub-organizations provide assurance to the Authority, that they similarly will undertake affirmative action programs and that they will require assurances from their sub-organizations, as required by 14 CFR Part 152, Subpart E, to the same effect.

The Authority reserves the right to further develop or improve the landing area of the airport as it sees fit, regardless of the desires or view of the Tenant and without interference or hindrance.

The Authority reserves the right, but shall not be obligated to the Tenant to maintain and keep in repair the landing area of the airport and all publicly owned facilities of the airport, together with the right to direct and control all activities of the Tenant in this regard.

This lease shall be subordinate to the provisions and requirements of any existing or future agreement between the Authority and, the United States, relative to the development, operation and maintenance of the airport.

There is hereby reserved to the Authority, it's successors and assigns, for the use and benefit of the public, a right of flight for the passage of aircraft in the airspace above the surface of the premises herein leased. This public right of flight shall include the right to cause in said airspace any noise inherent in the operation of any aircraft used for navigation or flight through the said airspace or landing at, taking off from or operation on this airport.

Tenant agrees to comply with the notification and review requirements covered in Part 77 of the Federal Aviation Regulations in the event future construction of building is planned for the leased premises, or in the event of any planned modification or alteration of any present or future building or structure situated on leased premises.

The Tenant, by accepting this lease expressly agrees for itself, it's successors and assigns that it will not erect nor permit the erection of any structure or object nor permit the growth of any tree on the land leased hereunder which would violate the obstruction height limitations as set forth in Federal Air Regulation (FAR), Part 77. In the event the aforesaid covenants are breached, the Authority reserves the right to enter upon the land leased hereunder and to remove the offending obstruction, all of which shall be at the expense of the Tenant.

The Tenant, by accepting this lease, agrees for itself, its successors and assigns that it will not make use of the leased premises, in any manner which might interfere with the landing and taking off of aircraft from this airport or otherwise constitute a hazard. In the event the aforesaid covenant is breached, the Authority reserves the right to enter upon the premises hereby leased and causes the abatement of such interference at the expense of the Tenant.

It is understood that nothing herein contained shall be construed to grant or authorize the granting of an exclusive right within the meaning of Section 308a of the Federal Aviation Act of 1958, as amended

This lease and all the provision hereof shall be subject to whatever right the United States Government now has or in the future may have or acquire, affecting the control, operation, regulation and taking over of said airport or the exclusive or non-exclusive use of the airport by the United States during time of war or national emergency.



# EXHIBIT B

United Technologies Realty, Inc.
4 Farm Springs Road
Farmington, Connecticut 06032



July 22, 2011

Southern California Aviation, LLC
18438 Readiness Street
Victorville, California 92394
Attn: Robby Word, General Manager

Re:  Hangar #681, Southern California Logistics Airport, Victorville, CA (the "Facility")

Dear Mr. Word:

This letter (this "Agreement") shall confirm the agreement that Pratt & Whitney Maintenance Services, Inc. ("Pratt") shall sublease to Southern California Aviation, LLC ("SCA") all of the space, with appurtenant rights, at the above-referenced Facility leased by Pratt from the Southern California Logistics Airport Authority ("SCLAA") under that certain Sublease Agreement dated as of July 1, 2011, a copy of which is attached hereto and incorporated herein by reference (the "Sublease"), for a term commencing on the Sublease Commencement Date (as defined in the Sublease) and expiring on the day immediately preceding the fifth anniversary of the Sublease Commencement Date. Notwithstanding the foregoing, this Agreement shall sooner terminate in the event the Sublease terminates for any reason.  SCA hereby agrees to be bound by and perform all of the provisions and obligations of Pratt under the Sublease, with the exception that SCA shall pay the required rent and other payments under the Sublease to Pratt and Pratt shall then pay such sums to SCLAA. Notwithstanding the foregoing, SCA shall not have the right to renew the Sublease with SCLAA, and shall not assign, sublet or alter the Facility without the prior written consent of Pratt.

By signing a copy of this Agreement where indicated below, SCA hereby acknowledges and agrees to the above terms.  If you have any questions, please feel free to contact Peter Stergos at (860) 284-3623.

Very truly yours,

PRATT & WHITNEY LINE MAINTENANCE
SERVICES, INC.

By: _____
Stephen Forino, President of
United Technologies Realty, Inc.
Authorized agent

Acknowledged and agreed to:

SOUTHERN CALIFORNIA AVIATION, LLC

By: _____          7/26/2011
John Tokarz, CEO                                          Date

EXHIBIT E
330

# EXHIBIT C



ComAv Facilities, LLC
18498 Phantom West
Victorville, CA 92394

February 9, 2016

Southern California Logistics Airport Authority
18374 Phantom
Victorville, CA 92394
Attn:   Keith Metzler
        Assistant City Manager &
        Assistant Executive Director for SCLAA

RE:     Southern California Logistics Airport Authority Standard Sublease Agreement
        #681), dated as of July 1, 2011, between Southern California Logistics Airport
        Authority (as "Sublessor") and Pratt & Whitney Line Maintenance Services, Inc.
        (as "Sublessee"), concerning certain real property and improvements as
        described therein (the "Sublease")

        Negotiating Agreement for Development of Real Property between Sublessor
        and ComAv Facilities, LLC ("ComAv Facilities"), an affiliate of ComAv
        Technical Services, LLC ("CTS"), dated March 23, 2015 (the "Negotiating
        Agreement")

Dear Mr. Metzler:

        Any capitalized term used but not defined herein shall have the meaning ascribed to it in the
Sublease.

        Thank you for our prior conversations and correspondence regarding the Subleased Premises.
Our desire to occupy the Subleased Premises upon expiration of the Sublease continues. Continuing to
lease the facility to ComAv is a long-term solution that is in the best interest of Sublessor.

        ComAv is one of the largest, if not the largest, employers at the Airport. We have also been the
primary tenant of Building 681 since its construction in 2006. While we have periodically licensed joint
use of the facility to others (Boeing and FedEx) on a temporary basis, we have done so in an effort to
preserve business that would have otherwise not come to or left the Airport. A key example is the
FedEx Manpad project. We originally stored material for free when the project's existing lease was
terminated and then shared the use of the Subleased Premises, with the Airport 's consent, to maintain
the Manpad program on Airport, frankly at the expense of other projects and opportunities, and to
preserve our long term relationship with FedEx. This is true even though the Manpad project will not
be renewing or seeking further use of Building 681 because of a long term program gap and because of
their overall commitment to work through the ComAv relationship. This does not, however, impact our
continuing requirement for the facility, including for our current day-to-day operations and to support
new and expanding business. This new and expanding business which requires ComAv exclusive use,
includes being recently contracted by Boeing for dramatically expanded services (deepening our already

strong relationship with Boeing); expanded business with customers like FedEx, British Airways, China Southern, Lufthansa, Boeing Capital and Honeywell; securing new contracts with top aircraft leasing companies including CIT, Willis Leasing, ALAFCO and Avolon Leasing; and more. Continuing ComAv's leasehold of Building 681 in support of high profile customers such as these is the best long-term solution and comes with ComAv's proven track record of sustainability at the Airport.

Our business also depends upon having adequate facilities and, as mentioned above, we have immediate requirements for the use of Building 681. ComAv's new opportunities and use of Building 681 will result in the addition of jobs by ComAv at the Airport. Conversely, if we are not able to continue to lease Building 681, our business will suffer, expansion efforts will be severely curtailed or eliminated, and we may be forced to downsize our workforce to align with any reduced business levels.

The continued use of Building 681 is also complimentary to our plans for constructing new facilities under the Negotiating Agreement. While we continue to require new facilities, our needs with respect to Building 681 are immediate. If, however, we are not able to continue our use of Building 681, the viability of the new hangar project will be severely jeopardized due to the negative impact it will have on our current and growing business levels. The addition of the new hangar facilities will add to the value of the properties at SCLA; bring in increased lease revenue; create jobs, business and activity at SCLA and will help make and sustain SCLA's status as a world-class facility. But, this hinges on ComAv's continued use of Building 681.

Lastly, there are simple economic reasons for continuing to lease Building 681 to ComAv: (i) there will be no gap between leases and, more importantly, in rental payments received by Sublessor, (ii) Sublessor will not be required to make any tenant improvements and/or offer other common incentives to a new tenant, such as rent concessions, moving allowances, etc., (iii) Sublessor will not be obligated to pay any brokerage fees for a new lease, (iv) Sublessor will not have to go through a lengthy process of qualifying a new tenant and negotiating a new lease with a new party, and (v) the parties will be able realize other benefits from the continuity ComAv brings by continuing to operate the facility.

For these reasons, continuing to the lease Building 681 to ComAv is very much a part of a long-term, strategic solution that is in the interest of the Airport.

Accordingly, we hereby propose, offer and agree to the following:

1. Sublessor and ComAv Facilities will enter a new lease for the Subleased Premises, the term of which shall commence immediately upon the termination of the Sublease (the "New Lease"). The terms and conditions of the New Lease will be substantially similar to the terms and conditions of the Sublease, except as provided herein.

2. The sublessee under the New Lease shall be ComAv Facilities.

3. The term of the New Lease will be for a five (5) year period, with sublessee having the right to exercise two (2) option periods of five (5) years each.

4. The initial Monthly Base Rent under the New Lease, based on the Subleased Premises comprising approximately 67,500 square feet of hangar space and 3,272 square feet of office space, together with improvements thereon, will be $0.70 per square foot on a triple net basis.

EXHIBIT E
333
2

5. The Monthly Base Rent under the New Lease will escalate during the term and during any exercised option period by one percent (1%) per lease year; provided, however, there shall be no annual escalation in any given lease year in which the average annual CPI – All Urban Consumers for Riverside - San Bernardino - Ontario, CA MSA (not seasonally adjusted) (the "CPI") for the then most recent calendar year (Jan – Dec) decreased from the prior calendar year's average annual CPI. For example, if the average annual CPI for calendar year 2019 is calculated to be 240.00 and the average annual CPI for calendar year 2020 is calculated to be 239.5 (representing a decrease), there shall be no annual escalation for the lease year commencing in 2021.

6. ComAv Facilities shall have the right to assign its right, title, interest and obligations under the New Lease or to sublease the Subleased Premises to CTS or a ComAv affiliate.

7. The parties agree to cooperate with one another in good faith and proceed to entering a definitive written agreement for the New Lease based on these terms and conditions.

   To confirm Sublessor's agreement to these matters, please countersign where indicated below and return a copy to me at william.morris@comav.com. ComAv Facilities' offer herein shall expire on February 23, 2016; provided, however, that ComAv Facilities reserves both the right to revoke the offer prior to acceptance by Sublessor and to extend the offer beyond such date.

Respectfully,

William Morris
Executive Vice President

Agreed:

SOUTHERN CALIFORNIA LOGISTICS AIRPORT AUTHORITY

Signature: _____
Name: _____
Title: _____
Date: _____

cc:   Green, de Bortnowsky & Quintanilla, LLP
      23801 Calabasas Road, Suite 1015
      Calabasas, CA  91302
      Attn: Andre de Bortnowsky

EXHIBIT E
334

3

# EXHIBIT D



*Southern California*
# LOGISTICS AIRPORT

February 16, 2016

William S. Morris
Executive Vice President
ComAv Technical Services, LLC
18438 Readiness Street
Victorville, CA 92394

**RE: Lease Proposal – Hangar #681 at the Southern California Logistics Airport**

Dear Mr. Morris:

I have received and reviewed your letter dated February 9, 2016 regarding the above referenced subject matter. After having done so, I do thank you for your continued interest in Hangar # 681 at the Southern California Logistics Airport (SCLA). Since discussing this subject matter with ComAv, which dates back to June of 2015, SCLA has been marketing the subject property to prospective users and has seen a wide array of interest in the subject facility. To further that effort, SCLA has retained Cushman & Wakefield to assist.

Reviewing the business points contained in your offer, the proposed Monthly Base Rent of $0.70 per square foot on a triple net basis is substantially less than SCLA's asking price of $1.25 per square foot. Currently, SCLA doesn't view the offer as an acceptable rate, however, SCLA is interested in negotiating further. I am copying SCLA's Broker, Kent Hinds to further those efforts. Believing that we can ultimately come to terms on business points, SCLA will require due diligence to better understand who ComAv Facilities LLC is, credit worthiness and contractual relationships with Boeing among others, as referenced in your proposal to help support a lease to ComAv Facilities LLC of Hangar #681 at SCLA.

I look forward to your continued dialogue with Mr. Hinds and hope that SCLA and ComAv Facilities LLC can come to terms. Mr. Hinds can be contacted at 909-942-4654.

Sincerely,

Keith C. Metzler
Assistant Executive Director

**SOUTHERN CALIFORNIA LOGISTICS AIRPORT**
18374 Phantom West • Victorville, CA 92394 • 760.243.1900 • www.victorvillecity.com

EXHIBIT E
336

cc:  Kent Hinds, Cushman & Wakefield
      Sophie L. Smith, Director of Economic Development

Attachments:    February 9, 2016 ComAv Letter Proposal

# EXHIBIT E



ComAv Technical Services, LLC
18438 Readiness Street
Victorville, CA 92394
Tel. 760.530.2400 / Fax 760.246.1186
FAA Repair Station O2RR414Y / EASA 145.5678
www.comav.com

March 9, 2016

Southern California Logistics Airport Authority
18374 Phantom
Victorville, CA 92394
Attn:   Keith Metzler
        Assistant City Manager &
        Assistant Executive Director for SCLAA

        RE:   Negotiating Agreement for Development of Real Property between Southern
              California Logistics Airport Authority (Authority) and ComAv Facilities, LLC,
              an affiliate of ComAv Technical Services, LLC (CTS), dated March 23, 2015
              (Negotiating Agreement)

              CTS Hangar Development Team Member, Dr. Barbara Lichman

              Hangar 681 at the Southern California Logistics Airport (Airport)

Dear Mr. Metzler:

        Thank you for your letter dated February 24, 2016, acknowledging the extension of the
Negotiating Agreement through September 22, 2016. These additional wide-body hangars are important
expansion projects for CTS and its customers, and we appreciate the Authority's support on this project.
You can expect to see more regular updates to and coordination with the Authority as the project
continues to accelerate, including regular status and planning meetings, starting this month, to which you
and your staff will be invited. We welcome that participation.

        As part of the new hangar project team, I would like to formally introduce you to Dr. Barbara
Lichman of the Orange County office of BuchalterNemer. Dr. Lichman serves as the law firm's Chair
of the Aviation, Airports and Transportation Practice Group and has extensive experience representing
airports, municipalities, developers and companies operating on airports such as ComAv. We are very
excited about this addition to our team for this project, and we are happy to introduce Dr. Lichman by
copy hereon.

        A key aspect of the continuing CTS growth, but also, frankly, a current area of concern, is the
renewal of the Hangar 681 lease. As you know, CTS (formerly Southern California Aviation) has been
the beneficial lessee of Hangar 681 since its construction in 2006, and CTS and its affiliates were the first
operating aeronautical businesses on the Airport, starting in 1998, now over 18 years ago. Our concern
is that despite our several offers and efforts to renew and extend this lease, commencing with the formal
CTS offer dated June 24, 2015 (8 months ago) at the current market value, but also including the latest
CTS offer at $.70 per square foot (which we believe would be the highest rate of any current, long-term

tenant at the Airport for comparable facilities), there has been no substantive progress in consummating this renewal with the Authority. This failure jeopardizes the new hangar build out project, substantial pending job growth and hundreds of existing full time jobs. Additionally, CTS' presence confers a number of benefits on the Airport, from increased lease revenue to the creation of jobs and business opportunities for the Airport and its tenants, and, ultimately, enhances the Airport's status in the community of aviation facilities. In the interest of all stakeholders, including CTS, the Airport, the City of Victorville and the Victor Valley as a whole, we simply must bring this lease renewal to closure.

We request two things:

First, we would like to formalize the meetings and the specific parties the Authority would like to have participating in the new hangar project status meetings, including whether you will be participating personally and any preference on frequency and weekday.

Second, we need a formal response with respect to the Hangar 681 lease, preferably by acceptance of our last offer (which is renewed hereby to the requested response date) or a formal counteroffer if the latest ComAv offer is not acceptable as proposed. We intend put the new lease in the name of CTS rather than ComAv Facilities, LLC. As time is of the essence, we request the Airport's formal response by no later than March 16th.

Thank you in advance.

Respectfully,

William Morris
Executive Vice President

cc:   Andre de Bortnowsky, Green, de Bortnowsky & Quintanilla, LLP (via email: andre@gdblawoffices.com)

Dr. Barbara Lichman, BuchalterNemer (via email: blichman@buchalter.com)

Kent Hindes, Cushman & Wakefield (via email: kent.hindes@cushwake.com)

2

# EXHIBIT F

## Lichman, Barbara

| | |
|---|---|
| **From:** | Sophie Smith <ssmith@CI.VICTORVILLE.CA.US> |
| **Sent:** | Wednesday, March 09, 2016 7:30 PM |
| **To:** | william.morris@comav.com |
| **Cc:** | Lichman, Barbara; Kent Hindes; Andre de Bortnowsky; Keith Metzler; Eric Ray; cgarrick@comav.com |
| **Subject:** | FW: ComAv - New Hangar Project & Hangar 681 |
| **Attachments:** | 16.02.16.Ltr to Mr. Morris re Hanger 681 Proposal.pdf; 16.03.09.ltr from ComAv RE Negotiating  Agmt &  Hangar 681.pdf |

Dear Mr. Morris,

Mr. Metzler forwarded me your email to make sure you receive a timely response.  Mr. Metzler has very recently been assigned additional responsibilities in his role as Assistant City Manager, and as such, has delegated the SCLA operational and business transactions to myself and the Airport Director, Mr. Eric Ray.  Please direct future correspondence to me with a copy to Mr. Ray so we can respond quickly to you.

I have reviewed the correspondence you sent today (attached) .  You have requested a formal response regarding your offer on the Hangar 681 lease.  I have attached Mr. Metzler's February 16, 2016, formal response to your February 9, 2016 offer.  In his response, Mr. Metzler indicated "…the proposed Monthly Base Rent of $0.70 per square foot on a triple net basis is substantially less than SCLA's asking price of $1.25 per square foot.  Currently, SCLA doesn't view the offer as an acceptable rate, however, SCLA is interested in negotiating further.  I am copying SCLA's Broker, Kent Hinds to further those efforts."

SCLA would like to see negotiations on Hangar 681 progress.  My understanding is you have spoken with Mr. Hindes a few times, and an in-person meeting is in the process of being scheduled.  I would encourage you to continue those discussions with Mr. Hindes who will report the status of such negotiations to me.

It is our desire to keep the 681 lease negotiations and the new hangar construction project separate.  Regarding the new construction project, Mr. Ray and I will be your primary contacts.  Mr. Metzler will join our meetings as necessary and as his schedule allows.  I have no preference on frequency or day of the week at this point, but I hope we can schedule a meeting in the next few weeks to talk about progress to date.  That should help us to decide on frequency of future meetings.

I'm very much looking forward to working with you.
Thanks,


*Sophie L. Smith*
*Economic Development Director*
*City of Victorville/Southern California Logistics Airport*
14343 Civic Drive
Victorville, CA  92392
760-955-5033 office
760-559-3065 cell
www.victorvillecity.com

---

**From:** Keith Metzler
**Sent:** Wednesday, March 09, 2016 5:07 PM

**To:** Sophie Smith
**Subject:** FW: ComAv - New Hangar Project & Hangar 681

---

**From:** William Morris [mailto:william.morris@comav.com]
**Sent:** Wednesday, March 09, 2016 11:34 AM
**To:** Keith Metzler
**Cc:** 'Andre de Bortnowsky'; Barbara Lichman; Kent Hindes; Craig Garrick
**Subject:** ComAv - New Hangar Project & Hangar 681

Dear Mr. Metzler,

Please find the attached regarding the new hangar project and Hangar 681.

Best regards,

William

William Sherman Morris
Executive Vice President
ComAv, LLC
Phone: 901-500-6657
Email: william.morris@comav.com



The information contained in this communication is confidential and intended only for the use of the named party above. This transmission may be legally privileged and if the reader of this message is not the intended recipient, this warning will serve as notice that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, accidentally or otherwise, please return it to the sender immediately and delete the message from your hard drive. ComAv, LLC is not a law firm and any information contained in this e-mail shall not be construed as legal advice.

EXHIBIT E
343

# EXHIBIT G

Email: william.morris@comav.com



The information contained in this communication is confidential and intended only for the use of the named party above. This transmission may be legally privileged and if the reader of this message is not the intended recipient, this warning will serve as notice that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, accidentally or otherwise, please return it to the sender immediately and delete the message from your hard drive. ComAv, LLC is not a law firm and any information contained in this e-mail shall not be construed as legal advice.

**From:** Kent Hindes <kent.hindes@cushwake.com>
**Date:** Thursday, March 17, 2016 at 12:13 PM
**To:** William Morris <william.morris@comav.com>
**Cc:** Keith Metzler <KMetzler@ci.victorville.ca.us>, Sophie Smith <ssmith@CI.VICTORVILLE.CA.US>, "eray@victorvilleca.gov" <eray@victorvilleca.gov>
**Subject:** Hanger 681- ConAv

Good Morning William,

Thank you again for your continued interest in Hanger 681. It is standard practice that before we can proceed with a counter proposal, we will need to review your current financial condition.
At your earliest convenience, please provide us with your last three years audited tax returns as well as a current Balance Sheet and Income Statement. Once we review these we will craft the appropriate response and put our best foot forward.

**Kent G. Hindes**
Senior Director
Brokerage
CA License 00866896

Direct:  +1 909 942 4654
Mobile: +1 909 816 8425
Fax:    +1 909 989 4440
kent.hindes@cushwake.com



901 N. Via Piemonte, Suite 200
Ontario, CA 91764 | USA
www.cushmanwakefield.com

LinkedIn | Facebook | Twitter | YouTube | Google+ | Instagram

The information contained in this communication is confidential, may be privileged and is intended for the exclusive use of the above named addressee(s). If you are not the intended recipient(s), you are expressly prohibited from copying, distributing, disseminating, or in any other way using any information contained within this communication. If you have received this communication in error please contact the sender by telephone or by response via mail.

EXHIBIT E
345

We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses.

# EXHIBIT H

**From:** William Morris [mailto:william.morris@comav.com]
**Sent:** Monday, March 21, 2016 7:26 AM
**To:** Kent Hindes
**Cc:** Keith Metzler; Sophie Smith; eray@victorvilleca.gov; 'Andre de Bortnowsky'; Craig Garrick; Barbara Lichman
**Subject:** Re: Hanger 681- ConAv

Good morning Kent,

We would be surprised to learn that this is the Airport's standard practice, as we do not believe financials have ever been required in our 18 years at the Airport in order to receive a counteroffer – particularly for a facility where we've been the beneficial tenant since construction.  We also have never been asked for financials in connection with a lease extension, which this essentially is.  Just in July of 2015, we entered a long term extension for Hangar 691 and the 240 acre parking area (a substantial "Premises" for the Airport's footprint); yet no financials were requested.  To be frank, this feels like another delay tactic by the Airport.

We acknowledge that it will be appropriate for the Airport to receive reasonable and adequate financial assurances regarding ComAv's ability to perform its obligations under a lease prior to entering the lease, but we need to proceed with a counteroffer without delay.  If the counteroffer needs to contain appropriate contingencies, such as receipt by the Airport of those reasonable financial assurances prior to entering a lease, please include them as would be appropriate.

Requesting financials prior to making a counteroffer seems to suggest that there are suddenly minimum financial criteria for leasing hangars at the Airport.  If that is the case, please identify them in writing.  They will need to be reviewed in the context of the Airport's obligations to treat all aeronautical users reasonably and equitably.

Can we expect a reasonable counteroffer by Wednesday of this week?

Best regards,

William

William Sherman Morris
Executive Vice President
ComAv, LLC
Phone: 901-500-6657

EXHIBIT E
348 **2**

# EXHIBIT I

**Lichman, Barbara**

| | |
|---|---|
| **From:** | Craig Garrick <cgarrick@comav.com> |
| **Sent:** | Wednesday, March 23, 2016 2:04 PM |
| **To:** | Sophie Smith |
| **Cc:** | William Morris; Keith C. Metzler; C. Eric Ray; Andre de Bortnowsky; Lichman, Barbara; Kent Hindes |
| **Subject:** | Hanger 681--CTS |

Sophie:

Thank you for copying me on this correspondence. I think it might be helpful for me to respond on several of the discussion points.

Financial Statements: As you know, the airport authority already has approximately three years of CTS (SCA) financial statements. They were provided to the authority after completion of the negotiations for a new lease for Buildings 780 & 789, at the same approximate time CTS provided insurance certificates for the same facilities. And, though the process you are requesting here is different than our prior lease negotiations, we are willing to provide supplemental information for 2015 early and will do so. We expect that this supplemental financial information will, however, continue to be subject to strict confidentiality as has been promised before. I will tell you, though, that the supplemental FYE 2015 will have the same general profitable results as before, and this is true despite the very limiting impact of our supporting and protecting FedEx Manpad by sharing access of Hangar 681 (Hangar). Despite this limitation, the Sales for FYE 2015 were approximately $17.M, with income at approximately $1.6M. Equity continues to grow and was approximately $8M at year-end (M = Million). Further, we expect that this financial performance, as it has been before, will continue to be adequate to support this lease. (And this is without multiple available forms of lease-credit enhancement vehicles available to CTS if such a thing were really required.)

Negotiation Process: I cannot speak to what processes you are now developing (which I would hope are being consistently applied), but the negotiating process you are imposing on this specific transaction with regard to financial qualification in advance is not consistent with our prior experience. In the last "new" lease negotiation, the Authority had retained a third party broker as well, but the negotiations were completed and a definitive LOI was executed by both parties before CTS was required to provide supplemental financial information and insurance verification, both expected contingencies before any final agreement. With regard to lease renewal discussions (vs. a new lease), which we consider this to be, I am not aware that we have ever been required to provide supplemental financial statements.

General Concerns: I should also tell you that normally we would not be as concerned about this change in process or the timing of this request if we were not already concerned about the difficulty we are having in obtaining real, substantive progress in the lease negotiations. Please remember, we started this process in June of last year, almost 9 months ago. Further, in a spirit of openness and good faith, some of the perceptions we have had along the way have not been comforting. We hope that you can help us with that. But some of the other concerns include the following:

—We have not received accurate information about the purpose or parties for whom we have been providing access to the Hangar. Often we have been told that the purpose was to support the defense of the SEC lawsuit against the Authority, but that has not turned out to be true.

—There appears to be more focus on a public name than true local, full-time employment substance. When Pratt was our partner here, they never employed more that 3 people in Victorville. CTS on the other hand has employed hundreds and continues to grow. And, as the Authority fully understands, Pratt has never been the employer or beneficial lessee. The Authority has copies of the several written assignment of rights and obligation agreements between Pratt and CTS.

—We were surprised that despite the Authority being party to the FedEx license agreement that included a non-circumvention agreement, the Authority still reached out to FedEx encouraging them to negotiate on the Hangar in violation of that agreement.

—We are also concerned that the Authority does not fully appreciate, but should as an FAA regulated entity, the dramatic negative impact that losing the Hangar would have on the CTS operating certificate, not only jeopardizing CTS but risking literally hundreds of local full time (not temporary or contract) jobs. (The average longevity of our full time employee work force is over 7 years, which is significant considering the employment base growth.)

I hope the Authority really is working with us in good faith to continue to build the business and jobs that we have been building for over 18 years. Even before the impact of the new hangars, which we cannot get to without the bridge of the current Hangar, we expect to add over 75 more full time jobs over the next few months to staff Hangar 681 alone. I promise you, undermining these efforts is not in the best interest of the community, the Airport or CTS. I truly hope that we can focus on making true substantive progress, and do so quickly.

Thank you.

Craig


On Mar 21, 2016, at 2:58 PM, Sophie Smith <ssmith@CLVICTORVILLE.CA.US> wrote:

Hello Mr. Morris,
Thank you for continuing to work with SCLA's broker, Mr. Kent Hindes of Cushman & Wakefield on the current lease negotiations.

I have to respond to your email below as I know Mr. Hindes was not involved with SCLA in prior lease negotiations and does not have all of the relevant information regarding prior negotiations.

I want to assure you that it is SCLA's intent to handle lease negotiations reasonably and equitably. In fact, as I mentioned in previous correspondence, we've had a recent change in responsibility for SCLA's duties, and one of the most pressing reasons for bringing Cushman & Wakefield on board was to handle lease negotiations and tenant qualifications on our behalf. To suggest this is a delay tactic by SCLA is incorrect. It is our obligation to assess the financial condition of any potential tenant. In fact, I have searched our records and found the attached letter dated May 23, 2011 in which Mr. Keith Metzler discussed then-ongoing negotiations for Hangar 681 with ComAv and Pratt Whitney. Specifically, Mr. Metzler's letter indicated he would consider ComAv's proposal (if a renewal with Pratt Whitney did not move forward) however "SCLA would be required to further qualify ComAv as a legal entity and its financial strength. Doing so will require a confidential review of company formation document, financial statements and service contracts (to the extent said contracts are relied upon to support revenue projections)." The letter also stated, "SCLA's current rates for hangar space is $.65 per square foot of building space and $1.35 per square foot for office space. However, a factor of SCLA's lease rates is credit risk of the tenant. Accordingly, SCLA reserves the right to charge a credit risk premium to the

extent a tenant is determined to be inadequately capitalized to provide security for the lease payments, or does not otherwise demonstrate an adequate level of creditworthiness."

You have suggested asking for financials prior to a counter offer is not our standard practice. I believe this letter demonstrates otherwise. We would not be doing our jobs if we do not assess ComAv or any other tenant appropriately. As you know, we are well aware that FedEx's sublease for Hangar 681 has provided a revenue stream that well exceeds the lease rate ComAv pays SCLA for the hangar. In the absence of FedEx's sublease, we must determine ComAv financial ability to enter into a new lease for the hangar.

Please understand SCLA brought the professional brokerage firm of Cushman & Wakefield on board to help us maximize our real estate portfolio and qualify our tenants. If ComAv would like to move forward with negotiations in a timely manner, I would suggest you help Mr. Hindes get through the tenant qualification phase by providing the financial information requested.

Thank you very much for your consideration.

*Sophie L. Smith*
*Economic Development Division Head*
*City of Victorville/Southern California Logistics Airport*
14343 Civic Drive
Victorville, CA 92392
760-955-5033 office
760-559-3065 cell
www.victorvillecity.com

---

**From:** William Morris [mailto:william.morris@comav.com]
**Sent:** Monday, March 21, 2016 7:26 AM
**To:** Kent Hindes
**Cc:** Keith Metzler; Sophie Smith; eray@victorvilleca.gov; 'Andre de Bortnowsky'; Craig Garrick; Barbara Lichman
**Subject:** Re: Hanger 681- ConAv

Good morning Kent,

We would be surprised to learn that this is the Airport's standard practice, as we do not believe financials have ever been required in our 18 years at the Airport in order to receive a counteroffer – particularly for a facility where we've been the beneficial tenant since construction. We also have never been asked for financials in connection with a lease extension, which this essentially is. Just in July of 2015, we entered a long term extension for Hangar 691 and the 240 acre parking area (a substantial "Premises" for the Airport's footprint); yet no financials were requested. To be frank, this feels like another delay tactic by the Airport.

We acknowledge that it will be appropriate for the Airport to receive reasonable and adequate financial assurances regarding ComAv's ability to perform its obligations under a lease prior to entering the lease, but we need to proceed with a counteroffer without delay. If the counteroffer needs to contain appropriate contingencies, such as receipt by the Airport of those reasonable financial assurances prior to entering a lease, please include them as would be appropriate.

Requesting financials prior to making a counteroffer seems to suggest that there are suddenly minimum financial criteria for leasing hangars at the Airport. If that is the case, please identify them in writing. They will need to be reviewed in the context of the Airport's obligations to treat all aeronautical users reasonably and equitably.

Can we expect a reasonable counteroffer by Wednesday of this week?

Best regards,

William

William Sherman Morris
Executive Vice President
ComAv, LLC
Phone: 901-500-6657
Email: william.morris@comav.com

<Image001.png>

The information contained in this communication is confidential and intended only for the use of the named party above. This transmission may be legally privileged and if the reader of this message is not the intended recipient, this warning will serve as notice that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, accidentally or otherwise, please return it to the sender immediately and delete the message from your hard drive. ComAv, LLC is not a law firm and any information contained in this e-mail shall not be construed as legal advice.

---

From: Kent Hindes <kent.hindes@cushwake.com>
Date: Thursday, March 17, 2016 at 12:13 PM
To: William Morris <william.morris@comav.com>
Cc: Keith Metzler <KMetzler@ci.victorville.ca.us>, Sophie Smith <ssmith@CI.VICTORVILLE.CA.US>, "eray@victorvilleca.gov" <eray@victorvilleca.gov>
Subject: Hanger 681- ConAv

Good Morning William,

Thank you again for your continued interest in Hanger 681.  It is standard practice that before we can proceed with a counter proposal,  we will need to review your current financial condition.
At your earliest convenience, please provide us with your last three years audited tax returns  as well as a  current  Balance Sheet and Income Statement.  Once we review these we will craft the appropriate response and put our best foot forward.

Kent G. Hindes
Senior Director
Brokerage
CA License 00866898

Direct:  +1 909 942 4654
Mobile: +1 909 816 8425
Fax:    +1 909 989 4440
kent.hindes@cushwake.com

<image002.png>

901 N. Via Piemonte, Suite 200
Ontario, CA  91764 | USA
www.cushmanwakefield.com

LinkedIn | Facebook | Twitter | YouTube | Google+ | Instagram

EXHIBIT E
4
353

# EXHIBIT J

**BuchalterNemer**
A Professional Law Corporation

18400 VON KARMAN AVENUE, SUITE 800, IRVINE, CALIFORNIA 92612-0514
TELEPHONE (949) 760-1121 / FAX (949) 720-0182

File Number: C5649-0002
Direct Dial Number: (949) 224-6292
Direct Facsimile Number: (949) 224-6480
E-Mail Address: *blichman@buchalter.com*

April 15, 2016

**VIA E-MAIL (ERAY@CI.VICTORVILLE.CA.US)**

Eric C. Ray
Airport Manager
Southern California Logistics Airport
18374 Phantom West
Victorville, CA  92394

      Re:    ComAv Technical Services – Negotiations Re: Lease for Hangar 681

Dear Mr. Ray:

      We represent ComAv Technical Services ("CTS") in its negotiations with Southern California Logistics Airport Authority ("SCLAA" or "Authority") for the renewal of the lease for Hangar 681 on the Southern California Logistics Airport ("SCLA" or "Airport"). First, we want to thank the Authority for the productive meeting with CTS on March 31, 2016, and look forward to bringing the negotiations to a mutually agreeable resolution in the immediate future.

      There remain, however, several issues raised in your e-mail of April 5, 2016 that need to be addressed. First, we share your concerns with the economic integrity of the Airport, and the need to maintain it in a safe and functional condition for all users, as well as in compliance with FAA's grant assurances in general, and economic non-discrimination requirements in particular. Nevertheless, we are equally concerned about the lease rate the Authority is currently contemplating imposing on Hangar 681.

      While your e-mail alludes to the imminent "coming to term" of the "Pioneer leases" on the Airport, we are confused by the reference, as, to our knowledge, the earliest leases of facilities comparable to Hangar 681 are years away from expiration. For example, the Boeing lease for Hangar 678 appears to be in its first option period, which expires in August, 2019; the Leading Edge lease for Hangar 746 appears to be in its first option period, which expires in March, 2021, and the Leading Edge lease for Hangar 747 appears to be in its first option period, which expires in June, 2018. All of these leases have additional option periods beyond those mentioned herein, with set mechanisms to determine lease rates – for many years to come. Thus, none of the leases for facilities comparable to Hangar 681 are coming to term; quite to the contrary, they may be extended far into the future by express rights that have been granted by the Authority to the current tenants of those facilities.

Los Angeles • Orange County • San Francisco • Scottsdale

EXHIBIT E
355

BuchalterNemer

Eric C. Ray
City of Victorville/Southern California Logistics Airport
April 15, 2016
Page 2

  While the FAA acknowledges that rental rates may need to be revised from time to time, the FAA instructs new rates to "be imposed at a time when the rates can be changed for all similarly situated tenants at the same time to avoid any claims of unjust discrimination" and, further, to limit "the term of new agreements to expire when existing agreements expire in order to bring all similarly situated tenants under a common rate structure at one time." FAA Order 5190.6B, § 9.2.d. As the leases for facilities comparable to Hangar 681 are not all coming to expiration contemporaneously with the lease of Hangar 681, the Authority cannot meet the requirement of changing all rates at the same time; accordingly, the only option the Authority has, without unjustly discriminating, it to offer a lease on Hangar 681 at comparable rates to the other hangars until such time as all the lease expirations can be aligned, at which time all rates could then be changed at the same time.[1]

  It should also be mentioned that the reference in your email to the FedEx lease is off point. CTS has repeatedly explained to the Authority that the FedEx license rate is not a triple net rate. As between CTS and FedEx, CTS retains the financial obligation for maintenance, insurance and taxes. Furthermore, CTS made, at its own expense, considerable improvements to the facilities for FedEx's use. Accordingly, these costs and expenses are passed through to FedEx via a grossed up rate. If the FedEx license rate were converted to a triple net rate, it would be substantially in line with the other rates being paid at the Airport for comparable facilities. It should also be noted that FedEx is vacating Hangar 681 as the facility no longer meets its needs; accordingly, this rate will no longer be generated by any facility at the Airport.

  Further, even if the other "Pioneer" leases were to expire in the near term, and understanding the urgency to comply with the Airport's contractual obligation for economic non-discrimination, *see, e.g.*, FAA Order 5190.6B, § 9.7 [requiring the airport proprietor "to negotiate in good faith for the lease of premises available to conduct aeronautical activities"], where an aeronautical user like CTS is already an incumbent, it must be subject to "substantially comparable rates, fees, rentals and charges [if it] assume[s] similar obligations, use[s] similar facilities and make[s] similar use of the airport." FAA Order 5190.6B, § 9.2.a. Thus, where, as here, an aeronautical user is already an incumbent, it is even more important that its treatment be both "reasonable," *see, e.g.*, FAA Order 5190.6B, § 14.3, and "equitable," FAA Order 5190.6B, § 9.5.d.

  While the FAA acknowledges the potential for differences in lease rates based on differences in the nature or use of the facilities in question, those differences must be justified and supported by the attributes of the facilities themselves (such as, by way of example, location) or the structure of their ownership (such as, by way of example, a lease for improved real property vs. a ground lease with the tenant having constructed and financed the improvements). *See*, FAA Order 5190.6B, § 9.2.d. Accordingly, differences in the location of the aeronautical

---

[1] Note that this letter does not attempt to address whether it is in the best interests of the Airport and the surrounding community to have substantial increases in lease rates at the Airport.

EXHIBIT E
356

BuchalterNemer

Eric C. Ray
City of Victorville/Southern California Logistics Airport
April 15, 2016
Page 3

facility, its condition, whether it is owned or leased, whether the airport or the lessee provides the improvements to the facility, may substantiate potential differences in lease rates. However, none of these factors would justify a substantially higher lease rate for Hangar 681 when compared to Hangars 678, 746 and 747, as they are all similarly situated in these regards. Most critically, the airport must also show that, even though the lease rates have a substantial basis in the nature of the facility, and are therefore "comparable," if not equal, they are also "equitable". *See*, FAA Order 5190.6B, § 9.5.d. Consequently, charging vastly divergent present and future rates for the same facility, *e.g.*, Hangar 681, would fly in the face of FAA regulation.

In the final analysis, if "the [aeronautical users] at the airport are making the same or similar uses of the airport facilities under the same circumstances, then the same rates, fees and rental structure will apply." FAA Order 5190.6B, § 9.6.d. Therefore, the acceptable comparison for purposes of establishing lease rates for Hangar 681 is, simply, what other aeronautical users on the airport are *currently* paying for "similar" facilities. Any other comparison is antithetical to FAA's regulatory scheme, and unnecessarily prejudicial to the Airport's Grant Assurances and continued federal funding.

We appreciate the Authority's efforts toward reaching an agreement and are confident that a mutually satisfactory resolution for Hangar 681 can be reached. Toward that end, we will expect a counter to our offer no later than Wednesday, April 20, 2016. With your cooperation, we are certain that the parties can continue working together collaboratively for the betterment of the Airport; the employees, tenants and businesses of the Airport; the City of Victorville and the entire Victor Valley.

Sincerely,

BUCHALTER NEMER
A Professional Corporation

By *Barbara Lichman*

Barbara Lichman

cc:   Sophie Smith
      Keith Metzler
      Andre DeBortnowsky
      Craig Garrick
      William Morris
      Cory Cloward

EXHIBIT E
357

# EXHIBIT K



Calabasas | 23801 Calabasas Road, Suite 1015, Calabasas, California 91302
Telephone 818.704.0195 • Facsimile 818.704.4729

Rancho Mirage | 41750 Rancho Las Palmas Drive, Suite P-1, Rancho Mirage, California 92270
Telephone 760.770.0873 • Facsimile 760.770.1724

www.gdblawoffices.com

April 26, 2016

*VIA ELECTRONIC MAIL to*
*blichman@buchalter.com*

Barbara Lichman
Buchalter Nemer, P.C.
18400 Von Karman Avenue, Suite 800
Irvine, California 92612-0514

Dear Ms. Lichman:

Thank you for your correspondence of April 25, 2016 in connection with the negotiation of a lease for Hangar 681 at Southern California Logistics Airport. As you point out in your April 25 correspondence, we need to be certain that the Southern California Logistics Airport Authority (the "Authority") is taking steps necessary to ensure that it is "seeking to conform to the mandates of the FAA Guidelines". As such, we are heeding your advice and we have been directed to review the issues raised in your prior April 15 correspondence. We are still in the process of doing so.

As I am sure you can appreciate, these issues are even more important given that they have been raised by legal counsel representing a client in lease negotiations. Any time an attorney is inserted into real estate negotiations in a manner that could be perceived as trying to influence the outcome of such negotiations, it "raises the stakes" and, accordingly, it gives rise to a course of action that ensures that all t's are crossed and i's are dotted.

Therefore, in light of your recent communications, and your engagement as part of the lease negotiation process we believe it prudent to update the Authority as to the status of negotiations and seek direction from the Authority as to appropriate price and terms that should be considered in the ongoing negotiations. As such I have deemed it necessary to schedule this matter for discussion with my client, the Authority, at the next upcoming Authority Board meeting. Until such direction is received from the client, it would seem premature to meet or submit a counter-offer by the deadlines imposed in your April 25 correspondence.

The Authority looks forward to being able to continue good faith negotiations with your client in the hopes of structuring a mutually beneficial transaction. However, based on the concerns raised in your prior letters, we deem it important to ensure the integrity of the process before proceeding further.

EXHIBIT E
359

Barbara Lichman
Buchalter Nemer, PC
April 26, 2016
Page 2


        If you have any immediate questions, please don't hesitate to contact me at your earliest convenience.


                        Very truly yours,

                        GREEN de BORTNOWSKY, LLP


                        Andre de Bortnowsky, General Counsel

AdB:law
cc:     Michelle McCarron
        Keith Metzler
        Eric Ray
        Sophie Smith
        Craig Garrick
        William Morris
        Cory Cloward
SCAA/0009/LTR/052

# EXHIBIT L



Calabasas | 23801 Calabasas Road, Suite 1015, Calabasas, California 91302
Telephone 818.704.0195 • Facsimile 818.704.4729

Rancho Mirage | 41750 Rancho Las Palmas Drive, Suite P-1, Rancho Mirage, California 92270
Telephone 760.770.0873 • Facsimile 760.770.1724

www.gdblawoffices.com

May 5, 2016

*VIA ELECTRONIC MAIL to*
*blichman@buchalter.com*

Barbara Lichman
Buchalter Nemer, P.C.
18400 Von Karman Avenue, Suite 800
Irvine, California 92612-0514

Dear Ms. Lichman:

As a follow up to my prior April 26 correspondence, I was able to confer with the Authority Board to seek input as to price and terms of a counter offer to ComAv Technical Services.

The Board has deemed it appropriate to consider the credit-worthiness of a prospective tenant in connection with establishing appropriate price and terms in connection with any lease transaction. Apparently, to date the Authority has only received minimal documentation as to the financial ability of CTS and therefore the Board has directed Staff to request reviewed financial statements and documentation, which must be evaluated before proceeding further (namely, financial statements reviewed and prepared by a CPA, akin to an audit).

As such, I would request that you have your client submit appropriate financial documentation at their earliest convenience so that good faith negotiations may proceed expeditiously.

If you have any immediate questions, please don't hesitate to contact me at your earliest convenience.

Very truly yours,

GREEN de BORTNOWSKY, LLP

/s/ Andre de Bortnowsky

Andre de Bortnowsky, General Counsel

EXHIBIT E
362

Barbara Lichman
Buchalter Nemer, PC
May 5, 2016
Page 2


AdB:law
cc:   Michelle McCarron
      Keith Metzler
      Eric Ray
      Sophie Smith
      Craig Garrick
      William Morris
      Cory Cloward

SCAA/0009/LTR/053

# EXHIBIT M

**Lichman, Barbara**

| | |
|---|---|
| **From:** | Craig Garrick <cgarrick@comav.com> |
| **Sent:** | Tuesday, May 24, 2016 12:51 PM |
| **To:** | William Morris; Lichman, Barbara |
| **Subject:** | Fwd: CTS Hangar 681 Lease Extension Offer |
| **Attachments:** | 052 - Response Letter to CTS - SCLAA Neg 4 26 2016.pdf; ATT00001.htm; CTS, SCLA Authority, Hangar 681 Offer, 5-23-16 .pdf; ATT00002.htm |

FYI.

Begin forwarded message:

**From:** Keith Metzler <KMetzler@ci.victorville.ca.us>
**Subject: RE: CTS Hangar 681 Lease Extension Offer**
**Date:** May 24, 2016 at 12:15:39 PM PDT
**To:** "Craig Garrick" <cgarrick@comav.com>
**Cc:** Sophie Smith <ssmith@CI.VICTORVILLE.CA.US>, Eric Ray <eray@CI.VICTORVILLE.CA.US>

Thanks Craig.

I do, very much, appreciate your email. I also appreciate you bringing into context, our discussion last week on the telephone. One issue not brought up in your email below is the point made by the Authority that as a critical precursor to moving forward with a productive negotiation, is the need for your legal counsel and the Authority's legal counsel, to resolve concerns shared by the Authority's legal counsel in the attached April 26, 2016 letter. While I am anxious to hear that our Counsel's have resolved their concerns, as of this morning, Authority legal counsel has not yet been contacted by your attorney. The sooner we can dispel what is viewed as a legal challenge by your counsel, the sooner we can resume negotiations.

Anticipating an ability to resume negotiations, your email seems to speak to audited financials not being available because CTS shareholder or financing sources don't require them. What the Authority has asked for are "reviewed financials" which are prepared by a CPA, but not to a full blown auditing standard. A "reviewed financials" prepared by a CPA will at the least, share opinion that the financials presented by the company don't require any modifications, therefore allowing them to be considered reliable. Having this information is important to the Authority as it considers a lease transaction of this significance.

I do encourage an immediate phone conversation among your counsel and the Authority's counsel before we can discuss the aspects of negotiation further. Time is of the essence as we are entertaining other proposal(s).

Kind regards
Keith

-----Original Message-----
From: Craig Garrick [mailto:cgarrick@comav.com]
Sent: Tuesday, May 24, 2016 7:39 AM
To: Keith Metzler
Cc: Sophie Escobar; Eric Ray
Subject: CTS Hangar 681 Lease Extension Offer
Importance: High

Keith:

Thank you for taking my call last week regarding Hangar 681. It is hard to believe that it has almost been a full year since our first offer to the Authority to extend the CTS lease on Hangar 681. Despite this initial offer and the several that have followed, we have not received an acceptance or a counter during this entire period and that has been frustrating. I am hopeful that we can change that here and would sincerely appreciate your efforts in helping us do so.

Attached is an update of the last formal offer made in February of this year. We are requesting a formal response, either an acceptance or counter-offer, including the specific terms and conditions that the Authority would be seeking. In an effort to be helpful to the process, please note the following:

EXHIBIT E
365

—Financial Assurance:  As we have confirmed several times, we acknowledge the appropriateness of having reasonable financial assurance of any tenant's financial ability to perform.  Accordingly, aside from the financial summary already provided, please note that:
—CTS has 18 years of history with the Authority, and ten years of history with regard to Hangar 681 specifically, and during this entire period, CTS has been the primary responsible financial party for all of the leases it has held,
including its assigned interest in Hangar 681.  Further, we are proud to note, which you well know and understand, that during this entire 18 years history the Authority has always been paid and has never been put in a position that would require it to write-off or discount in any way the rental income due from CTS.  This is true, incidentally, even though there were several significant economic disruptions and challenges during this period for all businesses, including and particularly for those in the aviation industry during the 911 event.
--While we do not currently generate audited finical statements (they are not required by our shareholders or financing sources), we are willing to have the accounting and tax firm that handles these matters for CTS (HW LLP of Sherman Oaks (the same firm that was used by United Technologies/Pratt & Whitney)) prepare a reasonable summary and response to any of the specific questions and/or assurances that are needed by the Authority to support this lease.  But, please include the specific information that would be helpful as a contingency in the acceptance or counter offer.
.—We would also welcome, as a contingency of financial assurance, the opportunity to have our CFO meet with the Authority and make a financial presentation on CTS, including responding to any specific question.

—Pending Programs:  Please also know that one of the key reasons that the delays in this negotiation process have been so difficult for CTS is that we are currently transitioning the Hangar activity from supporting the MANPAD project and doing intermittent maintenance work to a full lease transitional maintenance activity, the capital cost for which is significant, including tooling, equipment and outfitting the hangar, and we have already had to start this activity.   Further, this activity alone will require approximately 75 new hires, which we are already recruiting.

Again, Keith, thank you for taking my call.  We are urgent about finalizing now what we expected to be able to finalize 11 months ago.  I hope you will help us do that.

Thank you.

Craig

EXHIBIT E
366²

# MORRIS DECLARATION

## DECLARATION OF WILLIAM SHERMAN MORRIS

I, William Sherman Morris, declare as follows:

1.      I am Executive Vice President of ComAv, LLC, owner of ComAv Technical Services, LLC ("CTS"), previously known as Southern California Aviation, LLC ("SCA") and ComAv Asset Management, LLC ("CAM"). In the course of my employment, I have been involved in the issues surrounding Hangar 681 at Southern California Logistics Airport ("Airport"), operated by the Southern California Logistics Airport Authority ("Airport Authority"). I have first-hand personal knowledge of all matters set forth herein and could and would competently testify to those matters if called upon to do so at trial.

2.      I was asked by our President Craig Garrick to obtain some information concerning comparable hangars on the Airport for the purpose of documenting lease negotiations with the Airport Authority.

3.      In the course of doing so, I discovered through reviewing publicly available documents, that there are three existing hangars at the Airport that are comparable to Hangar 681, occupied by CTS. They are Hangars 746 and 747, occupied by Leading Edge ("LE"), and Hangar 678, occupied by The Boeing Company ("Boeing"). Hangar 678 was leased by Pacific Aerospace and Technology up to 2013, when that lease was mutually terminated due to performance issues, and, ultimately, leased to Boeing. The three hangars (746, 747 and 678) are the only hangars on the Airport comparable to Hangar 681. All the other hangars on the Airport are much older and/or are not comparable in terms of financial structure. For example, General Electric has a similar hangar, but they simply have a ground lease and built the hangar structure, so its lease payments would not be comparable.

4.      Below is a chart containing the results of my investigation.

EXHIBIT E
368

| | CTS | Boeing | PART | LE (pre-TI)* | LE (post-TI)* | LE (pre-TI)* | LE (post-TI)* |
|---|---|---|---|---|---|---|---|
| Lease | 681 | 678 | 678 + office | 746 | 746 | 747 | 747 |
| | | | | | | | |
| Hangar | 67,500 | 90,235 | 90,727 | 75,475 | 75,475 | 75,370 | 75,370 |
| Office | 5272 | 9,927 | 26,596 | 8,000 | 8,000 | 8,000 | 8,000 |
| Other | | | | | | 3,224 | 3,224 |
| Total Sq. Ft. | 72,772 | 100,162 | 117,323 | 83,475 | 83,475 | 86,594 | 86,594 |
| | | | | | | | |
| 2016 rate | $0.68 | $0.53 | $0.74 | $0.75 | $0.69 | $0.76 | $0.68 |
| Esclator | 1% | 3% | 3% | 3% or FMV, whichever is less | 3% or FMV, whichever is less | 3% or FMV, whichever is greater | 3% or FMV, whichever is greater |
| Initial Term | 5 year | 3 year | Terminated 2013 | | | | |
| Options | none | 3 - 3 year | | 4 - 5 year | 4 - 5 year | 3 - 5 year | 3 - 5 year |
| Potential Exp. | 2016 | 2025 | | 2036 | 2036 | 2028 | 2028 |

*Leading Edge made Tenant Improvements to both hangars = $550,000 each and received reduced rent

5.     The bottom line is that 2016 lease rates vary from $.53 per square foot for Hangar 678 to $.69 per square foot for Hangar 746. Thus, CTS' Hangar 681 falls directly within the scope of those per square foot lease rates. Moreover, CTS' lease rate could be construed to be somewhat on the high end of the leasing prices as CTS' lease contains no option to renew as do the leases for Hangar 678 (three, 3 year options); Hangar 746 (four, 5 year options); and Hangar 747 (three, 5 year options).

6.  Finally, when questioned about the basis of the Airport Authority's asking price of $1.25 per square foot, Assistant Airport Manager Keith Metzler admitted that the Airport Authority had not obtained an appraisal on the value of Hangar 681.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 1st day of June, 2016 at Memphis, Tennessee.

William Sherman Morris

# BARRETT
# DECLARATION

## DECLARATION OF SUSAN BARRETT

I, Susan Barrett, declare as follows:

1.       I am assistant to Barbara Lichman at the law firm of Buchalter Nemer.  I have first-hand personal knowledge all matters set forth herein and could and would competently testify to them if called upon to do so at trial.

2.       In the course of my duties, I had reason to access the case of *Securities and Exchange Commission, Plaintiff v. City of Victorville, Southern California Logistics Airport Authority, Kinsell, Newcomb & DeDios; KND Affiliates, LLC; J. Jeffrey Kinsell, Janees L. Williams and Keith C. Metzler, Defendants and KND Holdings, Inc., Relief Defendant,* United States District Court, Central District of California Case No. EDCV13-0776 ("SEC Complaint").

3.       I accessed the SEC Complaint from PACER (Public Access to Court Electronic Records), https://www.pacer.gov/.  A true and correct copy of the Complaint obtained through PACER is attached hereto as Exhibit A.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of June, 2016 at Irvine, California.

Susan Barrett

BN 20854999v1

EXHIBIT E

# EXHIBIT A

1 | SAM S. PUATHASNANON, Cal. Bar No. 198430
Email: puathasnanons@sec.gov
2 | ROBERT H. CONRRAD, Cal Bar. No. 199498
Email: conrradr@sec.gov
3 | THERESA M. MELSON, Cal. Bar No. 185209
E-mail: melsont@sec.gov
4 | TODD S. BRILLIANT, Cal. Bar No. 147727
Email: brilliantt@sec.gov
5
6 | Attorneys for Plaintiff
Securities and Exchange Commission
7 | Elaine C. Greenberg, Chief
Mark R. Zehner, Deputy Chief
Municipal Securities and Public Pensions Unit
8 | Philadelphia Regional Office
The Mellon Independence Center
9 | 701 Market Street
Philadelphia, Pennsylvania 19106
10
11 | Michele Wein Layne, Regional Director
Lorraine B. Echavarria, Associate Regional Director
12 | John W. Berry, Regional Trial Counsel
Los Angeles Regional Office
13 | 5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
14 | Telephone: (323) 965-3998
Facsimile: (323) 965-3908

**FILED**
CLERK, U.S. DISTRICT COURT

APR 29 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

15

**UNITED STATES DISTRICT COURT**

16

**CENTRAL DISTRICT OF CALIFORNIA**

17

| | |
|---|---|
| 18  SECURITIES AND EXCHANGE COMMISSION, | Case No.  EDCV13-0776 JAK(DTBx) |
| 19          Plaintiff, | |
| 20     vs. | |
| 21  CITY OF VICTORVILLE, SOUTHERN CALIFORNIA LOGISTICS AIRPORT | **COMPLAINT** |
| 22  AUTHORITY, KINSELL, NEWCOMB, & DEDIOS; KND AFFILIATES, LLC; J. | |
| 23  JEFFREY KINSELL, JANEES L. WILLIAMS and KEITH C. METZLER, | |
| 24          Defendants, | |
| 25      and | |
| 26  KND HOLDINGS, INC., | |
| 27          Relief Defendant. | |
| 28 | |

EXHIBIT E
374

1      Plaintiff Securities and Exchange Commission (the "SEC") alleges as

2  follows:

## SUMMARY

4      1.      This matter involves a fraud committed by Defendants in connection

5  with the offer and sale of tax increment municipal bonds issued from 2006 to 2008

6  by one of the Defendants, the Southern California Logistics Airport Authority (the

7  "Authority"), which is an agency with redevelopment powers controlled by its co-

8  Defendant, the City of Victorville (the "City"). The Authority was created to

9  redevelop a 132-square mile area in and around a former Air Force base in San

10  Bernardino County, California.  It conducted several tax increment bond offerings

11  in connection with this redevelopment.  Defendant Kinsell, Newcomb & DeDios,

12  Inc. ("KND") was the sole underwriter for these bond offerings.

13      2.      Tax increment bonds are secured solely by and repaid solely from

14  increases in property tax revenues attributable to increases in the total assessed

15  value of the property located in the redevelopment project area.  This means that

16  the "tax increment" – that is, the increase in tax revenue from increases in property

17  value – is critical to the security of the tax increment bonds.  Equally important is

18  the metric called the "debt service ratio," which compares the annual tax increment

19  revenue available to pay the outstanding bonds to the annual debt service on those

20  bonds.

21      3.      The Authority used tax increment bond offerings to finance a number

22  of ill-conceived redevelopment projects, including the construction of a power

23  plant and four new airplane hangars ("Hangars") on the former Air Force base.  By

24  late 2007, it needed $50 million to pay a deposit on a turbine for the power plant,

25  and planned to finance that payment with a new $68 million tax increment bond

26  offering.  However, given the tightening credit market and the subordinate nature

27  of the bonds, prospective bond purchasers demanded that the debt service ratio for

28  this offering be increased to 1.25 (from the 1.10 ratio governing prior bond

1  offerings).  As a result, the Authority was forced to downsize its December 2007

2  bond offering from $68 million to $42 million.  This left the Authority with few

3  resources to continue its redevelopment activities.  Indeed, by this time, nearly all

4  of the tax increment available to the Authority had been used to secure its prior

5  bond issuances.

6         4.    In February 2008, in an effort to escape from this financial constraint,

7  the Authority borrowed $35 million in short-term financing.  It then publicly

8  offered $13.3 million of subordinate tax increment bonds in April 2008 to repay

9  part of that short-term debt.  This April 2008 financing was premised, in part, on

10  an assessed value of $65 million for the four Hangars.  This $65 million valuation

11  was used to determine the all-important tax increment for the April 2008 bond

12  offering, and allowed the Authority to satisfy the minimum 1.25 annual debt

13  service ratio for the offering.

14         5.    However, the Hangars' $65 million assessed value was vastly inflated,

15  resulting in the disclosure of false tax increment and debt service ratios in the

16  Official Statement provided to investors in the April 2008 bond offering.

17  Defendant Keith Metzler ("Metzler"), the Director of Economic Development for

18  the City and an agent for the Authority, and the two KND investment bankers—

19  Defendant Jeffrey Kinsell ("Kinsell"), the owner of KND, and Defendant Janees

20  Williams—all knew that the assessed value of the Hangars was inflated, and, as a

21  result, that the tax increment and debt service ratios disclosed to investors were

22  false.  Yet they each withheld this information, resulting in materially misleading

23  disclosures and a substantially oversized bond offering.

24         6.    Kinsell and KND also engaged in an additional fraudulent scheme to

25  take undisclosed construction and management fees collected on the airport hangar

26  project.  In 2006, the Authority retained Defendant KND Affiliates, LLC

27  ("Affiliates"), an entity partially-owned by Kinsell, to manage this project.  The

28  Authority agreed to compensate Affiliates and its contractor under a "cost plus

1    10% construction management fee" contract. However, Affiliates exploited this

2    fee arrangement by paying itself at least $450,000 more in fees than it was owed.

3         7.      Affiliates further misappropriated $2.3 million of bond proceeds

4    through a fictitious 15% monthly "property management fee." Affiliates

5    transferred over $1 million of unauthorized property management fees to Relief

6    Defendant KND Holdings ("Holdings"), the parent of KND. KND then used the

7    majority of these fees to finance KND's operating expenses, including payroll.

8    The Authority never authorized Affiliates to collect these excessive fees, which

9    Affiliates took from bond proceeds intended to complete construction of the

10    Hangars. As a result of the unauthorized construction management fees and

11    property management fees, Affiliates misappropriated a total of approximately

12    $2.7 million in bond proceeds.

13         8.      By engaging in this conduct, the Authority, KND, Affiliates and

14    Kinsell violated Section 10(b) of the Securities Exchange Act of 1934 (the

15    "Exchange Act") and Rule 10b-5 thereunder, and Section 17(a) of the Securities

16    Act of 1933 (the "Securities Act"), and the City, Metzler, KND, Kinsell and

17    Williams aided and abetted violations of these antifraud provisions of the federal

18    securities laws. Moreover, KND violated Section 15B(c)(1) of the Exchange Act

19    and Municipal Securities Rulemaking Board Rules G-17, G-27 and G-

20    32(a)(iii)(A)(2), Kinsell aided and abetted each of these violations, and Williams

21    aided and abetted KND's violations of Section 15B(c)(1) and Rule G-17.

22    Therefore, with this action, the SEC seeks permanent injunctions, disgorgement

23    with prejudgment interest and civil penalties against Defendants.

24                     **JURISDICTION AND VENUE**

25         9.      This Court has jurisdiction over this action pursuant to Sections 20(b),

26    20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a),

27    and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Exchange Act, 15 U.S.C.

28    §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa.

1      10.    Defendants Authority, KND, Affiliates and Kinsell have, directly or

2  indirectly, made use of the means or instrumentalities of interstate commerce, of

3  the mails, or of the facilities of a national securities exchange in connection with

4  the transactions, acts, practices and courses of business alleged in this Complaint.

5      11.    Venue is proper in this district pursuant to Section 22(a) of the

6  Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.

7  § 78aa, because certain of the transactions, acts, practices and courses of conduct

8  constituting violations of the federal securities laws occurred within this district.

9  In addition, venue is proper in this district because the City, the Authority and

10  Metzler all reside in this district.

11                **DEFENDANTS**

12      12.    **The City of Victorville** is located in southwestern San Bernardino

13  County, approximately 90 miles northeast of Los Angeles, California.  As of 2012,

14  the City's population was estimated at approximately 115,000 residents.  The City

15  is governed by a five-member council, the members of which also comprise the

16  governing board of the Authority.

17      13.    **The Southern California Logistics Airport Authority**, a joint

18  exercise of powers authority under state law, is the issuer of the relevant bonds

19  discussed herein, and is considered a component unit of the City for accounting

20  purposes.  The Authority is governed by a five-member commission, which

21  consists of all members of the city council of the City, and the City's

22  administrative staff serves as the Authority's administrative staff.  The Mayor

23  serves as the Authority's Chairman, the City Manager serves as the Authority's

24  Executive Director and the City's Finance Director serves as the Authority's

25  Treasurer.

26      14.    **Kinsell, Newcomb, & DeDios, Inc.** is a California corporation

27  formed on March 22, 1985 and located in Carlsbad, California.  It has been

28

1 | registered with the SEC as a broker-dealer since May 30, 1985. It is owned by
2 | KND Holdings, which in turn is owned by Kinsell.

3 |      15.    **KND Affiliates, LLC** is located in Carlsbad, California. Affiliates
4 | was incorporated in the state of California on October 29, 2002. After June 2006,
5 | it was used for the sole purpose of developing the Hangars. Kinsell is one of two
6 | managing members, who each have a 50% interest in Affiliates.

7 |      16.    **J. Jeffrey Kinsell**, age 61, resides in Carlsbad, California. He is the
8 | owner, Director, President and Chief Compliance Officer of KND. He is the
9 | owner of KND Holdings and 50% owner of Affiliates. He has series 7, 24, 53 and
10 | 63 FINRA licenses.

11 |      17.    **Janees L. Williams**, age 36, resides in San Diego, California. She is
12 | the Vice President of KND. She has series 7 and 63 FINRA licenses.

13 |      18.    **Keith C. Metzler**, age 37, of Victorville, California, is the current
14 | Assistant City Manager of the City. Although never formally a part of the
15 | Authority's staff, during the relevant time period, Metzler was the City's Director
16 | of Economic Development, in which capacity he integrated redevelopment
17 | activities, marketed industrial and commercial developments in the City, and
18 | administered redevelopment related grant programs.

19 | **RELIEF DEFENDANT**

20 |      19.    **KND Holdings, Inc.** is located in Carlsbad, California. KND
21 | Holdings was incorporated in the state of California on August 15, 2001, by
22 | Kinsell. KND Holdings is owned solely by Kinsell and is the parent company of
23 | KND.

24 | **STATEMENT OF FACTS**

25 | **A.**    **The City and the Authority**

26 |      20.    Formerly a small town on the edge of the Mojave Desert, during the
27 | 2000s, the City became an "ex-urb" of Los Angeles, and saw its population jump
28 | from 40,000 in 1990 to 115,000 in 2012, making it one of the fastest growing cities

1   in the nation.  The City sought to use its expanding property tax base to establish

2   local industries and create jobs, particularly after the 1992 closure of one of its

3   largest employers, George Air Force Base, located within the City.

4        21.      Working in conjunction with the County of San Bernardino and other

5   local communities, the City created the Authority.  The Authority adopted a plan

6   under California's redevelopment law to redevelop a 132-square mile project area

7   in and around the former George Air Force Base now known as the Southern

8   California Logistics Airport (the "Airport").  Much of the work on the

9   redevelopment plan was conducted under the auspices of the Authority's

10   predecessor, the Victor Valley Economic Development Authority, which delegated

11   all of its redevelopment powers to the Authority.

12   **B.**       **Tax Allocation, or Tax Increment, Financing**

13        22.      Municipalities often raise funds through "general obligation bonds,"

14   which, in general, are secured and their debt service paid by a municipality's its

15   ability to raise revenue through the imposition of taxes.

16        23.      However, the Authority does not have the power to levy property

17   taxes.  Therefore, instead of general obligation bonds, it relied on "tax allocation"

18   bonds, also known as "tax increment" bonds, to finance the capital projects for the

19   redevelopment of the Airport area.

20        24.      Although fairly common in California, tax increment bonds are

21   structured very differently than the more familiar general obligation bonds.  Unlike

22   general obligation bonds, tax increment bonds cannot rely on a municipality's

23   general taxing authority to secure and pay the obligation of the bonds.  Instead, tax

24   increment bonds are only secured, and their obligations can only be paid, by the

25   "incremental" increase in property tax revenues resulting from an increase in the

26   aggregate assessed value of the property within the relevant redevelopment area.

27   The increased assessed value can result from appreciation in existing properties or

28   new construction.

25.    Consequently, the amount of tax increment bonds that a redevelopment agency like the Authority can issue is limited to the increase in the aggregate assessed value of the property in the redevelopment area.

26.    To calculate the amount of the property tax increment available to secure and pay the debt service of tax increment bonds, the assessed value of property in a redevelopment area is first determined for a particular "base" year, typically the year immediately before the redevelopment plan was adopted. The annual tax revenue collected from the property in the area is then divided among the local taxing agencies within the redevelopment project area and the redevelopment agency. Generally, the tax agencies receive the taxes that are generated from the base year valuation of that property, while, subject to various exceptions and carve-outs, the redevelopment agency receives the remainder—that is, the "tax increment"—which is the tax revenue collected on any increase in the assessed value of the project area over the base year valuation of that property. The redevelopment agency may then pledge this tax increment revenue to repay tax increment bonds used to finance or refinance redevelopment projects.

27.    A redevelopment agency does not typically pledge tax increment to repay a specific bond issuance by that agency. Instead, the aggregate amount of the tax increment in a project area is often "pooled" and pledged to repay all of the associated tax increment bonds issued by the agency. Nevertheless, specific tax increment bonds may have a senior or subordinated claim to the aggregate tax increment pledged by a redevelopment agency. Generally, investors holding subordinate bonds, like the April 2008 bonds that are at the heart of this action, are more sensitive to any changes in the tax increment than those holding senior lien bonds.

28.    Because the obligations under tax increment bonds are secured by and paid from the incremental increase in property tax revenues, the amount of the increase in the aggregate assessed value of the redevelopment area is material

1   information for the bond investors, especially those holding subordinate bonds.

2   For the same reason, the ability of the agency issuing the bonds to pay the debt

3   service is material information for bond investors, and even more so for

4   subordinated bondholders.  One common measure of this ability is the "debt

5   service ratio," which compares the annual tax increment revenue available to repay

6   bonds to the annual debt service payments on all outstanding bonds.  The ratio

7   shows how much the Authority and bondholders would be protected in the event

8   assessed property values in the project area dropped.  For example, a debt service

9   ratio of 1.25 means that the tax increment has a 25% cushion above the amount

10  owed on all outstanding bonds.  As a result, the debt service ratio was material

11  information to bond investors.

12  C.      The Authority's Tax Increment Bond Offerings

13          1.      The Offerings, KND and the Official Statements

14          29.     Between 2006 and 2008, the Authority offered and sold at least four

15  tax increment financings relevant to this action:  (1) a $34,980,000 tax allocation

16  revenue parity bond offering dated November 1, 2006 (the "November 2006 Parity

17  Bonds"); (2) a $64,165,000 subordinate tax allocation revenue bond offering dated

18  November 21, 2006 (the "November 2006 Revenue Bonds"); (3) a $42 million

19  subordinate tax allocation bond offering dated December 5, 2007 (the "December

20  2007 Bonds"); and (4) a $13,334,924.85 subordinate tax allocation bond offering

21  dated April 30, 2008 (the "April 2008 Bonds").

22          30.     For each of the four tax increment bond offerings by the Authority,

23  investors were provided with an "Official Statement" describing the terms and

24  conditions of each bond.

25          31.     KND was the underwriter for each of these four tax increment bond

26  offerings.  KND was first engaged as the underwriter for the City in 1997, and by

27  2001, it began serving as the sole underwriter for the Authority.  Between 2001

28

1   and 2008, KND earned over $5.1 million in underwriter fees for bonds issued by

2   the Authority and sold by KND to investors.

3        **2.**     **The Tax Increment for the Bonds**

4        32.    The assessed valuation of the Airport project area for its 1997-1998

5   base year was $1.8 billion.  Any increase in this assessed valuation, and the

6   resulting tax revenue, subject to various exceptions and carve-outs, represented the

7   tax increment available to the Authority for securing and paying the obligations of

8   its tax increment bonds.  However, as discussed below, by the end of 2007, the

9   Authority's total outstanding debt from its previously-issued tax increment bonds

10   was so large that the Authority could not issue any additional tax increment bonds

11   unless the property value in the area increased or there was new development in

12   the area.

13        33.    For each offering, the Authority hired a fiscal consultant (the

14   "Consultant") to determine the additional tax increment revenue available to secure

15   the repayment of any new bond issue, and to prepare a report included as an

16   appendix to the Official Statements for the bond offerings.

17        34.    In calculating projected tax increment revenues, the Consultant first

18   looked to the county assessor's most recent property rolls to determine the assessed

19   value of property in the area.  The county assessor is the municipal official

20   responsible for determining the value of property in the county for tax purposes.

21        35.    The assessor's office revises the property tax rolls only once a year,

22   creating a lag time before the current assessed values of properties resulting from

23   new sales or construction appear on the property tax rolls.  As a result, the

24   Consultant could not simply compare the county assessor's most recent annual

25   property roll to that for the 1997-1998 base year.

26        36.    Rather, the Consultant had to add the new assessed values due to new

27   construction, which had not yet been incorporated onto the annual property roll, to

28   the assessed values reflected on the last annual property roll.  The Consultant

1   typically received the increased assessed values regarding new construction for the
2   project area from Metzler's office.
3       37.     The Authority's Official Statements referenced the Consultant's
4   reports, which discussed among other things, the current status of development in
5   the project area and the resulting tax increment revenue available to serve as
6   security for the bonds. The Official Statements also attached the Consultant's
7   reports as an appendix. As such, the Consultant's reports were also provided to
8   bond investors.
9   **D.    The Fraudulent Official Statement for the April 2008 Bond Offering**
10      **1.    The Hangars and the November 2006 Bond Offerings**
11      38.     The Authority undertook a variety of ill-conceived projects in
12  connection with its efforts to develop the Airport area. These included the
13  construction of a proposed power plant known as "Victorville 2," an inter-modal
14  rail facility and, at the crux of this action, the Hangars.
15      39.     In 2005 and 2006, the Authority issued bonds underwritten by KND
16  in order to build the Hangars, including the November 2006 Parity Bonds and the
17  November 2006 Revenue Bonds. The Authority initially hired an outside
18  developer to develop the Hangars. As discussed in more detail below, however,
19  the Authority eventually hired Affiliates to take over the project.
20      **2.    The Downsized December 2007 Bond Offering**
21      40.     The Authority initially planned to issue approximately $68 million of
22  tax increment bonds in late 2007 to finance an initial deposit for an electric turbine
23  for the "Victorville 2" power plant. Ultimately, by the time it issued the December
24  2007 Bonds, the Authority was only able to offer $42 million in bonds, and netted
25  just $37 million from the offering.
26      41.     The Authority was forced to downsize the December 2007 Bond
27  offering because prospective bond purchasers demanded that the Authority
28  increase the debt service ratio. Bond investors had previously accepted a debt

1    service ratio of 1.10. However, due to the tightening credit market at the time and

2    the subordinate nature of the bonds, prospective bond purchasers demanded a

3    significant increase in the annual debt service ratio to 1.25.

4        42.    The debt service ratio is determined by taking the projected annual tax

5    increment revenue available to repay all tax increment bonds and dividing that

6    number by the annual debt service payments on all outstanding tax increment

7    bonds. The debt service ratio was determined from data provided by the consultant

8    and KND. Specifically, the projected annual tax increment revenue available to

9    repay all tax increment bonds was calculated by the Consultant and set forth in the

10    report it issued for the December 2007 Bonds (the "December 2007 Report"). The

11    annual debt service payments on all outstanding tax increment bonds was

12    calculated by KND.

13        43.    Although the aggregate tax increment revenue available to pay debt

14    service was substantial, by December 2007, the Authority had already consumed

15    all but a small portion of that amount to service its prior bond issues. Therefore,

16    under the increased debt service ratio of 1.25 required by prospective investors, the

17    Authority was no longer able to service $68 million in debt. Therefore, it

18    downsized the bond issuance from $68 million to $42 million.

19        44.    Prospective investors also demanded that, for all of the Authority's

20    future tax increment bond issuances, the annual debt service ratio for each year all

21    of the bonds are outstanding must be at least 1.25 to comply with the 1.25 annual

22    debt service ratio. This requirement was incorporated in the "additional bonds"

23    covenant under the governing indenture, which generally set limitations on the

24    Authority's ability to issue new bonds.

25        3.    **The Private Placement in February 2008**

26        45.    The downsizing of the December 2007 bond issuance from $68

27    million to $42 million left the Authority with few resources to continue its

28    redevelopment activities. Indeed, the Authority needed to apply all of the net

1    proceeds of the December 2007 Bonds to make the initial deposit on the

2    "Victorville 2" electric turbine.

3        46.    In late November 2007, Kinsell recognized the Authority's difficult

4    financial situation. He wrote emails stating that the Authority had essentially "put

5    themselves out of the redevelopment business and have few resources to do

6    anything else." Kinsell also described the Authority as being "panicked" at this

7    time and believed it "needed money right away." He noted that a third party could

8    emerge to help the Authority obtain funds for other projects.

9        47.    Third-party financing is the option the Authority ultimately pursued.

10    In particular, the Authority borrowed $35 million in a private placement offering of

11    Subordinate Tax Allocation Revenue Notes to a major commercial bank (the

12    "Bank"), on February 29, 2008.

13        48.    As part of this private placement, the Bank required the Authority to

14    enter into a forward bond purchase agreement that, in essence, obligated the

15    Authority to issue publicly offered "forward" tax increment bonds, at the time of

16    the Bank's choosing, for the purpose of repaying, in whole or in part, the $35

17    million invested by the Bank. The Bank was not obligated to purchase any of

18    those forward bonds, and the Authority's obligation was dependent on the

19    existence of sufficient tax increment to secure such bonds.

20        **4.    The Hangars' Assessed Value for the Private Placement**

21        49.    The Authority needed sufficient tax increment revenue to repay the

22    $35 million in Subordinate Tax Allocation Revenue Notes held by the Bank.

23    Therefore, during the private placement negotiations, the Bank focused on the

24    estimated additional assessed value and resulting tax increment from any new

25    construction that had not been used to secure the December 2007 Bonds.

26        50.    On December 17, 2007, just two days after the December 2007 Bonds

27    closed, the Bank held a conference call with Williams, Metzler and the Consultant

28    to discuss the timing and amount of any new assessments, and, by virtue of being a

1    factor in determining the amount of any new assessed value, the cost of any new

2    development at the Airport.  As conditions for closing the private placement, the

3    Bank required, among other things, that:  (1) the Consultant certify the estimated

4    tax increment revenues and compliance with the additional bonds test; and (2)

5    Metzler provide an affidavit, attached to his estimates of assessed valuations,

6    certifying that the estimates were correct to the best of his knowledge.

7        51.    Metzler prepared a spreadsheet for the Bank that, among other things,

8    set forth the estimated additional assessed values for projects not reflected in the

9    December 2007 Bonds (the "Metzler Spreadsheet").  These projects included the

10   four Hangars, as well as the expansion of a cement factory by one of the largest

11   taxpayers in the project area.  The assessed value of these projects was critically

12   important to the Authority's ability to close the private placement with the Bank.

13       52.    On January 17, 2008, Metzler reported to the Bank, Kinsell and

14   Williams that the assessor's office informed him the cement factory's additional

15   assessed value was just $41 million.  This was tens of millions less than the

16   anticipated range of $91 million to $141 million in additional assessed value from

17   the cement factory expansion.

18       53.    That same day, Williams wrote to Kinsell that the Bank was

19   concerned about the unexpectedly low assessed valuation increase.  Williams also

20   called Metzler on or about January 17, 2008 to discuss the situation, and cautioned

21   him that his assumptions need to be correct because they related to tax increment.

22   Around this time, Kinsell also expressed concern about the unexpectedly low

23   assessed value of the cement factory.

24       54.    Although the increase in the assessed value for the cement factory

25   dropped significantly from the earlier estimates, the estimated assessed value of all

26   four Hangars never changed.  On January 17, 2008, Williams told the Bank that the

27   total value of the four Hangars would be $65 million.  This figure had been

28

1  provided by Affiliates, and was purportedly based on the Hangars' construction
2  costs.

3       55.    On January 18, 2008, Metzler forwarded an email he received from
4  the assessor's office to Williams showing it had assessed the values of Hangar
5  Nos. 1 and 2 at an aggregate value of only $8,779,000 for the 2007-2008 fiscal
6  year, and $8,955,000 for the 2008-2009 fiscal year. The assessor's office also
7  informed Williams that it had not yet assessed the value of Hangar Nos. 3 and 4.

8       56.    These assessment figures undermined the $65 million estimate for all
9  four Hangars. Under this assessment, the remaining two Hangars (Nos. 3 and 4)
10  would have to be valued at approximately $56 million alone for the previously
11  provided estimate for all four Hangars of $65 million to have any validity. But the
12  remaining two Hangars could not be assessed at over $56 million. The four
13  Hangars were too similar for such a disparate valuation to be possible.

14       57.    Nevertheless, Williams and Metzler used the $65 million assessed
15  value for all four Hangars. Metzler included the $65 million value in a draft of the
16  Metzler Spreadsheet he prepared in advance of a conference call with the Bank,
17  Williams, the Authority's counsel ("Disclosure Counsel") and others. Williams
18  emailed the Metzler Spreadsheet to the meeting participants, as well as to Kinsell.
19  The Metzler Spreadsheet reflected: (1) the estimated $65 million assessed value
20  for all four Hangars for the 2008-2009 fiscal year; and (2) the $56,221,000 Hangar
21  valuation available for bonding in 2008-2009 (i.e., the $65 million estimated
22  assessed value for the Hangars in 2008-2009 minus the $8.779 million assessed
23  value for Hangars No. 1 and 2 in 2007-2008 ).

24       58.    The Consultant relied on the $65 million estimated assessed value
25  Metzler provided for the Hangars when it conducted its tax increment analysis.
26  The Consultant prepared a spreadsheet (the "Consultant Spreadsheet") showing the
27  total value of new development at the Airport was $111,309,322, and that the
28  Hangars constituted $56,221,000, or over half, of that amount. The Consultant