1   noted in its spreadsheet that the $56,221,000 valuation was based on "Data

2   Provided By Keith [Metzler]." On February 11, 2008, Williams emailed the

3   Consultant Spreadsheet to the Bank, Kinsell and Metzler. As alleged below, the

4   Consultant used the $111,309,322 value of the new development at the Airport,

5   which included the inflated $65 million value of the four Hangars, to determine the

6   tax increment revenue for the April 2008 Bonds.

7       59.   On February 19, 2008, the Consultant sent a letter to Metzler,

8   Williams and Disclosure Counsel setting forth the methodology it used to

9   determine its tax increment revenue projection of $22,606,356. That letter noted

10   that the assessed values in the Airport's portion of the project area increased by

11   $111,309,322 due to new construction.

12       60.   Metzler and Williams were concerned that the assessor's office would

13   provide assessed values for Hangar Nos. 3 and 4 that, when added to the assessed

14   values of Hangar Nos. 1 and 2, would reduce the total assessed value of the four

15   Hangars to less than $65 million. On February 19, 2008, Metzler received an

16   email that attached a voicemail from the assessor's office alerting him that it had

17   not received construction cost information for Hangar Nos. 3 and 4. Metzler

18   forwarded the email and attached voicemail to Williams that same day and wrote:

19   "Can you follow up and make sure this happens…. My concern is without the

20   construction numbers, they will value the hangars low as the leases are not

21   commensurate with the construction costs." Williams forwarded the email to

22   Kinsell that same day.

23       61.   As part of the closing documents for the private placement on

24   February 29, 2008, Metzler provided the final version of the Metzler Spreadsheet

25   and attached it to a signed certification stating that his estimates were true and

26   accurate based on his personal knowledge and communications with the assessor's

27   office and the Airport's master developer. In his certification to the Bank, Metzler

28   noted that: (1) the $65 million estimate for the Hangars was based on an estimate

1  provided by Affiliates; and (2) it was possible the value could change because the

2  assessor's office had yet to complete its valuation of the Hangars.  Notably,

3  Metzler did not make a similar disclosure in connection with the April 2008 Bonds

4  sold to the public.

5      **5.    The April 2008 Bond Offering**

6      62.    In April 2008, the Bank exercised its option to require the Authority

7  to issue publicly offered bonds to repay part of the $35 million note.

8  Approximately $13.335 million in subordinate tax increment bonds were offered

9  on April 30, 2008 to repay part of this debt (the "April 2008 Bonds").

10     63.    The April 2008 Bonds are at the crux of this action.  The April 2008

11 Bonds were the only forward bonds the Authority was ever able to issue pursuant

12 to its forward bond purchase agreement with the Bank.

13     **6.    The Hangars' Assessed Value for the April 2008 Bond Offering**

14     64.    When the Authority began preparing for the April 2008 Bond offering

15 to make the required payment to the Bank, the Consultant needed to revisit the

16 amount of available tax increment.  For the April 2008 Bonds, the Consultant

17 prepared a supplement to its December 2007 Report (the "April 2008

18 Supplement") that "contain[s] tax increment projections that supplement

19 information contained in" the December 2007 Report.  The December 2007 Report

20 and the April 2008 Supplement (collectively, the April 2008 Report") were

21 attached as Appendix D to the Official Statement for the April 2008 Bonds (the

22 "April 2008 Official Statement").  The April 2008 Official Statement also

23 references the April 2008 Report at page 23.  The April 2008 Official Statement

24 and the April 2008 Report contained material information for bond investors

25 related to the bonds' tax increment and debt service ratio.

26     65.    Like the Consultant's spreadsheet prepared for the February 2008

27 private placement, the April 2008 Supplement included assessed values and

28 resulting increased tax increment derived from new, finalized construction and

1   sales not included in the December 2007 Report. The April 2008 Supplement, at

2   Exhibit 10C on page 4, provided that the increased assessed value due to new

3   development at the Airport was $111,309,322, the same amount used in the

4   Consultant Spreadsheet prepared for the private placement.

5       66.   This $111,309,322 valuation of new development at the Airport

6   included Williams's and Metzler's inflated $65 million estimated value for all four

7   Hangars. The Consultant used this $111,309,322 valuation of new development at

8   the Airport to determine the tax increment revenue for the April 2008 Bonds.

9       67.   By April 2008 though, Metzler, Williams and Kinsell knew that the

10   Hangars' $65 million estimated assessed value was no longer valid. On March 10,

11   2008, Metzler received an email from the assessor's office informing him that

12   Hangar No. 3's 2008-2009 assessed value was only $9,483,260. The assessor's

13   office also informed Metzler that it had not heard from Affiliates regarding the

14   construction cost of Hangar No. 4. It further noted that if it did not hear from

15   Affiliates, the assessor's office would assess Hangar No. 4 at the same value as

16   Hangar No. 3 because "[b]oth hangars are identical." Metzler directed his assistant

17   to forward the assessor's office's email to Williams with the dictated message:

18   "FYI…lower than we expected." Williams forwarded that email the same day,

19   copying Kinsell, and wrote that "we need to get this done ASAP this week."

20       68.   Also on March 10, 2008, Metzler's assistant replied to the assessor's

21   office's email, asking if the assessor's office could re-send the assessed valuations

22   for Hangar Nos. 1 and 2. The assessor's office provided those assessed values to

23   Metzler's assistant that night. Metzler's assistant printed out her March 10, 2008

24   email correspondence with the assessor's office showing the assessed values for

25   Hangar Nos. 1, 2 and 3, as well as the likely assessed value for Hangar No. 4, and

26   gave it to Metzler on or about March 10, 2008.

27       69.   On April 16, 2008, Williams sent an email to Metzler asking him to

28   confirm various facts for proposed buyers of the April 2008 Bonds. Among the

1   items she asked Metzler to confirm was "4 Hangars approximately $65,000,000

2   based on construction value." Metzler's assistant responded at his direction to

3   Williams the same day by email, attaching the assessor's office's March 10, 2008

4   emails containing the assessed valuations for Hangar Nos. 1, 2 and 3, and the likely

5   assessed valuation for Hangar No. 4. That same day, Williams forwarded the

6   email, along with the attached assessor's office's email, to Kinsell.

7       70.    Assuming Hangar No. 4 would be assessed at the same value as

8   Hangar No. 3, the total assessed values of the four Hangars would have been $27.7

9   million for 2007-2008 and $27.9 million for 2008-2009. In either case, this

10   valuation is less than half the estimated value of $65 million that was used in the

11   April 2008 Supplement, referenced in and attached to the Official Statement.

12       71.    The minimum 1.25 annual debt service ratio for the April 2008 Bond

13   offering was only achieved because the approximate $111.3 million valuation of

14   new development at the Airport included the inflated $65 million valuation of the

15   four Hangars.

16       **7.**    **The False and Misleading April 2008 Official Statement**

17       72.    Page 24 of the April 2008 Official Statement contained a debt service

18   schedule listing the annual tax increment and debt service ratios for the April 2008

19   Bonds (the "Debt Service Schedule"). One column on that schedule listed the tax

20   increment for every bond year (the "Total Non-Housing Increment"); another

21   column showed an "all-in," "no growth" debt service ratio of 1.26 for 2008

22   (representing tax increment revenues of $22,606,356 and total debt service of

23   $17,825,734), and 1.25 for every bond year thereafter.

24       73.    KND, which through Williams and Kinsell knew that the estimated

25   assessed value of the Hangars was inflated, prepared the Debt Service Schedule.

26   The figures KND used in the Total Non-Housing Increment column of the Debt

27   Service Schedule relied on the inflated value of the Hangars, and came from the

28

1    "Total Pledge Revenue" column of Exhibit 10A on page 2 of the Consultant's

2    April 2008 Supplement, which was attached to the April 2008 Official Statement.

3          74.    The statements regarding the tax increment and the debt service ratios

4    in the April 2008 Official Statement and the attached April 2008 Supplement were

5    false and misleading.

6          75.    Neither the Consultant nor Disclosure Counsel knew that the tax

7    increment analysis in the April 2008 Report relied on false and inflated Hangar

8    values overstating the tax increment revenue.  Williams, Kinsell and Metzler each

9    failed to inform Disclosure Counsel that the $65 million estimated assessed value

10   of the Hangars was wrong.  As a result, the Debt Service Schedule in the April

11   2008 Official Statement and Exhibits 10A and 10C of the April 2008 Supplement

12   overstated the tax increment available to secure those bonds and to repay investors.

13         76.    The Debt Service Schedule also overstated the debt service ratio for

14   the offering.  The Authority only met the required 1.25 minimum annual debt

15   service ratio because it used the overstated Hangar valuation.  Therefore, the Debt

16   Service Schedule failed to disclose a debt service ratio based on an accurate

17   valuation of the four Hangars.  Had the Authority used the accurate valuation, it

18   would have failed to meet the minimum 1.25 ratio in every bond year after 2008.

19         77.    Moreover, because of the overstated values of the Hangars and

20   resulting false disclosure of the tax increment and annual debt service ratio, the

21   April 2008 Bonds were substantially oversized.

22         78.    The tax increment and debt service ratio misrepresentations and

23   omissions in the April 2008 Official Statement and the April 2008 Supplement

24   were material.  The tax increment securing the April 2008 Bonds and the annual

25   debt ratios disclosed in the Debt Service Schedule were critical factors investors

26   used to determine how they would be repaid.  Moreover, the market required the

27   1.25 debt service ratio, which ensured that the Authority's total projected annual

28   tax increment revenue would be 25% greater than the total annual debt service

1  payments for each year bonds would be outstanding, thereby providing a safety net
2  in the event assessed property values in the project area suffered unexpected losses.
3  Meeting the annual debt service ratio of 1.25 was also a prerequisite to the issuance
4  of the bonds under the indenture. Moreover, the credit rating agencies focused on
5  the debt service ratio, and a ratio below 1.25 would have affected the credit quality
6  of the April 2008 Bonds.

7      79.   The December 2007 Bonds and April 2008 Bonds are currently in
8  default, and as of April 2013 were trading at roughly forty-five cents on the dollar.

9      **3.   The Defendants' Roles in the April 2008 Official Statement**
10        **a.   The Authority, the City and Metzler**

11      80.   As the issuer, the Authority had ultimate authority over all of the
12  contents of the Official Statements and the attached Consultant reports, including
13  the April 2008 Official Statement and the attached April 2008 Supplement.

14      81.   Metzler played a significant role in connection with the Authority's
15  tax increment bond offerings, including the April 2008 Bonds. He had intimate
16  knowledge of the projects at the Airport, and understood tax increment financing
17  and how annual debt service ratios are calculated.

18      82.   Although the Authority's Official Statements were drafted initially by
19  Disclosure Counsel, these drafts were circulated to an unofficial disclosure
20  committee for comments. Metzler was a member of this committee. Working at
21  the direction of the City Manager, who also served as the Executive Director of the
22  Authority, Metzler worked with the Disclosure Counsel and the underwriters at
23  KND to draft sections of the Official Statements. He took the lead in drafting
24  some of the disclosure language concerning the Authority's redevelopment
25  projects.

26      83.   Metzler was the Authority's "point person" concerning its Official
27  Statements for all of the bond issuances, including the April 2008 Official
28  Statement. He communicated with the ratings agencies, gave presentations to

1   potential investors and transmitted the county assessor's most recent assessed

2   value figures to the Consultant. The Executive Director specifically tasked

3   Metzler with obtaining and providing the taxable assessed valuation data to the

4   Consultant, and with reviewing the Official Statements to ensure they were

5   accurate. In signing the April 2008 Official Statement, the Executive Director

6   relied on Metzler's work and due diligence. Disclosure Counsel and the

7   underwriter looked to Metzler as the Authority's representative to approve the

8   Official Statements. As such, Metzler and his employer, the City, substantially

9   assisted in the making of the misstatements and omissions in the April 2008

10   Official Statement regarding the inflated tax increment and debt service ratios.

11       84.   Metzler knew, or was reckless in not knowing, that the April 2008

12   Official Statement materially misstated the tax increment and debt service ratio for

13   the April 2008 Bonds. Because he was an employee of the City, and reported to

14   the City Manager, the City had actual knowledge of, or was reckless in not

15   knowing, the falsity and misleading nature of these misstatements.

16       85.   Moreover, Metzler was the agent for the Authority with regard to

17   content in the Authority's Official Statements. The Authority authorized him to

18   perform acts and communicate on its behalf in connection with the Authority's

19   bond offerings. Therefore, the Authority had actual knowledge of, or was reckless

20   in not knowing, the falsity and misleading nature of the misstatements concerning

21   the tax increments and the debt service ratio.

22       **b.   KND, Kinsell and Williams**

23       86.   KND, as the underwriter, had ultimate authority over the portions of

24   the Official Statements it prepared, including the false and misleading Debt

25   Service Schedule in the April 2008 Official Statement. KND's name was also

26   prominently featured on the first page of the Official Statement for each bond

27   offering that it underwrote for the Authority.

28

1    87.    Kinsell and Williams knew that the April 2008 Official Statement

2  materially misstated the tax increment and debt service ratio for the bonds.

3  Williams was a member of the informal disclosure committee for the Official

4  Statement, and both Kinsell and Williams reviewed and commented on draft

5  official statements, the April 2008 Supplement and other documents related to the

6  April 2008 Bonds.  Despite knowing that the $65 million estimated assessed value

7  of the Hangars was wrong, Williams nonetheless used the April 2008 Supplement

8  to determine the size of the April 2008 Bonds and to generate the false Debt

9  Service Schedule in the April 2008 Official Statement.  The annual debt service

10  ratios were critical to Williams's sizing calculation because they limited the

11  principal amount of the bond offering.  As such, Kinsell and Williams, along with

12  KND, substantially assisted the Authority in making that false and misleading

13  April 2008 Official Statement.  Moreover, Kinsell and Williams substantially

14  assisted KND in making the false and misleading Official Statement.

15    88.    Because Williams and Kinsell were employees of KND, KND had

16  actual knowledge that the April 2008 Official Statement, the April 2008

17  Supplement attached as an appendix and the Debt Service Schedule were false and

18  misleading.

19  **E.    Kinsell, Affiliates and KND's Scheme to Misappropriate Bond Proceeds**

20    89.    Kinsell, Affiliates and KND, which underwrote the Authority's bond

21  offerings from November 2006 through 2008, misappropriated over $2.7 million of

22  bond proceeds from the Authority and bondholders in connection with the project

23  to construct the four Hangars.

24    **1.    The Unauthorized Construction Management Fees**

25    90.    Affiliates misappropriated bond proceeds of at least $450,534 from

26  the Authority and the bondholders in the form of unauthorized and excessive

27  construction management fees.

28

1   91. By mid-2006, the Authority and Kinsell learned of allegations that the

2 developer for the Hangars project had not been paying the subcontractors and that

3 the developer's principal had likely diverted some of the bond proceeds from the

4 project for his own personal use.

5   92. Kinsell reached a "handshake deal" in June or July 2006 with the

6 Executive Director of the Authority whereby Kinsell, through Affiliates, would

7 oversee the project.  Although formed earlier in 2002, the sole purpose of Affiliates

8 after June 2006 was to develop the Hangars.  Kinsell is one of two managing

9 members of Affiliates, each of whom holds a 50% interest in the company.  Kinsell

10 had no construction experience but retained a longtime friend as the new contractor

11 to complete construction of the Hangars.

12   93. Although that "handshake deal" was never reduced to a written

13 contract, all of the parties understood that it was a "cost plus 10% construction

14 management fee" arrangement.  In a memorandum Kinsell sent on October 18,

15 2006 to Disclosure Counsel and to Authority representatives, Kinsell confirmed

16 that a 10% construction management fee would be charged "where necessary for a

17 general contractor to be involved."  He also explained that he was "dividing these

18 monies by eight (8%) to [the new contractor] and two percent (2%) to Affiliates for

19 the overall project coordination."  Thus, although Affiliates was not actually

20 building the Hangars, it would be paid this 2% to oversee the use of the funds and

21 to perform "fund control."

22   94. In July 2006, the Authority approved Affiliates's new role, and, over

23 the next two years, made five separate loans totaling $60.38 million to Affiliates.

24 These loans included $22.2 million lent in August 2006, which was used:  (1) to

25 immediately pay over $12 million to disgruntled subcontractors and $6 million to

26 the original developer to resolve various claims; and (2) to pay a portion of the

27 remaining costs necessary to complete the Hangars.

28

95.   All of the loans made to Affiliates were funded from the proceeds of bonds or notes issued by the Authority and underwritten or placed by KND. Affiliates placed these lump sum amounts into bank accounts in its name, and there was little, if any, oversight regarding how Affiliates spent these bond funds.

96.   Periodically throughout the construction of the Hangars, Affiliates paid the new contractor the 10% construction management fee that had been earned as of that date. The contractor retained its 8% share of the fee and "rebated" back to Affiliates the 2% fee owed to Affiliates, totaling not more than $865,990 from October 2006 through October 2010.

97.   However, Affiliates actually took at least $1,316,524 as the 2% construction management fee, or at least $450,534 more than the amount that was "rebated" back to it by the contractor. Affiliates simply took this excess – and unauthorized – construction management fee directly from the bond proceeds the Authority loaned Affiliates to construct the Hangars.

98.   Affiliates collected the unauthorized 2% construction management fee based on expenses incurred in August 2006 that had nothing to do with the remaining costs of construction, such as the payments to subcontractors for prior work and the payment to the original developer to settle claims. Thus, before KND underwrote bonds for the Authority in November 2006, Kinsell and KND knew, or were reckless in not knowing, that Affiliates planned to charge more than the authorized 2% construction management fee and did not disclose this information to investors.

**2.   The Unauthorized "Property Management" Fees**

99.   Affiliates also charged the Authority a fictitious and unauthorized 15% "property management fee" to misappropriate an additional $2.3 million – purportedly to "manage" the Hangars for the Authority.

100.   Kinsell told Affiliates's CFO in August 2006 that Affiliates was earning the property management fee as a result of Kinsell's discussion with the

EXHIBIT E

1   Executive Director of the Authority.  This was false.  Kinsell never told the

2   Executive Director about the property management fees, and the Authority never

3   authorized or agreed to pay the purported property management fee taken by

4   Affiliates.  In addition to the absence of any document confirming the property

5   management fee agreement, the Executive Director lacked the authority to enter

6   into any verbal agreement above $1,500 and any written agreement exceeding

7   $125,000 per year, limitations that Kinsell generally understood.

8        101.   To keep track of the property management fees, Kinsell directed

9   Affiliates's CFO to begin accruing the 15% property management fee based on

10   what Kinsell claimed were the "market rates" for the Hangar rents, as opposed to

11   the actual rents collected, which were much lower.  Affiliates's CFO prepared an

12   internal spreadsheet showing that Affiliates was purportedly accruing the fees as

13   early as March 2006, several months before KND underwrote the November 2006

14   Parity and Revenue Bonds.  The Official Statements for these bonds did not

15   disclose this property management fee or the resulting conflict of interest.

16        102.   Although Affiliates began accruing these fees as early as March 2006,

17   it did not take any of the property fees until much of the Hangars project was

18   complete.  Specifically, the CFO's spreadsheet shows that Affiliates accrued

19   property management fees of $3,657,540 from March 2006 until June 2011, when

20   the Hangars were finally returned to the Authority.  But Affiliates only

21   misappropriated $2,295,322 of these accrued fees because, as Kinsell explained, by

22   2009 or 2010 "the money ran out."  Indeed, Affiliates's bank records confirm that

23   only $32,187 remained in its accounts as of December 2009.

24        103.   Kinsell used a significant portion of the unauthorized property

25   management fees collected by Affiliates to pay the expenses of KND and its parent

26   company, Holdings.  In October 2007 Affiliates transferred $25,000 to Holdings

27   with the notation "payroll" and, just a day before the April 2008 Bonds were

28   issued, Affiliates lent Holdings $100,000.  In July 2008, KND agreed to

1  immediately pay $4 million to the U.S. Treasury to settle unrelated I.R.S. claims

2  involving advance refunding municipal bonds underwritten by KND between 1993

3  and 2003.  Beginning at that time and continuing through at least June 2011,

4  Affiliates transferred over $1 million in unauthorized property management fees to

5  Holdings.  Without the funds from Affiliates, it would have been difficult for KND

6  to pay its employees.

7      **3.**      **Kinsell, KND and Affiliates's Lulling and Concealment of the**

8                 **Property Management Fees from the Authority**

9         104.  Throughout the scheme, Kinsell and Affiliates misled Authority

10  representatives and hid the fact that Affiliates was earning a property management

11  fee.  For example, in an October 18, 2006 memorandum to the Authority, Kinsell

12  wrote that "KND Affiliates will provide a full accounting to-date of the

13  Authority's loan proceeds and then on a monthly basis," but Kinsell never did so.

14  Moreover, on November 2, 2007, Affiliates's CFO provided the Deputy City

15  Attorney with a spreadsheet showing the operating expenses of each Hangar, but it

16  did not include the 15% monthly property management fee.  Further, on May 16,

17  2008, Affiliates's CFO provided the Authority's Director of Finance with an

18  "operating expenses spreadsheet," but it did not include any reference to the

19  property management fee.

20         105.  In March 2008, the City hired an independent audit firm to review

21  Affiliates's books and records and identify all related party transactions.

22  Affiliates's CFO disclosed the 2% construction management fee to the auditors,

23  but not the property management fee.  Around the same time, in February 2008,

24  the Director of Finance personally visited Affiliates's office to review its books

25  and did not see any indication that Affiliates was earning a property management

26  fee.  Kinsell failed to tell the auditors or the Director of Finance about the property

27  management fees.

28

106. Kinsell and Affiliates waited until late 2008, after the auditors and the Director of Finance had completed their on-site review of Affiliates's books and records, to begin transferring the unauthorized property management fees out of Affiliates's bank account.

107. On October 15, 2008, the Director of Finance emailed Kinsell about transferring the Hangars back to the Authority and confirmed that any unused loan proceeds would revert back to the City, to which Kinsell agreed. In November 2008 and September 2009, the contractor hired by Kinsell to construct the Hangars, acting at the direction of Affiliates, provided detailed accountings to the Director of Finance. On November 10, 2008, the contractor provided the Director of Finance with a detailed accounting that stated that Affiliates held excess funds and contingency funds totaling over $2 million. The September 2009 accounting showed that Affiliates held at least $1.5 million in excess funds and contingency funds. These accountings, however, were false. As of September 2009, only $644,391 remained in Affiliates's bank accounts. Kinsell reviewed both accountings but never told the contractor or the Authority that the majority of the excess bond proceeds had already been taken by Affiliates, allegedly as property management fees.

108. From 2010 through June 2011, after many key individuals initially involved with the Hangars had left the Authority, Kinsell continued to conceal the property management fees as new Authority representatives negotiated the transfer of the Hangars back to the Authority. Kinsell misled these representatives by repeatedly characterizing himself as the "good guy" and "white knight" who had "bailed the City out of the mess that they were in." He further represented to the new City Manager that he had not made any money on the Hangar transaction. As of February 2010, Kinsell claimed that there were no construction funds left.

109. In September 2010, when the new City Manager asked questions about the Hangars, Kinsell told him to look at the report from the independent

1   audit firm that reviewed Affiliates's books and records. Kinsell claimed the report

2   set forth "the fees being charged by KND Affiliates for management services," but

3   Kinsell did not tell him that the report excluded any reference to the property

4   management fees collected by Affiliates because Kinsell had concealed those fees

5   from the auditors.

6       110.   After many months of negotiations, the Authority voted and approved

7   paying Kinsell and Affiliates an additional $40,000 for anticipated tax liabilities

8   Kinsell claimed he would personally incur when the Hangars were transferred back

9   to the Authority.

10      **4.    KND and Williams's Lack of Disclosure of the Fees**

11      111.   None of the Official Statements for the bonds the Authority issued

12  between November 2006 and April 2008 disclosed to investors that Affiliates

13  received more than the agreed upon 2% construction management fee or that

14  Affiliates, an entity related to Kinsell and KND, was accruing an unauthorized

15  property management fee.

16      112.   Affiliates received $9.9 million of proceeds from the November 2006

17  Parity Bonds, which, for a fee of $437,250, had been underwritten by KND. The

18  Official Statement for the November 2006 Parity Bonds did not disclose that:  (1)

19  Affiliates was acting as construction manager of the Hangars and was receiving a

20  2% construction management fee; (2) Affiliates had already received $22,200,000

21  in bond proceeds from the Authority; or (3) Affiliates was accruing an

22  unauthorized property management fee.

23      113.   On November 21, 2006, the Authority issued the November 2006

24  Revenue Bonds, which KND underwrote for a fee of $802,000. Affiliates received

25  $13.6 million of the proceeds from that offering. The Official Statement disclosed

26  that Affiliates had taken over the Hangars from the prior developer and that "[f]or

27  its efforts in overseeing the completion of the Hangar-Facilities, KND Affiliates is

28  in negotiations with the Authority to receive a construction management fee in an

1    amount no greater than 2% of the remaining costs to complete the Hangar

2    Facilities . . ." Although this Official Statement disclosed Affiliates's anticipated

3    role as construction manager and its 2% fee, KND and Kinsell concealed from

4    investors that Affiliates also charged a 2% fee for costs that were unrelated to the

5    remaining construction and that Affiliates was also accruing an unauthorized 15%

6    monthly property management fee.

7        114.   On February 29, 2008, the Authority issued the $35 million in

8    Subordinate Tax Allocation Revenue Notes in the private placement with the

9    Bank.  KND received a fee of $262,500 as the placement agent.  That same date,

10   Affiliates received $10.4 million of the proceeds from this private placement to

11   build the Hangars.

12       115.   During this 2007-2008 time period, KND underwrote other bonds

13   issued by the Authority.  Although none of the proceeds of these issuances went to

14   Affiliates, it was not disclosed to investors that Affiliates was taking unauthorized

15   property management and excess construction management fees that came from

16   prior bonds issued by the Authority and underwritten by KND.  These include the

17   following bonds: (1) Taxable Housing Set-Aside Revenue Parity Bonds in March

18   2007 in the amount of $41,460,000 for which KND received an underwriter's fee

19   of $518,250; (2) the December 2007 Bonds for which KND received an

20   underwriter's fee of $735,000; and (3) the April 2008 Bonds for which KND

21   received an underwriter's fee of $133,349.

22       116.   The misstatements and omissions in the Official Statements for the

23   Authority's bonds from November 2006 through April 2008 were material because

24   a reasonable investor would want to know about an undisclosed financial

25   arrangement such as here, where an entity related to the underwriter, like

26   Affiliates, received unauthorized proceeds from bonds underwritten by KND.

27   These misstatements and omissions were also material to the Authority because

28   such fees increased the costs of issuing the bonds.

1    F.    KND's, Kinsell's and Williams's Due Diligence Failures

2        117.   KND, through Williams and Kinsell, served as the underwriter in

3    negotiated offerings with the Authority and therefore substantially participated in

4    the preparation of the Authority's Official Statements for the bonds.  KND's name

5    appeared prominently on the first page of each Official Statement.  KND also

6    recommended and sold the Authority's municipal securities to investors.  In so

7    doing, KND made an implied representation it had reviewed the accuracy of the

8    Authority's Official Statements and formed a reasonable basis for belief in the

9    truthfulness and completeness of the key representations made therein.

10       118.   Kinsell and Williams worked on behalf of KND to underwrite the

11   bonds.  In that regard, each reviewed and commented on draft Official Statements,

12   the Consultant Reports, indentures and other bond documents.  Both Kinsell and

13   Williams had authority to sign the bond purchase agreements.  Although Williams

14   was responsible on a day-to-day basis, she made sure to copy Kinsell on emails

15   and to talk to him daily about the bonds.  Indeed, the Authority was Kinsell's client

16   and he had hands-on involvement with regard to the Authority's bond offerings.

17       119.   Notwithstanding its obligation as an underwriter, KND's implicit

18   representations regarding its due diligence were false.  First, as alleged above, the

19   April 2008 Official Statement, the Debt Service Schedule and the April 2008

20   Supplement misstated the tax increment and debt service ratios based on inflated

21   assessed values of the Hangars.  Kinsell and Williams substantially assisted in

22   preparing the Official Statement, and each knew the April 2008 Supplement relied

23   on the inflated $65 million estimated assessed value of the Hangars, but omitted to

24   disclose the estimate was no longer valid.  As set forth above, on two separate

25   occasions before the April 2008 Bonds were issued, Williams and Kinsell received

26   emails from the assessor's offices showing that the Hangars' $65 million estimated

27   assessed value was inflated by more than 100%.

28

1      120.  Second, KND's lack of disclosure regarding the construction and

2  property management fees paid to Affiliates in connection with the Authority's

3  bonds from November 2006 through April 2008 was misleading. Kinsell

4  substantially assisted in preparing the Official Statements, and knew that these fees

5  were being accrued by Affiliates. Despite this knowledge, none of the Official

6  Statements for those bonds disclosed to investors that Affiliates received more than

7  the agreed upon 2% construction management fee or that Affiliates, an entity

8  related to Kinsell and KND, was accruing an unauthorized property management

9  fee.

10      121.  Following the April 2008 Bond offering, Kinsell decided to transition

11  from investment banker to financial advisor for the City in order to assist the City

12  with a power plant project. Kinsell expressly acknowledged that in his new role as

13  financial advisor, he was a fiduciary to the City, yet he never disclosed that

14  Affiliates was taking unauthorized management fees from bond proceeds issued by

15  the Authority.

16                      **FIRST CLAIM FOR RELIEF**

17       **Fraud in Connection with the Purchase or Sale of Securities**

18     **Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

19                      **(against the Authority)**

20      122.  The SEC realleges and incorporates by reference paragraphs 1

21  through 121 above.

22      123.  Defendant Authority made material misrepresentations and omissions

23  to investors in the April 2008 Official Statement, including the Debt Service

24  Schedule and the April 2008 Supplement, regarding, among other things, the tax

25  increment amount available to repay those bonds and the projected annual debt

26  service ratios for every bond year after 2008.

27      124.  Defendant Authority by engaging in the conduct described above,

28  directly or indirectly, in connection with the purchase or sale of a security, by the

1   use of means or instrumentalities of interstate commerce, of the mails, or of the

2   facilities of a national securities exchange, with scienter, made untrue statements of

3   a material fact or omitted to state a material fact necessary in order to make the

4   statements made, in the light of the circumstances under which they were made,

5   not misleading.

6       125.   By engaging in the conduct described above, Defendant Authority

7   violated, and unless restrained and enjoined, will continue to violate, Section 10(b)

8   of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R.

9   § 240.10b-5(b).

10                 **SECOND CLAIM FOR RELIEF**

11           **Fraud in the Offer or Sale of Securities**

12       **Violations of Section 17(a)(2) of the Securities Act**

13                    **(against the Authority)**

14       126.   The SEC realleges and incorporates by reference paragraphs 1

15   through 121 above.

16       127.   The Authority's April 2008 Official Statement, including the Debt

17   Service Schedule and the April 2008 Supplement contained material

18   misrepresentations and omissions to investors regarding, among other things, the

19   tax increment amount available to repay those bonds and the projected annual debt

20   service ratios for every bond year after 2008.

21       128.   Defendant Authority by engaging in the conduct described above,

22   directly or indirectly, in the offer or sale of securities by the use of means or

23   instruments of transportation or communication in interstate commerce or by use

24   of the mails, obtained money or property by means of untrue statements of a

25   material fact or by omitting to state a material fact necessary in order to make the

26   statements made, in light of the circumstances under which they were made, not

27   misleading.

28

1    129.  By engaging in the conduct described above, Defendant Authority

2  violated, and unless restrained and enjoined, will continue to violate, Section 17(a)

3  of the Securities Act, 15 U.S.C. § 77q(a).

4                    **THIRD CLAIM FOR RELIEF**

5           **Fraud in Connection with the Purchase or Sale of Securities**

6      **Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

7                          **(against KND)**

8    130.  The SEC realleges and incorporates by reference paragraphs 1

9  through 121 above.

10   131.  Defendant KND, as underwriter for the Authority's bond offerings,

11  made an implicit representation that it had reviewed the accuracy of the

12  Authority's Official Statements, including the Debt Service Schedule and the April

13  2008 Supplement for the April 2008 Bond offering, and formed a reasonable basis

14  for belief in the truthfulness and completeness of the key representations made in

15  those offering documents.  These implicit representations were false.

16   132.  Defendant KND made material misrepresentations and omissions to

17  investors in the April 2008 Official Statement, including the Debt Service

18  Schedule, regarding, among other things, the tax increment amount available to

19  repay those bonds and the projected annual debt service ratios for every bond year

20  after 2008.

21   133.  Defendant KND also made material misrepresentations and omissions

22  to investors in the Official Statements for the November 2006 Revenue and Parity

23  Bonds regarding, among other things, KND's and Affiliates's compensation and

24  the use of bond proceeds.

25   134.  Moreover, Defendant KND made material misrepresentations and

26  omissions to investors in the Official Statements for the Authority's bonds issued

27  from November 2006 through April 2008 regarding, among other things,

28

1   Affiliates's unauthorized receipt and misappropriation of over $2.7 million in bond

2   proceeds.

3        135.   Defendant KND by engaging in the conduct described above, directly

4   or indirectly, in connection with the purchase or sale of a security, by the use of

5   means or instrumentalities of interstate commerce, of the mails, or of the facilities

6   of a national securities exchange, with scienter, made untrue statements of a

7   material fact or omitted to state a material fact necessary in order to make the

8   statements made, in the light of the circumstances under which they were made,

9   not misleading.

10        136.   By engaging in the conduct described above, Defendant KND

11   violated, and unless restrained and enjoined, will continue to violate, Section 10(b)

12   of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R.

13   § 240.10b-5(b).

14                      **FOURTH CLAIM FOR RELIEF**

15                   **Fraud in the Offer or Sale of Securities**

16              **Violations of Section 17(a)(2) of the Securities Act**

17                            **(against KND)**

18        137.   The SEC realleges and incorporates by reference paragraphs 1

19   through 121 above.

20        138.   Defendant KND, as underwriter for the Authority's bond offerings,

21   made an implied recommendation that it had reviewed the accuracy of the Official

22   Statements and formed a reasonable basis for belief in the truthfulness and

23   completeness of the key representations made in those offering documents. These

24   implicit representations were false.

25        139.   Moreover, Defendant KND obtained money or property by means of

26   material misrepresentations and omissions to investors in the April 2008 Official

27   Statement, including the Debt Service Schedule and the April 2008 Supplement,

28   regarding, among other things, the tax increment amount available to repay those

1   bonds and the projected annual debt service ratios for every bond year after 2008.

2       140.   Defendant KND also obtained money or property by means of

3   material misrepresentations and omissions to investors in the Official Statements

4   for the November 2006 Revenue and Parity Bonds regarding, among other things,

5   KND's compensation and the use of bond proceeds.

6       141.   Defendant KND also obtained money or property by means of

7   material misrepresentations and omissions to investors in the Official Statements

8   for the Authority's bonds issued from November 2006 through April 2008

9   regarding, among other things, Affiliates's unauthorized receipt and

10   misappropriation of over $2.7 million in bond proceeds.

11       142.   Defendant KND by engaging in the conduct described above, directly

12   or indirectly, in the offer or sale of securities by the use of means or instruments of

13   transportation or communication in interstate commerce or by use of the mails,

14   obtained money or property by means of untrue statements of a material fact or by

15   omitting to state a material fact necessary in order to make the statements made, in

16   light of the circumstances under which they were made, not misleading.

17       143.   By engaging in the conduct described above, Defendant KND

18   violated, and unless restrained and enjoined, will continue to violate, Section 17(a)

19   of the Securities Act, 15 U.S.C. § 77q(a).

20                   **FIFTH CLAIM FOR RELIEF**

21            **Fraud in the Offer or Sale of Securities**

22     **Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act**

23         **(against Kinsell, KND and Affiliates)**

24       144.   The SEC realleges and incorporates by reference paragraphs 1

25   through 121 above.

26       145.   Defendants Kinsell, KND and Affiliates directed a series of acts and

27   events with the principal purpose and effect of creating a false appearance about

28   the true use of the bond proceeds and deceiving the Authority and other third

1 | parties to further the scheme to misappropriate bond proceeds.

2 |       146. Defendants Kinsell, KND and Affiliates, and each of them, by

3 | engaging in the conduct described above, directly or indirectly, in the offer or sale

4 | of securities by the use of means or instruments of transportation or

5 | communication in interstate commerce or by use of the mails:

6 |           (a)    with scienter, employed devices, schemes, or artifices to

7 |                   defraud; and

8 |           (b)    engaged in transactions, practices, or courses of business which

9 |                   operated or would operate as a fraud or deceit upon the

10 |                   purchaser.

11 |       147. By engaging in the conduct described above, Defendants Kinsell,

12 | KND and Affiliates, and each of them, violated, and unless restrained and

13 | enjoined, will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. §

14 | 77q(a).

15 | <u>**SIXTH CLAIM FOR RELIEF**</u>

16 | **Fraud in Connection with the Purchase or Sale of Securities**

17 | **Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

18 | **(against Kinsell, KND and Affiliates)**

19 |       148. The SEC realleges and incorporates by reference paragraphs 1

20 | through 121 above.

21 |       149. Defendants Kinsell, KND and Affiliates directed a series of acts and

22 | events with the principal purpose and effect of creating a false appearance about

23 | the true use of the bond proceeds and deceiving the Authority and other third

24 | parties to further the scheme to misappropriate bond proceeds.

25 |       150. Defendants Kinsell, KND and Affiliates, and each of them, by

26 | engaging in the conduct described above, directly or indirectly, in connection with

27 | the purchase or sale of a security, by the use of means or instrumentalities of

28 | interstate commerce, of the mails, or of the facilities of a national securities

1  exchange, with scienter:

2        (a)    employed devices, schemes, or artifices to defraud; and

3        (b)    engaged in acts, practices, or courses of business which

4            operated or would operate as a fraud or deceit upon other

5            persons.

6       151.   By engaging in the conduct described above, Defendants Kinsell,

7  KND and Affiliates, and each of them, violated, and unless restrained and

8  enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. §

9  78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

10                  **SEVENTH CLAIM FOR RELIEF**

11          **Aiding and Abetting Violations of Section 10(b)**

12             **of the Exchange Act and Rule 10b-5**

13      **(against the City, KND, Kinsell, Williams and Metzler)**

14       152.   The SEC realleges and incorporates by reference paragraphs 1

15  through 121 above.

16       153.   Defendant Authority violated Section 10(b) of the Securities Act and

17  Rule 10b-5(b) thereunder by making material misrepresentations and omissions to

18  investors in the April 2008 Official Statement regarding, among other things, the

19  tax increment amount available to repay those bonds and the projected annual debt

20  service ratios for every bond year after 2008.

21       154.   Defendants City, Metzler, KND, Kinsell and Williams knowingly

22  provided substantial assistance to the Authority in its violation of Section 10(b) of

23  the Securities Act and Rule 10b-5(b) thereunder in connection with the Authority's

24  April 2008 Bond offering.

25       155.   Defendant KND violated Section 10(b) of the Securities Act and Rule

26  10b-5(b) thereunder by making material misrepresentations and omissions to

27  investors (1) in the April 2008 Official Statement regarding, among other things,

28  the tax increment amount available to repay those bonds and the projected annual

1  debt service ratios for every bond year after 2008; (2) in the Official Statements for

2  the November 2006 Revenue and Parity Bonds regarding, among other things,

3  KND's compensation and the use of bond proceeds; (3) in the Official Statements

4  for the Authority's bonds issued from November 2006 through April 2008

5  regarding, among other things, Affiliates's unauthorized receipt and

6  misappropriation of over $2.7 million in bond proceeds and KND's professional

7  review of the accuracy of the Authority's Official Statements and its reasonable

8  basis for belief in the truthfulness and completeness of the key representations

9  made in those offering documents.

10      156.   Defendants Kinsell and Williams knowingly provided substantial

11  assistance to KND in its violation of Section 10(b) of the Securities Act and Rule

12  10b-5(b) thereunder in connection with the Authority's bond offerings from

13  November 2006 through April 2008.

14      157.   By engaging in the conduct described above, Defendants City,

15  Metzler, KND, Kinsell and Williams, and each of them, aided and abetted and,

16  unless restrained and enjoined, will continue to aid and abet violations of Section

17  10(b) of the Securities Act and Rule 10b-5 thereunder.

18                  **EIGHTH CLAIM FOR RELIEF**

19        **Violations of Section 15B(c)(1) of the Exchange Act and**

20       **MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2)**

21                     **(against KND)**

22      158.   The SEC realleges and incorporates by reference paragraphs 1

23  through 121 above.

24      159.   Defendant KND, by engaging in the conduct described above, directly

25  or indirectly, by use of means or instrumentalities of interstate commerce, or of the

26  mails, to effect a transaction in, or to induce the purchase or sale of, a municipal

27  security in contravention of Rules promulgated by the Municipal Securities

28  Rulemaking Board ("MSRB"), in particular Rules G-17, G-27 and G-

1   32(a)(iii)(A)(2).

2       160.   Defendant KND, by engaging in the conduct described above,

3   directly or indirectly, by use of means or instrumentalities of interstate commerce,

4   or of the mails, to provide advice to or on behalf of a municipal entity with respect

5   to municipal financial products or the issuance of municipal securities in

6   contravention of Rules promulgated by the MSRB, in particular Rules G-17, G-27

7   and G-32(a)(iii)(A)(2).

8       161.   By engaging in the conduct described above, Defendant KND

9   violated, and unless restrained and enjoined, will continue to violate, Section 15B

10  of the Exchange Act, 15 U.S.C. § 78o-4.

11                      **NINTH CLAIM FOR RELIEF**

12      **Aiding and Abetting Violations of Section 15B(c)(1) of the Exchange Act**

13              **and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2)**

14                      **(against Kinsell and Williams)**

15      162.   The SEC realleges and incorporates by reference paragraphs 1

16  through 121 above.

17      163.   By engaging in the conduct alleged above, Defendant KND violated

18  Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17, G-27 and G-

19  32(a)(iii)(A)(2).

20      164.   Defendant Kinsell knowingly provided substantial assistance to KND

21  in its violations of Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17,

22  G-27 and G-32(a)(iii)(A)(2).

23      165.   Defendant Williams knowingly provided substantial assistance to

24  KND in its violations of Section 15B(c)(1) of the Exchange Act and MSRB Rule

25  G-17.

26      166.   By engaging in the conduct described above, Defendant Kinsell aided

27  and abetted and, unless restrained and enjoined, will continue to aid and abet

28  violations of Section 15B(c)(1) of the Securities Act and MSRB Rules G-17, G-27

1   and G-32(a)(iii)(A)(2).

2        167.   By engaging in the conduct described above, Defendant Williams

3   aided and abetted and, unless restrained and enjoined, will continue to aid and abet

4   violations of Section 15B(c)(1) of the Securities Act and MSRB Rule G-17.

5                              **PRAYER FOR RELIEF**

6        WHEREFORE, the SEC respectfully requests that the Court:

7                                        **I.**

8        Issue findings of fact and conclusions of law that the Authority, the City,

9   KND, Affiliates, Kinsell, Williams and Metzler committed the alleged violations.

10                                       **II.**

11        Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of

12   Civil Procedure, permanently enjoining Defendant Authority and its agents,

13   servants, employees, and attorneys, and those persons in active concert or

14   participation with any of them, who receive actual notice of the judgment by

15   personal service or otherwise, and each of them, from violating Section 17(a) of

16   the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15

17   U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

18                                       **III.**

19        Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of

20   Civil Procedure, permanently enjoining Defendant KND and its agents, servants,

21   employees, and attorneys, and those persons in active concert or participation with

22   any of them, who receive actual notice of the judgment by personal service or

23   otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15

24   U.S.C. § 77q(a), and Sections 10(b) and 15B(c)(1) of the Exchange Act, 15 U.S.C.

25   §§ 78j(b) and 78o-4(c)(1), Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5 and

26   MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2),and from aiding and abetting

27   violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

28

**IV.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Affiliates and its agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

**V.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant City and its agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from aiding and abetting violations of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

**VI.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Metzler and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from aiding and abetting violations of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

**VII.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Kinsell and his agents, servants, employees, and attorneys, and those persons in active concert or participation with

1  any of them, who receive actual notice of the judgment by personal service or

2  otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15

3  U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and

4  Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5, and from aiding and abetting

5  violations of Sections 10(b) and 15B(c)(1) of the Exchange Act, Rule 10b-5

6  thereunder, and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2).

7                                    **VIII.**

8       Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of

9  Civil Procedure, permanently enjoining Defendant Williams and her agents,

10  servants, employees, and attorneys, and those persons in active concert or

11  participation with any of them, who receive actual notice of the judgment by

12  personal service or otherwise, and each of them, from aiding and abetting

13  violations of Sections 10(b) and 15B(c)(1) of the Exchange Act, Rule 10b-5

14  thereunder, and MSRB Rule G-17.

15                                    **IX.**

16       Order Defendants City, Authority, KND, Affiliates, Kinsell, Williams and

17  Metzler and Relief Defendant Holdings to disgorge all ill-gotten gains from their

18  illegal conduct, together with prejudgment interest thereon.

19                                    **X.**

20       Order Defendants City, Authority, KND, Affiliates, Kinsell, Williams and

21  Metzler to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C.

22  § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

23                                    **XI.**

24       Retain jurisdiction of this action in accordance with the principles of equity

25  and the Federal Rules of Civil Procedure in order to implement and carry out the

26  terms of all orders and decrees that may be entered, or to entertain any suitable

27  application or motion for additional relief within the jurisdiction of this Court.

28

1

## XII.

2          Grant such other and further relief as this Court may determine to be just and

3  necessary.

4

5  Dated: April 29, 2013                    Respectfully submitted,

6

7                                           _____
                                            Sam S. Puathasnanon
8                                           Robert H. Conrrad
                                            Theresa M. Melson
9                                           Todd S. Brilliant
                                            Attorneys for Plaintiff
10                                          Securities and Exchange Commission

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge John Kronstadt and the assigned discovery Magistrate Judge is David T. Bristow.

The case number on all documents filed with the Court should read as follows:

## EDCV13- 776 JAK (DTBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Sam S. Puathasnanon, Cal. Bar No. 198430
Email: puathasnanons@sec.gov
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | CASE NUMBER |
| PLAINTIFF(S) | EDCV13-0776 |
| v. | |
| CITY OF VICTORVILLE; SOUTHERN CALIFORNIA LOGISTICS AIRPORT AUTHORITY; KINSELL, NEWCOMB, & DEDIOS; KND AFFILIATES, LLC; J. JEFFREY KINSELL; JANEES L. WILLIAMS and KEITH C. METZLER | SUMMONS |
| DEFENDANT(S). | |

KND HOLDINGS, INC., Relief Defendant

TO:     DEFENDANT(S):

        A lawsuit has been filed against you.

        Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Sam S. Puathasnanon_____, whose address is _SEC, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

APR 2 9 2013

Clerk, U.S. District Court

Dated: _____

By: _____
                    Deputy Clerk

                    (Seal of the Court)

[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].

CV-01A (10/11)                              SUMMONS

| (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | CITY OF VICTORVILLE; SOUTHERN CALIFORNIA LOGISTICS AIRPORT AUTHORITY; KINSELL, NEWCOMB & DEDIOS; KND AFFILIATES, LLC; J. JEFFREY KINSELL; JANEES L. WILLIAMS and KEITH C. METZLER, defendants; KND HOLDINGS, INC., Relief Defendants |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) |
|---|---|
| Sam S. Puathasnanon          (323) 965-3998<br>Securities and Exchange Commission<br>5670 Wilshire Boulevard, 11th Floor<br>Los Angeles, CA 90036 | See attachment |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES-**For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ MONEY DEMANDED IN COMPLAINT: $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.) The Complaint alleges violations of the federal securities laws. 15 U.S.C. §§ 77q(a)(1), 77q(a)(2) & 77q(a)(3); 15 U.S.C. § 78j(b) & 78o-4; 17 C.F.R. §§ 240.10b-5(b) & 240.10b-5(c); and MSRB Rules G-17, G-27 & G-32(a)(III)(A)(2).

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☒ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number:  **EDCV13-0776**

**AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.**

EXHIBIT E
420

CV-71 (02/13)                          CIVIL COVER SHEET                          Page 1 of 2

## CIVIL COVER SHEET

**I(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**I(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ NO  ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**VENUE:** (When completing the following information, use an additional sheet if necessary.)

List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named ⁣intiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| ⁣nty in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named ⁣endant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| ⁣nty in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| ⁣e attachment |  |

List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
⁣TE: In land condemnation cases, use the location of the tract of land involved.

| ⁣nty in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| ⁣n Bernardino County |  |

⁣s Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
⁣te: In land condemnation cases, use the location of the tract of land involved

**SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):**  _[signature]_      DATE: 4/29/13

⁣ice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or ⁣er papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed ⁣ is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

⁣to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

## SEC v. CITY OF VICTORVILLE, et al.
### United States District Court — Central District of California

Attachment to Civil Cover Sheet

**I(b)   DEFENDANTS Attorneys (for Defendants and Relief Defendant)**

Terree A. Bowers, Esq.
Arent Fox LLP, Attorneys at Law
Gas Company Tower
555 W. Fifth Street, 48th Floor
Los Angeles, California 90013
Telephone: (213) 629-7400
*Attorneys for Defendants City of Victorville and Southern California Logistics Airport Authority*

John R. Larson, Esq.
Messerli & Kramer P.A.
1400 Fifth Street Towers
100 S. Fifth Street
Minneapolis, Minnesota 54402
Telephone: (612) 672-3600
*Attorneys for Defendants Kinsell, Newcomb & Dedios; KND Affiliates, LLC; J. Jeffrey Kinsell and Janees L. Williams; and Relief Defendant KND Holdings, Inc.*

James N. Kramer, Esq.
Orrick, Herrington & Sutcliffe LLP
405 Howard Street
San Francisco, California 94105
Telephone: (415) 773-5700
*Attorneys for Defendant Keith C. Metzler*

**IX(b)   VENUE** (List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.)

City of Victorville – San Bernardino County; Southern California Logistics Airport Authority – San Bernardino County; Kinsell, Newcomb & DeDios, Inc. – San Diego County; KND Affiliates, LLC – San Diego County; J. Jeffrey Kinsell – San Diego County; Janees L. Williams – San Diego County; Keith C. Metzler – San Bernardino County; KND Holdings, Inc. – San Diego County