1
2
3
4
5
6
7

BUCHALTER NEMER
A Professional Corporation
BARBARA E. LICHMAN, PH.D. (SBN 138469)
blichman@buchalter.com
PAUL J. FRAIDENBURGH (SBN 280354)
pfraidenburgh@buchalter.com
18400 Von Karman Avenue, Suite 800
Irvine, CA  92612
Telephone: (949) 760-1121; Facsimile: (949) 720-0182

Attorneys for Plaintiffs
COMAV, LLC and
COMAV TECHNICAL SERVICES, LLC

8
9
10

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

11
12
13

14

15
16
17
18
19
20
21
22
23

24

COMAV, LLC, a California limited
liability company; COMAV
TECHNICAL SERVICES, LLC, a
Delaware limited liability company,

   Plaintiffs,

  vs.

SOUTHERN CALIFORNIA LOGISTICS
AIRPORT AUTHORITY, a joint powers
authority; CITY OF VICTORVILLE,
CALIFORNIA, a municipal corporation;
PRATT & WHITNEY LINE
MAINTENANCE SERVICES, INC., a
Delaware corporation and division of
United Technologies Corporation;
UNITED TECHNOLOGIES
CORPORATION, a Delaware
corporation; PACIFIC AEROSPACE
RESOURCES AND TECHNOLOGY,
LLC, a Nevada limited liability company;
UNITED TECHNOLOGIES REALTY,
INC., a Connecticut corporation; and
DOES 1 through 10, inclusive,

   Defendants.

Case No. 5:16-cv-1267

**FIRST AMENDED VERIFIED
COMPLAINT FOR:
(1) VIOLATION OF 42 U.S.C. §
1983; (2) INTENTIONAL
INTERFERENCE WITH
PROSPECTIVE ECONOMIC
ADVANTAGE; (3) NEGLIGENT
INTERFERENCE WITH
PROSPECTIVE ECONOMIC
ADVANTAGE; (4) BREACH OF
THE COVENANT OF GOOD
FAITH AND FAIR DEALING;
(5) DECLARATORY RELIEF; AND
(6) INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

[28 U.S.C. §§ 1331, 1343, 2001-2202,
42 U.S.C. § 1983; 28 U.S.C. § 1367]

25
26
27
28

/ / /

/ / /

/ / /

Plaintiffs ComAv, LLC ("ComAv") and affiliate ComAv Technical Services, LLC ("CTS") (collectively "Plaintiffs") allege as follows:

<u>**NATURE OF THE CASE**</u>

1.     This case arises out of the grant of airport hangar subleases for Hangar 681 on Southern California Logistics Airport ("Airport") from Defendants Southern California Logistics Airport Authority ("Airport Authority"), and its surrogate, City of Victorville, California ("City"), and Pratt & Whitney Line Maintenance Services, Inc., a division of United Technologies Corporation (""Pratt"), and its subsidiary, United Technologies Realty, Inc., to CTS' predecessor, Southern California Aviation ("SCA"), as assigned to CTS ("CTS Sublease").

2.     Defendants Airport Authority, City and Pratt, and each of them, have attempted in bad faith to summarily terminate the CTS Sublease by, among other things, refusing to comply with either (a) the express terms of the CTS Sublease, which specifically authorizes Plaintiffs continued possession after June 30, 2016 as a "month-to-month tenancy" and (b) their legal obligation under federal laws and regulations to enter into negotiations for renewal of CTS' Sublease on any terms, let alone the "reasonable" and "equitable" terms that Defendants Airport Authority, City and Pratt are obligated by federal law and regulation to observe where aeronautical services providers such as CTS are involved.  In doing so, Defendants Airport Authority, City and Pratt all attempt to ignore governing contract provisions, the mandates of federal law, Plaintiffs' 18-year incumbency on the Southern California Logistics Airport ("Airport") in various facilities, and Plaintiffs' faithful performance of the terms and conditions of numerous such leases or subleases.

3.     Far from engaging in any good faith negotiations (or discussions) with Plaintiffs, on June 21, 2016, the City Council of Defendant City voted unilaterally (and in closed session) to award the lease of Hangar 681 to Defendant Pacific Aerospace Resources and Technology, LLC ("PART") (Defendants Airport

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**FIRST AMENDED VERIFIED COMPLAINT**

BN 21091975v3

1  Authority, City, Pratt and PART are collectively referred to herein as
2  "Defendants").

3       4.       While Plaintiffs could not obtain any audience with Defendant Airport
4  Authority, Defendants claim to have been "negotiating" among themselves for
5  weeks on a lease rate 40% higher than that currently paid by Plaintiffs or any other
6  similarly situated aeronautical service provider on the Airport.

7       5.       Plaintiffs are informed and believe, and upon such information and
8  belief allege, that at the core of these failures to negotiate with Plaintiffs (including
9  unprecedented and impractical demands/conditions placed upon Plaintiffs as
10 pretexts for refusals) are Defendants City and Airport Authority's attempts to obtain
11 a lease rate that could potentially circumvent pending claims against various
12 Defendants for securities fraud as brought by the Securities and Exchange
13 Commission ("SEC"), *Securities and Exchange Commission v. City of Victorville,*
14 *et al.*, U.S.D.C. Case No. EDCV13-0776 JAK (DTBx) (a true and correct copy of
15 the SEC Complaint is attached hereto and incorporated herein by reference as
16 Exhibit A).

17      6.       In essence, as a result of the SEC's complaint alleging fraudulent
18 manipulation of the value of four hangars on the Airport, including the hangar at
19 issue here, Hangar 681, Defendants Airport Authority and City have consistently
20 and emphatically refused to enter into negotiations with Plaintiffs concerning the
21 CTS Sublease (a true and correct copy of which is attached hereto and incorporated
22 herein by reference as Exhibit B), or a new sublease directly with Defendant
23 Airport Authority, and have ignored Plaintiffs' repeated efforts to begin
24 negotiations for a new sublease, based on the "reasonable" and "equitable" lease
25 rate required by federal law and regulation for aeronautical service providers.

26      7.       By stark contrast, Defendants City and Airport Authority have
27 somehow contemporaneously been negotiating freely with both aeronautical and
28 non-aeronautical users, on and off the Airport, for a new sublease between

Defendants Airport Authority and PART at a vastly higher lease rate to artificially increase the valuation of Hangar 681 and thereby moot SEC's charges against Defendants Airport Authority and City.

8.      On June 1, 2016, Defendant Pratt sent a 30-Day notice to vacate Hangar 681 to Plaintiffs (a true and correct copy of which is attached hereto and incorporated herein by reference as Exhibit C).  This notice was entirely inconsistent with:  (a) Plaintiffs' interrelated business operations at the Airport, (b) extensive business practices among Plaintiffs and Defendants, including several other leases and subleases currently pending at the Airport; (c) preemptive federal law governing priority to aeronautical users in the occupancy and use of airport properties; and (d) the express "holding over" provisions included in both the CTS Sublease and Pratt's direct sublease from Defendant Airport Authority ("Pratt Sublease") (a true and correct copy of which is attached to the CTS Sublease and incorporated therein as part of Exhibit B).  These "holding over" provisions provide (emphasis added):

> In the event Sublessee [Pratt or ComAv], **with or without Sublessor's [Airport Authority's] prior written consent**, holds over and continues in possession of the Subleased Premises after the Termination Date of this Sublease [of June 30, 2016], **Sublessee's occupancy of the Subleased Premises <u>shall</u> be considered a month-to-month tenancy** subject to all the terms and conditions of this Sublease in effect on the day immediately preceding the Termination Date, **except** that the Monthly Base Rent for any such holdover period shall be increased to one hundred fifty percent (150%) of the Monthly Base Rent.

9.      As a result of their actions and/or inactions, Defendants City and Airport Authority have violated:

        a.      the express terms of the CTS Sublease authorizing Plaintiffs continued possession subject to all previous terms *except* rental rate;

        b.      federal law and contractual obligations to the Federal Aviation Administration, enacted for the purpose of protecting aeronautical users of an

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**FIRST AMENDED VERIFIED COMPLAINT**
BN 21091975v3

airport, under, among others, 47 U.S.C. § 47107(a)(1)-(6), implemented by Grant Assurance 22, Economic Nondiscrimination; 49 U.S.C. § 40103(e), implemented by Grant Assurance 23, prohibiting the grant to any aeronautical service provider of an "exclusive right" to do business on the airport; and 49 U.S.C. §§ 47107(b), 47133(a), and 47107(2)(a), implemented by Grant Assurance 25, the rules governing the use of "airport revenues;"

        c.      Plaintiffs' procedural and substantive due process rights pursuant to the 5th and 14th Amendments to the United States Constitution and Article 1, Section 7 of the California Constitution, as applied through 42 U.S.C. § 1983; and, along with Defendant Pratt

        d.      state law prohibitions on breach of the covenant of good faith and fair dealing inherent in the CTS Sublease, and intentional and negligent interference with Plaintiffs' prospective economic advantage in continuing Plaintiffs' business operations and relationships with existing and future clients on the Airport.

        10.      Defendants Airport Authority and City's refusal to even discuss with Plaintiffs an extension of the current CTS Sublease and/or entry into a new sublease directly with Defendant Airport Authority has serious, damaging consequences to Plaintiffs.  Without a sublease for Hangar 681, Plaintiffs will not be able to serve either narrow or wide-body aircraft, their "bread and butter," and among the largest aircraft in the world fleet.  Moreover, because the maintenance of Plaintiffs' license as a certificated repair station is partially dependent upon Plaintiffs ability to provide a maintenance hangar large enough to accommodate the largest aircraft permitted on its license, and because it cannot do so without Hangar 681, Plaintiffs' license will be severely jeopardized.  The damages suffered by Plaintiffs will be multiple, *i.e.*, loss of immediate, valuable business opportunities; loss of the ability to do business on the Airport into the indefinite future; and the jeopardy to its license enabling it to do business at all.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), 2201-2202 (declaratory judgment), and 42 U.S.C. § 1983.

12.     This Court further has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the City and Airport Authority are located within this district, and a substantial part of the events and/or omissions giving rise to ComAv's claims occurred in this district.

## PARTIES

14.     Plaintiff ComAv is an affiliate of Plaintiff CTS, and, along with its other affiliates, an 18 year hangar tenant, aircraft maintenance service provider on narrow and wide-body aircraft, and an aeronautical user of the Airport.

15.     Plaintiff CTS is an affiliate of ComAv, an aircraft maintenance service provider, and sublessee from Pratt of Hangar 681.

16.     Defendant Airport Authority is a California joint powers authority, and sponsor and operator of the Airport.  The Airport Authority was formed to assume control of the former George Air Force Base from the initial delegee, the Victor Valley Economic Development Corporation to which a portion of the former George Air Force Base was leased by the Air Force after George Air Force Base closed in 1993, pursuant to the Base Reuse and Realignment Act of 1993.   The Airport Authority is also the issuer of the relevant bonds in the SEC's Complaint for securities fraud, and is considered a component unit of the City for accounting purposes.

17.     Defendant City is located in southwestern San Bernardino County, approximately 90 miles northeast of Los Angeles, California.  The City is governed by a five-member City Council, the members of which also comprise the governing

FIRST AMENDED VERIFIED COMPLAINT

board of the Airport Authority.  City staff, including the Assistant City Manager, Keith Metzler, constitute the staff of the Airport Authority.

18.    Defendant Pratt is a Delaware corporation and a division of United Technologies Corporation, and direct sublessee of Hangar 681 from Defendant Airport Authority, pursuant to the Pratt Sublease.

19.    Defendant United Technologies Corporation is a Delaware corporation and parent company of Defendant Pratt.

20.    Defendant PART is a Nevada limited liability company, former and current lessee of a hangar on the Airport, and Plaintiffs' only competitor on the Airport in providing airline maintenance services.

21.    Plaintiffs are informed and believe, and upon such information and belief allege, that Defendant United Technologies Realty, Inc. is a Connecticut corporation and affiliate of Defendant United Technologies Corporation.

22.    Plaintiffs are currently unaware of the true names and capacities of Defendants DOES 1 through 10, inclusive, as the information concerning their identities is within the sole and exclusive control of Defendants.  Therefore, Plaintiffs sue those parties by such fictitious names.  Plaintiffs are informed and believe, and on that basis allege, that DOES 1 through 10, inclusive, are agents of Defendants, and each of them is responsible in some manner for the conduct alleged in this Complaint.  Plaintiffs will seek leave to amend this Complaint to state the true names and capacities of the fictitiously named parties when the same have been ascertained.

23.    Defendants identified in paragraphs 16 through 22, inclusive, are sometimes referred to collectively herein as "Defendants."

### GENERAL ALLEGATIONS

**A.    ComAv and CTS Enter Into a Sublease Agreement for Hangar 681.**

24.    ComAv, through its affiliate CTS, is the longest term aeronautical service provider on the Airport, and one of its largest employers.  ComAv's

incumbency at the Airport began in 1998, shortly after the closure of George Air Force Base in the 1993 Base Reuse and Realignment process, and the original lease of some portions of the former base to the Victor Valley Economic Development Authority, at which time George Air Force Base became the Southern California Logistics Airport.

25.     Subsequently, the Victor Valley Economic Development Authority delegated its decisionmaking power over the Base property to Defendant Airport Authority.  In or about 2001, ComAv entered into a partnership with Pratt.  Pratt subleased Hangar 681 directly from Defendant Airport Authority, which is the primary lessee from the Air Force, and subsequently further subleased Hangar 681 to CTS' predecessor SCA in July, 2011.  The original 2011 sublease was subsequently amended and restated May 1, 2013, which Amended and Restated Sublease superseded the original 2011 sublease (a true and correct copy of the 2013 Amended and Restated Sublease is attached hereto and incorporated herein by reference as Exhibit B).  (The 2011 and 2013 CTS Subleases will generally be referred to collectively herein as "CTS Sublease.")  Even through ComAv purchased Pratt's interest in 2013, the Pratt and CTS Sublease are still in force and effect.

26.     The Pratt Sublease with Defendant Airport Authority obligates Pratt to "comply with all applicable Federal, State and local laws, regulations and standards that are or may become applicable to Sublessee's activities on the Subleased Premises," Pratt Sublease, ¶ 31, including the provision which states "it is understood that nothing herein contained shall be construed to grant or authorize the granting of an exclusive right. . ."  Pratt Sublease, Exh. C.

27.     All of the terms, provisions, covenants and conditions in the Pratt Sublease are made applicable to the CTS Sublease pursuant to CTS Sublease, paragraph 2.

**B.**  **Defendants City and Airport Authority are Trying to Cover Their Tracks for Having Raised Funds for Airport Development Using Tax Increment Bonds Based on Fraudulently Inflated Property Values of the Hangars at the Airport.**

28.    Municipalities often raise funds through "general obligation bonds," which, in general, are secured and their debt service paid by a municipality's ability to raise revenue through the imposition of taxes.

29.    However, Defendant Airport Authority does not have the power to levy property taxes.  Therefore, instead of general obligation bonds, it relied on "tax allocation" bonds, also known as "tax increment" bonds, to finance the capital projects for the redevelopment of the Airport area.

30.    Although formerly fairly common in California until the demise of Redevelopment agencies on February 1, 2012, tax increment bonds were structured very differently than the more familiar general obligation bonds.  Unlike general obligation bonds, tax increment bonds could not rely on a municipality's general taxing authority to secure and pay the obligation of the bonds.  Instead, tax increment bonds were only secured, and their obligations could only be paid, by the "incremental" increase in property tax revenues resulting from an increase in the aggregate assessed value of the property within the relevant redevelopment area. The increased assessed value resulted from appreciation in existing properties or new construction.  Consequently, the amount of tax increment bonds that a redevelopment agency like Defendant Airport Authority could issue was limited to the increase in the aggregate assessed value of the property in the redevelopment area.

31.    In the mid-2000s, Defendant Airport Authority used tax increment bond offerings to finance a number of redevelopment projects, including the construction of a power plant and four new airplane hangars ("Hangars") on the former Air Force base.   By late 2007, it needed $50 million to pay a deposit on a

turbine for the power plant, and planned to finance that payment with a new $68 million tax increment bond offering.  However, given the tightening credit market and the subordinate nature of the bonds, prospective bond purchasers demanded that the debt service ratio for this offering be increased to 1.25 (from the 1.10 ratio governing prior bond offerings).  As a result, Defendant Airport Authority was forced to downsize its December 2007 bond offering from $68 million to $42 million.  This left Defendant Airport Authority with few resources to continue its redevelopment activities.  Indeed, by that time, nearly all of the tax increment available to Defendant Airport Authority had been used to secure its prior bond issuances.

32.    In February 2008, in an effort to escape from this financial constraint, Defendant Airport Authority borrowed $35 million in short-term financing.  It then publicly offered $13.3 million of subordinate tax increment bonds in April 2008 to repay part of that short-term debt.  This April 2008 financing was premised, in part, on a stated value of $65 million for the four Hangars including Hangar 681.  This $65 million valuation was used to determine the all-important tax increment for the April 2008 bond offering, and allowed Defendant Airport Authority to satisfy the minimum 1.25 annual debt service ratio for the offering.  However, the Hangars' $65 million stated value was vastly inflated according to the tax assessor, resulting in the disclosure of false tax increment and debt service ratios in the Official Statement provided to investors in the April 2008 bond offering.

C.    **The SEC Sues Defendants City and Airport Authority for Securities Fraud Arising from the Artificially Inflated Hangar Prices.**

33.    On April 29, 2013, the SEC filed a federal complaint (*see* Exhibit A) based, *inter alia*, on the allegations stated in Paragraphs 28 through 32, *supra*.  The SEC's lawsuit targeted Defendant City; Defendant Airport Authority; Defendant Airport Authority's Bond Underwriter and Construction Manager, Kinsell Newcomb and DeDios; its principal, Jeffrey Kinsell; and Defendant City's then-

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

FIRST AMENDED VERIFIED COMPLAINT
BN 21091975v3

Director of Economic Development, now Assistant Airport Manager, Keith Metzler, for, among other things, fraud in connection with the sale of securities under various sections of the Securities Exchange Act of 1934, and Securities Act of 1933. The SEC's complaint specifically charged: "By engaging in this conduct, the Authority, KND, Affiliates and Kinsell violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act of 1933 (the "Securities Act"), and the City, Metzler, KND, Kinsell and Williams aided and abetted violations of these antifraud provisions of the federal securities laws… Therefore, with this action, the SEC seeks permanent injunctions, disgorgement with prejudgment interest and civil penalties against Defendants." Exhibit A, ¶ 8. SEC further alleges the improper diversion of revenue by entities including KND, and Jeffrey Kinsell, charged with the management of construction of the hangar project.

34.    The SEC's action against Defendants City and Airport Authority is currently pending in this judicial district.

**D.    Defendants City and Airport Authority Impede Lease Renewal Negotiations with ComAv and Inflate the Price per Square Foot of ComAv's Hangar.**

35.    In 2011, Defendant Pratt renewed the Pratt Sublease for Hangar 681, which it subsequently further subleased to CTS.

36.    Despite Plaintiffs' successful service to the Airport and the community, Defendants Airport Authority and City have, without explanation, refused to initiate negotiations with them for a "reasonable" (FAA Order 5190.6B, § 14.3), and "equitable" (FAA Order 5190.6B, § 9.5.d.), lease rate for an extension of the existing sublease or a new sublease for Hangar 681 as required by federal law and regulations, instead making multiple different excuses for delay, including most recently the requirement of audited financial reports as a precondition to negotiation, rather than its previous procedure, over the course of Plaintiffs' 18-year

incumbency in various facilities on the Airport, of reaching an agreement on lease rates contingent upon proof of financial viability, and despite its manifest willingness to negotiate with other potential lessees and the ultimate lessee, Defendant PART.

37.    Beginning their attempt to informally resolve its lease issue with the Defendants City and Airport Authority almost a year ago, on June 10, 2015, Plaintiffs submitted a written request to Defendants to begin negotiations for a new sublease without delay.  After response from Defendant Airport Authority indicating they would be marketing the hangar publicly, on June 24, 2015, Plaintiffs made an offer for a sublease renewal at "fair market rent" with the same to be determined by independent appraisers.

38.    On or about February 9, 2016, after a number of phone calls and letters, none of which resulted in a single counteroffer from Defendants City or Airport Authority, Plaintiffs revised their offer upward to include: (a) a new sublease; (b) with a term of five years, with ComAv given two option periods of five years each to extend the term; and (c) an initial lease rate of $.70 per square foot on a triple net basis with escalation clauses allowing increases of 1% per year during the option periods.

39.    On February 16, 2016, Defendants City and Airport Authority responded through Keith Metzler, a named defendant in the SEC's action, notifying Plaintiffs that their previous offer of $.70 per square foot was far below Defendant Airport Authority's general asking price of $1.25 per square foot; that Defendant Airport Authority would require verification of creditworthiness before it would enter into negotiations; Defendant Airport Authority was marketing the property to an array of outside interests, and would negotiate through its real estate broker Kent Hinds at Cushman and Wakefield.

40.    On March 9, 2016, Plaintiffs responded to Metzler's February 16th letter, complaining that, despite several offers by Plaintiffs, dating back eight

FIRST AMENDED VERIFIED COMPLAINT

1   months (at that time), there had been no progress in negotiating, much less

2   consummating, the lease for Hangar 681, although other hangar lease negotiations

3   were ongoing by Defendant Airport Authority and third parties.  Plaintiffs' letter

4   further requested a formal response or counteroffer for Hangar 681.  Finally,

5   Plaintiffs' letter informed Defendant Airport Authority that Plaintiffs intended to

6   put the new sublease in the name of CTS to which SCA had assigned its interests.

7           41.     Also on March 9, 2016, in response to the above letter from Plaintiffs,

8   Sophie Smith, the City's Economic Development Director for Defendant City,

9   referred to the February 16 letter from Keith Metzler, as rejecting the $.70 per

10  square foot offer made by Plaintiffs; referred to the previously mentioned $1.25 per

11  square foot asking price from Defendant Airport Authority; but refused to make a

12  formal counteroffer, including conditions and contingencies, and instead referred

13  Plaintiffs to further conversations with realtor Kent Hinds.

14          42.     On March 17, 2016, Plaintiff ComAv's Executive Vice President

15  William Morris received another e-mail from realtor Kent Hinds, again refusing to

16  make a counterproposal and instead imposing the condition that "before we can

17  proceed with a counterproposal, we will need to review your current financial

18  conditions," and requesting the last three years of "audited" financial reports, as

19  well as a current balance sheet and income statement.  Hinds further stated that

20  "once we review these we will craft the appropriate response."

21          43.     On March 21, 2016, Plaintiffs responded to the March 17 e-mail from

22  Kent Hinds, acknowledging not only the necessity "for the Airport to receive

23  reasonable and adequate financial assurances," but once again reiterating its request

24  that Defendant Airport Authority "proceed with the counteroffer without delay."

25          44.     On March 29, 2016, despite Defendant Airport Authority and City's

26  refusal to cooperate, Plaintiffs once again went one step further and produced the

27  supplemental financial information Defendant Airport Authority had requested in

28  its March 17, 2016 letter, with the exception of the condition that they be "audited,"

1   on the grounds that audited reports were not immediately available, because

2   Plaintiffs' lenders and investors do not require them.

3        45.    On April 15, 2016, Plaintiffs' outside counsel, Barbara Lichman, sent

4   a letter to Eric Ray, Airport Manager, expressing Plaintiffs' further concerns about

5   the potentially discriminatory implications of Defendant Airport Authority's

6   disparate treatment of existing leaseholders and lease renewals for substantially

7   similar facilities.

8        46.    On April 26, 2016, Plaintiffs' outside counsel received a letter from

9   Defendant Airport Authority's outside counsel, Andre de Bortnowsky, who used

10  Plaintiffs' April 15, 2016 letter as an excuse to further delay making a counteroffer

11  by seeking direction on settlement terms from Defendant Airport Authority's

12  Board, and refusing to either meet or submit a counteroffer until after that next

13  (unspecified date) Board meeting.  In addition, on May 5, 2016, Plaintiffs' counsel

14  received yet another letter from Defendant Airport Authority's counsel, requesting

15  even more financial data on the ground that the data previously received did not

16  constitute "financial statements received and prepared by a CPA, akin to an audit,"

17  and on that basis further delaying submission of a counteroffer.

18       47.    On May 24, 2016, Defendant Airport Authority, through Keith

19  Metzler, set up yet another roadblock to negotiation of a lease renewal, by making a

20  "critical precursor to productive negotiation" the agreement not to bring a legal

21  challenge to vindicate Plaintiffs' rights under the Federal Aviation Administration's

22  ("FAA") Grant Assurances and acknowledging that the Airport is "entertaining

23  other proposals," for Hangar 681 while at the same time refusing to entertain the

24  proposals already made by Plaintiffs.

25       48.    On June 1, 2016, Plaintiffs received from Defendant Pratt a notice to

26  vacate Hangar 681 no later than June 30, 2016, pursuant to the CTS Sublease.

27       49.    On or about June 21, 2016, Plaintiffs discovered that Defendant City

28  voted (in a closed session) to grant a new sublease to Defendant PART (a true and

correct copy of the Minutes of the City Council of the City of Victorville are attached hereto and incorporated herein by reference as Exhibit D), for the amount of $1.05 per square foot, $.40 a square foot higher than the amount currently paid by Plaintiffs; similarly in excess of the amounts paid by the only other similarly situated aeronautical service providers, Boeing Gold Care, which does not do general third party maintenance work, and has no resident mechanics ($.53 a square foot); and Leading Edge, an aircraft painting company ($.69 a square foot); and vastly in excess of the $.14 a square foot airport subsidized rate currently paid by PART.

50.    On or about June 7, 2016, Plaintiffs submitted to FAA a "Complaint and Request for Investigation Pursuant to 14 C.F.R. Part 16" challenging Defendant Airport Authority's violations of, among others, 49 U.S.C. §§ 47107 and 47133, and Grant Assurances 22, 23 and 25 (a true and correct copy of Plaintiffs' Part 16 Complaint is attached hereto and incorporated herein by reference as Exhibit E).

51.    On or about June 29, 2016, Plaintiffs' outside counsel sent a letter to Defendant Pratt giving notice of Plaintiffs' intent to remain in possession of Hangar 681and cure any alleged defaults pursuant to the CTS Sublease, which expressly incorporated the terms and provisions of the Pratt Sublease with the Airport Authority of July 1, 2011, including paragraph 9, which gives to both Defendants Pratt and Plaintiffs the unconditional right to convert to a period tenancy at the end of the lease term, without notice or consent, and on the sole condition that Sublessee (Pratt or Plaintiffs) remain in possession beyond June 30, 2016 (a true and correct copy of Plaintiffs' June 29, 2016 letter is attached hereto and incorporated herein by reference as Exhibit F).

52.    On June 30, 2016, Plaintiff CTS wrote a letter to Defendant Airport Authority tendering the new monthly base rent required by the Subleases' "holding over" provisions (a true and correct copy of CTS' June 30, 2016 letter is attached hereto and incorporated herein by reference as Exhibit G).

53.     On or about June 30, 2016, Plaintiffs received a letter from Defendant Airport Authority's outside counsel, stating Defendant Airport Authority's position that Plaintiffs were not entitled to hold over, and returning the check (a true and correct copy of Defendant Airport Authority's letter is attached hereto and incorporated herein by reference as Exhibit H).

54.     To compound Plaintiffs' injuries, on July 1, 2016, Defendant Airport Authority closed down access from Plaintiffs' offices in Hangar 681 to the main hangar, and sent notice to the company whose aircraft at that time occupied the hangar to remove its aircraft from the hangar, despite the express language in the Pratt Sublease, paragraph 9, as incorporated by the CTS Sublease and specifically authorizing Plaintiffs' continued possession on all the same terms as before *except* the rental rate, which was agreed to in advance of any such continued possession as 150% of Monthly Base Rent.

55.     In response, on July 1, 2016, Plaintiffs sent Defendant Airport Authority a "Notice to Cease and Desist all Self-Help Remedies and Forcible Eviction" with factual and legal authority supporting Plaintiffs' continued possession (a true and correct copy of Plaintiffs' July 1, 2016 Notice to Cease and Desist is attached hereto as Exhibit I).

56.     Defendants City and Airport Authority's refusal to negotiate a new lease, coupled with their and Defendant PART's manifest efforts to disrupt Plaintiffs' business relationships, have caused serious prejudice to Plaintiffs' ability to do business on the Airport, including, but not limited to, interference with Plaintiffs' commitments to its customers to provide maintenance on narrow and wide-body aircraft requiring a hangar the size of Hangar 681.  More specifically, under 14 C.F.R. § 145.103, Plaintiff CTS' repair station license requiring a maintenance hangar large enough to accommodate the largest aircraft permitted under its license, 14 C.F.R. § 145.103(b), will be placed in serious jeopardy. Consequently, Defendants City and Airport Authority's refusal to negotiate may

FIRST AMENDED VERIFIED COMPLAINT
BN 21091975v3

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

1    not merely raise the level of operational uncertainty, but put Plaintiffs, long-term,

2    positively contributing, aeronautical users at the Airport since its inception, out of

3    business entirely.

4    **E.    Defendants' Obligation to Enter Into Lease Negotiations with Plaintiffs**

5    **Arises Out of Federal Statutes and Regulations, and Their Application**

6    **in the Pratt Sublease.**

7        57.    "Part 16 of the FAA's regulations permits a 'person directly and

8    substantially affected by any alleged noncompliance [to] file a complaint with the

9    Administrator,'" *Boca Airport, Inc. v. FAA*, 389 F.3d 185, 186 (D.C. Cir. 2004),

10   quoting 14 C.F.R. § 16.23.  The regulations define noncompliance as "'anything

11   done or omitted to be done by any person in contravention of any provision of any

12   Act . . . as to matters within the jurisdiction of the Administrator.'"  14 C.F.R. §

13   16.3.

14       58.    The Airport and Airway Improvement Act of 1982, as amended, and

15   codified at 49 U.S.C. §§ 40101, *et seq.*, and 47101, *et seq.* ("AAIA") makes a

16   condition of receiving federal funds for airport improvements that airport sponsors

17   such as Defendant Airport Authority make written assurances that the sponsor will

18   make the airport available for public use without unjust discrimination and will

19   subject Fixed-Based Operators (or FBOs) who use the airport in a similar manner to

20   the same charges.  *See Gary Jet Center, Inc. v. Gary/Chicago International Airport*

21   *Authority*, 2014 U.S. Dist. LEXIS 45201.  "A fixed-base operator (FBO) is a

22   commercial entity providing aeronautical services such as fueling, maintenance,

23   storage . . . to the public."  FAA Order 5190.6B, Chapter 8, Exclusive Rights, p. 8-

24   11, fn. 25.

25       59.    Grant Assurance 22 implements the provisions of 49 U.S.C. §

26   47107(a)(1)-(6), and requires, in pertinent part, that the operator of a federally

27   obligated airport, among other requirements, "make [its] airport available as an

28   airport for public use on reasonable terms and without unjust discrimination to all

types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport." Grant Assurance 22(a). "The term 'unjust discrimination' is not statutorily defined, but the agency has interpreted it to require a showing that a party similarly situated to the complainant was treated preferentially." *R/T 182, LLC v. Federal Aviation Administration*, 519 F.3d 307, 309 (6th Cir. 2008).

60.    With respect to FBOs like Plaintiffs, Grant Assurance 22 further ensures that "each fixed-based operator at any airport owned by the sponsor shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed-base operators making the same or similar uses of such airport and utilizing the same or similar facilities. [Assurance 22(c)]" *See Skydance Helicopters, Inc. d/b/a Skydance Operations, Inc. v. Sedona Oak-Creek Airport Authority, et al.*, Director's Determination, Docket No. 16-02-02.

61.    FAA Order 5190.6B further expands upon the statutory definitions, where it requires an airport proprietor "to negotiate in good faith for the lease of premises available to conduct aeronautical activities," FAA Order 5190.6B, § 9.7, and requires that an FBO be subjected to "substantially comparable rates, fees, rentals, and charges . . . [if it] assume[s] similar obligations, use[s] similar facilities, and make[s] similar use of the airport." FAA Order 5190.6B, § 9.2.a. In short, the treatment of "aeronautical users" such as FBOs must be "reasonable," FAA Order 5190.6B, § 14.3, as well as "equitable," FAA Order 5190.6B, § 9.5.d.

62.    While the FAA acknowledges the potential for differences in lease rates based on differences in the nature or use of the facilities of the airport, those different lease rates must be justified by the attributes of the facilities themselves (such as location), or the structure of ownership (*e.g.,* a lease for improved real property versus a ground lease with the tenant having constructed and financed the improvements), FAA Order 5190.6B, § 9.2.d.

FIRST AMENDED VERIFIED COMPLAINT

BN 21091975v3

63.    In this case, when Defendants City and Airport Authority's initially demanded lease rate from Plaintiffs of $1.25 per square foot is compared to the lease rates of other FBOs on the Airport performing aircraft maintenance services; in facilities that are virtually identical in attribute; with beneficial options to renew their leases not available to Plaintiffs; and in generally similar financial arrangements when adjusted for differences in the structures of the lease, Defendants' violation of Grant Assurance 22(c) comes clearly into focus.

64.    Specifically, there are currently three comparable hangar tenants (and three affected hangars) on the Airport – Boeing Gold Care (Hangar 678); PART (previously occupying Hangar 678 with office space); Leading Edge (Hangers 746 and 747). All perform services to aircraft that although "similar" are not identical, in hangars that range between 117,323 square feet (including office space) and 67,500 square feet in size (although Defendant PART's lease for its 117,323 square foot hangar was previously terminated due to payment issues). All paid, or are currently paying, between $.53 per square foot (Boeing) and $.69 (Leading Edge). Notably, the other tenants have the further benefit of options to remain after their initial lease terms expire, carrying Hangar 678 to the year 2025; Hangar 746 to the year 2036, and Hangar 747 to the year 2028. Clearly, therefore, because Plaintiff CTS currently uses similar facilities(hangar in excess of 60,000 square feet), makes similar use of the Airport (FBO services), and assumed similar obligations (its previous, similar lease rate per square foot for the similar facility), it fits directly within the scope of the term "similarly situated," and Defendants are obligated "to negotiate in good faith" for a new sublease with Plaintiffs that includes rates, fees and rental charges that are "substantially comparable" to those of Boeing and Leading Edge, FBOs that use similar facilities in size and make similar use of the Airport for aircraft servicing purposes.

65.    Nevertheless, Defendants City and Airport Authority have proceeded thus far by simply alluding to a proposed general lease rate of $1.25 per square foot,

1    without any specific reference to the specific attributes of Hangar 681, and without

2    having performed an appraisal, and, thus, without any substantiation for the price

3    demanded.  The rationale for the Defendants City and Airport Authority's refusal to

4    perform an appraisal can clearly be discerned.  Plaintiffs are informed and believe,

5    and upon such information and belief allege, that any disclosure of the true, lower,

6    lease value of Hangar 681 would essentially eviscerate Defendants City and Airport

7    Authority's defense to the SEC Lawsuit, because it would demonstrate conclusively

8    that the hangar had been overvalued in the bond offering, as the County's tax

9    assessor had already determined.

10        66.    Moreover, Defendants City and Airport Authority have persistently

11   refused to make counteroffers since June, 2015, thus forcing Plaintiffs to negotiate

12   against themselves on such pretexts as:

13            a.    the requirement for ever expanding assurances of financial

14   viability, despite Plaintiffs' 18 year tenure on the Airport, characterized by their

15   faithful performance of their obligations under the various subleases, including the

16   current sublease for Hangar 681; Defendant Airport Authority's 18-year history of

17   negotiating leases with Plaintiff ComAv and its affiliates, based on the satisfaction

18   of contingencies, including the subsequent requirement of proof of financial

19   viability; and Plaintiffs' submission of financial information on March 29, 2016;

20   and

21            b.    Plaintiffs' use of outside legal counsel in lease negotiations,

22   which Defendant Airport Authority's outside counsel, in his April 26, 2016 letter,

23   chose to regard as "raising the stakes" on the negotiations; causing a delay in

24   negotiations while Defendant Airport Authority investigates the issues raised in

25   Plaintiffs' April 15, 2016 letter (concerning grant assurance obligations about

26   which Defendant Airport Authority should already have been well aware); and

27   soliciting the direction of the Board of Defendant Airport Authority in lease

28   negotiations (which should long since have been ascertained).

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

FIRST AMENDED VERIFIED COMPLAINT
BN 21091975v3

67.     In their later communication of May 24, 2016, Defendants City and Airport Authority insisted on, as a "critical precursor" to "negotiation" by Defendant City and Airport Authority, some kind of telephonic conversation between its outside counsel and Plaintiffs' to "resolve concerns" raised by Plaintiffs about potential violations of grant assurances.  When Plaintiffs' counsel made several phone calls to Defendants' counsel without success, it became apparent that Defendant City and Airport Authority's "condition" was nothing more than a veiled threat to stop dealing with Plaintiffs, absent Plaintiffs' agreement to relinquish its legal right to object to Defendant City and Airport Authority's delaying tactics, failure to fully engage in negotiation, and consequent violation of its grant assurances.

68.     Moreover, and in addition to the failure to negotiate with Plaintiffs, Defendants City and Airport Authority failed to justify their almost 100% increase in the current lease rates by any independent change in the attributes of the facilities occupied by Plaintiffs, or by comparison between Hangar 681 and the other comparable hangars on the Airport occupied by other FBOs, as required by FAA Order 5190.6B, § 9.2d.

69.     Finally, and in direct violation of the Pratt  and CTS Subleases, among other sections, Pratt has sent a 30-day notice to vacate, predicated upon Defendant City and Airport Authority's acts in violation of the Grant Assurances, contractual commitments with which by the terms of the Pratt Sublease, Pratt is also obligated to comply.

70.     In short, Defendants are seeking to increase the lease rate paid by Plaintiffs for Hangar 681 by fiat, making that rate almost double that paid by Plaintiffs' peers on the Airport, without a shred of statutory or regulatory support or financial justification.  Therefore, based on Defendants' violation of  49 U.S.C. §§ 47101(1)-(6), and Grant Assurance 22, alone, Defendants should be compelled to act in accordance with the law and regulation and negotiate with Plaintiffs for a

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**FIRST AMENDED VERIFIED COMPLAINT**

1    new lease, or lose the benefit of FAA funding that has been so instrumental in the

2    Airport's development.

3        71.    Defendants' conduct has also violated 49 U.S.C. § 47107(a)(4) and

4    40103(c).  The Congress of the United States has spoken unequivocally at least

5    twice on the issue of "exclusive rights" ["A person does not have an exclusive right

6    to use an air navigation facility on which Government money has been expended,"

7    49 U.S.C. § 40103(e); "a person providing, or intending to provide, aeronautical

8    services to the public will not be given an exclusive right to use the airport," 49

9    U.S.C. § 47107(a)(4)].

10       72.    Federal regulation implements that position, where it states, in

11   pertinent part, that "the sponsor of a federally obligated airport '… will permit no

12   exclusive right for the use of the airport by any persons providing, or intending to

13   provide, aeronautical services to the public …'"" *Skydance Helicopters, supra*, p.

14   19, citing Grant Assurance 23.  An "exclusive right" has been judicially defined as

15   a "power, privilege, or other right excluding or debarring another or others from

16   enjoying or exercising a like power, privilege or right."  *See, e.g.*, *41 North 73*

17   *West, Inc. v. United States DOT,* 408 Fed.Appx. 393, 400 (2010), citing *Pompano*

18   *Beach, supra*, 774 F.2d at 1541.

19       73.    Moreover, such an exclusive right need not be expressly conferred.

20   Rather, "[s]uch a right is constructively granted when 'the imposition of

21   unreasonable standards or requirements' has the practical effect of imposing a

22   significant burden on an entity's ability to engage in a particular aeronautical

23   activity . . ." *Id.*

24       74.    Virtually the same circumstances exist here, with the notable exception

25   of the fact that, unlike the applicant in *Pompano*, who was applying for *initial*

26   access to the airport, Plaintiffs have proven themselves reliable, contributing

27   members of the Airport and Victorville communities for *18 years*.   Here, as in

28   *Pompano*, Defendant Airport Authority seeks to impose requirements on Plaintiffs

in terms of a lease rate double that which is applicable to other similarly situated FBOs and hangar occupants.  Moreover, and although, in *Pompano*, the court found prejudicial mere "delay" in the negotiation of a lease, Defendant Airport Authority's actions in this case are far more prejudicial where it has entirely refused to negotiate the lease extension with Plaintiffs.  It is, therefore, impossible to determine with any specificity what further conditions Defendants City and Airport Authority may attempt to impose on Plaintiffs, except to say that even the doubling of the current lease rate will, in and of itself, have, like the conditions imposed on the applicant in *Pompano*, substantial prejudicial effect on Plaintiffs' ability to do business at the Airport.  *Id*. at 1543.

75.    Moreover, Defendant Pratt has benefitted by Defendants City and Airport Authority's unjustified demand, in direct contravention of the terms of its own sublease, which prohibit the actual or effective grant of an exclusive right.

76.    In addition, the grant of the lease to Defendant PART has created an actual exclusive right, in that Hangar 681 is the only remaining, available hangar on the Airport suitable to accommodate Plaintiffs' FAA certificated maintenance activities; Defendant PART occupies the only other hangars which would be suitable to accommodate the performance of those functions, due to their size, location and configuration; and, therefore, if Defendants Airport Authority and City's grant of the lease to Defendant PART is allowed to stand, Defendant PART would have an actual exclusive right to perform the same maintenance services that are currently also being performed by Plaintiffs.

77.    In summary, Defendants' unreasonable demand of twice the lease rate of other similarly situated hangar occupants, and its refusal to negotiate further with Plaintiffs, without any justification, constitutes the quintessential imposition of an unreasonable standard, with the practical effect of placing an unreasonable burden on Plaintiffs' ability to sustain their business at the Airport, and, thus, the constructive grant of an exclusive right in contravention of federal law and policy.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**FIRST AMENDED VERIFIED COMPLAINT**
BN 21091975v3

**F.    Plaintiffs Exhausted Their Administrative Remedies.**

78.    On June 7, 2016, Plaintiffs filed a Complaint and Request for Investigation Pursuant to 14 C.F.R. Part 16 with the FAA (Exhibit E hereto).

79.    Plaintiffs' Part 16 Complaint states the following in its request for relief from the FAA: "The Airport Authority's refusal to initiate lease negotiations with ComAv/CTS under lease terms comparable to those applicable to other, similarly situated, aeronautical users on the Airport, has not merely violated the Airport Authority's contractual obligations under Grant Assurances 22, 23 and 25, but has also serious, damaging consequences for ComAv and its affiliates.  Without Hangar 681, CTS will not be able to serve its narrow and wide-body customers who operate among the largest aircraft in the world fleet, and, its license as a certificated repair station, which requires that CTS provide a maintenance hangar large enough to accommodate the largest aircraft permitted under its license, will be severely jeopardized.  14 C.F.R. § 145.103(b).  Therefore, the damages suffered by ComAv and CTS will be multiple – the loss of both a valuable current business opportunity, and the potential for loss of the opportunity to do business on the Airport into the indefinite future.

80.    What Plaintiffs asked of the FAA at that time was the opportunity for fair and open lease negotiations consistent with Defendant Airport Authority's past history with Plaintiffs, and its obligations under its Grant Assurances.  In the absence of Defendant Airport Authority's compliance, Plaintiffs asked FAA to find Defendant Airport Authority in violation of Grant Assurances 22, 23 and 25, and require that it immediately comply with its statutory, regulatory and contractual responsibilities, or lose the funding upon which it so heavily relies.  *See* Exhibit E, ¶ 49.

81.    On July 7, 2016, Plaintiffs agreed to a request by Defendant Pratt to extend various briefing deadlines in the FAA action.

### FIRST CLAIM FOR RELIEF

**Violation of 42 U.S.C. § 1983**

**(Against Defendants City and Airport Authority**

**and DOES 1 through 10, inclusive)**

82.     Plaintiffs hereby incorporate by reference into their First Claim paragraphs 1 through 81 of this Amended Complaint as if set forth herein in full.

83.     A plaintiff asserting a violation under 42 U.S.C. § 1983 must establish the following four factors:  (1) the plaintiff was deprived of a constitutional right; (2) the local authority or municipality has a policy or custom; (3) the local policy or custom amounted to deliberate indifference to plaintiff's constitutional rights; and (4) the policy was the moving force behind the constitutional violation.  *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691-94 (1978).  *See also, Mabe v. San Bernardino County Department of Public Social Services*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

84.     Official municipal policy includes the decisions of governmental lawmakers, the acts of policymaking officials, and practices so persistent and widespread as to practically have the force of law.  *See Connick v. Thompson*, 563 U.S. 51, 60 (2011).  The act of an airport authority board in rejecting a lease proposal has been found "an action taken under color of state law that represents the policy of Defendant Airport Authority."  *Kriss v. Fayette County,* 827 F.Supp.2d 477, 489-490 (2011).

85.     Defendants City and Airport Authority, and each of them, have violated Plaintiffs' procedural and substantive due process rights under the United States and California Constitutions.  To prevail on a substantive due process claim, a plaintiff must also prove the particular interest at issue was protected by the substantive due process clause, and the government's deprivation of that protected interest shocks the conscious.  *Id*. at 492.  "Because ownership of real property is protected by substantive due process, a plaintiff alleges a property interest worthy

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

FIRST AMENDED VERIFIED COMPLAINT

BN 21091975v3

1  of substantive due process protection 'in situations where the governmental

2  decision in question impinges upon a landowner's use and enjoyment of property.'"

3  *Id.* citing *DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell*, 53 F.3d

4  592, 600-01 (3d Cir. 1995).

5     86.   To prevail on a procedural due process claim, a plaintiff must

6  demonstrate a protected interest or property interest; a deprivation of that interest

7  by the government; and a lack of process. *Portman v. County of Santa Clara*, 995

8  F.2d 898, 904 (9th Cir. 1993).

9     87.   Plaintiffs have established sufficient facts to support their claim of a

10  violation of their right to substantive due process. Plaintiffs have established that:

11  (1) Plaintiffs have an indisputable property interest in their occupancy of Hangar

12  681, through the express terms of the Pratt and CTS Subleases; (2) Defendants City

13  and Airport Authority, and each of them, have demonstrated a local policy of

14  ignoring the requirements of federal law and regulation, including, but not limited

15  to, the requirements of Securities law as well as the statutes and regulations creating

16  and governing the FAA's Grant Assurances, and thereby deprived Plaintiffs of that

17  property interest arbitrarily and capriciously, without so much as a gesture at

18  negotiation to discuss its deprivation, or the opportunity to be heard by Defendant

19  City's governing body; and without a basis in any violation of a term of the existing

20  sublease; and (3) that policy was inconsistently applied so that Defendant City

21  could "award" a new lease to Defendant PART, effectively creating a prohibited

22  "exclusive right," and trampling on Plaintiffs' lease rights, including, but not

23  limited to, its right to continue possession on a "month-to-month tenancy" during

24  the adjudication of its claims at the FAA and in this Court.

25     88.   Defendants City and Airport Authority's action, or inaction, and each

26  of them, moreover, shocks the conscious, and involves the most egregious official

27  conduct, where Plaintiffs are informed and believe, and on information and belief

28  allege, they were taken or not taken to artificially enhance the lease value of Hangar

681 in order to mask Defendants City and Airport Authority's previous violations of federal law, and to avoid the sanction of federal law for Defendants City and Airport Authority's fraudulent conduct in creating a false value for the hangar and thereby wrongfully gaining financial advantage, in defiance of federal law, as charged by the SEC in its Complaint.

89.    Plaintiffs have also established a violation of their procedural due process rights.  Not only do Plaintiffs have a protected property interest, persistently violated by a contrary local policy and custom of failing to observe federal law and regulations, including those governing local airport development and financing, but Defendants, and each of them, have also demonstrated a policy or custom of denying procedural due process where they refused to negotiate with Plaintiffs or to allow them to present their case to the City Council, while at the same time granting those rights to others.

90.    Therefore, Defendants City and Airport Authority, and each of them, have violated Plaintiffs' rights under 42 U.S.C. § 1983 where Plaintiffs were deprived of their federal constitutional rights to substantive and procedural due process and the protections of federal law, by a local policy articulated and carried out by policymaking officers, who ignored over the period of a year Plaintiffs' repeated pleas for negotiation toward a reasonable and equitable sublease agreement, as required by federal law and regulation.  Defendants City and Airport Authority's actions and/or failure to act were carried out for reasons that are, in and of themselves, in violation of federal law and regulation, and those actions and/or failures to act have resulted in extreme jeopardy to Plaintiffs' property interests.

## SECOND CLAIM FOR RELIEF

### Intentional Interference with Prospective Economic Advantage

### (Against All Defendants and DOES 1 through 10, inclusive)

91.    Plaintiffs hereby incorporate by reference into their Second Claim paragraphs 1 through 81 of this Amended Complaint and paragraphs 83 through 90 of their First Claim as if set forth herein in full.

92.    Plaintiffs have an existing and valid sublease from Defendant Pratt, which both parties knew would give rise to, and would in the future continue to result in, substantial economic benefit to Plaintiffs.

93.    Defendants City and Airport Authority, and each of them, have had, and continue to have, knowledge of, and have given approval to, Plaintiffs' sublease with Defendant Pratt.  Nevertheless, Defendants, and each of them, have intentionally interfered with the relationship between Plaintiffs and their customers by (a) failing and refusing to negotiate with Plaintiffs for a continuation of the CTS Sublease, or to negotiate with Plaintiffs for a new sublease for Hangar 681 directly with the Airport Authority; (b) attempting to force Plaintiffs to immediately vacate Hangar 681, without consideration of the express terms of the Pratt and CTS Subleases or the actual loss of Plaintiffs' current business, and loss of any opportunity for the development of future business; and (c) approving a new lease with Defendant PART before the resolution of those issues and during the term of the lease with Plaintiffs, in blatant defiance of the provisions of the CTS Sublease.

94.    Defendant Pratt has intentionally and negligently interfered with Plaintiffs' economic advantage by, among other things, overtly contacting and attempting to intimidate Plaintiffs' customers, and contractors without the benefit of any judicial or contractual sanction and to the severe economic detriment of Plaintiffs.

95.    As a result, Plaintiffs will suffer severe economic injury by virtue of, among other things: (1) the absence of a venue within which to provide services to

FIRST AMENDED VERIFIED COMPLAINT

potential clients; and (2) the potential impairment of their license to provide aeronautical services, and will continue to suffer such economic harm into the indefinite future, if Defendants are permitted to carry out their illegal plans.

## THIRD CLAIM FOR RELIEF

### Negligent Interference with Prospective Economic Advantage

### (Against all Defendants and DOES 1 through 10, inclusive)

96.    Plaintiffs hereby incorporate by reference into their Third Claim paragraphs 1 through 81 of this Amended Complaint, paragraphs 83 through 90 of their First Claim for Relief, and paragraphs 92 through 95 of their Second Claim for Relief as if set forth herein in full.

97.    Defendant Pratt knew or should have known when it entered the CTS Sublease that Plaintiffs would be dependent upon Hangar 681 to conduct its business and serve current and future clients.

98.    Defendants City and Airport Authority, and each of them, knew or should have known of the CTS Sublease from the time it was first approved in 2011, and have further known or should have known, since at or before that time that Plaintiffs require the use of Hangar 681 to continue to conduct their existing business; obtain future business; and maintain their license to provide aircraft service.

99.    Despite that knowledge, Defendants, and each of them, have repeatedly failed and refused, and continue to fail and refuse, to initiate or participate in lease negotiations with Plaintiffs toward a new lease for Hangar 681, or an extension of the current CTS Sublease.

100.   Defendant PART knew or should have known, as the only FBO on the Airport engaged in substantially the same type of aircraft maintenance activity, that Plaintiffs would be dependent upon Hangar 681 to conduct its business and serve current and future clients, and maintain its license.  Nevertheless, Defendant PART overtly, intentionally and/or negligently negotiated with Defendants City and

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

FIRST AMENDED VERIFIED COMPLAINT
BN 21091975v3

Airport Authority to deprive Plaintiffs of the only hangar on the Airport in which it is suitable for Plaintiffs to conduct their business.

101.   It was reasonably foreseeable by Defendants, and each of them, that their conduct in failing and refusing to negotiate for a sublease extension or a new sublease, and instead negotiating and approving a new lease with Defendant PART, would interfere with, impair, and even terminate, Plaintiffs' business relationships on the Airport, although Defendants, and each of them, to this date, have taken no steps to exercise due care in attempting to mitigate the damage to Plaintiffs' business relationships they have already caused, or will inevitably cause in the future.

102.   The conduct of Defendants, and each of them, has, in fact, already resulted in such damage to Plaintiffs' business relationships by, among other things: (1) interfering with Plaintiffs' ability to consummate existing contracts; (2) interfering with Plaintiffs' ability to consummate future maintenance contracts with various aircraft manufacturers; and (3) placing in jeopardy Plaintiffs' license to perform such maintenance services at all, by depriving Plaintiffs of a facility large enough to accommodate the largest aircraft allowed by its certificate, as required by FAA regulation 14 C.F.R. § 145.103(b).

103.   Defendants, and each of them, have, therefore, negligently as well as intentionally interfered with Plaintiffs' current and prospective economic advantage resulting in serious economic damage and detriment to Plaintiffs.

## FOURTH CLAIM FOR RELIEF

### Breach of the Covenant of Good Faith and Fair Dealing

### (Against Defendant Pratt and DOES 1 through 10, inclusive)

104.   Plaintiffs hereby incorporate by reference into their Fourth Claim paragraphs 1 through 81 of this Amended Complaint, paragraphs 83 through 90 of their First Claim for Relief, paragraphs 92 through 95 of their Second Claim for

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

FIRST AMENDED VERIFIED COMPLAINT
BN 21091975v3

Relief, and paragraphs 97 through 103 of their Third Claim for Relief as if set forth herein in full.

105.   "In California, the factual elements necessary to establish a breach of the covenant of good faith and fair dealing are: (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Mora v. US Bank*, 2015 U.S. Dist. LEXIS 97731 at *9 (2015) citing *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010).

106.   Implied in the CTS and Pratt Subleases is a duty of good faith and fair dealing upon the parties in their performance.

107.   It is undisputed that Plaintiffs have fulfilled each and every one of their duties and obligations under the CTS Sublease for Hangar 681.

108.   Defendant Pratt has acted in bad faith by intentionally and negligently interfering with Plaintiffs' current and future business relationships through, among other things, Defendant Pratt's notice to vacate Hangar 681, even though the CTS and Pratt Subleases expressly allow Plaintiffs continued possession on a month-to-month basis at 150% of the current lease rate until the issues raised by Defendants are resolved, thus causing serious harm to Plaintiffs' current and future business relationships and prospects.

109.   In adopting this course of action, Defendant Pratt has wrongfully and intentionally breached the duty of good faith and fair dealing implied in the CTS Sublease for Hangar 681, and has thereby proximately and directly caused Plaintiffs' damages.

# FIFTH CLAIM FOR RELIEF

## Declaratory Relief

### (Against All Defendants and DOES 1 through 10, inclusive)

110.   Plaintiffs hereby incorporate by reference into their Fifth Claim paragraphs 1 through 81 of this Amended Complaint, paragraphs 83 through 90 of their First Claim for Relief, paragraphs 92 through 95 of their Second Claim for Relief, paragraphs 97 through 103 of their Third Claim for Relief, and paragraphs 105 through 109 of their Fourth Claim for Relief as if set forth herein in full.

111.   An actual controversy has arisen and now exists between Plaintiffs and Defendants, and each of them, as to their respective rights and duties.  Plaintiffs contend, and the FAA and United States courts have agreed, that federal law preempts state law in the operation of an airport; compels Defendants to act in good faith to negotiate and offer leases containing reasonable terms as required by federal law; and to do so without discrimination or unreasonable delay or the imposition of unreasonable barriers or restrictions.  Defendants, and each of them, disputes Plaintiffs' contentions, and maintains that their federal obligations do not compel Defendants to enter into negotiations for new lease terms with Plaintiffs or to request reasonable and equitable lease terms consistent with those applied to other, similarly situated, aeronautical users.

112.   Plaintiffs further contend that Defendant Pratt has a contractual duty of good faith to consider the impacts of its notice to vacate, and to use all possible means within the scope of the underlying sublease between Defendants Pratt and Airport Authority, including provisions expressly authorizing Plaintiffs' continued possession, to mitigate Plaintiffs' damages until such time as the issues raised by Defendants can be resolved by this Court.

113.   Plaintiffs desire a judicial determination of their rights and a declaration as to the preemptive authority of the applicable federal statutes and regulations; reasonableness of Defendants' conduct under those statutes and

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

FIRST AMENDED VERIFIED COMPLAINT

BN 21091975v3

regulations, including, but not limited to, Defendants' refusal to negotiate toward a new or extended sublease with Plaintiffs; or to allow the extension of the CTS Sublease on a monthly basis, as specifically provided in the existing CTS and Pratt Subleases. A judicial declaration is necessary and appropriate at this time and under the circumstances so that Plaintiffs may ascertain their rights under both federal law and the Subleases. Defendants' refusal to meet their obligations is causing a burden on Plaintiffs because the uncertainty regarding Plaintiffs' future at the Airport is disrupting Plaintiffs' ability to operate Plaintiffs' business and disrupting Plaintiffs' current and future relationships with clients, vendors, and others with whom Plaintiffs enjoy or would otherwise enjoy beneficial relationships.

## **SIXTH CLAIM FOR RELIEF**

### **Injunctive Relief**

### **(Against all Defendants and DOES 1 through 10, inclusive)**

114. Plaintiffs hereby incorporate by reference into their Sixth Claim paragraphs 1 through 81 of this Amended Complaint, paragraphs 83 through 90 of their First Claim for Relief, paragraphs 92 through 95 of their Second Claim for Relief, paragraphs 97 through 103 of their Third Claim for Relief, paragraphs 105 through 109 of their Fourth Claim for Relief and paragraphs 111 through 113 of their Fifth Claim for Relief as if set forth herein in full.

115. Beginning in or about June 10, 2015, and continuing to the present time, Defendants, and each of them, have wrongfully refused to negotiate in good faith toward a new sublease for Hangar 681, and have instead ordered Plaintiffs to vacate Hangar 681 in patent violation of Defendants' federal obligations, and the provisions of the existing Pratt and CTS Subleases, and without any attempt to mitigate the severe economic repercussions of their actions.

116. Due to the termination of the initial term of the CTS Sublease, the renewal of which Defendants, and each of them, have persistently refused to

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**FIRST AMENDED VERIFIED COMPLAINT**

BN 21091975v3

negotiate, this Amended Complaint seeks immediate judicial intervention to require Defendants, and each of them: (a) to immediately cease and desist from any and all self-help remedies, including, but not limited to, closing access to the hangar from offices or ramp, and contacting Plaintiffs' customers; (b) to immediately cease and desist from any attempt to unlawfully evict Plaintiffs from Hangar 681, pending resolution of the claims stated herein; and (c) to immediately cease and desist from any attempt to implement the terms of the recently approved Sublease with Defendant PART pending resolution of those claims.

117.   Injunctive relief is also necessary to preserve the jurisdiction of the FAA over the pending Part 16 enforcement proceedings (and ultimately that of the United States Court of Appeals for the Ninth Circuit or the District of Columbia Circuit), pursuant to 9 U.S.C. §§ 47151(b) and 47122.

118.   Injunctive relief is further necessary to protect Plaintiffs from these unconstitutional actions brought under color of law, and as such is authorized pursuant to 42 U.S.C. § 1983.

119.   Defendants' wrongful conduct, unless and until enjoined and restrained by order of this Court, will cause and is causing great and irreparable injury to Plaintiffs as Plaintiffs will suffer immediate cessation of a vital part of their business at the Airport; severe jeopardy to Plaintiffs' license as aeronautical service providers; and serious negative impact on the Airport, and the Victor Valley where Plaintiffs employ almost 200 persons.

120.   Plaintiffs have no plain, speedy, and adequate remedy in the ordinary course of law for the injuries currently being suffered, as it will be impossible for Plaintiffs to determine the precise amount of damage that Plaintiffs will suffer if they are no longer able to carry out their business.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them, as follows:

1.      For a declaratory judgment finding that federal law imposes preemptive authority over the operation of the Airport and the treatment of its aeronautical service providers, and that, under that law, Plaintiffs have a right to negotiate for and lease facilities at the Airport, for aviation use, on reasonable terms and without unjust discrimination, pursuant to, among other statutes and regulations, 42 U.S.C. §§ 47107 and 47133, and 42 U.S.C. § 1983;

2.      For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining defendants, and each of them, and their agents, servants, employees, and successors in office, and all persons acting under, in concert with, or for them, from taking any action that unreasonably affects Plaintiffs' right, title, or interest in Hangar 681 pending the final decision of this Court adjudicating the claims stated herein.

3.      For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendants, and each of them, and their agents, servants, employees, and successors in office, and all persons acting under, in concert with, or for them, from continuing to pursue the termination of Plaintiffs' lease in disregard of express provisions contained in the both the Pratt and CTS Subleases; pending the final decision of this Court adjudicating the claims stated herein;

4.      For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendants, and each of them, and their agents, servants, employees, and successors in office, and all persons acting under, in concert with, or for them, from prosecuting an unlawful detainer action or other action against Plaintiffs in retaliation for Plaintiffs' exercise of their rights under the First and Fourteenth Amendments to the United States Constitution and under the

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**FIRST AMENDED VERIFIED COMPLAINT**

BN 21091975v3

1   Federal Grant Assurances pending the final decision of this Court adjudicating the

2   claims stated herein;

3       5.      For an order requiring Defendants to show cause why they should not

4   be enjoined as set forth in this Amended Complaint during the pendency of this

5   action;

6       6.      For damages in the sum of no less than $225,000, plus damages in

7   such further sums as may be sustained and as are ascertained before final judgment

8   in this action;

9       7.      For punitive or exemplary damages;

10      8.      For costs of suit incurred in this action;

11      9.      For an award of attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

12      10.     For such other and further relief as the Court deems proper.

13  Dated:  July 8, 2016                    BUCHALTER NEMER

14

15                                          */s/ Barbara E. Lichman*
                                            Barbara E. Lichman, Ph.D.
                                            Paul J. Fraidenburgh
16                                          BUCHALTER NEMER
                                            18400 Von Karman Avenue
17                                          Suite 800
                                            Irvine, CA  92612
18                                          (949)760-1121
                                            (949)720-0182 Fax
19                                          blichman@buchalter.com
                                            pfraidenburgh@buchalter.com
20
                                            *Counsel for Complainants*
21                                          *COMAV, LLC and COMAV TECHNICAL*
                                            *SERVICES, LLC*
22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action.

Dated:  July 8, 2016                    BUCHALTER NEMER

                                        */s/ Barbara E. Lichman*
                                        Barbara E. Lichman, Ph.D.
                                        Paul J. Fraidenburgh
                                        BUCHALTER NEMER
                                        18400 Von Karman Avenue
                                        Suite 800
                                        Irvine, CA  92612
                                        (949)760-1121
                                        (949)720-0182 Fax
                                        blichman@buchalter.com
                                        pfraidenburgh@buchalter.com

                                        *Counsel for Complainants*
                                        *COMAV, LLC and COMAV TECHNICAL*
                                        *SERVICES, LLC*

FIRST AMENDED VERIFIED COMPLAINT

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 21091975v3

## VERIFICATION

I am President and CEO of Plaintiff ComAv, LLC, of which Plaintiff ComAv Technical Services, LLC ("CTS") is an affiliate, and am authorized to execute this Verification on behalf of Plaintiffs.  I have read the foregoing **FIRST AMENDED VERIFIED COMPLAINT FOR: (1) VIOLATION OF 42 U.S.C. § 1983; (2) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (4) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; (5) DECLARATORY RELIEF; AND (6) INJUNCTIVE RELIEF** and am familiar with its contents.  The facts stated in the foregoing document are true of my own personal knowledge, except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is due and correct, and that this Verification is executed on July 8, 2016 at Victorville, California.

_____
Craig Garrick

FIRST AMENDED VERIFIED COMPLAINT

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES